UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,       )      CR-SEITZ
                                )      CASE NO. 99-00196
        *Plaintiff,*            )
                                )
v.                              )
                                )
NICHOLOAS BERGONZOLI,           )
                                )
        *Defendant.*            )
_____)

---

**INTERVENER'S CONSOLIDATED RENEWED
MOTION TO UNSEAL COURT FILE AND
MOTION TO DISQUALIFY JOAQUIN PEREZ**

---

ROY BLACK, ESQ.                    G. RICHARD STRAFER, ESQ.
HOWARD SREBNICK, ESQ.              G. RICHARD STRAFER, P.A.
BLACK, SREBNICK, KORNSPAN          2400 S. Dixie Highway
 & STUMPF, P.A.                    Suite 200
201 South Biscayne Boulevard       Miami, Florida 33133
Suite 1300                         Tele: (305) 857-9090
Miami, Florida 33131               [*Of Counsel*]
Tele:  (305) 371-6421
[*Counsel for Intervener Fabio Ochoa*]



# TABLE OF CONTENTS

**Page**

REQUESTS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Ochoa's Post-Indictment Contacts
          With Bergonzoli and Perez . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Bergonzoli's Role In the FBI's Obstruction
          of Justice Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    C.    Ochoa's Truncated Litigation About Bergonzoli
          And Perez In His Own Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    D.    Bergonzoli: A Potential Defense Witness At Trial . . . . . . . . . . . 22

    E.    The Government's and Perez's Continuing
          Efforts To Prevent Ochoa From Investigating
          Bergonzoli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    F.    The Nature of Bergonzoli's Cooperation . . . . . . . . . . . . . . . . . . 29

II.  THE ENTIRE CASE FILE SHOULD BE UNSEALED . . . . . . . . . . . . . . . . . . . . 32

    A.    Sealing and Unsealing Standards . . . . . . . . . . . . . . . . . . . . . . . . 32

    B.    The Violations of *Valenti* In This Case . . . . . . . . . . . . . . . . . . . . 35

    C.    Ochoa's Need For Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.  THE COURT SHOULD DISQUALIFY ATTORNEY
     PEREZ FROM CONTINUING TO REPRESENT
     BERGONZOLI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-SEITZ |
| | ) | CASE NO. 99-00196 |
| *Plaintiff,* | ) | |
| | ) | **INTERVENER'S CONSOLIDATED** |
| v. | ) | **RENEWED MOTION TO UNSEAL** |
| | ) | **COURT FILE AND MOTION TO** |
| NICHOLAS BERGONZOLI, | ) | **DISQUALIFY JOAQUIN PEREZ** |
| | ) | |
| *Defendant,* | ) | |
| | ) | |

The Intervener, FABIO OCHOA-VASQUEZ (hereinafter "Ochoa"), through undersigned counsel, respectfully moves this Court, pursuant to his common law and First Amendment rights of access to court proceedings, Local Rule 5.4, and the Due Process Clause of the Fifth Amendment, for an order unsealing forthwith the remaining sealed proceedings in this case, including:

1. The original motion to seal the entire court file in this case which was apparently filed in open court by the government on December 9, 1998;[1]

2. The transcript of the hearing before Magistrate Judge Ted E. Bandstra on December 9, 1998, including but not limited to the "oral order" sealing all proceedings in this case, including the case number and entire docket;[2]

3. The transcript of the "change of plea" hearing before the Honorable Judge Edward B. Davis on February 10, 2000;[3]

---

[1] The docket sheets in this case reflect the filing of this motion but do not assign the motion a docket entry (hereinafter "DE") number.

[2] The docket sheets in this case reflect the occurrence of this hearing and the "oral order" but fail to assign these events any DE numbers.

[3] The docket sheets in this case reflect the occurrence of this hearing but fail to assign it any DE number. Pages 9-14 of this hearing were unsealed on May 23, 2003, pursuant to DE 54.

4.    The transcript of Bergonzoli's sentencing conducted by this Court on January 29, 2002;[4]

5.    The transcript of Joaquin Perez' *ex parte in camera* presentation to Judge Moore, standing in for this Court, on April 23, 2003 (*see* DE 55); and

6.    Docket Entry numbers 9, 14, 19 (in its entirety),[5] 27, 30, 36 and 42.

Ochoa further moves this Court, pursuant to the Right To Counsel Clause of the Sixth Amendment and Rules 4-1.6, 4-1.7 and 4-1.9 of the Rules Regulating the Florida Bar, as incorporated into the local rules of this Court by Southern District of Florida Rule 11.1(C) and Rule I(A) of the Rules Governing Attorney Discipline, for an order disqualifying Bergonzoli's counsel-of-record herein, Joaquin Perez, due to disabling conflicts-of-interest arising out of Perez' successive and sometimes simultaneous representation of Bergonzoli, Ochoa, indicted Colombian "paramilitary" leader and "terrorist" Carlos Castaño[6] and Ramon Sanchez.

In the event that either the government or Bergonzoli (through counsel not laboring under any conflicts-of-interest) objects to the unsealing of any of the still sealed hearings, transcripts, pleadings and exhibits listed above, Ochoa further requests that the Court compel the government and Bergonzoli to publicly file any such objections, setting forth the "reasonable basis for departing from the general policy of a public filing." *See* Local Rule 5.4. The Court should further require that any such

---

[4] The docket sheets in this case reflect the occurrence of Bergonzoli's sentencing on this date but fail to assign the hearing any DE number.

[5] The first page of this pleading, entitled "Objections To Pre-Sentence Investigation," and some of its exhibits were unsealed by DE 54 on May 23, 2003. The entire text of the motion and any other exhibits remain sealed.

[6] On September 10, 2001, U.S. Secretary of State Colin Powell formally designated the paramilitary group Castaño headed, the *Autodefensas Unidas de Colombia* or "AUC," as a "foreign terrorist organization."

2

objections be made on a hearing-by-hearing, document-by-document and line-by-line basis and provide a sufficient factual basis to permit meaningful review by this Court and the Eleventh Circuit.[7]   Moreover, the Court should require a fact-specific explanation as to why there there still exists a legitimate interest to keep *anything* about Bergonzoli's case secret and sealed in light of both: (A) the fact that the government is currently using Bergonzoli as a witness in a *civil* forfeiture case pending in the United States District Court for the District of Arizona in which the government has already openly filed *in the public record* an affidavit executed by Bergonzoli in which Bergonzoli has described not only the substance of some of the still sealed proceedings in this case but also his cooperation against potentially violent third parties, most notably one of Perez' other clients, Carlos Castaño;  and (B) national and international publicity which has also already exposed the nature of some of the sealed proceedings and Bergonzoli's cooperation against Castaño and others.

   In support of these requests, Ochoa submits the following Memorandum.  Part I sets forth in a single "Statement of Material Facts" all the facts deemed necessary to decide both the unsealing and disqualification issues.  Part II demonstrates that the entire case file herein should be unsealed because there is no longer any valid basis to keep anything in this case sealed in light of the government's current and intended use of Bergonzoli as a witness in a civil case.  Part II also demonstrates that Ochoa has a compelling need to gain access to the full docket in this case in order to pursue his

---

[7] *See United States v. Valenti*, 987 F.2d 708, 711-12 (11th Cir.), *cert. denied sub nom. Times Publ. Co. v. U.S. Dist. Court for the Middle Dist. of Fla.*, 510 U.S. 907 (1993). *See also United States v. Yousef*, 327 F.3d 56, 167 (2d Cir. 2003) ("[u]nder no circumstances should either the District Court or the Government handle such [sealed] proceedings in a way that prevents, or risks preventing, appellate review").

pending motion for new trial before Judge Moore and his eventual direct appeal of his recent conviction to the Eleventh Circuit. Part III demonstrates that the Court should disqualify Joaquin Perez from any further representation of Bergonzoli due to multiple conflicts of interest that have already adversely affected Ochoa's substantial rights.

**MEMORANDUM**

I.   **STATEMENT OF MATERIAL FACTS**

A.   **Ochoa's Post-Indictment Contacts With Bergonzoli and Perez**

In early 1999, prosecutors working under the supervision of the United States Attorney for the Southern District of Florida, the DEA and law enforcement agencies in Colombia, South America, commenced a joint investigation dubbed "Operation Millennium," the goal of which was to obtain sufficient evidence to charge and extradite to the United States a host of Colombian drug traffickers. The investigation resulted in a series of indictments, including the indictment that named Ochoa as a defendant for the first time on August 26, 1999. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (s) (DE 10 and 111).[8] Other superseding indictments followed but, in all their permutations, the indictments charged Ochoa in Counts 2 and 3 with conspiring with lead defendant, Alejandro Bernal-Madrigal, and others to import and distribute cocaine between December 17, 1997, and the return dates of the indictments, in violation of 21 U.S.C. §§ 846 and 963. None of Ochoa's approximately 43 named co-defendants included Nicholas Bergonzoli. Nor was Bergonzoli mentioned in the package of extradition materials submitted to Colombian authorities to arrest and

---

[8] Ochoa requests that the Court take judicial notice of those matters contained in Case No. 6153 that have not been specifically attached as exhibits hereto.

4

extradite Ochoa to the United States. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 111).

Pursuant to the extradition request, the Colombian government arrested Ochoa on October 13, 1999. For the next two years, Ochoa contested his extradition through the legal processes of the Colombian judicial system. Soon after Ochoa's arrest, his two brothers -- Juan David Ochoa and Jorge Ochoa -- began to receive a series of visits from long-time government informant, Baruch Vega, and various intermediaries, including Bergonzoli and another Colombian drug trafficker, Carlos Ramon.[9] These intermediaries presented the following proposal: If the Ochoa family paid Vega $30 million, Vega would assist them in brokering a plea bargain for Fabio Ochoa with the DEA. In return for the money, Ochoa would receive no more than a 5-year sentence. Unbeknownst to these intermediaries, the Ochoas tape recorded these meetings.

For example, on December 12, 1999, the Ochoas recorded Ramon explaining the parameters of the program run by Vega and a group of DEA agents ("Group 43"), referred to openly as "the Resocialization of the Colombian Drug Traffickers." *See* Transcript, December 12, 1999, **EXHIBIT 1**. Ramon explained that the Program was approved in Washington and that the money paid to Vega actually "goes to financing causes that they can't finance officially. Like the contras, like the paramilitary groups in Colombia." *Id.* at pp. 18, 20, 25. Ramon also indicated that other traffickers had already bought their way into the Program through Vega, ***including Bergonzoli*** and

---

[9] Ramon was charged in a separate Operation Millennium indictment. *See United States v. Carlos Ramon, et al.*, Case No. 99-711-Cr-Highsmith (S.D. Fla.). As with all the cases connected to Operation Millennium, Ramon's case has been permeated with sealed proceedings and court filings.

another client of Joaquin Perez, Julio Correa.[10]  Ramon indicated that he had agreed to

pay "forty-something million, in money and half in positives."  *Id.* at pp. 21, 28, 33, 51.[11]

Ramon then told Juan David and Jorge Ochoa that Fabio Ochoa could enter the Program

for "thirty million" under similar terms -- "half in cash and the other half in positive[s]."

*Id.* at pp. 35, 50.  In return for the money and help in convincing the other Operation

Millennium defendants to join the Program, Ochoa would be guaranteed to receive a

maximum sentence of 5 years.  *Id.* at pp. 42-47.

In late 1999 and early 2000, Fabio Ochoa – while still in jail in Colombia

contesting his extradition -- retained Miami attorney Joaquin Perez to represent him in

connection with the Miami charges.  In at least two pleadings filed in litigation before

Judge Moore, Perez has admitted to having represented Ochoa.  *See United States v.*

*Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.), Joaquin Perez's Motion

To Intervene For Limited Purposes and Incorporated Memorandum of Law (DE 1087),

at p. 6, n. 4, and p. 8, and Joaquin Perez's Motion To Quash Subpoena Duces Tecum and

Incorporated Memorandum of Law (DE 1118), at p. 2, n. 1.  Copies of these pleadings

are attached hereto as **COMPOSITE EXHIBIT 2**.

While Perez has sought to downplay his representation of Ochoa in these

pleadings by characterizing it as "brief" and "limited," Perez has never denied forming

---

[10]  Correa was originally indicted in 1995.  *See United States v. Julio Correa-Valdez, et al.*, Case No. 95-Cr-813-Middlebrooks (S.D. Fla.).  Although Correa was reportedly killed in Colombia in 2001 after attending a soccer match, all portions of his case file reflecting his cooperation with the government remain sealed on a non-public docket -- in the same manner that Bergonzoli's case was hidden from the public from December 1998 until December 2003.

[11]  "Positivos" (translated as "positives") was the euphemism used to describe the phony or purchased drug shipments that the traffickers used to satisfy their cooperation agreements with DEA Group 43.

6

a full-blown attorney-client relationship with Ochoa -- a relationship that should have triggered a duty to provide Ochoa with conflict-free representation and Perez' undivided loyalty even after his representation of Ochoa ended, as required by the Sixth Amendment and Rules 4-1.6, 4-1.7 and 4-1.9 of the Rules Regulating the Florida Bar. From the inception and throughout Perez' representation of Ochoa, however, Perez concealed the fact that in 1998 he had negotiated a secret, sealed cooperation agreement for his other client, Bergonzoli, with the United States Attorney's Office for the Southern District of Florida. That fact only became public on May 23, 2003, when a portion of Bergonzoli's case file was finally unsealed by DE 54. Perez also concealed from Ochoa that Perez had negotiated Bergonzoli's surrender, not to prosecutors in Connecticut where he was indicted, but to prosecutors in Miami. And, he concealed from Ochoa that these Miami prosecutors then authorized Bergonzoli's release into the custody of DEA Group 43 and DEA Agent Larry Castillo -- the agents in charge of Vega's "program" -- for proactive cooperation in Colombia that targeted Perez' new client, Fabio Ochoa, among others. Bergonzoli's United States Attorney's Office-sanctioned custodial arrangement with the DEA also only became public on May 23, 2003, through DE 54. Although Ochoa knew that Perez represented Bergonzoli and Correa and that Bergonzoli and Correa had obtained some kind of leniency agreements with the Group 43 agents working with Vega, he did *not* know, and certainly was never told by his attorney Perez, that Berganzoli had been *authorized* to work with the Group 43 agents by the same United States Attorney's Office that had indicted him.

When the Ochoas continued to refuse to pay the $30 million extortion/bribe demand made by Vega and his government handlers -- handlers that, until the recent unsealing of a portion of Bergonzoli's case file, were thought *only* to be DEA Group 43

7

and *not* the United States Attorney's Office in Miami -- on January 27, 2000, Joaquin Perez met with Jorge Ochoa in a hotel room in Medellin, Colombia. This meeting was recorded by the Ochoas. *See* EXHIBIT 3. During this conversation, Perez admitted that he had spoken to Vega about purchasing a deal for Ochoa for $30 million. Due to Ochoa's pedigree, Perez indicated that such a deal was "not feasible" -- at least not "with that amount." *Id.* at p. 17.

In another conversation with Jorge that same day, Perez indicated that both Bergonzoli and Correa had "cut deals" with the DEA. *See* EXHIBIT 4. However, Perez did *not* disclose to Ochoa that Bergonzoli's deal was also sanctioned by prosecutors working for the same United States Attorneys Office that had indicted and was trying to extradite him. Moreover, Perez led Ochoa's family to believe that the deals made by Bergonzoli and Correa were corrupt and purchased with money:

> [PEREZ]: They cut deals approximately ... Julio [Correa] about three years ago, and Nicolas [Bergonzoli] a year and a half ago.
>
> [JORGE OCHOA]: But, did they do it by paying or not?
>
> [PEREZ]: [UI] combination.
>
> [JORGE OCHOA]: [UI] paying and waiting [UI].
>
> [PEREZ]: [UI] that's the truth.
>
> [JORGE OCHOA]: A combo.
>
> [PEREZ]: Of course.

*Id.* at p. 10. Later in this same conversation, Perez discussed using the Ochoas' wealth to fund *positivos*, as Perez' other client, Correa, had done. *Id.* at pp. 40-44.

8

In one of the hundreds of Spanish recordings disclosed in discovery to Ochoa by the government in discovery, on March 23, 1999, the government intercepted lead Operation Millennium defendant Alejandro Bernal-Madrigal describing the entire Vega program to three other drug traffickers. *See* EXHIBIT 5. Among other things, Bernal indicated that Correa, using "the attorney from Bergonzoli" -- obviously Joaquin Perez -- had already paid Vega $8 million of the $11 million fee demanded of Vega and his government handlers. *Id.* He also described how these funds were used to fund *positivos. Id.*

There are only two possible explanations for Perez's taped statements. Perez either had direct knowledge that the "deals" he "cut" for Bergonzoli and Correa with the DEA Group 43 agents through Vega were corruptly obtained through bribes or he was *himself* acting in an undercover capacity along with two of his clients, Bergonzoli and Correa, against his new third client, Fabio Ochoa. Either explanation would require his disqualification herein.

Two days later, on January 29, 2000, Perez met Jorge Ochoa and Bergonzoli at Bergonzoli's ranch. This meeting was also recorded by the Ochoas. *See* EXHIBIT 6. Perez began the meeting by presenting Jorge Ochoa with the business card of prosecutor Teresa Van Vliet, the former lead prosecutor of Operation Millennium. On the back of the card, Van Vliet had written the following message: "Jorge, feel free to call me. Teresa." *See* EXHIBIT 7. In testimony before Magistrate Judge Turnoff, Van Vliet has admitted giving Perez the card, knowing that Perez represented Fabio Ochoa. *See*

*United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.), Hearing Transcript, February 4, 2003, attached hereto as **EXHIBIT 8**, at pp. 29-34.[12]

During the recorded meeting on January 29, 2000, Bergonzoli bragged about how he went to court with Perez and was released to work "positivos" through Vega and how an "extremely wealthy man" could buy "deals of 1,000 or 2,000 [UI] and they fall, brother." **EXHIBIT 6**, at p. 7. The transcript of Bergonzoli's court appearance before Magistrate Judge Bandstra on December 9, 1998, a court appearance that did, in fact, result in his release directly into the custody of the DEA, is one of the proceedings that remains sealed herein.

---

[12] Ms. Van Vliet thus testified:

> Q.    What role, if any, did you understand Mr. Perez played vis-a-vis the defendant Fabio?
>
> A.    *I understood that he represented Mr. Ochoa-Vasquez* in terms of trying to, as I said, negotiate a surrender or perhaps a waiver of extradition in connection with the Millennium charges.
>
> Q.    And how would you have come to that understanding, or how did you come to that understanding?
>
> A.    *He told me that. He being Joaquin Perez.*
>
> ＊＊＊
>
> Q.    Now, as you understood it, at the time that you gave Mr. Joaquin Perez both that letter and later -- or when you gave him the business card, *you understood that he was Fabio Ochoa's lawyer, correct?*
>
> A.    *Correct.*
>
> Q.    And you certainly treated him as such, correct?
>
> A.    Correct.

*Id.* at pp. 30, 48-49 (emphasis added).

10

Bergonzoli then told the Ochoas that he had to "spend a bundle" to buy his own deal from the government and that the DEA was fully aware of how the Program worked, including the use of only phony cooperation. *Id.* at 17. At one point, Bergonzoli sarcastically apologized, asking "Joaquin" Perez to "forgive" him because Perez "does not like to hear this part" – *i.e.*, Perez did not "like to hear" Bergonzoli openly discuss the corrupt nature of his cooperation agreement with third parties. *Id.* at pp. 9, 17.

Bergonzoli also acknowledged that Fabio Ochoa was innocent of the charges in his indictment and was not engaged in "traqueteando" or drug dealing. *Id.* at p. 10. However, Bergonzoli indicated that Ochoa's actual innocence would not help him in the United States. The only person who could help Ochoa, according to Bergonzoli and Perez, was Baruch Vega. *Id.* at p. 13. Bergonzoli then bragged about his own deal, telling Ochoa that although "I had to spend a bundle, I spent it" and now he was about to get his U.S. "residency ... they're going to process my residency for me." *Id.* at p. 17.

Bergonzoli, the man who "spen[t] a bundle" to buy his deal, is the same defendant this Court was convinced, in a still sealed sentencing hearing, to sentence to ***only 39 months in prison***. Bergonzoli's guilty plea before Judge Davis on February 10, 2000, and sentencing before this Court on January 29, 2002, both took place after this January 29, 2000, conversation with the Ochoas. Since the transcripts of both of the plea and sentencing remain sealed -- based upon the arguments of Joaquin Perez and Bergonzoli -- Ochoa cannot confirm whether Judge Davis and this Court were ever told about the full circumstances surrounding Bergonzoli's conduct in Colombia while released on bond in the custody of the Group 43 agents. If, indeed, Bergonzoli was merely "play acting" in a *bona fide* role as an undercover informant for DEA Group 43 and United

11

States Attorney's Office when he and Perez spoke with the Ochoas in January 2000 -- at no time did Perez ever disclose to his other client, Fabio Ochoa, that Bergonzoli's cooperation was being supervised by the United States Attorney's Office or that Bergonzoli's description of the allegedly corrupt nature of Bergonzoli's cooperation was false and part of an undercover sting directed at Ochoa and his brothers.

Thus, there again are only two possible explanations for Perez' conduct. Perez either had (and presumably still has) direct knowledge that the "deal" he "cut" for Bergonzoli with Vega and Group 43 was corrupt and that the United States Attorney's Office was responsible for obtaining the release of Bergonzoli into the custody of the Group 43 agents as early as *1998* -- *i.e.,* long before that same office indicted Perez' other client, Fabio Ochoa -- or Perez was *himself* acting in an undercover capacity, in conjunction with Bergonzoli, in a sting directed at Fabio Ochoa. Both of these alternatives would require Perez' disqualification herein and have constitutional implications for Ochoa in his own case.

The Ochoas not only continued to refuse to capitulate to these lobbying efforts but, in February 1999, Fabio Ochoa authorized his next American counsel, Jose M. Quiñon, to personally notify the acting United States Attorney in Miami, Guy Lewis, about the attempts to extort the Ochoas. Mr. Quiñon subsequently turned over to the United States Attorneys Office some of the tapes recorded by the Ochoas in Colombia.

## B.   Bergonzoli's Role In the FBI's Obstruction of Justice Complaint

On March 22, 2000, the FBI arrested Baruch Vega and his partner, Ramon Suarez, on a Criminal Complaint, charging them with obstruction of justice. *See* COMPOSITE EXHIBIT 9. The Criminal Complaint was supported by a sworn affidavit

12

from FBI Special Agent John C. Jones. *Id.* Not only were Perez and Bergonzoli uncharged, but Suarez and Vega were represented by Perez and his office-mate, Nelson Rodriguez Varela, *without any objection from the government.* The two DEA Agents in charge of supervising Vega and the operation of the "program" in Panama and Colombia, Agents Larry Castillo and David Tinsley, also were not charged. However, in an effort to discredit them enough so that Vega's activities would not be attributed to the government, Castillo and Tinsley were suspended from the DEA. As the recent partial unsealing of the case file herein reflects, these same agents had been operating the "program" all along under the supervision of the United States Attorney's Office since at least 1998 using Bergonzoli as an informant.

The FBI's Criminal Complaint alleged that between 1999 and 2001 -- *i.e.,* at the time that this Court had released Bergonzoli into the custody of DEA Agents Castillo and Tinsley -- Vega, Suarez and these same two DEA agents operated "the Program for the Resocialization of the Drug Traffickers." According to the FBI, this "program" amounted to a criminal scheme to obstruct justice by "circumvent[ing] the United States justice system, by taking money from federally indicted and as yet unindicted narcotics traffickers, in order to ... arrange phony cooperation deals to insure that the traffickers [did] not receive sentences of imprisonment." *Id.* The FBI also documented that Vega used two unidentified "intermediaries" -- quite obviously Perez's clients Bergonzoli and Correa -- to help convince other traffickers to sign and pay up. *Id.*

The Criminal Complaint further indicated that the FBI's allegations were based, in part, on evidence obtained through the use of a Cooperating Witness or "CW" --

13

easily identified as Carlos Ramon.[13]  According to Agent Jones, the "CW" recorded a number a conversations with Vega and Suarez at the behest of the FBI.  Vega and Suarez were apparently recorded stating that 80% of the money they extorted from the traffickers went to "government officials in Washington, D.C." and 10% each to Vega and Suarez.  *Id.*

The government eventually realized it could not continue to pursue criminal charges against Vega and Suarez.  In their defense, Vega and Suarez would have implicated Bergonzoli, Correa and members of Group 43 in the "program" and jeopardized the government's ultra-secret negotiations with Colombian "paramilitary" leader and declared "terrorist" Carlos Castaño -- negotiations being conducted through Bergonzoli and perhaps Perez himself. *See* Section I(F) *infra.*  On November 14, 2001, the Criminal Complaint against Vega and Suarez was dismissed by the government. *See* **EXHIBIT 10**.  Prior to the dismissal, the government never approached Ochoa or any of his *bona fide* attorneys for additional evidence about Vega's and Bergonzoli's attempts to extort the Ochoas.

### C.   Ochoa's Truncated Litigation About Bergonzoli and Perez In His Own Case

After exhausting legal challenges to his extradition in Colombia, on September 8, 2001, Ochoa was extradited to the United States.  Following his retention of undersigned counsel, Ochoa began an investigation into the FBI's allegations against Vega and Suarez in preparation for both a defense at trial and for pretrial motions to

---

[13]  Among other identifying features, Ramon had used the same term to describe the Program -- "the Program for the Resocialization of the Drug Traffickers" -- in his taped conversation with the Ochoas. *See* **EXHIBIT 1.**  This tape was one of those previously turned over to the government by Mr. Quiñon.

14

dismiss the indictment.  Media reports about the FBI's Complaint against Vega and Perez's client Suarez indicated that Perez's client Bergonzoli was an integral part of the Vega program and, indeed, had been acting as an intermediary between the DEA and Castaño, who, as discussed *infra*, was or later became a client of Perez as well. *See* **COMPOSITE EXHIBIT 11**. These reports also discussed the alleged events in the still sealed proceedings in this case.

For example, in December 2000, *The Wall Street Journal*, published two lengthy articles alleging that in 1998, Bergonzoli flew to Ft. Lauderdale, Florida, on a jet (U.S.A. N-230TS) allegedly chartered and paid for by government informant, Baruch Vega.  The *Journal* reported (quite accurately, as it turned out), that Bergonzoli had made an initial appearance in a "closed Miami federal courtroom" and had been released on bond.  *Id.*  *The Journal* further indicated that Bergonzoli was "working out a plea agreement with U.S. officials" through his attorney, Joaquin Perez, and that Bergonzoli paid Vega a downpayment of $200,000 "for his help."  *Id.*  The *Journal* also reported that the government was using Bergonzoli "to persuade Mr. [Carlos] Castano to encourage drug traffickers operating in his territory to surrender to U.S. authorities." *Id.*  At some point, presumably as early as March 1999, Bergonzoli also was reportedly designated a "cooperating source" by the DEA:  "CS 99-096049."  Vega reportedly "acted as a translator in some of the discussions." *Id.*  Richard Sharpstein, the attorney for DEA Agent David Tinsley, one of the agents supervising Bergonzoli's cooperation, also "confirm[ed]" to the *Journal* "that various meetings between Messrs. Bergonzoli and Tinsley took place between December 1998 and February 2000 in Florida and Costa Rica." *Id.*  In an interview with Colombian Television Network RCN, Castaño himself

15

corroborated these contacts with the DEA and Bergonzoli, stating that "a drug trafficker he identified as Nicolas [B]ergonzoli relayed the message asking for cooperation in convincing Colombian traffickers to turn themselves in to legal authorities." *Id.*

In light of these revelations, undersigned counsel contacted Ochoa's former counsel, Perez, to learn (1) what Perez knew about these matters, (2) the full scope of Perez' representation on behalf of Ochoa and (3) the substance of all confidential communications made by Ochoa to Perez. Perez refused to discuss any of these matters with counsel and, indeed, would not even admit that he had ever represented Ochoa.

On September 24, 2002, approximately six weeks before Ochoa's pretrial motions were due to be filed with Judge Moore, prosecutors with the Department of Justice in Washington, D.C., indicted Castaño and two co-defendants, Salvatore Mancuso-Gomez and Juan Carlos Sierra-Ramirez, for drug trafficking in the United States District Court for the District of Columbia. *See* **EXHIBIT 12**. The return of the indictment received widespread publicity, nationally and internationally -- publicity generated in no small part by government officials, including Attorney General John Ashcroft, DEA Director Asa Hutchinson and Secretary of State Colin Powell. *See* **COMPOSITE EXHIBIT 13**. Joaquin Perez also openly acknowledged to the media that he represented Castaño and was trying to negotiate Castaño's surrender. *Id.*

Undersigned counsel obtained a copy of the indictment, albeit without a case number, and attached it as an exhibit to Ochoa's motion to dismiss. *See* **EXHIBIT 12**. Castaño has never surrendered, as promised by Perez to the media in September 2002, and remains at large in Colombia. Prior to filing the instant motion, counsel attempted to discover what, if anything, has transpired in the *Castaño* case since September 2002.

A computer search using PACER of the public docket in the United States District Court for the District of Columbia, however, reveals *no case* -- or no publically available case anyway -- against *any* of the three defendants named in the *Castaño* indictment. We respectfully submit that it is unlikely that the non-public nature of both the *Bergonozli* and *Castaño* cases is a coincidence, especially since the use of non-public docketing violates existing precedents in both the Eleventh and District of Columbia Circuits. *See* Section II *infra*.

Despite having received no cooperation from Ochoa's prior counsel Perez, on November 20, 2002, undersigned counsel filed a motion to dismiss the *Ochoa* indictment on Ochoa's behalf, along with voluminous exhibits. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 987, 988, 989). The motion and exhibits documented how Ochoa and his family had been some of the intended victims of the obstruction of justice scheme described by the FBI, as well as Perez' conflict of interest in representing Ochoa and at least four others with conflicting interests: Bergonzoli, Correa, Castaño and Suarez. The relief requested included the dismissal of the indictment due to "outrageous government conduct" and vindictiveness, the disqualification of Perez from representing Bergonzoli, Correa (if still alive), Castaño and Suarez. Ochoa also filed a separate motion seeking a court order compelling the government to unseal dozens of sealed matters in his own case, as well as the entire files in *Bergonzoli* and *Correa*. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 985).

The motion to dismiss also documented how Ochoa's efforts to investigate the facts necessary for his motion were hindered by government conduct, Perez's conflicts of interest and this District's unconstitutional non-public docketing system. The most

17

prominent example of this obstruction involved Bergonzoli.  While attempting to investigate Bergonzoli's background, Ochoa discovered that Bergonzoli had been indicted in the District of Connecticut on October 3, 1995.  *See* EXHIBIT **14.**  As of November 2002 and, indeed, until May 23, 2003, Bergonzoli's indictment was a matter of public record *only* in the skeletal file maintained by United States District Court for the District of Connecticut.  The public docket in that court reflected that on March 12, 1999, the case was transferred to the Southern District of Florida under Fed. R. Crim. P. 20 and that Bergonzoli was being represented by Perez.  *Id.*  The bare case file also contained a copy of Bergonzoli's arrest warrant, indicating that the warrant had been "executed" on Bergonzoli on that same date, *March 12, 1999. Id.*  Only upon the partial unsealing of this case on May 23, 2003, did counsel learn that this date was incorrect and that Bergonzoli had, in fact, surrendered in Miami on *December 9, 1998.*  Moreover, neither the docket sheets nor the court file in Connecticut reflected the filing of any *motion* seeking the removal order, any *hearing* on a motion or any *personal appearance in court* by Bergonzoli at any time.  (*Id.*)  The removal order seemingly appeared out of thin air.  The Connecticut court file did reveal, however, that on March 18, 1999, a Deputy Clerk in the District of Connecticut wrote a cover letter to the Clerk of this Court with certified copies of the Connecticut docket sheets, the indictment and the Rule 20 order.  (*Id.*)  The letter was stamped with the Florida case number:  99-00196-Cr-Davis.  When counsel sought to obtain access to that case number in the Clerk's Office and through PACER, no such number appeared, at least on any publicly maintained docket.[14]

---

[14] Counsel also discovered that Correa's case file was missing any record of events
(continued...)

On January 13, 2003, the government filed its response to Ochoa's motion to dismiss. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 1071). The government admitted "that Vega may have approached Operation Millennium defendants and offered to fix their cases for a large sum of money" but denied being legally responsible for Vega's actions because, according to the government, no links existed between "Vega's allegedly improper conduct and the government officials investigating and prosecuting [Ochoa]." *Id.*, at pp. 6-7, 15. Indeed, the government claimed that no prosecutor "even knew" about "Vega's purported misconduct" until after Ochoa was indicted in August 1999. *Id.* at pp. 8, 10, 13-14.

With respect to Perez' multiple conflicts, although the government knew -- from prosecutor Van Vliet -- that Perez had represented Ochoa, the government claimed that Ochoa had not sufficiently "demonstrated" the existence of *any* attorney-client relationship between Ochoa and Perez. *Id.* at p. 16. Moreover, the government asserted that since its case against Ochoa was allegedly based on tape recordings, Perez did not represent any government witness or, in an obvious reference to Ochoa's accusations about Perez' representation of Bergonzoli, any "*potential witness*" against Ochoa. *Id.* at p. 17 (emphasis added).   Accordingly, the government urged Magistrate Judge Turnoff and Judge Moore to summarily deny Ochoa's motions to dismiss and to unseal without a hearing. *Id.* at pp. 17, 20-21.

On February 3-4, 2003, Magistrate Judge Turnoff convened a limited evidentiary hearing on Ochoa's motions.  Prior to the hearing, Ochoa issued a subpoena duces tecum

---

(...continued)
published by the media about his alleged surrender and participation in Vega's program.

to Perez, seeking both Perez' testimony at the hearing and a copy of Perez' file and financial records for his representation of Ochoa. Perez "intervened" in the proceedings and moved to quash the subpoena in its entirety. *See* COMPOSITE EXHIBIT 2. In his pleadings, Perez acknowledged his representation of both Ochoa and Bergonzoli but he continued to conceal that his representation of Bergonzoli included enlisting Bergonzoli in cooperating with Group 43 with the approval of the United States Attorney's Office -- the Office that Perez knew (through his knowledge of the Government's Response) was falsely denying any knowledge of Vega's operation until late 1999.

At the commencement of the evidentiary hearing, Perez's motion to quash remained pending. Magistrate Judge Turnoff ultimately would only allow two witnesses to testify, DEA Special Agent Paul Craine and prosecutor Van Vliet. Both testified that the case against Ochoa came entirely from tape recordings made in Colombia. Van Vliet disavowed any knowledge of Vega or his activities prior to late October or November 1999. *See* EXHIBIT 8, at pp. 18, 42-43. As previously noted, she did fully admit dealing with Perez as Ochoa's lawyer, but she disclaimed any "knowledge or any suspicion" that Vega had any role in the negotiations Perez was proposing on Ochoa's behalf. *Id.* at p. 31. When asked specifically about Bergonzoli, Van Vliet led Magistrate Judge Turnoff to believe he had nothing to do with Ochoa's case. She thus testified that she never met Bergonzoli, never looked at his file, did not know who was prosecuting him in this district and flatly denied that he was a "a witness in Millennium." *Id.* at pp. 49-50, 83.

Agent Craine also denied that any of the information used to indict Ochoa was acquired "directly or indirectly" through Vega's activities. *Id.* at 132. Regarding

20

Bergonzoli, Agent Craine, like Van Vliet, claimed to know nothing. He knew only the name Bergonzoli but had never debriefed him, did not know the identity of Bergonzoli's prosecutor and claimed to have no direct knowledge of Bergonzoli's working relationship with Vega. *Id.* at 103, 123. However, Agent Craine did testify that he was "sure" that Vega had contacted several of Ochoa's co-defendants, including Bernal himself. *Id.* at pp. 91, 101-102, 108. He also corroborated Ramon's statements to the Ochoas, *see* EXHIBIT 1, that Ramon had paid Vega money for his bargain and for those of three other co-defendants of Ochoa, Juan Gabriel Usuga, Luis Berardo Sanchez, Carlos Ramon and Oscar Campuzano. *Id.* at 108-110. However, Agent Craine too tried to distance himself from Vega and the DEA agents supposedly supervising him, claiming that he was not aware that Vega "was authorized to meet with" Millennium defendants. *Id.* at 98. He admitted only to hearing something about Vega from a conversation intercepted in Bernal's office in April 1999, but he claimed that he did not understand the meaning of the conversation. *Id.* at 129-131.[15]

Based on the government's representations and the sworn testimony of prosecutor Van Vliet and Agent Craine, Magistrate Judge Turnoff refused to allow Ochoa to call Bergonzoli, Vega or Perez as witnesses (*id.* at 145), and he ultimately quashed the subpoena issued to Perez in its entirety. Magistrate Judge Turnoff also recommended that Ochoa's motion to dismiss be denied without further hearings on the basis of the government's defense that it lacked responsibility for whatever had occurred:

> ► "Operation Millennium agents and prosecutors were unaware of Vega's allegedly improper activities, as they related to their investigation, when they indicted Defendant";

---

[15] As previously discussed, on March 23, 1999, Bernal was recorded describing the entire Vega program. *See* EXHIBIT 5.

▸ "The record is clear that no evidence deriving from Vega, directly or indirectly, was utilized before the Grand Jury that indicted Defendant";

*See* Report and Recommendation, *United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 1063: 3). Although Perez had admitted representing Ochoa, and Van Vliet, in her hearing testimony, acknowledged dealing with Perez as Ochoa's lawyer, Magistrate Judge Turnoff found: "[T]he defendant has not alleged facts sufficient to demonstrate the formation of an attorney-client relationship with" Perez. (DE 1163: 7.)

Ochoa appealed Magistrate Judge Turnoff's rulings to Judge Moore but Judge Moore summarily affirmed and adopted them. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 1339). Judge Moore also summarily denied Ochoa's motion to unseal, or to compel the government to unseal, proceedings in its entirety, including Ochoa's request for access to the *Bergonzoli* case file. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.) (DE 1193).[16]

### D.    Bergonzoli:  A Potential Defense Witness At Trial

At trial, the government's case was ***not*** based upon tape recordings made in Colombia but upon the testimony of newly cooperating witnesses, including star witness Bernal. And, the government's theory of prosecution at trial suddenly centered upon Ochoa's and Bernal's alleged dealings with none other than Nicholas Bergonzoli -- the

---

[16] Ochoa filed an interlocutory appeal to the Eleventh Circuit from Judge Moore's unsealing order. Since Ochoa's trial was scheduled to commence on May 5, 2003, on April 5, 2003, Ochoa filed a motion with the Eleventh Circuit to expedite the briefing schedule of the interlocutory appeal. The government opposed Ochoa's motion and the motion to expedite was denied. The appeal is proceeding on the Eleventh Circuit's normal calendar at this time.

man who the indicting prosecutor (Van Vliet) and primary witness in the grand jury (Agent Craine) claimed to know nothing about and the man who the government, in its pretrial pleadings, represented was not even a "potential" witness in this case. *See* p. 19 *supra*.

Bernal testified that in 1994 and 1996 -- *i.e.,* at a time when Ochoa was incarcerated in Colombia -- he (Bernal) engaged in numerous cocaine shipments with Bergonzoli. *See United States v. Fabio Ochoa-Vasquez*, Case No. 99-6153-Cr-Moore (S.D. Fla.), Trial Transcript, May 8, 2003, at pp. 28-31. In 1996, one of these shipments -- 800 kilograms of cocaine worth $4.8 million -- was seized in Mexico. *Id.* at p. 32. Under the terms of the Bernal-Bergonzoli conspiracy, Bernal was "held responsible" for the loss and thus became indebted to Bergonzoli for the $4.8 million. *Id.* at 32-33. Bernal testified that he repaid $2 million of this debt to Bergonzoli in February 1997 but still owed Bergonzoli the balance of $2.8 million. *Id.* at pp. 38-40.

On the date that Bernal made his $2 million payment to Bergonzoli, Bernal claimed that Bergonzoli told him that he (Bergonzoli) had "run into" Ochoa. Bergonzoli was allegedly interested in purchasing some land owned by Ochoa in Colombia and allegedly told Bernal "[t]hat if I[Bernal] was agreeable to that he [Bergonzoli] would take over the land from Fabio and then I [Bernal] would pay Fabio the two point eight million dollars." *Id.* at p. 39. According to Bernal, he met with Ochoa shortly thereafter and Ochoa agreed to this arrangement. *Id.* at pp. 40-41. Bernal testified that he began repaying this debt to Ochoa in 1999. He initially paid Ochoa $1 million in cash. Bernal claimed that he sought to repay the $1.8 million balance by assigning 100 kilograms to Ochoa from a much larger drug shipment that Bernal sent to Houston, Texas. *Id.* at pp. 56-60.

### E.   The Government's and Perez' Continuing Efforts To Prevent Ochoa From Investigating Bergonzoli

Through a writ of habeas corpus ad testificandum, undersigned counsel had secured Bergonzoli's presence in the Southern District of Florida in late 2002 for the evidentiary hearings before Magistrate Judge Turnoff on Ochoa's motion to dismiss.[17] Although, as noted above, Magistrate Judge Turnoff would not allow counsel to call Bergonzoli to the stand, counsel kept Bergonzoli in the Southern District of Florida as a possible trial witness On May 2, 2003, just three days before trial, Ochoa's former attorney, Joaquin Perez, filed a motion to quash the subpoena on behalf of his other client Bergonzoli. *See* **EXHIBIT 15**. Oblivious to the patent conflict of interest in his open litigation on behalf of a current client (Bergonzoli) against the interests of a former one (Ochoa), Perez urged Judge Moore to quash Ochoa's subpoena and to send Bergonzoli back to prison in Pennsylvania before trial even commenced.[18]   Judge Moore, however, did not rule on the motion before trial and Bergonzoli remained at FDC.

Confronted with the government's new theory of prosecution that revolved around Bergonzoli, Ochoa again asked Judge Moore to compel the government to unseal Bergonzoli's case file so that counsel could intelligently determine whether to call

---

[17]  Although all details about Bergonzoli's criminal case were sealed at the time, his location within the Bureau of Prisons ("BOP") was publicly available through the BOP's website and prisoner locator service.

[18]  Perez even had the temerity to argue, as one of the reasons why Judge Moore should grant relief to his current client Bergonzoli was because Bergonzoli had been forced to rotate in and out of the "Special Housing Unit" or the "SHU," from time to time, while incarcerated at the FDC. *Id.* at p. 2. Perez's former client Ochoa has been forced to endure the harsh conditions of the SHU since his arrival in the United States -- *i.e.* for almost *two years*.

him as a defense witness.[19]  Although Judge Moore initially refused to do so, he invited counsel to seek emergency relief before this Court. Thereafter, on May 22, 2003, Ochoa filed an emergency motion to unseal the entire *Bergonzoli* file. (*See* DE 50.) Since this Court was unavailable, the emergency motion was reassigned, by coincidence, to Judge Moore.

Meanwhile, the next morning, May 23, 2003, Perez exacerbated his conflict of interest by filing an opposition to Ochoa's emergency motion, entitled "Bergonzoli's Response To Motion To Unseal File." (*See* DE 53.)  The response sarcastically characterized his former client's current attorneys as a "well-financed defense team" who allegedly were responsible for "creat[ing] an emergency" by not intervening earlier. *Id.* at p. 1.[20]  Perez then proceeded to argue that most of Bergonzoli's file should remain sealed to protect "higher values," including the purported confidentiality of Bergonzoli's cooperation. *Id.* Perez further claimed that "[i]mproper" disclosures about Bergonzoli's cooperation had already jeopardized his safety and the safety of his family in Colombia.

---

[19] As previously discussed, in a taped conversation on January 29, 2000, Bergonzoli told Jorge Ochoa that Fabio Ochoa was innocent of the charges in his indictment and was not engaged in "traqueteando" or drug dealing. *See* p. 11 *supra*.

[20] Contrary to Perez, a defendant does not have the duty to commence law suits in other forums in order to obtain sealed material that the government should be required to produce to him. As in the *Giglio* context, the government has the responsibility to unseal relevant proceedings and produce them and, if it does not do so voluntarily, the federal judge assigned to the defendant's case has the authority to compel the government to do so. In Ochoa's original motion to unseal, he identified the existence of potentially relevant but sealed materials in at least *six* cases, in addition to his own:  (1) *United States v. Nicholas Bergonzoli*, Case No. 99-00196-Cr-DAVIS;  (2) *United States v. Julio Correa-Valdez, et al.*, Case No. 95-Cr-813-MIDDLEBROOKS (S.D. Fla.); (3) *United States v. Ramon, et al.*, Case No. 99-711-CR-HIGHSMITH (S.D. Fla.);  (4) *United States v. Ivonne Maria Escaf de Saldarriaga, et al.*, Case No. 99-CR-433-SEITZ (S.D. Fla.);  (5) *United States v. Prado, et al.*, No. 99-27-Cr-DIMITROULEAS (S.D. Fla.);  and (6) *United States v. James Spencer Springette, et al.*, Case No. 98-Cr-49 (S.D. Ga.).  Under Perez's argument, Ochoa would have been required to file lengthy motions such as the instant one and commence potentially extensive litigation in six separate forums, including at least one in another state.

Perez closed by accusing his former client Ochoa of using the motion as a "ploy" and a "subterfuge" to harm his current client Bergonzoli. *Id.* at p. 2.

Such accusations against the interests of a former client were, we submit, blatantly unethical. *See* Section III *infra*. Moreover, neither Perez nor the government informed Judge Moore or this Court that what Perez described as "improper disclosures" about Bergonzoli's cooperation had actually been openly disclosed *by the government itself* in a civil forfeiture case pending in the United States District Court for the District of Arizona. In Arizona, the government identified Bergonzoli as a material witness in a civil case and freely described his cooperation at the behest of the United States government. The pleadings were *not* filed under seal or under any kind of protective order and included an affidavit from Bergonzoli himself in which he openly boasted of his cooperation with the DEA in Vega's program and his cooperation against Colombian paramilitary leader and declared terrorist Carlos Castaño. *See* Section I(F) *infra*.

On May 23, 2003, Judge Moore convened a hearing on the emergency motion and Perez's opposition. Over Ochoa's objections, Judge Moore allowed Perez to make a still sealed, *ex parte* presentation in support of Bergonzoli's objections to Ochoa's motion. *See* Court Minutes (DE 55). In openly opposing the interests of his former client Ochoa, Perez again violated Ochoa's Sixth Amendment right to conflict-free counsel and Rules 4-1.6, 4-1.7 and 4-1.9 of the Rules Regulating the Florida Bar. *See* Section III *infra*. Although Perez's presentation is still sealed, Ochoa also assumes that Perez continued to conceal that Bergonzoli was a government witness in a civil forfeiture case in Arizona, that, as such, Bergonzoli was subject to being fully deposed under Fed. R. Civ. P. 30 and that Bergonzoli had already acknowledged -- in an affidavit

available from the public record -- being a cooperating witness against Colombia's most notorious paramilitary leader and terrorist Castaño.

Based on Perez's *ex parte* representations against the interests of his former client, on May 23, 2003, Judge Moore, in consultation with this Court, issued an order unsealing only a small portion of Bergonzoli's file and adopting Perez' argument "that denial of access is necessary to preserve higher values." (*See* DE 54.)

On May 24, 2003, Ochoa and counsel returned to trial before Judge Moore after reviewing the limited materials unsealed pursuant to DE 54. These materials revealed that, although Bergonzoli was indicted in Connecticut, he negotiated his surrender *to the United States Attorney's Office in Miami* on *December 9, 1998.* The materials further revealed that his surrender was the product of negotiations between Perez, DEA Agent Larry Castillo -- Vega's supervisor -- *and AUSA Patricia Diaz.* How long Bergonzoli had actually been cooperating *before* his surrender is not reflected in any of the unsealed materials but plainly the negotiations must have taken some time.

Bergonzoli appeared in court before Magistrate Judge Bandstra on December 9, 1998, and was granted a "stipulated" personal surety bond of only $150,000 and placed directly into the custody of Agents Tinsley and Castillo -- with the blessing of the United States Attorney's Office. To assist his client even further, Perez allowed *his own address* to be used in place of any address for Bergonzoli on the "Standard Conditions of Bond" form. (DE 5.)   We assume that neither Perez nor Bergonzoli informed Magistrate Judge Bandstra about the "bundle" Bergonzoli "spent" on obtaining this bargain with the government. *See* p. 11 *supra.* As Bergonzoli continued to cooperate in Vega's program through a bond and custodial arrangement that the unsealed records

27

now show were approved by the same United States Attorney's Office that later indicted Ochoa, his removal to Connecticut was first stayed and later waived entirely. (DE 8.)

The unsealed documents also reflect that Perez continued to represent Bergonzoli at his guilty plea hearing on February 10, 2000 -- approximately two weeks after Perez (purportedly representing Fabio Ochoa's interests) and Bergonzoli were tape recorded by Jorge Ochoa in Colombia trying to convince the Ochoas to pay $30 million to join the Vega program. *See* pp. 9-11, *supra*. Although only pages 9-13 of the plea hearing transcript have been unsealed to date, the top margin of these pages reflects that one of the witnesses at the plea hearing was DEA Agent Tinsley, one of the agents supervising Vega. AUSA Diaz continued to represent the government at the hearing, as well. Following the plea, Bergonzoli apparently conducted proactive work for the United States Attorney's Office and the DEA, as his sentencing was repeatedly continued to accommodate that cooperation. On January 30, 2002, Bergonzoli received an initial 39 month sentence from this Court but the government has filed a protective motion to reduce his sentence even further due to still ongoing cooperation.

Although, as discussed *infra*, the nature of Bergonzoli's cooperation was a matter of public record in the District of Arizona, Perez and the government sought to keep it secret from Ochoa. After reviewing the unsealed materials, undersigned counsel returned to Ochoa's trial on May 24, 2003, and requested a continuance from Judge Moore to consider and investigate these revelations further. Counsel argued that the unsealed materials: (1) indicated that Ochoa may have had an entrapment defense due to the early nature Bergonzoli's cooperation; (2) supported the re-opening of the proceedings on Ochoa's motion to dismiss since they demonstrated that the government's representations about its lack of involvement in Vega's "program" prior

28

to November 1999 were contradicted by its direct involvement with and supervision of Vega "intermediary" Bergonzoli in 1998 and early 1999; and (3) further demonstrated that Perez had a conflict of interest in representing Ochoa and may, in fact, have been acting as a *de facto* government agent himself by actively assisting Bergonzoli's proactive work in Colombia against Ochoa in violation of Ochoa's Sixth Amendment rights. Judge Moore, however, denied the continuance and suggested that any matters raised by the disclosures should be put in writing and filed after the verdict.

Since Bergonzoli's conduct and, indeed, the conduct of Ochoa's own former attorney Perez remained a mystery, Ochoa could not risk blindly calling Bergonzoli as a trial witness. The defense rested and, in closing arguments, the prosecutors continued to urge Ochoa's conviction based upon the Bernal-Bergonzoli-Ochoa land-swap theory. Shortly thereafter, Ochoa was convicted.

On June 17, 2003, Ochoa filed a motion for new trial, arguing, among other things, that Perez' conduct in actively representing those with interests that conflicted with Ochoa -- primarily Nicholas Bergonzoli -- violated Ochoa's Sixth Amendment right to conflict-free counsel. *See generally Cuyler v. Sullivan*, 466 U.S. 335, 348 (1980). That motion is pending.

## F.    The Nature of Bergonzoli's Cooperation

The government's conduct vis-a-vis Bergonzoli in the Southern District of Florida stands in marked contrast to its conduct in the District of Arizona. In that district, on April 30, 2001, the government filed a civil forfeiture complaint against an airplane. *See* Docket Sheets, *United States v. 1985 Gulfstream Commander 1000 Aircraft*, Case No. Civ-01-0763-PHX-JAT (D. Ariz.), **EXHIBIT 16**. As the docket sheets reflect, the case

29

has become hotly contested. In an effort to obtain summary judgment, on September 23, 2002, the government filed a Statement of Material Facts In Support of Motion To Strike Claim and Answer. *See* **COMPOSITE EXHIBIT 17**. Among other exhibits, the Arizona prosecutors attached to their motion an affidavit executed by Nicholas Bergonzoli. Neither the government's motion nor Bergonzoli's affidavit was filed under seal, and the docket sheets reflect no motion for a protective order seeking to protect Bergonzoli in the name of safety, security or any other "higher value."

In his affidavit, Bergonzoli explained many of the details of what occurred in the Miami proceedings still sealed by this Court. These details link Bergonzoli *directly* to the Vega program and a secret operation by the government to negotiate with terrorist Castaño:

> After returning to the United States, I began cooperating with the DEA in Miami. I pled guilty to the charges against me in the United States, and was released pending sentencing. During this period, the idea of having a group surrender of the highest-level drug traffickers in Colombia to U.S. authorities was contemplated. I was chosen to communicate this idea to Carlos Costano [sic], the leader of the Autodefensas Unidas de Colombia (AUC).... Shortly thereafter, I returned to Colombia and stayed at a location near Monteria, in the state of Cordova. I had numerous face-to-face meetings with Costano [sic] regarding this issue.

Bergonzoli Affidavit, ¶11, **COMPOSITE EXHIBIT 17**. Bergonzoli did not mention Vega by name nor the payment of money for the cooperation agreements but he did openly describe meetings in Panama with Carlos Ramon and at least three of Ochoa's co-defendants, Juan Gabriel Usuga, Luis Berardo Sanchez, Carlos Ramon and Oscar Campuzano, as well as other alleged Colombian drug traffickers who have not yet been apprehended. *Id.* at ¶12.

30

Although Bergonzoli has yet to be deposed in the Arizona case, the government's decision to rely on Bergonzoli subjects him to being deposed about *all* his activities, including those the government and Perez have gone to great lengths to conceal from Ochoa in this District.  *See* Fed.R.Civ.P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence").   Moreover, the government (at least in Arizona) is willing to expose Bergonzoli in this fashion *simply to forfeit a small private airplane*.  So much for Perez' contention that secrecy is necessary in order to preserve "higher values."

Other newly discovered evidence sheds additional light on the government's use of Bergonzoli.  In June 2003, several newspapers in Colombia reported that the United States government has continued to negotiate with Castaño through three "emissaries" who allegedly have been acting on behalf of the CIA.  *See* **COMPOSITE EXHIBIT 18**. The parameters of the negotiations reportedly involved Castaño providing assistance in forcing drug traffickers to surrender and in intelligence against the communist FARC in return for "the relocation of the paramilitary bosses and their families to the United States to begin a new life." *Id.*  The articles also reported that this offer was really "[n]othing different" from "what the DEA had offered during the times of Ambassador Curis Kamman, at the end of the nineties, when the anti-drug agency made a tempting offer to Castano to achieve the dismantlement of the drug organizations...." *Id.*  This "tempting offer" had reportedly been made by the DEA and United States Attorney's Office using Bergonzoli as the messenger.

## II.   THE ENTIRE CASE FILE SHOULD BE UNSEALED

### A.   Sealing and Unsealing Standards

In 1993, the United States Court of Appeals for the Eleventh Circuit in *United States v. Valenti*, 987 F.2d 708 (11th Cir.), *cert. denied sub nom. Times Publ. Co. v. U.S. Dist. Court for the Middle Dist. of Fla.*, 510 U.S. 907 (1993), issued a series of rulings involving the use of sealed proceedings and a dual docketing system by the judges in the Middle District of Florida.   The Eleventh Circuit held that it was unconstitutional under the First Amendment for the Middle District to record the occurrence of even *properly* sealed events and pleadings on a separate docket that was itself completely sealed from public view.   The Eleventh Circuit's holding was unambiguous:   "The Middle District's maintenance of a public and a sealed docket is inconsistent with affording the various interests of the public and the press meaningful access to criminal proceedings." *Valenti*, 987 F.2d at 715.   That holding was consistent with every circuit that has decided a similar question.[21]

---

[21]   *See, e.g., In re Providence Journal Co., Inc.*, 293 F.3d 1, 5, 12-13 (1st Cir. 2002) (holding unconstitutional under the First Amendment Rhode Island's "long-standing practice of refusing to place" legal memoranda filed by the parties in support of motions "in the case file, available for public perusal"); *CBS, Inc. v. District Court*, 765 F.2d 823, 826 (9th Cir. 1985) ("a two-tier system, open and closed" erodes public confidence in the accuracy of records, and thus denies the public and press its right to meaningful access). *See also Washington Post v. Robinson*, 935 F.2d 282, 289 (D.C. Cir. 1991) (motions to seal plea agreements, for which there is a First Amendment right of access, must be publicly filed); *In re State-Record Co.*, 917 F.2d 124, 128-29 (4th Cir. 1990) (requiring public docketing of a criminal proceeding because of the constitutional right of access); *Webster Groves Sch. Dist. v. Pulitzer Publig' Co.*, 898 F.2d 1371, 1377 (8th Cir. 1990) (ordering court to produce a redacted public docket of a sealed case to protect common law right of access to the courts); *Stone v. Univ. of Maryland*, 855 F.2d 178, 181 (4th Cir. 1988) (requiring district court to maintain a public docket where parties have a common law right of access); *In re Herald Co.*, 734 F.2d 93 (2d Cir. 1984) (permitting district court proceedings to occur *ex parte* and *in camera* where they are based on sustainable findings regarding the need for confidentiality and where there is a public docketing to indicate that sealed proceedings have occurred); *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 475-76 (6th Cir. 1983)
(continued...)

The Eleventh Circuit in *Valenti* also established procedures for handling requests to seal and unseal court proceedings consistent with the First Amendment jurisprudence of the Supreme Court.

*First*, *Valenti* held that any sealing order "must be supported with a finding that the denial of access is necessary to preserve higher values, and is narrowly tailored to serve that interest." *Valenti*, 987 F.2d at 714, quoting *Press Enterprise Co. v. Superior Court of California for Riverside County*, 464 U.S. 501, 510 (1984). *See also Brown v. Advantage Engineering, Inc.*, 960 F.2d 1013 (11th Cir. 1992) (before proceedings can be sealed, the denial of access must be supported by "a compelling governmental interest, and is narrowly tailored to ... that interest") (citations omitted); *United States v. Kooistra*, 796 F.2d 1390, 1391 (11th Cir. 1986) (reversing district court's summary order denying motion to unseal court proceedings where court "articulated no reasons for its denial"); *Providence Journal*, 293 F.3d at 11, 13 ("[w]e caution that this inquiry requires specific findings; the First Amendment right of public access is too precious to be foreclosed by conclusory assertions or unsupported speculation").

*Second*, prior to granting a request to seal records, courts should give the parties and the public notice that a request to seal has been made reasonably in advance of deciding the issue "to provide interested parties an opportunity to object to sealing." *Stone v. University of Maryland*, 855 F.2d 178, 181 (4th Cir. 1988). *Accord Valenti*, 987 F.2d at 713 (citations omitted).

*Third*, the requisite findings must be expressly made. Either before or after sealing a proceeding, a district court must "articulate `findings specific enough that a

_____

(...continued)
(admonishing district court to publicly docket motions to seal proceedings).

33

reviewing court can determine whether the closure order was properly entered.'" *Id.* at 713, quoting *Press Enterprise*, 464 U.S. at 510. *See generally* Local Rule 5.4 and Proposed Sealed Filing Cover Sheet. Similarly, any orders denying motions to unseal "must be supported with a finding that the denial of access is necessary to preserve higher values, and is narrowly tailored to serve that interest." *Valenti*, 987 F.2d at 714 (citation omitted). *Accord Newman*, 696 F.2d at 803-804 (district courts must "articulate any reason for excluding the appellants that outweighed the presumption of access to the court proceedings"). "Under no circumstances should either the District Court or the Government handle such proceedings in a way that prevents, or risks preventing, appellate review." *United States v. Yousef*, 327 F.3d 56, 167-168 (2d Cir. 2003).

*Fourth*, to be "narrowly tailored," orders sealing or denying motions to unseal should evaluate whether partial redaction on a document-by-document basis is a viable option. *See generally Providence Journal*, 293 F.3d at 15 ("the district court's refusal to consider redaction on a document-by-document basis is insupportable" because "the First Amendment requires consideration of the feasibility of redaction on a document-by-document basis, and the court's blanket characterization falls well short of this benchmark"); *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995) ("it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document"); *United States v. Biaggi (In re N.Y. Times)*, 828 F.2d 110, 116 (2d Cir. 1987) (rejecting "wholesale sealing" of papers, in part, because "limited redaction [might] be appropriate"). *Cf. Valenti*, 987 F.2d at 714-715 ("no error in the district court's failure to state specifically that it considered and rejected the alternative of releasing a redacted

34

version of the transcripts" when newspaper intervened but did not "offer any alternative other than unsealing [all] the disputed transcripts").

*Fifth*, and perhaps most importantly in this case, the First Amendment requires that even properly sealed proceedings must be unsealed "when the danger of prejudice has passed." *Valenti*, 987 F.2d at 714 (citation omitted).  *See also* Local Rule 5.4 (requiring that motions to seal "shall specifically state the period of time that the party seeks to have the matter maintained under seal" and requiring specific sealing orders). The "danger" has passed when the information that the sealing was intended to keep hidden from the public has been broadcast over the media worldwide through government press conferences.

### B.  The Violations of *Valenti* In This Case

For approximately 4½ years -- from December 9, 1998 until May 23, 2003 -- not only were particular events in this case filed under seal but the very existence of the case itself was sealed and all events filed on a non-public docketing system that directly violated the First Amendment under *Valenti*.  This initial violation occurred on December 9, 1998 -- five years after *Valenti* was decided -- when, according to the recently unsealed docket sheets, Magistrate Judge Bandstra pronounced an "oral order" granting an "oral motion to seal case." *See* p. 1 *supra*. Prior to granting the "oral motion to seal case," Magistrate Judge Bandstra did not provide any notice to the public so that interested parties would have an opportunity to object. *See Valenti*, 987 F.2d at 715 (recognizing that the vice of a dual docketing system is that it effectively prevents the press and the public from even "seeking to exercise their constitutional right of access"). It is to this day impossible to determine, at least from any publically available material,

whether that original "oral order" was itself "supported with a finding that the denial of access [was] necessary to preserve higher values, and [was] narrowly tailored to serve that interest." *Valenti*, 987 F.2d at 714. And, if it was, that order was never entered and filed in a way to permit contemporaneous appellate view.

When Ochoa finally prevailed in obtaining the public docketing of this case and the partial unsealing of some of the proceedings on May 23, 2003, no explanation or justification was even tendered for the prior constitutional violation. And, while Judge Moore's order of May 23, 2003, at least asserted that "denial of access" was still "necessary to preserve higher values" (DE 541), that order defied appellate review because it failed to "articulate `findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" *Id.* at 713, quoting *Press Enterprise*, 464 U.S. at 510.

If the "higher value" relied upon by Judge Moore was the potential danger to Bergonzoli from the public discovering that he was cooperating with the government against potentially violent third parties – as Perez' written objections to the unsealing request argued -- then Judge Moore's finding that this "higher value" justified the continued sealing of proceedings in this case must be vacated. As early as the year 2000, *The Wall Street Journal* and Colombian television were reporting the events that are sealed in Bergonzoli's case as well as Bergonzoli's role as an intermediary between the DEA and Carlos Castaño. By September 2002, the government chose to expose Bergonzoli to full civil discovery by naming him as a witness in a civil forfeiture case and attaching his affidavit as an exhibit in the public record. In his affidavit, Bergonzoli freely discussed events in the still sealed proceedings herein and his cooperation against Castaño and others still at large in Colombia. By that point in time, Castaño had been

indicted in the District of Columbia and declared a terrorist by Secretary of State Colin Powell.  According to media reports, that designation was well earned.[22]  Since the government has demonstrated its willingness to expose Bergonzoli to Castaño's wrath simply to forfeit a small airplane,  surely Ochoa's interest in winning back his liberty is a sufficiently compelling interest to require the unsealing of the remainder of Bergonzoli's court file.

### C.   Ochoa's Need For Access

The facts discussed in Section I demonstrate that Ochoa has a compelling need to gain access to the full record of events in this case.  The sealed proceedings are inextricably intertwined with the issues pending in Ochoa's motion for new trial and the issues that he intends to raise on appeal in the Eleventh Circuit if the motion for new trial is denied.  Without full access, Ochoa and his current, conflict-free counsel will be crippled in their ability to fully and effectively litigate the Fifth and Sixth Amendment issues at stake in Ochoa's case.

---

[22]  *See, e.g.,* Maria Cristina Caballero, "Mapiripan: A Shortcut to Hell," CAMBIO 16, July 28/November 3, 1997, issues (posted on the International Consortium of Investigative Journal website) (discussing Castaño's massacre of 26 civilians);  Jo-Marie Burt, "Storm Over Colombia," North American Congress on Latin America, *NACLA Report on the Americas,* No. 5, Vol. 33, March 1, 2000 (reporting that AUC "went on a grisly killing spree in Mapiripan, hacking victims to death, decapitating many with chain saws and noting that Carlos Castaño "unabashedly took credit for the massacre");  Jim Lobe, "Politics-U.S.:  Massacres Jeopardize Anti-Drug Aid To Colombia," *Inter Press Service,* January 14, 1998; *Douglas Farah, "Massacres Imperil U.S. Aid to Colombia;  Paramilitary Groups Linked to Army," The Washington Post,* January 31, 1999.

The public also has an interest in exposing the events in this case to the light of day. One of the reasons public access to court proceedings is so essential is that it acts as a check against overreaching or abusive conduct by the Executive Branch:

> The Executive Branch seeks to uproot people's lives, outside the public eye, and behind a closed door. Democracies die behind closed doors.... When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment "did not trust any government to separate the true from the false for us."

*Detroit Free Press, et al. v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) (citation omitted). *See also Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("[a]n informed public is the most potent of all restraints upon misgovernment").

As the facts of this case underscore, allowing government "programs" to operate "behind a closed door" invites abuse by the government "outside the public eye." In blatant violation of the sealing standards established by the Eleventh Circuit in *Valenti* in 1993, the government has managed to keep secret the full scope of its *Programa de Resocializacion de Narcotraficantes* -- a "program" run by a government informant, Baruch Vega, who, according to the FBI at least, obstructed justice by selling phony cooperation agreements to Colombian drug traffickers through "intermediaries." One of those intermediaries was Nicholas Bergonzoli. Purchasing cooperation or obtaining the benefits from the cooperation of third parties is not only improper, *see United States v. Doe*, 870 F.Supp. 702, 706 (E.D. Va. 1994); *United States v. Ambercrombie*, 59 F. Supp. 2d 585 (S.D. W.Va. 1999); *United States v. Bush*, 896 F. Supp. 424 (E.D. Pa. 1995), but constitutes obstruction of justice. *See, e.g., United States v. Taveres*, 133 F. Supp. 2d 298, 300 n. 2 (S.D.N.Y. 2001); *United States v. Baum*, 32 F. Supp. 2d 641 (S.D.N.Y. 1999). *See generally* Barry Tarlow, *The Perils of Representing the Rat and*

*a Lesson in Vicarious Cooperation -- Just Your Everyday Cruise on the Titanic*, 24 CHAMPION 33 (April 2000);  Robert G. Morvillo and Robert J. Anello, *Cooperation: The Pitfalls and Obligations for Defense Attorneys*, NEW YORK LAW JOURNAL, December 5, 2000. Yet, Bergonzoli has never been charged with obstruction of justice, despite having  bragged on tape of having "spen[t] a bundle" to buy his deal with the government  that produced a mere 39-month prison sentence. *Cf. Newman*, 696 F.2d at 801 (the public has "a legitimate interest in learning which inmates are being released from prison and the reasons why" and "whether [government] officials are recommending the release of only those who are most deserving or those who have political or other influential connections").

This Court too has an interest in unsealing the entire file in this case.  When sentencings are conducted behind closed doors and kept sealed in the wake of scandalous revelations about the sentenced defendant, the public may question the propriety of the proceedings themselves.  If "public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process," *Newman*, 696 F.2d at 801, the converse is equally true.  The denial of public access -- either through non-public docketing procedures or the over-use of "sealed" proceedings -- fosters an appearance of impropriety, at least "to the average man on the street," *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980), *cert. denied*, 449 U.S. 820 (1980).   If this Court *was not* informed about Bergonzoli's apparent purchase of his deal through Vega and DEA Group 43, then the Court has a compelling interest in ensuring that not only Ochoa but the public knows that fact.  Conversely, if this Court *was* informed that the taped events were part of a government sting directed against the Ochoas, then not only does Fabio Ochoa have the right to know that the

39

government and his lawyer Perez were violating his Sixth Amendment right to counsel in this fashion but this Court has the compelling interest in dispelling the appearance that this Court's lenient sentence was tainted. Whatever the truth was, the government has jeopardized the appearance of impartiality that is vital to independence of the judiciary by convincing this Court to keep this case completely non-public for four years in violation of the First Amendment .

The partial unsealing that occurred on May 23, 2003, has done nothing to ameliorate these concerns. On the contrary, it has only exacerbated them. Bergonzoli's involvement with Vega and the suspended DEA agents now appears to have been condoned by the judges and magistrates assigned to this case since 1998, and the veil of secrecy that has shrouded these events appears to be serving no "higher purpose" other than to conceal a government scandal. "If [a Court] has any duty to perform ... it is to see that the waters of justice are not polluted" by obstruction of justice. *Mesarosh v. United States*, 352 U.S. 1, 14 (1956). The government use of a "dual docketing" system that permitted the instant case to remain non-public for 4½ years inevitably created an environment for such pollution. Under these circumstances, the Court should summarily reject any continued objections raised by the government or Bergonzoli to the full unsealing of this case.

## III. THE COURT SHOULD DISQUALIFY ATTORNEY PEREZ FROM CONTINUING TO REPRESENT BERGONZOLI

"Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). *Accord United States v. Register*, 182 F.3d 820, 832 (11th Cir. 1999). That interest

trumps a defendant's qualified right to counsel of choice where a defendant's choice of counsel has an actual or, indeed, even just a "potential" conflict of interest arising from loyalties owed to a former client. *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994) ("even a potential conflict suffices for disqualification") (citing *Wheat*, 486 U.S. at 164), *cert. denied*, 515 U.S. 1132 (1995). *See also Freund v. Butterworth*, 165 F.3d 839, 858-860 (11th Cir.) (en banc), *cert. denied*, 120 S.Ct. 57 (1999).

When an attorney's actual or potential conflict of interest is brought to the attention of the Court, the Court's interest in ensuring fair and ethical proceedings may require the attorney's disqualification, even in situations where the attorney's clients have attempted to waive their conflict. "Our goal is to discover whether the defense lawyer has divided loyalties that prevent him from effectively representing the defendant." *Ross*, 33 F.3d at 1523-1524 (affirming disqualification of trial attorney for actual and potential conflicts and refusing attempted waivers of the conflicts by the clients). *Accord United States v. Algee*, 309 F.3d 1011, 1014-15 (7th Cir. 2002). Where the conflict is ***not*** waived, the Court's duty to disqualify the offending attorney is virtually automatic. See, e.g., *United States v. Miranda,* 936 F. Supp. 945, 951 n. 6 (S.D. Fla. 1996) (disqualifying defense counsel based upon counsel's prior representation of government witness, where current client was willing to waive the conflict but former client "has expressly stated that he does not consent to Shohat's continued representation" of the current client). *See also United States v. Culp*, 934 F. Supp. 394, 397-400 (M.D. Fla. 1996) (disqualifying attorney from representing criminal defendant based in part upon the violation of his duty of loyalty owed to two former clients both of whom were now cooperating with the government); *United States v. Cheshire*, 707 F. Supp. 235, 237-240 (M.D. La. 1989) (same); *Shelby v. Revlon*

41

*Consumer Products Corp.*, 6 F. Supp. 577, 578 (N.D. Tex. 1997) (granting motion to quash deposition based on attorney's conflict-of-interest).

The scope of an attorney's duties to a former client in federal cases in this District is government by Rules 4-1.6, 4-1.7 and 4-1.9 of the Rules Regulating the Florida Bar, as incorporated into the local rules of of this Court by Southern District of Florida Local Rule 11.1(C) and Rule I(A) of the Rules Governing Attorney Discipline Rule 4-1.7(a) of the Rules Regulating the Florida Bar. In criminal cases, the attorney's duties is further informed by the Sixth Amendment.

*First*, Rule 4-1.6 governs "Confidentiality of Information" and prohibits an attorney from "reveal[ing] information relating to representation of a client." *See The Florida Bar Journal*, Vol. LXXVI, No. 8, September 2002, at p. 761. In this Circuit, "once the former client ... proves that the subject matters of the present and prior representations are 'substantially related,' the court will ***irrebuttably presume*** that relevant confidential information was disclosed during the former period of representation.'" *Freund*, 165 F.3d at 859 (emphasis added; citation omitted). *Accord State Farm Mut. Auto. Ins. Co. V. K.A.W.*, 575 So.2d 630, 633-34 (Fla. 1991). The presumption is irrebuttable because it is difficult to establish that confidences were actually disclosed to an opponent and because such a situation is "rife with the possibility of discredit to the bar and the administration of justice." *State Farm Mut.*, 575 So.2d at 634 (citation omitted).

*Second*, Rule 4-1.7 governs "Conflicts of Interest" generally and provides: "A lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless ... each client consents after consultation." *Id.* at pp. 762-763. The Comment to this general rule entitled "Conflicts

42

in Litigation" explains that this broad prohibition is intended to bar, among other things, an attorney from "act[ing] as an advocate against a person the lawyer represents in some other matter, *even if it is wholly unrelated*." *Id.* at 762 (emphasis added).

*Third*, Rule 4-1.9 governs conflicts of interest involving a "Former Client" and prohibits a lawyer "who has formerly represented a client in a matter" from both (a) "represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation" and (b) "us[ing] information relating to the representation to the disadvantage of the former client" unless that information has already become "generally known." *Id.* at 765.

*Fourth*, the Sixth Amendment to the United States Constitution guarantees that persons accused of crimes "shall enjoy the right ... to have the Assistance of Counsel for [their] defense." U.S. Const. amend VI. *See Gideon v. Wainwright*, 372 U.S. 335, 342-43 (1963); *Freund*, 165 F.3d at 858. The "Assistance of Counsel" means "effective" assistance, *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and "[p]art of effective assistance of counsel is the avoidance of conflicts of interest." *Hamilton v. Ford*, 969 F.2d 1006, 1011 (11th Cir. 1992), quoting *Strickland*, 466 U.S. at 692 (when counsel is burdened with a conflict of interest, he "breaches the duty of loyalty, perhaps the most basic of counsel's duties"), *cert. denied*, 507 U.S. 1000 (1993). The right to conflict-free counsel means that Fabio Ochoa had the right to the undivided loyalty of *all* the lawyers who have represented him, including Joaquin Perez. *See Spreitzer v. Peters*, 114 F.3d 1435, 1450 (7th Cir. 1997) ("[i]t is well settled that 'a criminal defendant is entitled to counsel whose undivided loyalties lie with the client'") (citation omitted), *cert. denied*, 488 U.S. 917 (1998); *United States v. Levy*, 577 F.2d 200, 211 (3d Cir. 1978) (Sixth

43

Amendment right to counsel encompasses "the right to effective assistance of an attorney who is singly devoted" to his client).

The facts described in Section I demonstrate that Joaquin Perez has already violated all of these principles. In 1998, Perez undertook the representation of Nicholas Bergonzoli and, by information and belief, Julio Correa, as well. Perez negotiated cooperation agreements for both Bergonzoli and Correa which entailed proactive work as secret informants in Colombia in connection with Operation Millennium for the DEA and United States Attorney's Office. At least one of the targets of Bergonzoli's cooperation was Fabio Ochoa.

In late 1999, Perez nonetheless undertook the representation of Fabio Ochoa. That representation was barred, from its inception, by both Rule 4-1.7 and 4-1.9 since the interests of Bergonzoli and Ochoa were already "directly" and "materially" adverse.[23] The "adversity" of the dual representation grew more serious when Ochoa refused to participate in the extortion/bribery scheme, refused to cooperate with the government and expressed the desire to contest the charges levied by the United States Attorney's Office. Since Perez's representation of Bergonzoli and Ochoas were "substantially related," the Court must now "irrebuttably presume" that Perez shared the confidential communications he had with Ochoa with his other client – government informant Bergonzoli – in violation of Rule 4-1.6. *See* pp. 42-43 *supra*.

---

[23] It is an "actual conflict of interest" for an attorney to reach an agreement for "one of his clients" to receive leniency "for his testimony against the other" client. *Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994). *Accord Ruffin v. Kemp*, 767 F.2d 748 (11th Cir. 1985). A lawyer cannot negotiate a plea agreement that "sacrifices one client ... in order to protect another client." *Burden*, 24 F.3d at 1305-06.

Perez's ethical violations compounded when Ochoa's pretrial litigation challenged the constitutionality of the "program" in which Bergonzoli had been an active participant through Perez's advice and representation. Instead of withdrawing as counsel for Bergonzoli at that point, Perez began "act[ing] as an advocate against" his former client Ochoa on Bergonzoli's behalf in direct violation of Rule 4-1.7. Indeed, shortly before trial, Perez filed a motion on Bergonzoli's behalf seeking to quash the subpoena Ochoa issued to Bergonzoli. *See* pp. 24-25 *supra* and **EXHIBIT 15**. Perez then continued to "act as an advocate against" Ochoa during the trial when Ochoa sought to unseal the file in this case, filing a written motion on Bergonzoli's behalf arguing ***against*** the relief sought by Ochoa. *See* pp. 25-26 *supra* and DE 53. "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993). Plainly, Perez's conflict was "actual" when Bergonzoli's interests "diverged" from Ochoa's interests with respect to Ochoa's unsealing requests herein.

Perez further compounded the conflict of interest and mounting ethical violations by making an *ex parte, in camera* presentation to Judge Moore on Bergonzoli's behalf that succeeded in preventing Ochoa from gaining timely and full access to information about Bergonzoli, whose conduct was ***the*** central feature of Ochoa's trial -- all of which was done for the purpose of assisting Bergonzoli in obtaining an additional sentence reduction from this Court. (*See* DE 48.)[24]   Moreover, in his written motion to quash,

---

[24] *See Burden*, 24 F.3d at 1306; *Ruffin*, 767 F.2d at 751-52; *United States v. Cook*, 45
(continued...)

and presumably in his oral presentation, Perez concealed from Judge Moore and the Court that Bergonozli was being freely used as a witness in a civil forfeiture case in Arizona – a disclosure that would surely have benefitted his former client Ochoa. Perez's failure to disclose the status of Bergonzoli in Arizona not only violated Perez's duty of loyalty to Ochoa but his duty of candor to Judge Moore and this Court under Rule 4-3.3(d) ("[i]n an ex parte proceeding a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse").

The government's open tolerance of Perez' multiple conflicts of interest in representing Ochoa, Bergonzoli, Correa, Suarez and Castaño is itself remarkable and stands in sharp contrast to its conduct in another case this Court handled during the same time in which Perez was representing Bergonzoli herein – *United States v. Augusto Guillermo Falcon, et al.,* Case No. 99-583-Cr-Seitz (S.D. Fla.)(s)(s)(s)(s). In that case, prosecutors from the same office that prosecuted Bergonzoli and Ochoa repeatedly moved this Court to disqualify criminal defense lawyers from representing Falcon based on their prior representation of other clients whose interests were actually or potentially in conflict with those of Falcon. A representative sample of these government pleadings is attached hereto as **COMPOSITE EXHIBIT 19.**[25] As a result of its relentless

---

(...continued)
F.3d 388, 393-94 (10th Cir. 1995).   If Perez prevented Bergonzoli from testifying that Ochoa was innocent, as he stated on tape to Jorge Ochoa, such advice would also constitute a blatant conflict of interest, *see United States v. Kliti,* 156 F.3d 150, 155 (2d Cir. 1998) (counsel's representation of co-defendant at bond hearing where co-defendant told him that defendant was innocent created actual conflict of interest), as well as a Sixth Amendment violation.

[25] *See, e.g., United States v. Augusto Guillermo Falcon,* Case No. 99-583-Cr-Seitz (S.D.
(continued...)

46

disqualification litigation during the *Falcon* case, the government succeeded in disqualifying John Bergendahl and Edward Shohat, partially disqualifying Richard Diaz[26] and convinced several other attorneys from entering their appearances for Falcon, including Albert Krieger, Jeffrey Weiner, Richard Sharpstein and Jose Quiñon. This Court entered several orders in the *Falcon* case, agreeing with most of the government's

---

(...continued)
Fla.): *Government's Motion To Disqualify Attorney John Bergendahl,* April 11, 2001 (DE 1644); *Government's Appeal of Order of Magistrate-Judge Denying Government's Motion To Disqualify Attorney John Bergendahl,* June 16, 2001 (DE 1765); *Government's Reply To Defendant's Response To Government's Appeal of Order of Magistrate-Judge Denying Government's Motion To Disqualify Attorney John Bergendahl,* September 13, 2001 (DE 1810); *United States' Reply To Defendant Falcon's Response In Opposition To the Government's Motion To Disqualify Attorney Richard J. Diaz, Esq., With Incorporated Memorandum of Law,* July 26, 2002 (DE 2284); *Government's Response To Defendant's Appeal of order of Magistrate Judge Disqualifying Attorney Edward Shohat,* September 12, 2002 (DE 2386); *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 (DE 2539); *Government's Response To Defendant's Appeal of order of Magistrate Judge Disqualifying Attorney Edward Shohat,* September 12, 2002 (DE 2386); *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 (DE 2539); *Government's Motion For Reconsideration of Order Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz As Trial Attorney For Defendant Falcon,* November 12, 2002 (DE 2564); *Government's Consolidated Reply To Defendant Falcon's Response To Government's Motion For Reconsideration of Order Overruling Magistrate Judge's Order Disqualifying Attorney Richard J. Diaz, Etc.,* November 27, 2002 (DE 2593); *Government's Response To Order To Show Cause Why Richard J. Diaz, Esq. Should Not Be Disqualified As Counsel For Defendant Falcon,* March 6, 2003 (DE 2752); *Government's Supplemental Memorandum In Support of Motion To Disqualify Richard Diaz, Esq., As Counsel For Defendant Falcon;* March 11, 2003 (DE 2758).

[26] For example, in urging the Court to disqualify Mr. Diaz due to his prior representation of a government witness, Gilberto Barrios, the government argued that "Barrios is entitled to continued protection of his interests, regardless of whether Falcon has opted to waive his protection from the clear conflict of interest" and "[b]oth ethical considerations and the attorney-client privilege extend Diaz's obligation to protect those interests, even though he no longer represents Barrios." *See* **COMPOSITE EXHIBIT 19**, *United States' Reply To Defendant Falcon's Response In Opposition To the Government's Motion To Disqualify Attorney Richard J. Diaz, Esq.,* July 26, 2002 (DE 2284). For the same reason, Perez's "obligation to protect" the interests of Fabio Ochoa exists to this day "even though he no longer represents" Ochoa.

47

views on disqualification issues. *See* COMPOSITE EXHIBIT 20.[27]  The only apparent

differences between the situations in *Falcon* and *Bergonzoli* is that the attorneys the

government sought to disqualify in  *Falcon* were all seeking to represent a defendant,

Falcon, who was actively contesting the government's charges while Perez has been

representing a defendant, Bergonzoli, who has been actively assisting the government

against Ochoa and others since 1998.  The government's tolerance for defense attorney

conflicts of interest should not turn on whose ox is being gored by the representation.

Nor should this Court's.

CONCLUSION

For all of the foregoing reasons, the Court should unseal all the remaining

documents and hearing conducted in this case and disqualify Joaquin Perez from any

further representation of Nicholas Bergonzoli.

Respectfully submitted,

ROY BLACK
[Fla. Bar No. 126088]
HOWARD M. SREBNICK
BLACK, SREBNICK, KORNSPAN &
STUMPF, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, FL 33131
Telephone: (305) 371-6421
[*Counsel for Fabio Ochoa*]

---

[27] *See, e.g., United States v. Augusto Guillermo Falcon*, Case No. 99-583-Cr-Seitz (S.D. Fla.): *Order Disqualifying Counsel*, December 12, 2001 (DE 1853);  *Order Affirming Magistrate Judge's Order Disqualifying Edward Shohat As Trial Counsel For Manuel Magluta*, October 3, 2002 (DE 2422);  *Order Partially Affirming and Partially Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz As Trial Attorney For Defendnat Falcon, Etc.*, October 30, 2002 (DE 2548); *Order Partially Disqualifying Richard Diaz, Esq. As Trial Counsel For Defendant Falcon*, March 18, 2003 (DE 2764).

48

G. RICHARD STRAFER
[Fla. Bar No. 389935]
G. RICHARD STRAFER, P.A.
2400 South Dixie Highway
Suite 200
Miami, FL 33133
Telephone: (305) 854-9090
[*Of Counsel*]

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of July, 2003, I caused a true and

correct copy of the foregoing Motion to be mailed to:

LILY ANN SANCHEZ
EMILY M. SMACHETTI
Assistant U.S. Attorneys
U.S. Attorney's Office
99 N.E. 4th Street
Miami, FL 33132
[*Counsel for the United States*]

EDWARD RYAN
Assistant U.S. Attorney
U.S. Attorney's Office
500 East Broward Blvd.
Suite 700
Ft. Lauderdale, FL 33394
[*Counsel for the United States*]

JOAQUIN PEREZ
6780 Coral Way
Miami, FL 33155
[*Counsel for Nicholas Bergonzoli*]

ROY BLACK

49