UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, )      CR-SEITZ
                         )      CASE NO. 99-00196
        *Plaintiff*,     )
                         )
v.                       )
                         )
NICHOLOAS BERGONZOLI,    )
                         )
        *Defendant*.     )
_____ )

---

**INTERVENER'S CONSOLIDATED RENEWED
MOTION TO UNSEAL COURT FILE AND
MOTION TO DISQUALIFY JOAQUIN PEREZ**

---

# EXHIBITS VOL. II

ROY BLACK, ESQ.                    G. RICHARD STRAFER, ESQ.
HOWARD SREBNICK, ESQ.              G. RICHARD STRAFER, P.A.
BLACK, SREBNICK, KORNSPAN          2400 S. Dixie Highway
 & STUMPF, P.A.                    Suite 200
201 South Biscayne Boulevard       Miami, Florida 33133
Suite 1300                         Tele: (305) 857-9090
Miami, Florida 33131               *[Of Counsel]*
Tele:  (305) 371-6421
*[Counsel for Intervener Fabio Ochoa]*



# TABLE OF CONTENTS

## VOLUME I

**EXHIBIT 1:** Certified Tape Transcript (Carlos Ramon and Juan David Ochoa), December 12, 1999.

**EXHIBIT 2:** *United States v. Fabio Ochoa-Vasquez,* Case No. 99-6153-Cr-Moore (S.D. Fla.): *Joaquin Perez's Motion To Intervene For Limited Purposes and Incorporated Memorandum of Law,* January 17, 2003 (DE 1087); *Joaquin Perez's Motion To Quash Subpoena Duces Tecum and Incorporated Memorandum of Law,* January 31, 2003 (DE 1118).

**EXHIBIT 3:** Certified Tape Transcript (Joaquin Perez and Jorge Ochoa), January 27, 2000.

**EXHIBIT 4:** Certified Tape Transcript (Joaquin Perez and Jorge Ochoa), January 27, 2000.

**EXHIBIT 5:** Certified Tape Transcript (Alejandro Bernal-Madrigal and others), March 23, 1999.

**EXHIBIT 6:** Certified Tape Transcript (Joaquin Perez, Nicholas Bergonzoli and Jorge Ochoa), January 29, 2000.

**EXHIBIT 7:** Business Card and Letter, Teresa M.B. Van Vliet, Senior Litigation Counsel, U.S. Department of Justice, to Joaquin Perez, March 1, 2000.

**EXHIBIT 8:** *United States v. Fabio Ochoa-Vasquez,* Case No. 99-6153-Cr-Moore (S.D. Fla.), Transcript of Evidentiary Hearing Before Magistrate Judge William C. Turnoff, February 4, 2003.

## VOLUME II

**EXHIBIT 9:** *United States v. Vega, et. al,* Case No. 00-2467-BANDSTRA (S.D. Fla.), Criminal Complaint and Affidavit of FBI Special Agent John C. Jones, March 22, 2000; *United States v. $1,1449,473.32 In U.S. Currency,* Case No. 01-4645-Civ-Lenard (S.D. Fla.), Verified Complaint For Forfeiture In

Rem, October 4, 2001.

**EXHIBIT 10**: *United States v. Vega, et al.*, No.00-M-2467-BANDSTRA (S.D. Fla.): Waiver of Indictment, Notice of Appearance, Unopposed Motion To Travel, Order For Dismissal, Motion To Exonerate Bond and Docket Sheets.

**EXHIBIT 11**: "Did DEA Informants Swindle Drug Lords?  Millions In Cash Allegedly Taken," *The Miami Herald*, May 21, 2000; Paramilitary Leader Denies Talks With US Drug Enforcement Administration," *BBC Summary of World Broadcasts, British Broadcasting Corp.*, August 14, 2000;  RCN Television, *Interview With Carlos Castano* (informal translation);  Jose de Cordoba, "A Big Score - and a Bust - Fashion Photographer Made Millions as Drug-Trafficking Informant -- A Guy `Who Could Sell Snow to the Eskimos,'" *The Wall Street Journal*, December 8, 2000; Jose de Cordoba, "Secret Agent Man:  Fashion Photographer Scores Big Off Pals in the Narcotics Trade -- Baruch Vega Made Millions As a Federal Informant, But Was Justice Served? -- A Private Jet To Panama City," *The Wall Street Journal*, December 7, 2000.

**EXHIBIT 12**: Indictment, *United States v. Carlos Castano-Gil, et al.*, Case No. [*unknown*] (D.D.C.) (September 24, 2002).

**EXHIBIT 13**: News Release, U.S. Department of Justice, September 24, 2002, *Attorney General and DEA Director Announce Indictments In AUC Drug Trafficking Case*; News Conference, U.S. Attorney John Ashcroft, September 24, 2002 (*FDCH Political Transcripts*); State Department Press Release, *U.S. Indictment of Colombian Paramilitaries,* September 24, 2002;  "U.S. Indicts Paramilitary Chief; Request Extradition," *Deutsche Presse-Agentur*, September 24, 2002; "U.S. Officials Unseal Indictment of Colombian Paramilitary Leader, *Associated Press Worldstream*, September 24, 2002; "Colombian Paramilitary Chief Facing Drug Charges In U.S.," *The Miami Herald*, September 25, 2002; "U.S. Indicts Three in Colombia Paramilitary, *The Washington Post*, September 25, 2002; "Colombian Warlord Says He Will Face Charges In US," *Voice of America News*, September 25, 2002; "Colombian Paramilitary Leader Says He Will Surrender To the U.S. Under Certain Conditions," *Associated Press Worldstream*, September 25, 2002; "Ex-Paramilitary Chief Ready To Turn

Himself Over To Authorities In Colombia," *Agence France Presse,* September 25, 2002; "Colombian Seeking a Deal in U.S. Drug Case," *The New York Times,* September 26, 2002; "Colombian Outlaw Vows To Surrender," *The Miami Herald,* September 26, 2002; "Colombian Warlord Ready To Turn Himself to US Authorities," *Voice of America News,* September 26, 2002; "US Indictment of Right-Wing Leader Carlos Castano For Drug Trafficking Gets Mixed Reaction," *National Public Radio,* Morning Edition, September 30, 2002; "Ashcroft Announces New Arrests," *CNN LIVE EVENT SPECIAL,* November 6, 2002; News Conference, U.S. Attorney John Ashcroft, November 6, 2002 (*FDCH Political Transcripts*); "U.S. Strategy In Colombia Connects Drugs and Terror," *The New York Times,* November 14, 2002; Secretary of State Press Release and Interview of Secretary Colin L. Powell with *El Tiempo, Colombia,* December 2, 2002; "Powell Heads to Colombia For Talks on Aid, Narcotics Trafficking," *Voice of America News,* December 3, 2003; Secretary of State Press Release and Interview of Secretary Colin L. Powell with *RCN TV, Colombia.,* December 3, 2002; Capital Hill Hearing Tesitmony, Steven W. Casteel, Assistant Administrator For Intelligence, DEA, May 20, 2003 (redacted).

**EXHIBIT 14**: Docket Sheets, Indictment and Removal Order, *United States v. Bergonzoli,* Case No. 3:95cr144PCD (D. Conn.).

**EXHIBIT 15**: *United States v. Fabio Ochoa-Vasquez,* Case No. 99-6153-Cr-Moore (S.D. Fla.): *Motion To Quash Writ of Habeas Corpus Ad Testificandum and Incorporated Memorandum of Law,* May 2, 2003 (DE 1341).

**EXHIBIT 16**: *United States v. Gulfstream No. 96080, et al.,* Case No. 01-CV-763 (D. Ariz.): *Docket Sheets.*

**EXHIBIT 17**: *United States v. Gulfstream No. 96080, et al.,* Case No. 01-CV-763 (D. Ariz.): *Government's Statement of Facts In Support of Motion To Strike Claim and Answer of Asia Cargo Trading of USA, Inc.* and Exhibit 15 (Affidavit of Nicholas Bergonzoli), September 24, 2002 (DE 101).

**EXHIBIT 18**: "U.S. Embassy Offical Reportedly Meets In Secret With Colombian Paramilitary Emissary," *Associated Press,* June 12, 2003; "The CIA's Offer," *El Espectador;* June 8, 2003; "FARC and AUC are Included In

'Clinton's List,'" *El Tiempo,* June 11, 2003; "The US Awaits Carlos Castaño," *El Colombiano,* June 13, 2003.

**EXHIBIT 19**:  *United States v. Augusto Guillermo Falcon,* Case No. 99-583-Cr-Seitz (S.D. Fla.): *Government's Motion To Disqualify Attorney John Bergendahl,* April 11, 2001 (DE 1644); *Government's Appeal of Order of Magistrate-Judge Denying Government's Motion To Disqualify Attorney John Bergendahl,* June 16, 2001 (DE 1765); *Government's Reply To Defendant's Response To Government's Appeal of Order of Magistrate-Judge Denying Government's Motion To Disqualify Attorney John Bergendahl,* September 13, 2001 (DE 1810); *United States' Reply To Defendant Falcon's Response In Opposition To the Government's Motion To Disqualify Attorney Richard J. Diaz, Esq., With Incorporated Memorandum of Law,* July 26, 2002 (DE 2284); *Government's Response To Defendant's Appeal of order of Magistrate Judge Disqualifying Attorney Edward Shohat,* September 12, 2002 (DE 2386); *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 (DE 2539); *Government's Response To Defendant's Appeal of order of Magistrate Judge Disqualifying Attorney Edward Shohat,* September 12, 2002 (DE 2386); *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 *Government's Response To Defendant's Appeal of Order of Magistrate Judge Disqualifying Attorney Richard Diaz,* October 18, 2002 (DE 2539); *Government's Motion For Reconsideration of Order Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz As Trial Attorney For Defendant Falcon,* November 12, 2002 (DE 2564); *Government's Consolidated Reply To Defendant Falcon's Response To Government's Motion For Reconsideration of Order Overruling Magistrate Judge's Order Disqualifying Attorney Richard J. Diaz, Etc.,* November 27, 2002 (DE 2593); *Government's Response To Order To Show Cause Why Richard J. Diaz, Esq. Should Not Be Disqualified As Counsel For Defendant Falcon,* March 6, 2003 (DE 2752); *Government's Supplemental Memorandum In Support of Motion To Disqualify Richard Diaz, Esq., As Counsel For Defendant Falcon;* March 11, 2003 (DE 2758).

**EXHIBIT 20**:  *United States v. Augusto Guillermo Falcon,* Case No. 99-583-Cr-Seitz (S.D. Fla.): *Order Disqualifying Counsel,* December 12, 2001 (DE 1853);

*Order Affirming Magistrate Judge's Order Disqualifying Edward Shohat As Trial Counsel For Manuel Magluta,* October 3, 2002 (DE 2422); *Order Partially Affirming and Partially Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz As Trial Attorney For Defendnat Falcon, Etc.,* October 30, 2002 (DE 2548); *Order Partially Disqualifying Richard Diaz, Esq. As Trial Counsel For Defendant Falcon,* March 18, 2003 (DE 2764).

# EXHIBIT "9"

AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

SOUTHERN                DISTRICT OF                FLORIDA

UNITED STATES OF AMERICA

v.

BARUCH JAIRO VEGA
and
ROMAN HERNANDO SUAREZ-LOPEZ

FILED by ___ D.C.
MAG. SEC

MAR 2 2 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. — MIAMI

CRIMINAL COMPLAINT

CASE NUMBER: 00-2467-Bandstra

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on a date unknown, but at least by May, 1999, and continuing to the present, in Miami-Dade County, in the Southern District of Florida and elsewhere the defendants did knowingly conspire to launder and did launder monetary instruments and conspired to obstruct and did obstruct justice in violation of Title __18__ United States Code, Section(s) __1956; 371; and 1503.__

I further state that I am a Special Agent of FBI and that this complaint is based on the following facts:

See Attached Affidavit.

Signature of Complainant
JOHN C. JONES
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence,

3-22-00
Date

at      Miami, Florida
        City and State

TED E. BANDSTRA
U.S. MAG. Judge
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

Signature of Judicial Officer

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 1 PAGE 1

<u>AFFIDAVIT</u>

Affiant, JOHN C. JONES, being duly sworn, states the following

1.  I am employed as a Special Agent with the Federal Bureau of Investigation, in Miami,

Florida.  I am currently assigned to the Public Corruption 2 squad investigating illegal activities

conducted by corrupt public officials including obstruction of justice.  I have been a Special Agent

for approximately two (2) years and have participated in several criminal investigations involving

obstruction of justice and other matters.  I have a Bachelor of Science degree in Economics from

PennState University and a Masters of Business Administration from the West Virginia Graduate

College.  This affidavit is based upon personal knowledge, information from other law

enforcement officers, information from audio tape recordings, as well as information from a

reliable cooperating witness (CW) and sources.

2.  In or about December 1999, myself and other agents of the FBI began an investigation

of BARUCH JAIRO VEGA (hereinafter "VEGA"), who is currently residing at 100 Lincoln

Road, Penthouse #5, Miami Beach, Florida, and ROMAN HERNANDO SUAREZ LOPEZ

(hereinafter "SUAREZ"), who is residing at 11870 SW 51 Street, Miami, Florida.  The

investigation has revealed that, from at least as early as May 1999 to the present, VEGA,

SUAREZ, and others have been obstructing justice and laundering money through a scheme

devised to circumvent the United States justice system, by taking money, both in cash and in the

form of wire transfers, which is known to VEGA and SUAREZ to be the proceeds of illegal

narcotics trafficking, from federally indicted and as yet unindicted narcotics traffickers, in order

to, according to VEGA and SUAREZ bribe members of the United States Justice Department,

United States Customs Service agents, and Drug Enforcement Administration agents to arrange

phony cooperation deals to insure that the traffickers do not receive sentences of imprisonment

A number of these traffickers have been indicted in federal cases in the Southern District of Florida and elsewhere.

3.   VEGA has been an intermittent source of information for numerous Federal agencies. These agencies include the Federal Bureau of Investigation (FBI), the U.S. Customs Service(USCS), the Drug Enforcement Administration (DEA), and according to VEGA the Central Intelligence Agency (CIA).  SUAREZ too has been a source of information for the DEA for a number of years.  VEGA and SUAREZ frequently discuss their involvement with these agencies with many people in Colombia, South America and in the United States.  As a result, VEGA and SUAREZ have convinced a number of Colombian narcotics traffickers to believe that they have has connections with, and influence over, highly placed members of the United States Justice Department and law enforcement agencies.  It is believed by the undersigned that VEGA and SUAREZ are obstructing justice by presenting their scheme of phony cooperation to drug traffickers who now do not want to cooperate legitimately with U.S. law enforcement.  VEGA and SUAREZ accomplish their illegal plan in part through the use of intermediaries.  VEGA, SUAREZ and their intermediaries approach indicted and unindicted narcotics traffickers, both arrested and unarrested, who are located in Colombia and other countries, and advise them that for a substantial fee, typically millions of dollars, they can bribe members of the U.S. Justice Department and Federal Agents.  Accordingly to VEGA and SUAREZ'S scheme, they represent to the traffickers that the federal officials will agree to the traffickers' release on bond and agree to credit phony cooperation to the traffickers to reduce their possible jail sentences.  VEGA and SUAREZ typically promise the traffickers that they will not serve a single day in jail.  VEGA and SUAREZ further arrange for the traffickers to surrender their own money or a load of cocaine

U.S. v. F. OCHOA, 99-CR-196.
MOTION TO DISMISS
EXHIBIT 1, PAGE 3

(which they own), to agents of the DEA with whom they are working, making it appear as though the money and the narcotics belong to another drug trafficking organization. The scheme calls for the trafficker to receive credit for the seizure of his own money or drugs, which credit ultimately goes towards reducing the trafficker's sentence. VEGA and SUAREZ refer to this phony cooperation procedure as a "positive." The traffickers refer to the VEGA and SUAREZ phony cooperation scheme as the "Programa de Resocialization de Narcotraficantes," which translates from Spanish to English as the "Rehabilitation Program of Narcotics Traffickers" (hereinafter "program"). The fee VEGA charges each trafficker to enter the program depends on their ability to pay. More successful traffickers are charged a larger fee. According to sources who have spoken with several of these drug traffickers, VEGA and SUAREZ'S fees have ranged from $6,000,000 to $100,000,000. The fee is broken down by VEGA and SUAREZ as follows: fifty percent of the fee goes to VEGA and SUAREZ in cash or wire transfers, the remaining fifty percent is paid in "positives." The fee is further broken down by VEGA and SUAREZ according to the following schedule: fifty (50) percent of the cash portion is due up-front, twenty-five (25) percent of the cash portion is due at the time of the bond hearing, and the remaining twenty-five (25) percent is due at the end of the case. The "positives" are explained by VEGA and SUAREZ as follows: between the time the trafficker appears in court and the time the trafficker receives his sentence, they will be provided with the "positives" to reduce their possible jail sentence.

4. In or about late September 1999, an indicted drug trafficker imprisoned in LaPicota Penitentiary in Bogota, Colombia (hereafter "DT-1"), directed a family member to contact VEGA and SUAREZ to deliver approximately $55,000 in cash to VEGA and SUAREZ, as part of the trafficker's $6,000,000 fee to participate in the VEGA and SUAREZ "program." The family

member directed a courier to deliver to VEGA and SUAREZ approximately $55,000 in cash at the Emerald Beach Hotel in St. Thomas, U.S. Virgin Islands.

5.   In or about early October 1999, DT-1 was told that VEGA and SUAREZ needed approximately $20,000 for additional travel expenses, and that the money should be paid directly to VEGA and SUAREZ. DT-1 was provided telephone contact numbers for VEGA. DT-1's family member called VEGA and arranged for a courier to deliver the $20,000 cash to VEGA and SUAREZ. The family member was told by VEGA his address of 100 Lincoln Road, Penthouse #5, Miami Beach, Florida. The courier delivered the approximately $20,000 in cash to VEGA and SUAREZ at the above address and obtained a business card from VEGA as proof of the delivery.

6.   On or about October 25, 1999, the CW and family members of several fugitive defendants indicted in the Southern District of Florida and elsewhere, met with an intermediary of VEGA and SUAREZ. The intermediary stated that he was cooperating with the U.S. Government and that he could put these fugitives in touch with U.S. officials so that they could surrender. The intermediary placed a telephone call to VEGA and turned the telephone over to the CW. VEGA organized a meeting with the CW to be held in Panama five days later to discuss the program.

7.   On or about November 1, 1999, VEGA and the intermediary met with the CW at the Miramar Hotel in Panama to discuss the program. VEGA told the CW that he was not an American official, but he knew many people in the American judicial system that he could get the CW close to. VEGA told the CW that he had U.S. officials in the hotel room next door and arranged for the CW to meet with them. The CW then met with four DEA agents and a Miami

4

police officer. The CW said VEGA was not in the room during the meeting with the DEA agents. The meeting lasted several hours, during which the agents discussed the procedures for the surrender and cooperation of the CW'S indicted family members. On or about November 10, 1999, a second meeting occurred between a DEA Agent and the CW.

8. Also during this time, the CW again met with VEGA. The CW has family members who are fugitives indicted in a case in the Southern District of Florida. VEGA told the CW that for a fee, the CW'S family members could join the program with him and SUAREZ. VEGA stated that the fee for the CW'S three indicted family members would be $12,000,000 each; $6,000,000 in cash and the remaining $6,000,000 in "positives," and $10,000,000 each for the CW and another unindicted family member, $5,000,000 in cash and the remaining $5,000,000 in "positives." These amounts were later renegotiated with VEGA to total approximately $42,000,000 for the five individuals. The CW was told by VEGA that the payments were to be made to VEGA and SUAREZ on the following schedule: fifty (50) percent of the cash payment was due to VEGA and SUAREZ up-front, twenty-five (25) percent of the cash payment was due to VEGA and SUAREZ at the time of the CW's bond hearing, and the remaining twenty-five (25) percent of the cash payment was due to VEGA and SUAREZ at the end of the CW's case. VEGA told the CW that between the time the CW appeared in court and the time the CW received his sentence, the CW would be provided with the "positives" to reduce the CW's sentence. VEGA advised the CW that he and SUAREZ typically kept twenty (20) percent of the money and the remaining 80 percent was paid to important people in Washington, D.C. to finance "covert operations" that could not be financed with public money. VEGA explained to the CW that he would continue in the role as an intermediary between the CW and the DEA agents with

5

whom he had been cooperating. VEGA represented that he would learn about drug trafficking routes that were either in use or had been discovered from "U.S. Officials," whom he would pay for the information. The officials would then put this information in a report attributing the information to the CW.

9. In or about the first week of November 1999, the CW had $500,000 in cash delivered to VEGA's representative in New York. This $500,000 in cash was the proceeds of the CW'S drug trafficking. The purpose of this payment was to determine if the CW's additional family members were to be indicted in an upcoming large drug trafficking case in the Southern District of Florida, and if so, for VEGA to prevent it from happening. VEGA had previously shown the CW on his Apple laptop computer, a list of ten individuals VEGA represented were to be indicted in the next round of indictments in that case. The CW recognized his/her name and the names of three others on the list, including the CW's spouse. VEGA, for the sum of $50,000 per person, said that he could determine whether or not the individual was going to be indicted and could thereafter arrange to have the family members' names dropped from the indictment. VEGA began urgently calling the CW for the $500,000 on a daily basis until the CW arranged for the drug money to be paid to VEGA in New York through an intermediary. The CW later received confirmation from VEGA that he had received personally the $500,000 in cash in Miami, and that the CW's spouse had been dropped from the list. The CW recalls VEGA complaining that $125,000 of the $500,000 VEGA received from CW was in denominations of $1 and $5 bills, instead of the customary $100 bill denomination.

10. In or about early December 1999, the CW paid $3,000,000 to VEGA and SUAREZ in New York through couriers, for an indicted family member, as partial payment of the

$5,000,000 cash portion of the family members fee negotiated with VEGA. VEGA confirmed to
the CW that he had received the $3,000,000 in cash, a portion of this payment was split with
SUAREZ. The $3,000,000 in cash was the proceeds of the CW'S drug trafficking. The CW told
VEGA on numerous occasions that the monies paid to VEGA by the drug traffickers were the
proceeds of illegal drug trafficking.

11. In addition to the $3,000,000 payment, another Colombian drug trafficker (hereinafter
"DT-2"), paid $1,000,000 in cash to VEGA, which was delivered to VEGA by DT-2's courier
from New York to Miami, in early January 2000, near the Miami International Airport. This cash
was the proceeds of DT-2'S drug trafficking activities. Later in January 2000, both VEGA and
DT-2'S secretary verbally confirmed to the CW VEGA'S receipt of the $1,000,000. A portion of
this cash fee was split with SUAREZ.

12. VEGA and SUAREZ have presented the program to several additional high level
drug traffickers. These traffickers have also paid VEGA and SUAREZ several million dollars in
drug proceeds to join the program.

13. On March 11, 2000, the CW had a meeting with SUAREZ and others. This meeting
was surveilled by law enforcement officers. During the meeting, SUAREZ admitted to having
received $700,000 from a drug trafficker and then paying the entire $700,000 for information for
a "positive", for the trafficker. VEGA had previously offered to sell this same "positive" to the
CW, but the CW did not accept the offer. SUAREZ admitted to paying two DEA informants for
the information. SUAREZ in turn provided the trafficker the information to give to the DEA as
part of his own cooperation. In the meeting, SUAREZ told the CW that eighty (80) percent of
the money paid to VEGA by the traffickers was paid to governmental officials in Washington,

7

D.C. and ten (10) percent each went to VEGA and SUAREZ. SUAREZ told the CW that the five people in Washington were in control and were able to acquire the appropriate approvals to reduce the trafficker's sentences.

14. On March 11, 2000 and March 13, 2000, the CW received facsimiles from DT-2's secretary, confirming twenty-three (23) wire transfers in various amounts and check deposit information totaling $2,481,370, all of which were directed to the account of BARUCH VEGA/UNITED PRODUCTIONS. The CW again confirmed to federal agents that the monies paid were from the proceeds of drug trafficking. The CW also received a handwritten note detailing VEGA's bank account number and wiring information, purported to be in VEGA's handwriting, addressed to DT-2's secretary, giving instructions for the wiring of monies into VEGA's UNITED PRODUCTIONS account.

15. Also on March 13, 2000, the CW had a consensually recorded meeting with VEGA, during which VEGA admitted to having received $1,000,000 from DT-2. Also during this meeting, VEGA showed the CW a facsimile from DT-2, which VEGA had received on the facsimile machine in VEGA's bedroom. This facsimile listed in summary fashion VEGA's deal with DT-2. The CW read the facsimile out loud which was confirmed by VEGA, that DT-2's deal was to pay VEGA a total of $9,000,000; $4,000,000 down payment consisting of $3,000,000 in wire transfers and $1,000,000 in cash.

16. On March 17, 2000, a partial history of VEGA's UNITED PRODUCTIONS account was received pursuant to a subpoena having been served on Nations Bank. The history detailed among other things, eighteen (18) wire transfers totaling $1,092,035 from February 22, 2000 to March 6, 2000, all of which, except one $8,000 transfer, matched the facsimile received by the

CW from DT-2's secretary, detailing the amounts paid to VEGA by the indicted Colombian drug trafficker DT-2.

17.   Based on your affiant's training and experience as a Special Agent of the FBI, and upon the above stated facts, there is probable cause to believe that VEGA SUAREZ and others are operating a scheme to obstruct justice and launder money for the purposes of obtaining monies from indicted and as yet unindicted drug traffickers in South America, the United States and elsewhere in violation of Title 18, United States Code, Sections 1956, 1503 and 371.

Your affiant further sayeth not.

JOHN C. JONES, Special Agent,
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me this 27~ day of March 2000.

TED E. BANDSTRA
UNITED STATES MAGISTRATE JUDGE

5

U.S. V. F. OCHOA, 99-CR-0196
MOTION TO DISMISS
EXHIBIT 1 PAGE 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

Plaintiff,

v.

ONE MILLION FOUR HUNDRED
FORTY-NINE THOUSAND FOUR
HUNDRED SEVENTY-THREE DOLLARS
AND THIRTY-TWO CENTS
($1,449,473.32) IN UNITED
STATES CURRENCY

Defendant.
_____/

# 01-4645

**CIV-LENARD**

*MAGISTRATE JUDGE*
*TURNOFF*

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Plaintiff, United States of America, by and through the undersigned attorneys, hereby files this Complaint for Forfeiture and alleges as follows:

1.  This is a civil action for forfeiture in rem of ONE MILLION FOUR HUNDRED FORTY-NINE THOUSAND FOUR HUNDRED SEVENTY-THREE DOLLARS AND THIRTY-TWO CENTS ($1,449,473.32) in U.S. currency ("defendant currency").

2.  This Court has jurisdiction and venue over this action pursuant to Title 28, United States Code, Sections 1345, 1355, and 1395 in that the defendant currency was seized in the Southern District of Florida and will remain within the Southern District of Florida during the pendency of this action.

3.  The United States seeks forfeiture of the defendant currency pursuant to Title 21, United States Code, Section 881(a)(6) and Title 28, United States Code, Section 2461. Title 21, United States Code, Section 881(a)(6) provides for the

forfeiture of moneys, negotiable instruments, securities, or
other things of value furnished or intended to be furnished in
exchange for controlled substances in violation of the Controlled
Substance Act, 21 U.S.C. §§ 801 et seq., and for the forfeiture
of property which constitutes proceeds traceable to such an
exchange.

### FACTS AND CIRCUMSTANCES SUPPORTING FORFEITURE

4.   The defendant currency was seized from 100 Lincoln Road,
Penthouse #5, in Miami, Florida, and accounts numbered
91000024265241, 003061168043, and 003669004664 at Nations Bank,
Miami Beach Branch, on or about March 21-23, 2000.  At the time
of the seizure, Baruch Jairo Vega resided at 100 Lincoln Road,
Penthouse #5, and the seized bank accounts were held in the name
of Baruch Vega and/or Baruch Vega United Productions.  Baruch
Vega is the owner of Baruch Vega United Productions.

5.   On May 29, 2000, Vega, through his attorney, filed a
claim of ownership to all of the defendant currency and a cost
bond contesting the forfeiture of the defendant currency.

6.   On July 20, 2000, Vega and his attorney executed a
written agreement with the government in which Vega knowingly and
voluntarily agreed to waive any right to prompt action by the
government in filing a complaint to commence civil forfeiture of
the defendant currency and agreed that should the government file
such a complaint, the forfeiture laws as they existed as of the
date of the agreement would govern any such action.  Attached as
Exhibit A is a copy of the agreement.

2

7.    The defendant currency was seized in connection with an investigation by agents of the Federal Bureau of Investigation into allegations of conspiracy, obstruction of justice and money laundering.  On or about March 22, 2000, Vega was arrested on a criminal complaint charging him with conspiring to obstruct and obstructing justice and conspiring to launder and laundering monetary instruments, in violation of Title 18, United States Code, Sections 1956, 371, and 1503.

8.    The FBI's investigation revealed that, from May 1999 through March 2000, while a confidential informant for the Drug Enforcement Administration, Vega engaged in a fraudulent scheme, wherein he tricked Colombian drug traffickers into giving him large amounts of money, which Vega claimed he would use corruptly to ensure that the drug traffickers would be treated leniently after they surrendered in the United States.  Some of the traffickers were already indicted and some were under federal criminal investigation.

9.    Vega received the large amounts of money from the drug traffickers in cash, money order checks, and wire transfers.  The money received by Vega from the drug traffickers was known by Vega and others to be proceeds of illegal narcotics trafficking. When interviewed by the FBI prior to and at the time of his arrest on March 21-22, 2000, Vega identified several people who knew that the money he received from the drug traffickers was the proceeds of narcotics trafficking.

10.  On March 21-22, 2000, Vega executed a written consent to the search of his residence and informed the searching agents that they would find cash and money orders representing money he received from the drug traffickers to whom he had pitched his fraudulent scheme.  The agents found and seized $453,892 in cash and $56,253 in money orders from Vega's residence.

11.  On or about March 21-22, 2000, Vega executed a written consent to the seizure of the money in his bank accounts.  On or about March 23, 2000, FBI agents executed a seizure warrant and seized all funds deposited in account numbers 003061168043, 003669004664 and 91000024265241 at Nations Bank, Miami Beach Branch.  The following amounts were seized from each account: $10,142.81 was seized from bank account number 91000024265241; $925,185.18 was seized from bank account number 003061168043; and $4,000.33 was seized from bank account number 003669004664.

12.  A confidential source ("CW"), who has previously provided reliable information, told the FBI that s/he used an intermediary to pay an associate of Vega's $3 million in cash in New York, which was the proceeds of illegal narcotics trafficking, to assist her/his indicted family members in approximately early December, 1999.  According to the CW, Vega confirmed that he had received the money and that he knew it was proceeds of the CW's narcotics trafficking.  When interviewed on March 21-22, 2000, Vega said that the CW had delivered $3 million to an associate of his in New York, but explained that the $3 million was used to pay several other people so that when Vega

4

received the money in Miami in January, 2000, only $1.2 million remained.  Vega said that he paid other people so that, of that $1.2 million, he only retained $500,000 in cash.

13.  According to the CW, in early January, 2000, a Colombian drug trafficker ("CDT") paid Vega $1 million in cash in Miami.  According to the CW, the cash was the proceeds of drug trafficking activities.  Also according to the CW, drug trafficking is CDT's only source of substantial amounts of cash.  When interviewed by FBI agents, Vega confirmed that he had received $1 million from CDT in January, 2000, at his residence.  He also stated that, of the $1 million, he retained approximately $350,000 in cash.

14.  According to the CW, Vega received additional payments by wire transfer and money order checks from CDT through accounts held by businesses based in New York, New York.  On March 13, 2000, Vega showed the CW a facsimile summarizing his deal with CDT and told the CW that he had received $1 million from CDT.  On March 11 and 13, 2000, CDT's assistant sent CW by facsimile wire transfer confirmations and summary check deposit information, confirming wire transfers and check deposits in various amounts totaling $2,481,370 to Nations Bank account number 003061168043, and a handwritten note in Vega's handwriting providing bank account and wire transfer information.  Copies of the wire transfer confirmations and summary check deposits were also

5

retrieved from Vega's residence during the consent search conducted on March 21-22, 2000.

15. By reason of the foregoing, the defendant currency is subject to forfeiture to the United States of America pursuant to the provisions of 21 U.S.C. §881(a)(6) in that it constitutes proceeds of exchanges for controlled substances and/or proceeds traceable to such exchanges in violation of 21 U.S.C §841 et seq.

WHEREFORE, the United States of America requests that a warrant of arrest be issued for the defendant currency; that the Court direct any and all persons having any claim to the defendant property to file and serve their Verified Claims and Answers as required by the Supplemental Rules for Certain Admiralty and Maritime Claims, or suffer default thereof; that the Court declare the defendant currency, and all accrued interest thereon, condemned and forfeited to the United States of America for disposition according to law; and that the United States be granted such other and further relief as this Court deems just and proper, together with costs and disbursements of this action.

Respectfully submitted,

NANCY NEWCOMB, no. A5500551
ALISON VAN HORN, no. A5500550
TRIAL ATTORNEYS/CRIMINAL DIVISION
PUBLIC INTEGRITY SECTION
U.S. DEPARTMENT OF JUSTICE
P.O. BOX 27518
McPHERSON SQUARE STATION
WASHINGTON, D.C. 20038
TEL. (202) 514-1412
FAX. (202) 514-3003

6

## VERIFICATION

I, John C. Jones, Special Agent, Federal Bureau of Investigation, declare under penalty of perjury pursuant to 28, United States Code, Section 1746, that the foregoing Complaint for Forfeiture in Rem is based on information known to me, and that the facts alleged are true and correct to the best of my knowledge and belief.

Executed on _October 4, 2001_

_____
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

7

## AGREEMENT

Defendant Baruch Jairo Vega, through his attorney, Elio Vazquez, and the United States, through its undersigned attorneys, hereby enter into the following Agreement:

1. On March 22-23, 2000, property belonging to Baruch Jairo Vega was seized by the Federal Bureau of Investigation in Miami Beach, Florida, for forfeiture. The relevant seizure numbers are:

> 3460-2000-F-0088
> 3460-2000-F-0090
> 3460-2000-F-0092
> 3460-2000-F-0093
> 3460-2000-F-0094

2. On May 29, 2000, Baruch Jairo Vega, through his attorney, filed a claim of ownership and cost bond contesting the forfeiture of property seized by the FBI.

3. Baruch Jairo Vega knowingly and voluntarily agrees to waive any right to prompt action by the government with respect to the government's filing of a complaint to commence civil forfeiture of the property.

4. The parties agree that should the government at a later date file a complaint to commence civil forfeiture of the property, the forfeiture laws as they exist as of the date of this Agreement will govern any such action.

**FOR THE UNITED STATES**

Nancy J. Newcomb
Senior Trial Attorney
Jonathan Biran
Trial Attorney
Public Integrity Section
Criminal Division
United States Department of Justice
P.O. Box 27518, McPherson Sq. Station
Washington, DC 20038
Tel: (202) 514-1412

Date: 7/20/00

**FOR BARUCH JAIRO VEGA**

Baruch Jairo Vega

Elio Vazquez
Attorney for Mr. Vega
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000

Date: 7/14/00

ATTACHMENT A

09/28/01  13:05 FAX                                                                            ☒002

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America

## DEFENDANTS

One Million Four Hundred Forty-Nine Thousand Four Hundred Seventy-Three Dollars and Thirty-Two Cents

CIV-LENARD

COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF

(b)

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT     Dade

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

B. Dade 01-4645 Civ JAL WOT

MAGISTRATE JUDGE
TURNOFF

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Nancy J. Newcomb and Alison Van Horn
Trial Attorneys, Public Integrity Section
P.O. Box 27518, Washington, D.C. 20038

ATTORNEYS (IF KNOWN)

Elio Vasquez
6780 Coral WAy
Miami, FL 33155

(d) CIRCLE COUNTY WHERE ACTION AROSE:   DADE   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE,   HIGHLAND

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## VI. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Exd. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | B SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions A OR B |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL UNLESS DIVERSITY.)

Civil action for forfeiture in rem, pursuant to 21 U.S.C. 881(a)(6) and 28 U.S.C. 2461

LENGTH OF TRIAL
via _____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S)   (See instructions):
IF ANY

JUDGE   Bandstra                              DOCKET NUMBER   00-2467

DATE   10/12/01

SIGNATURE OF ATTORNEY OF RECORD   Nancy J. Newcomb

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

# EXHIBIT "10"

AO 455 (Rev. 5/85)  Waiver of Indictment

# United States District Court

_____ DISTRICT OF _____

UNITED STATES OF AMERICA

v.

BaRuch VegA

**WAIVER OF INDICTMENT**

CASE NUMBER: *00-2467-Bandstra*

I, ___BaRuch VegA_____, the above named defendant, who is accused of


being advised of the nature of the charge(s), the proposed information, and of my rights, hereby waive

in open court on ___*March 27, 2000*___ prosecution by indictment and consent that the

Date

proceeding may be by information rather than by indictment.


X _____

Defendant

_____

Counsel for Defendant

Before _____

Judicial Officer

WILLIAM C. TURNOFF

U S v F OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _OD-2467 CR_

DYKSTRA

UNITED STATES OF AMERICA,

v.

_Baruch Vega_

NOTICE OF PERMANENT
APPEARANCE AS COUNSEL
OF RECORD

COMES NOW _____, and files this
appearance as counsel for the above named defendant(s).  Counsel
agrees to represent the defendant(s) for all proceedings arising
out of the transaction with which the defendant(s) is/are presently
charged in the United States District Court in and for the Southern
District of Florida.

Counsel hereby states that this appearance is unconditional
and in conformity with the requirements of Local General Rule 16
and the Special Rules Governing the Admission and Practice of
Attorneys.

Counsel acknowledges responsibility to advise the
defendant(s) of the right of appeal, to file a timely notice of
appeal if requested to do so by the defendant(s), and to pursue
that appeal unless relieved by Court Order.

**FEE DISPUTES BETWEEN COUNSEL AND CLIENT SHALL NOT BE A
BASIS FOR WITHDRAWAL FROM THIS REPRESENTATION.**

DATED: _3/28/00_

Attorney _____

Address _____

City _Miami_ State _FL_ Zip Code _33__

Telephone _305) 261-4000_

The undersigned defendant(s) hereby consent(s) to the
representation of the above counsel.

_____

_____

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-2467-BANDSTRA



UNITED STATES OF AMERICA,
    *Plaintiff,*

vs.

BARUCH VEGA,
    *Defendant.*

## UNOPPOSED MOTION
## FOR PERMISSION TO TRAVEL

Defendant, BARUCH VEGA, moves this Court for the entry of an Order authorizing him to travel to New York, New York for business purposes. In support of this motion Defendant would state as follows:

1.    Defendant has been released on a $200,000.00 dollar bond with special condition. Defendant is under electronic monitoring and has a curfew from 11:00 p.m. to 6:00 a.m.

2.    Defendant is a professional photographer. Marie Claire Magazine has hired the professional services of Mr. Vega for a photo shooting in New York, New York.

3.    Defendant would be traveling to New York on Wednesday, August 2, 2000 and would be returning to Miami, Florida on Saturday, August 5, 2000.

4.    Defendant will be providing an itinerary and will be reporting everyday by phone to special agent John Jones of the FBI.

5.    Undersigned counsel contacted Nancy Newcomb, Senior Trial Attorney, Public Integrity and she does not oppose this motion.

**WHEREFORE**, Defendant respectfully prays to this Honorable Court for the entry of an Order authorizing Defendant to travel to New York.

Respectfully submitted,

_____
Nelson Rodriguez-Varela, Esq.
Counsel for Defendant
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
Fax: (305) 662-8715
Fl. Bar No.: 876739

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this 15 day of August, 2000, to:

Nancy Newcomb, Senior Trial Attorney
Public Integrity
U.S. Department of Justice
1400 New York Avenue, NW
12th Floor
Washington D.C. 20530

BY: _____
Nelson Rodriguez-Varela, Esq.

FROM : UNITED FILMS                    PHONE NO. :                    Jun. 29 2000 11:32AM P1

# marie claire

LATIN AMERICA

July  2000

To whom it may concern:

This letter is to certify that United Productions, directed by Barush Vega and Alex López, have our consent to produce photo shoots for *Marie Claire* Latin America. We are requesting the booking of Laetitia Casta  for a cover, an interview and a fashion story for our magazine, to be used for our March 2001 issues. We apreciate all the help that you could extend to United Productions, so they can work under the best circumstances possible.

Thank you very much for your attention and collaboration.

Best regards,

Louise Mereles Gras
Editor in Chief
Marie Claire Latin America

U.S. v. F. Ochoa 99-CR-6153
Motion to Dismiss
Exhibit 36. Page 5

**Marie Claire Latin America**
Vasco de Quiroga #2000, Edificio E, 3rd floor.  México D.F., 01210 MEXICO
Tel. 52-5-261 2644 Fax. 52-5-261 2732 or 33     e-mail: louisemereles@editorial.televisa.com.mx

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-2467-BANDSTRA / O'Sullivan

UNITED STATES OF AMERICA,    )
       *Plaintiff,*    )
           )
vs.    )
           )
BARUCH VEGA,    )
       *Defendant.*    )
_____    )



FILED by _____ D.C.
MAG. SEC.

OCT 31 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## ORDER

This matter came before this Court upon Defendant's Motion for Leave to Change Home Address, and after due consideration thereof, it is hereby

### ORDERED, ADJUDGED AND DECREED:

1.    That Defendant's Motion is hereby GRANTED.

2.    Defendant is permitted to move to the following address: 14105 Whooping Krane Lane, Orlando, Florida 32824, Tel: (407) 816-1507.

3.    All other conditions of release remain in effect.

**DONE AND ORDERED** in chambers, on this 31st day of October, 2001.

_____
U.S. Magistrate Judge
FoK Judge O'Sullivan

cc:   Nelson Rodriguez-Varela, Esq.
      Nancy Newcomb, Trial Attorney
      Pre-Trial Officer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-M-2467-BANDSTRA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

BARUCH JAIRO VEGA,

        Defendant.

_____/



## ORDER FOR DISMISSAL

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure and by leave of court endorsed hereon, the United States of America, by and through the undersigned attorneys, hereby moves to dismiss the Complaint against Baruch Jairo Vega, without prejudice.

          ANDREW LOURIE
          ACTING CHIEF
          PUBLIC INTEGRITY SECTION
          CRIMINAL DIVISION
          U.S. DEPARTMENT OF JUSTICE

     BY: _____
          Nancy J. Newcomb
          Senior Trial Attorney

Leave of court is granted for the filing of the foregoing dismissal.

Dated: November 13ᴺ, 2001

         _____
         STEPHEN T. BROWN
         UNITED STATES MAGISTRATE JUDGE

cc:  Public Integrity Section
     Nelson Rodriguez-Varela, Counsel for defendant

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 00-2467-BANDSTRA / O'Sullivan

UNITED STATES OF AMERICA,   )
     *Plaintiff,*         )
         )
vs.               )
         )
BARUCH VEGA,         )
     *Defendant.*     )
_____ )

## MOTION TO EXONERATE BOND

Defendant, BARUCH VEGA, moves this Court for the entry of an Order exonerating the ten (10%) percent cash bond and the properties used to guarantee his release in the present case. In support of this motion Defendant would state as follows:

1.    On May 12, 2001, Defendant was released upon posting the required One Hundred Thousand ($100,000.00) Dollars personal surety bond with ten (10%) percent and a One Hundred Thousand ($100,000.00) corporate surety posted with the Clerk of the Court. (Exhibit I).

2.    While out on bond Defendant complied with all conditions and requirements imposed by the court.

3.    On November 13, 2001, the Government dismissed the Complaint filed against Mr. Vega. (Exhibit II).

4.    Defendant asks that the bond be discharged in the present case.



**WHEREFORE**, Defendant respectfully prays to this Honorable Court for the entry of an Order exonerating the ten (10%) percent cash bond and the corporate surety bond used to guarantee his release in the present case.

Respectfully submitted,

_____
Nelson Rodriguez-Varela, Esq.
Counsel for Defendant
6780 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
Fax: (305) 662-4067
Fl. Bar No.: 876739

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed this _____ day of December, 2001, to:

Nancy Newcomb, Senior Trial Attorney
Public Integrity
U.S. Department of Justice
1400 New York Avenue, NW
12th Floor
Washington D.C. 20530

BY: _____
Nelson Rodriguez-Varela, Esq.

```
Web PACER (v2.3)
Docket as of December 14, 2001 10:30 pm                    Page 1

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                               CLOSED

                                                         CLOSED
                    U.S. District Court
            Southern District of Florida (Miami)

         CRIMINAL DOCKET FOR CASE #: 00-M -2467-ALL

USA v. Vega, et al                                  Filed: 03/22/00
Dkt# in other court: None

Case Assigned to:  Magistrate Ted E. Bandstra

BARUCH JAIRO VEGA (1) , DOB:       Nelson Armando Rodriguez-Varela
12/5/46  Prisoner No. 60453-        [term  11/14/01]
004                                FTS 662-4067
     defendant                     305-261-4000
  [term  11/14/01]                 [COR LD NTC tmp]
                                   6780 Coral Way
                                   Miami, FL 33155


Pending Counts:

    NONE


Terminated Counts:

    NONE



Complaints                      Disposition

Conspiracy to Launder and did
Launder Monetary Instruments
and Conspiracy to Obstruct and
did Obstruct Justice.
18:1956; 371; 1503



===========================

⊓

Docket as of December 14, 2001 10:30 pm                    Page 2

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                               CLOSED

Case Assigned to:  Magistrate Ted E. Bandstra

ROMAN HERNANDO SUAREZ-LOPEZ        Ruben Oliva
(2)                                FTS 856-7771
```

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 10

5/9/02

```
        defendant                    305-856-6868
        [term  07/16/01]             [COR LD NTC ret]
                                     Rojas Oliva & Ventura
                                     2250 SW 3rd Avenue
                                     3rd Floor
                                     Miami, FL 33129
                                     305-856-6868

                                     Joaquin G. Perez
                                     FTS 662-4067
                                     305-261-4000
                                     [COR LD NTC tmp]
                                     6780 Coral Way
                                     Miami, FL 33155
```

Pending Counts:

    NONE


Terminated Counts:

    NONE



Complaints                              Disposition

Conspiracy to Launder and
Launder Monetary Instruments
and   Conspiracy to Obstruct
and did Obstruct Justice.
18:1956;   371; 1503



U. S. Attorneys:

   NONE


Docket as of December 14, 2001 10:30 pm              Page 3

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                         CLOSED

3/22/00  --     ARREST of Baruch Jairo Vega (md) [Entry date 03/23/00]

3/22/00  1      REPORT Commencing Criminal Action as to Baruch Jairo Vega
                DOB: 12/5/46  Prisoner # 60453-004 (md)
                [Entry date 03/23/00]

3/22/00  2      COMPLAINT as to Baruch Jairo Vega, Roman Hernando
                Suarez-Lopez (md) [Entry date 03/23/00]

3/22/00  3      ORDER on Initial Appearance as to Baruch Jairo Vega; Bond
                set to Temporary Pretrial Detention. Nelson Rodriguez
                appeared as temporary counsel of record. Arraignment set
                for 10:00 4/5/00; Report re counsel set for 10:00 3/29/00;

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 11

Detention hearing set for 10:00 3/27/00; Preliminary
examination set for 10:00 4/5/00 before Duty Magistrate,
,  (Signed by Magistrate Ted E. Bandstra on 3/22/00)
Tape # 00B-19-2218 CCAP (md) [Entry date 03/23/00]

3/22/00   4      NOTICE of Temporary Appearance for Baruch Jairo Vega by
                 Attorney Nelson Armando Rodriguez-Varela (md)
                 [Entry date 03/23/00]

3/22/00   --     ARREST of Roman Hernando Suarez-Lopez (md)
                 [Entry date 03/24/00]

3/23/00   5      REPORT Commencing Criminal Action as to Roman Hernando
                 Suarez-Lopez DOB: 8/9/47  Prisoner # 59198-079 (md)
                 [Entry date 03/24/00]

3/23/00   6      ORDER on Initial Appearance as to Roman Hernando
                 Suarez-Lopez; Bond set to Temporary Pretrial Detention
                 Arraignment set for 10:00 4/6/00; Report re counsel set for
                 10:00 3/28/00; Detention hearing set for 10:00 3/28/00
                 Preliminary examination set for 10:00 4/6/00 before Duty
                 Magistrate, ,  ( Signed by Magistrate Ted E. Bandstra
                 on 3/23/00) Tape # 00B-21-147 CCAP (md)
                 [Entry date 03/24/00]

3/23/00   7      NOTICE of Temporary Appearance for Roman Hernando
                 Suarez-Lopez by Attorney Joaquin G. Perez (md)
                 [Entry date 03/24/00]

3/27/00   8      STIPULATED ORDER OF DETENTION as to Baruch Jairo Vega (
                 Signed by Magistrate Judge William C. Turnoff on 3/27/00)
                 Tape # 00G34-702  CCAP (pv) [Entry date 03/28/00]

3/27/00   9      Waiver of Preliminary Examination or Hearing by Baruch
                 Jairo Vega  ( Signed by Magistrate Judge William C. Turnoff
                 on 3/27/00) CCAP [EOD Date: 3/28/00] (pv)
                 [Entry date 03/28/00]

3/27/00   10     WAIVER OF INDICTMENT by Baruch Jairo Vega (pv)
                 [Entry date 03/28/00]

☐

Docket as of December 14, 2001 10:30 pm              Page 4

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                          CLOSED

3/28/00   11     NOTICE of Permanent Appearance for Baruch Jairo Vega by
                 Attorney, Nelson Rodriguez-Varela. (md)
                 [Entry date 03/28/00]

3/28/00   12     NOTICE of Appearance for Roman Hernando Suarez-Lopez by
                 Attorney Ruben Oliva (pv) [Entry date 03/29/00]

3/28/00   13     Waiver of Preliminary Examination or Hearing by Roman
                 Hernando Suarez-Lopez  ( Signed by Magistrate Judge William
                 C. Turnoff on 3/28/00) CCAP [EOD Date: 3/29/00] (pv)
                 [Entry date 03/29/00]

     U.S. v. F OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 12     5/9/02

| 3/28/00 | 14 | STIPULATED ORDER OF DETENTION as to Roman Hernando Suarez-Lopez ( Signed by Magistrate Judge William C. Turnoff on 3/28/00) Tape # 00G35-2475  CCAP (pv) [Entry date 03/29/00] |

| 3/28/00 | 15 | ORDER as to Roman Hernando Suarez-Lopez  reset Arraignment for 10:00 4/20/00 for Roman Hernando Suarez-Lopez  before Duty Magistrate ( Signed by Magistrate Judge William C. Turnoff on 3/28/00) CCAP [EOD Date: 3/29/00]  Tape # 00G35-2475 CCAP□ (pv) [Entry date 03/29/00] |

| 3/29/00 | 16 | Arrest WARRANT Returned Executed as to Roman Hernando Suarez-Lopez on 3/29/00 (pf) [Entry date 03/31/00] |

| 4/5/00 | 17 | ORDER as to Baruch Jairo Vega Reset Preliminary Examination for 10:00 4/19/00 before Duty Magistrate, Reset Arraignment for 10:00 4/19/00 before Duty Magistrate (Signed by Magistrate Peter R. Palermo on 4/5/00) CCAP [EOD Date: 4/5/00] Tape # 00E-22-3044 CCAP□ (md) [Entry date 04/05/00] |

| 4/20/00 | 18 | ORDER as to Baruch Jairo Vega  reset Arraignment for 10:00 5/3/00 for Baruch Jairo Vega  before Duty Magistrate ( Signed by Magistrate Stephen T. Brown on 4/19/00) CCAP [EOD Date: 4/20/00]  Tape # 00D-32-260 CCAP□ (sl) [Entry date 04/20/00] |

| 4/20/00 | 19 | ORDER as to Roman Hernando Suarez-Lopez  reset Arraignment for 10:00 5/18/00 for Roman Hernando Suarez-Lopez  before Duty Magistrate ( Signed by Magistrate Stephen T. Brown on 4/20/00) CCAP [EOD Date: 4/20/00]  Tape # 00D-33-1380 CCAP□ (sl) [Entry date 04/20/00] |

| 5/3/00 | 20 | Waiver of indictment by Baruch Jairo Vega (ma) [Entry date 05/04/00] |

| 5/10/00 | 21 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 22 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 23 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

Docket as of December 14, 2001 10:30 pm                Page 5

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                              CLOSED

| 5/12/00 | 24 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 25 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 26 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 27 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 28 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

| 5/12/00 | 29 | SEALED DOCUMENT (ma) [Entry date 05/17/00] |

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 13

5/9/02

5/18/00   30   ORDER as to Baruch Jairo Vega Reset Preliminary
               Examination for 10:00 8/21/00 before Duty Magistrate,
               Reset Arraignment for 10:00 8/21/00 before Duty Magistrate
               (Signed by Magistrate Judge William C. Turnoff on 5/17/00)
               CCAP [EOD Date: 5/18/00] Tape # 00g-51-1984 CCAP☐ (md)
               [Entry date 05/18/00]

5/18/00   31   ORDER as to Roman Hernando Suarez-Lopez Reset Preliminary
               Examination for 10:00 8/21/00 before Duty Magistrate,
               Reset Arraignment for 10:00 8/21/00 before Duty
               Magistrate (Signed by Magistrate Judge William C. Turnoff
               on 5/18/00) CCAP [EOD Date: 5/18/00] Tape # 00G-53-1806
               CCAP☐ (md) [Entry date 05/18/00]

5/22/00   32   SEALED DOCUMENT as to Baruch Jairo Vega (ma)
               [Entry date 05/22/00]

5/22/00   33   SEALED DOCUMENT as to Roman Hernando Suarez-Lopez (ma)
               [Entry date 05/22/00]

6/14/00   34   SEALED DOCUMENT as to Baruch Jairo Vega (ma)
               [Entry date 06/19/00]

6/14/00   35   SEALED DOCUMENT as to Baruch Jairo Vega (ma)
               [Entry date 06/19/00]

7/21/00   36   SEALED DOCUMENT as to Baruch Jairo Vega (ma)
               [Entry date 07/26/00]

7/26/00   37   SEALED DOCUMENT as to Baruch Jairo Vega (pv)
               [Entry date 08/01/00]

7/27/00   39   SEALED DOCUMENT as to Roman Hernando Suarez-Lopez (ma)
               [Entry date 08/08/00]

8/1/00    38   MOTION by Baruch Jairo Vega to Travel to New York on
               8/2/00 and return on 8/5/00 (nf) [Entry date 08/03/00]

8/11/00   40   SEALED DOCUMENT as to Roman Hernando Suarez-Lopez (ma)
               [Entry date 08/14/00]

☐

Docket as of December 14, 2001 10:30 pm                    Page 6

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                          CLOSED

8/21/00   41   ORDER as to Baruch Jairo Vega, Roman Hernando Suarez-Lopez
                Reset Preliminary Examination for 10:00 8/23/00 before
               Duty Magistrate, Reset Arraignment for 10:00 8/23/00
               before Duty Magistrate (Signed by Magistrate Judge William
               C. Turnoff on 8/21/00) [EOD Date: 8/21/00] Tape #
               00G-73-573 CCAP☐ (md) [Entry date 08/21/00]

8/25/00   42   ORDER as to Baruch Jairo Vega, Roman Hernando Suarez-Lopez
                Reset Arraignment for 10:00 11/24/00 before Duty
               Magistrate (Signed by Magistrate Judge William C. Turnoff
               on 8/23/00)[EOD Date: 8/25/00] Tape # 00G-74-1718 CCAP☐ (md)

U.S. v F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 14

5/9/02

```
                          [Entry date 08/25/00]

8/30/00  43      SEALED DOCUMENT as to Baruch Jairo Vega (ma)
                 [Entry date 08/30/00]

11/15/00 44      Unopposed MOTION by USA as to Baruch Jairo Vega, Roman
                 Hernando Suarez-Lopez to continue arraignment date to
                 12/5/00 (cp) [Entry date 11/20/00]

11/17/00 45      ORDER RESETTING HEARING as to Baruch Jairo Vega, Roman
                 Hernando Suarez-Lopez granting [44-1] motion to continue
                 arraignment date to 12/5/00 as to Baruch Jairo Vega (1),
                 Roman Hernando Suarez-Lopez (2)  reset Arraignment for
                 10:00 12/5/00 for Baruch Jairo Vega, for Roman Hernando
                 Suarez-Lopez  before Duty Magistrate ( Signed by
                 Magistrate Judge Andrea M. Simonton on 11/16/00) CCAP [EOD
                 Date: 11/20/00] CCAP (cp) [Entry date 11/20/00]

11/21/00 46      SEALED DOCUMENT as to Baruch Jairo Vega (ma)
                 [Entry date 11/24/00]

12/4/00  47      SEALED DOCUMENT as to Baruch Jairo Vega, Roman Hernando
                 Suarez-Lopez (ma) [Entry date 12/06/00]

12/5/00  48      ORDER as to Baruch Jairo Vega, Roman Hernando Suarez-Lopez
                  Resetting Arraignment for 10:00 4/5/01 for Baruch Jairo
                 Vega, for Roman Hernando Suarez-Lopez  before Duty
                 Magistrate ( Signed by Magistrate Peter R. Palermo on
                 12/5/00) CCAP [EOD Date: 12/6/00]  Tape # 00A-49-1471 CCAP
                 (ma) [Entry date 12/06/00]

12/6/00  49      SEALED DOCUMENT as to Baruch Jairo Vega, Roman Hernando
                 Suarez-Lopez (ma) [Entry date 12/06/00]

4/6/01   50      ORDER as to Baruch Jairo Vega, Roman Hernando Suarez-Lopez
                  reset Arraignment for 10:00 8/7/01 for Baruch Jairo Vega,
                 for Roman Hernando Suarez-Lopez  before Duty Magistrate (
                 Signed by Magistrate Judge Andrea M. Simonton on 4/5/01)
                 CCAP [EOD Date: 4/6/01]  Tape # 01FX41-2123 CCAP (pv)
                 [Entry date 04/06/01]


Docket as of December 14, 2001 10:30 pm              Page 7

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                           CLOSED

8/6/01   51      ORDER as to Roman Hernando Suarez-Lopez  reset Arraignment
                 for 10:00 9/19/01 for Roman Hernando Suarez-Lopez  before
                 Duty Magistrate ( Signed by Magistrate Stephen T. Brown on
                 8/3/01) [EOD Date: 8/6/01] CCAP (sl) [Entry date 08/06/01]

8/7/01   52      ORDER as to Baruch Jairo Vega  RESET status  Arraignment
                 for 10:00 10/1/01 for Baruch Jairo Vega  before Duty
                 Magistrate ( Signed by Magistrate Judge Robert L. Dube on
                 8/7/01) [EOD Date: 8/7/01]  Tape # 01H-31-793 CCAP (nf)
                 [Entry date 08/07/01]

10/1/01  53      ORDER as to Baruch Jairo Vega reset
```

U.S. v F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 15                    5/9/02

Arraignment/preliminary hearing for 10:00 10/16/01 for
Baruch Jairo Vega  before Duty Magistrate ( Signed by
Magistrate Judge Andrea M. Simonton on 10/1/01) [EOD Date:
10/1/01]  Tape # 01FX100-2728 CCAP▢ (cp)
[Entry date 10/01/01]

10/16/01 54    ORDER as to Baruch Jairo Vega Reset Arraignment for 10:00
10/30/01 before Duty Magistrate ( Signed by Magistrate
Peter R. Palermo on 10/16/01) [EOD Date: 10/17/01] Tape #
01A-102-3499 CCAP▢ (md) [Entry date 10/17/01]

10/29/01 55    MOTION by Baruch Jairo Vega for leave to change home
address (ma) [Entry date 10/30/01]

10/29/01 57    MOTION by Baruch Jairo Vega for leave to change home
address (pf) [Entry date 11/01/01]

10/30/01 56    ORDER as to Baruch Jairo Vega  reset Preliminary
Examination for 10:00 11/13/01 for Baruch Jairo Vega before
Duty Magistrate,  reset Arraignment for 10:00 11/13/01
for Baruch Jairo Vega  before Duty Magistrate ( Signed by
Magistrate Ted E. Bandstra on 10/30/01) [EOD Date:
10/30/01]  Tape # 01B-93-435 CCAP▢ (nf)
[Entry date 10/30/01]

10/31/01 58    ORDER as to Baruch Jairo Vega  granting [57-1] motion for
leave to change home address as to Baruch Jairo Vega (1) (
Signed by Magistrate Ted E. Bandstra on 10/31/01) [EOD
Date: 11/1/01]  Tape # CCAP▢ (pf) [Entry date 11/01/01]

11/14/01 59    ORDER as to Baruch Jairo Vega dismissing complaint without
prejudice ( Signed by Magistrate Stephen T. Brown on
11/13/01) [EOD Date: 11/14/01] CCAP▢ (sl)
[Entry date 11/14/01]

12/5/01  60    MOTION by Baruch Jairo Vega to exonerate bond (pf)
[Entry date 12/10/01]

12/11/01 61    ORDER as to Baruch Jairo Vega  granting [60-1] motion to
exonerate bond as to Baruch Jairo Vega (1) ( Signed by
Magistrate Judge John J. O'Sullivan on 12/11/01) [EOD Date:
12/12/01] CCAP▢ (ma) [Entry date 12/12/01]
▢

Docket as of December 14, 2001 10:30 pm                Page 8

Proceedings include all events.
1:00m 2467-ALL USA v. Vega, et al                        CLOSED


[END OF DOCKET: 1:00m 2467-0]
-----------------------------------------------------------------------
                        PACER Service Center
                        Transaction Receipt

                        05/09/2002 16:04:22

PACER Login:  rk0025        Client Code:
Description:  docket report  Search Criteria:  1:00m02467
Billable Pages:         8  Cost:   0.56

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 36, PAGE 16

5/9/02

# EXHIBIT "11"

Source: My Sources > News > News Group File, All ❶
Terms: baruch vega (Edit Search)

☞ Select for FOCUS™ or Delivery
■

*The Miami Herald May 21, 2000 Sunday FINAL EDITION*

Copyright 2000 The Miami Herald
All Rights Reserved

# The Miami Herald

**Found on Miami ● com**

The Miami Herald

May 21, 2000 Sunday FINAL EDITION

**SECTION:** FRONT; Pg. 1A

**LENGTH:** 1964 words

**HEADLINE:** DID DEA INFORMANTS SWINDLE DRUG LORDS? MILLIONS IN CASH ALLEGEDLY TAKEN

**BYLINE:** TIM JOHNSON, timjohnson@herald.com

**DATELINE:** BOGOTA, Colombia

**BODY:**
No one disputes that Baruch Jairo Vega possesses the nerves of steel and savvy manner required of anyone who does business with international drug traffickers.

The question is whether Vega was audacious enough, or crazy enough, to snooker some of Colombia's biggest drug dealers out of millions of dollars and pocket the money. Or - his version - whether he instead performed extraordinary work as a confidential informant for the DEA and the FBI, and maybe the CIA, bringing the U.S. government both sought-after drug lords and cash.

Among those with the biggest stake in the answers are two Drug Enforcement Administration agents who oversaw Vega as he zigzagged between Miami and Panama in recent months to haggle with top Colombian drug dealers. Both agents are suspended with pay and under investigation. In the end, a federal judge hearing the case against Vega, who faces money laundering charges, will have to sort out the truth. But much of the improbable saga of the Miami Beach resident and his connections to the drug trade is already being told in court documents and attorneys' statements.

It is the story of huge piles of money and possible secret deals between the U.S. Justice Department and Colombian drug traffickers. Some Colombian officials say the deals lured drug lords to get out of the narcotics business, pay huge fines, and rat on colleagues in exchange for lenient U.S. treatment.

In Colombia, there is even a nickname for the group of drug barons allegedly involved with Vega - the cartel de los sapos, or "Cartel of the Snitches."

Although there are many unanswered questions, some Colombian authorities seem inclined to believe in the existence of an official, U.S.-sponsored operation.

U S v F OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 17, PAGE 1

For one thing, they have heard numerous tales of drug lords paying millions of dollars to Vega for what they believed was his official role in helping confessed drug traffickers get their records wiped clean by striking cooperation agreements with U.S. prosecutors and forfeiting half their wealth.

They also find it hard to believe that some of the world's shrewdest and most vicious criminals could be duped by a con man. "Either the narcos are stupid or this operation had some legitimacy," a Colombian intelligence official said, asking to remain unnamed.

Vega was the far more experienced of two Colombian-born informants who were arrested March 22 in South Florida. The FBI said Vega and the second man, Roman Suarez Lopez, conjured up "phony cooperation deals" with indicted and suspected Colombian drug lords, as DEA agents waited in adjoining hotel rooms.

"According to sources who have spoken with several of these drug traffickers, Vega and Suarez's fees have ranged from $6 million to $100 million," the criminal complaint says. It details how at least $6 million was paid to the two men by narco-traffickers, and says they received an additional "several million dollars in drug proceeds."

CHARGES FILED

The complaint portrays the two men as rogue snitches who became "intermittent" sources of information for federal agencies. It charges them with money laundering and obstruction of justice.

The two men went free on $100,000 bond May 12. Neither man would speak to The Herald, but their attorneys said their actions were sponsored by U.S. government agents.

"Let me tell you, whatever [Vega] did, he did with the understanding, knowledge and agreement of the DEA agents. This was a **Baruch Vega** joint venture with the DEA," said Nelson Rodriguez-Varela, his attorney.

Suarez's lawyer, Ruben Oliva, said his client and Vega concocted a plan under DEA auspices to lure drug traffickers into meetings, and received money with DEA knowledge.

"If it was a scam, it was like any scam that a [confidential informant] perpetrates on a criminal target," Oliva said.

Both in their 50s, Vega and Suarez were born in Colombia. They have lived in South Florida for decades.

LINKS TO AGENCIES

**Baruch Vega,** a professional photographer with a smooth manner, had long-standing ties with law enforcement agencies and even boasted of working for the CIA, the complaint says. He was the leader among the two men.

"Baruch is very slick, but he has to be," said an acquaintance, who noted Vega's frequent dealings with major Colombian drug smugglers.

"His whole world is deception," said Joseph Rosenbaum, a Miami lawyer for Larry E. Castillo, a DEA agent suspended with pay following Vega's arrest. Also suspended was Castillo's DEA supervisor, David Tinsley.

After nearly two decades as an informant, mostly for the FBI, Vega came into his heyday when Colombia's Congress ended a six-year ban on extradition of drug traffickers in late 1997. That move paved the way for U.S. authorities to seek to bring more drug lords to U.S.

U.S. v. F. OCHOA; 99-CR-6153
MOTION TO DISMISS
EXHIBIT 17 PAGE 2

prisons. Colombian drug traffickers fear nothing more than U.S. jails, and both Vega and U.S. law enforcement officials apparently saw an opportunity to strike cooperation deals with the narcos.

One Colombian who reportedly reached such an agreement, art dealer Arturo Piza, was gunned down in Medellin early last year, apparently in retaliation for a cooperation pact. But a surprising number of drug traffickers have apparently sought to reach similar deals since then with U.S. authorities, often working through Vega.

Neither the U.S. attorney's office in South Florida nor the DEA would talk about such alleged agreements or about **Baruch Vega** and Roman Suarez.

"No comment," said Rosa Rodriguez Mera of the U.S. attorney's office.

31 SEIZED IN RAID

A spark for the deals came with Operation Millennium, a massive DEA-sponsored raid in Colombia and Mexico in mid-October that netted 31 people, including Fabio Ochoa, a former leader of the Medellin Cartel. All 31 now await extradition to the United States.

As a result, Colombian drug criminals were forced to consider whether they might someday face extradition themselves - their worst nightmare. Enter Vega.

According to flight records, he flew between 10 and 12 times from South Florida to Panama to hold meetings with Colombian drug traffickers - mainly from the Northern Valley Cartel and from remnants of the Medellin Cartel - to seek alleged cooperation agreements, several sources close to Vega said.

On those trips, Vega and Suarez were usually accompanied by a coterie of DEA agents, local police officers, South Florida criminal lawyers - and a fashion model or two.

Panamanian aviation records seen by The Herald indicate that Miami-based DEA agent Larry E. Castillo was nearly always along. Also joining the group on occasion were Bill Gomez, a Miami-Dade Police Department narcotics officer; Daniel Forman, a criminal defense attorney in Miami; and Carlos Ramon Zapata, a 34-year-old suspected Colombian cocaine trafficker who apparently has struck a deal with U.S. prosecutors that leaves him enjoying his freedom at a high-rise on the southern tip of Miami Beach.

Ramon and Gomez could not be located for comment. Forman did not return repeated messages left at his office. Castillo declined through his attorney to speak to a Herald reporter.

MEETING IN PANAMA

Just two weeks after the Operation Millennium arrests, on Nov. 1, Vega and Suarez hosted a meeting at the Panama City hotel with a drug trafficker who is a cooperating witness in an ongoing drug probe in Colombia, the complaint says.

"Vega told the [cooperating witness] that he had U.S. officials in the hotel room next door and arranged for the [cooperating witness] to meet with them," it says. "The [cooperating witness] then met with four DEA agents and a Miami police officer."

According to the complaint, Vega and Suarez told visiting drug lords that they had the clout to bribe Justice Department officials, set up phony cooperation agreements and arrange for the drug barons to "not serve a single day in jail" - in exchange for huge sums of money.

One alleged drug lord, Carlos Julio Correa, lured other traffickers to Vega and Suarez,

U.S. v. F. OCHOA  99-CR-6153
MOTION TO DISMISS
EXHIBIT 17, PAGE 3

vouching for their legitimacy and showing off the U.S. visa he had reportedly obtained through them.

"When he began to enter and leave the United States without any problems, the other narcos saw this and got interested," the Colombian intelligence official said, noting that Vega and Suarez appeared to have great clout.

Adding spice to the frequent flights Vega made to Panama were some of Colombia's most alluring models.

SOCIAL OCCASION

On a flight Dec. 8 between Panama City's Tocumen International Airport and South Florida, Suarez and Vega were joined by Natalia Paris, Colombia's most widely known fashion model, flight records show.

Between drinks and socializing, Vega and Suarez reeled in some of the major smugglers of the Northern Valley and Medellin cartels, including Juan Usuga, Oscar Eduardo Campuzano and others, their attorneys said.

"[Vega] brought in Orlando Sanchez Cristancho. He brought in the Usugas. He brought in El Medico," said Rodriguez-Varela, Vega's attorney, referring to the nickname used by Carlos Ramon. "He was in the process of working a number of others."

If such traffickers genuinely collaborated with U.S. prosecutors, it would be a major coup against the Colombian cocaine trade, Colombian officials say.

In what has been interpreted as a sign that deals for cooperation are being struck, U.S. prosecutors have allowed several accused major traffickers to go free on bond in South Florida after their capture. Those alleged Colombian traffickers include Juan Usuga, Carlos Ramon and Carlos Julio Correa. Others in the so-called "Cartel of the Snitches" remain in Colombia, protected by the 8,000-man right-wing army run by Carlos Castano, who has declared all-out war against leftist guerrillas.

COCA CONNECTION

Both the guerrillas and Castano's militias receive financing from farmers of coca, the raw ingredient in cocaine, although Castano says he is now actively trying to help the U.S. counterdrug effort. In an e-mail to a Herald reporter last month, Castano touched on the issue of narcotics traffickers cooperating with the U.S. justice system.

"Drug traffickers are surrendering voluntarily to U.S. justice. As long as this doesn't lead to impunity, it is the best way to end narco-trafficking without violence," Castano wrote.

In a follow-up e-mail, Castano said through an intermediary that he is pressuring traffickers to strike deals with U.S. prosecutors, and that he will seek eradication of coca once his combatants rout leftist guerrillas.

The issue now is whether Vega and Suarez struck up a private scheme on the side to defraud drug traffickers of huge sums of money.

According to the complaint against the two men, they collected one payment of $1 million "near the Miami International Airport" in early January, and Vega received $3 million in New York City a month earlier.

In a separate instance, one of Colombia's biggest alleged drug traffickers, Hernando Gomez, who is known as "Rasguno," or "Scratch," paid $5 million to Vega, the intelligence official

U.S. v. F. Ochoa 99-CR-6153
MOTION TO DISMISS
EXHIBIT 17 PAGE 4

said.

SCAM DENIED

Vega's attorney denies that his client scammed narcos.

"He didn't make millions of dollars," Rodriguez-Varela said, adding that much of the money went to finance DEA operations that resulted in "bringing in these heavyweights," referring to narcotics traffickers.

Vega and Suarez were under DEA supervision, he said.

"They should not blame **Baruch Vega** for actions of agents who may have been overzealous," he said.

The attorney for Castillo, the suspended DEA agent, differs sharply on what the two Colombian-born informants did.

"They used their position as confidential informants . . . to enrich themselves without the knowledge of the agents," Rosenbaum said.

**LOAD-DATE:** January 31, 2002

Source:  My Sources > News > **News Group File, All** ⓘ
Terms:  **baruch vega**  (Edit Search)
View:  Full
Date/Time:  Thursday, June 6, 2002 - 2:25 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 17, PAGE 5

.../retrieve?_m=5cf1e6d13b65e0186edbd2ba823e2d40&docnum=23&_fmtstr=FULL&_startdoc= 6/6/02

Document Links:
Start of Document

Copyright 2000 British Broadcasting Corporation
BBC Summary of World Broadcasts

August 14, 2000, Monday

**SECTION:** Part 5 Africa, Latin America, and the Caribbean; LATIN AMERICA AND THE CARIBBEAN; COLOMBIA; AL/D3918/L

**LENGTH:** 700 words

**HEADLINE:** Paramilitary leader denies talks with US Drug Enforcement Administration

**SOURCE:** Source: 'El Tiempo' web site, Bogota, in Spanish 10 Aug 00

**BODY:**
[13]

Text of report by Colombian newspaper 'El Tiempo' web site on 10th August

Paramilitary leader Carlos Castano told RCN Television last night that he did not negotiate with the DEA. But he said a drug trafficker he identified as Nicolas Vergonzoli relayed the message asking for cooperation in convincing Colombian traffickers to turn themselves in to legal authorities. "I told the drug traffickers that they were cooperating with the guerrillas and that sooner or later the AUC war [United Self Defence Groups of Colombia (paramilitaries)] would reach them. And I don't think this warning can go unnoticed by the drug traffickers." Castano admitted that the paramilitaries have benefited from taxes on drug trafficking, but he said that they have never asked for anything in exchange for the pressure they put on drug traffickers. Nor was he certain as to whether the DEA or any other US institution was intervening in the matter. "What I do know is that, if the US government opens the door for drug traffickers to turn themselves in and pay for their crimes, they should do it, because that would bring an end to the political conflict in Colombia."

Colombian Baruch Jairo Vega was responsible for the rumours about alleged contacts between Castano and the DEA. Vega is a former informant for various US security organizations. This paper revealed his identity. It was Vega who set up various meetings between members of the Colombian Mafia and DEA agents with the goal of getting drug lords to turn themselves in to US legal authorities. According to Vega, the DEA agents offered to aid Castano in his counter-guerrilla efforts if he would help get the drug lords (who currently finance the paramilitaries) to turn themselves over to US law officials. "The idea was that Carlos Castano would help stop drug trafficking in Colombia... [ellipsis as published] trying to get all the drug traffickers to stop and turn themselves in," Vega told RCN, which broadcast excerpts of the interview with Vega last night. Obviously if drug trafficking ceased, all Carlos's aid would be suspended. Someone had to subsidize the war, and the US government was going to be the one subsidizing Carlos' war," Baruch told RCN.

Castano explained during an interview with 'Nuevo Herald' that he reached an agreement with DEA agents David Tinsley and Larry Castillo through Nicolas Vergonzoli, a friend under his protection. He said they agreed to hold a meeting at a location on the Colombian border. Other, unidentified US officials were to be present. Castano told the 'Herald' that the meeting did not take place because US government representative **Baruch Vega** "turned the intervention into a petty 'profit making' business". "Vega bogged down a historic process," Castano said. The "para" leader added that the agreement consisted in pressuring and if possible threatening drug traffickers with death so that they would turn themselves in to US legal authorities.

Castano only gave the names of the two DEA agents that participated in the contacts. But Vega - who today faces charges in a court in southern Florida for obstruction of justice and money laundering - said that Bill Gomez and Artur Ventura, who work in the US embassy in Panama, also participated in the meetings. 'El Tiempo' reported on 16th April that Special Agent Castillo and Tinsley, supervisor of DEA's 43rd group in Miami, were suspended from their positions. According to Terry Parham, DEA spokesman in Washington, the decision is related to an investigation in a US federal court that implicates them in alleged false arrangements for subjection to authority that they were involved with for several months with Colombian drug lords.

Finally, Castano denied intelligence reports from Costa Rica, Colombia and Panama that his organization received 800 R-15 rifles from the United States. "That is absolutely false. I have never received a single rifle from any international institution. We obtain weapons on the black market or take them away from our enemies. We do not accept arms or military training from the United States, but I would ally myself with the devil in order to get rid of the guerrillas."

**LOAD-DATE:** August 15, 2000

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Your use of this service is governed by Terms & Conditions. Please review them.

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 19, PAGE 1

# Castaño's Televised Admission that He Is a Narco

**Translation from Television Interview with Castaño by Claudia Gurasatti of RCN TV in Colombia conducted last Spring**

**Note: This and other texts below are excerpted and translated from the version that appears on Castaño's own Spanish-language web site. There are numerous elipses in that version and we suspect that it may itself be excerpted:**

**http://www.colombialibre.org/**

**Interviewer: Señor Carlos Castaño, in our 7 p.m. broadcast we featured an interview with Baruk Vega, who at this moment is free on bail in the United States, investigated for making deals between Colombian drug traffickers and North American authorities. He publically admitted that your delegates of the Autodefensas (paramilitaries) have had conversations with US DEA agents. Why are the Autodefensas Unidas de Colombia (AUC) interested in getting close to US authorities?**

**Castaño: This kind of situation creates confusion. First I must make clear to the country that I have not supplied you with this information and I suppose that it comes from Baruk Vega's declarations, a supposed link between DEA agents and some drug traffickers that some important newspapers in this country have published. First, I have never had contact with members of the US Department of State or any other US agency, whether the CIA, FBI, DEA or any other. I have never spoken with them.**

**Simply, on one ocassion a rancher arrived with information in which he told me that he had a drug trafficker friend that was talking with some DEA agents that sent a message through him saying there had been a possibility to stop drug trafficking in Colombia. I listened attentively and saw that I could play an important role in this situation.**

**Interviewer: We are speaking of Nicolás Bergonzoli?**

**Castaño: We are speaking of Nicolás Bergonzoli.**

**Interviewer: Is he very close to you and the Autodefensas?**

**Castaño: He is a rancher who has plantations in Autodefensa regions and for that he has to contribute economically to the Autodefensas to enjoy the security that we provide. This man, it seems he had some connections with drug trafficking in the past, wanted to fix his problem. He spoke with the men of the DEA. I recieved the call that they made to me and it is that the United**

U.S. v F. OCHOA 99-CR-6153
MOTION TO DISMISS
EXHIBIT 19 PAGE 2

States has opened the door for Colombian narcos to submit themselves to North American justice and that, in any case, they needed an important force in Colombia to help in this so that these people would go their way.

I have been an enemy of drug trafficking. I always have said that drug trafficking is what sustains the political conflict in Colombia. What I have been involved in, and I said, *caramba!*, if there is the possibility to end drug trafficking without a bomb, without assassinating a Colombian, and the drug traffickers opt to submit themselves to North American justice, whether there is impunity or not, this is a question of US Justice. Drug trafficking essentially damages North Americans because that is where the drugs go.

It was then I gave a kind of ultimatum to the drug traffickers and told them, men, you are contributing to the guerrilla. Sooner or later the Autodefensas will get to you. In this order I gave, that caused some drug traffickers, through someone I don't know, as I don't know any of them, are alleged, simply...

Interviewer (interrupting): But what is your role in the mediation of this delivery by drug traffickers to US authorities?

Castaño: My role was not as mediator. My role was to make the drug traffickers understand that sooner or later, US support against subversion and the anti-subversive fight of the Autodefensas inevitably will get them. That puts us in a very complex situation. I have understood that the drug traffickers would go there, but they would go only if they receive less than five years in prison. I say this from the reports of Mr. Baruk Vega who was the supposed intermediary. I don't have any proof that this is the policy of the DEA as an institution, nor of the US government as a State, or whether, to the contrary, they were some isolated DEA agents. This shouldn't create confusion for the Colombian people because it is more speculative than real.

Interviewer: Even if they had more than 10 meetings in Central America and Caribbean islands with DEA agents like Larry Castillo, David Tinsley, Billy Gómez and Arthur Ventura?

Castaño: Well, I know what the Colombian newspapers and media have published... that there had been meetings between drug traffickers and DEA agents... It's public knowledge that there are some in the US who are disposed to do it. Now, my call is, if there is sensibility on the part of the US and Colombian governments and if the narcos want to go in a parade to the United States to turn themselves in, they will be received there. The problem of the narcos and the US government is what to do with them.

Why, then, would they abort a project that is so noble? I think that it's not about there being impunity nor that someone is tossing a life raft to the drug traffickers. No. I am friendly to the idea that if the violence can be stopped and that it doesn't lead to impunity this method is welcome.

Interviewer: Baruk Vega spoke of a memorandum that US authorities knew

U.S. v F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 19, PAGE 3                    10/23/02

about in which you asked them for military aid and advisors for the Autodefensas Unidas de Colombia. In exchange you would collaborate with this, with the delivery of these drug traffickers to North American justice...

Castaño: First, I am not delivering the drug traffickers. My war is against the subversives. To the extent that the drug traffickers continue supporting the guerrilla the confrontation will have to be brought to them. I think that they must opt for this process of submitting themselves.

With respect to the memo, I don't know about it. It would be wrong for me to ask for support of the US government when Robert Helmart, when doctor Madeleine Albright, are always saying that the Autodefensas are financed with drug trafficking. It can not be denied that the Colombian conflict is economic, that it has stopped being political, that it is sustained with an illicit economy. End the illicit economy of drug trafficking and the political conflict ends. Thus, I repeat: I think that, to the contrary, the attitude of some North Americans is as hostile toward me as it is toward the guerrilla.

Interviewer: Fighting against drug trafficking also could be a double-edged sword for you because in the end you have been very clear and have also recognized that the fight of the Autodefensas, your growth, has been sustained with illicit money. In part, it's not convenient to you that drug trafficking ends.

Castaño: It's important to the entire country that drug trafficking is stopped, for all Colombians. I believe that it is very important to advance the fight against drug trafficking, to advance against all forms of financing for this conflict, thus, I repeat, to stop drug trafficking is to end the conflict. It's not that it's convenient to me. What's good for me is what's good for the country. I am really a defender in the Autodefensas because we have a country in conflict. Without drug trafficking, we would return to social normality in this country.

Interviewer: Are you in the position to tell the country how much money comes to you for the entire chain of drug trafficking to the Autodefensas Unidas de Colombia?

Castaño: It's very difficult to measure, but I will give you statistics that in La Gabarra and in San Lucas there are 600 million in taxes collected from the coca growers and those two fronts collect the financing there. They have to finance the entire North Bloc of the AUC. This doesn't make me a drug trafficker, not in any way, I am a good and interesting example for the country....

Interviewer: Plan Colombia has begun. It's going to bring money for military aid to eradicate the crops. How do you receive it?

Castaño: With Satisfaction.

U.S v F. Ochoa, 99-CR-6153
Motion to Dismiss
Exhibit 19 Page 4

Secret Agent Man: Fashion Photographer Scores Big Off Pals In the Narcotics Trade — Baruch Vega Made Millions As a Federal Informant, But Was Justice Served? — A Private Jet to Panama City
By Jose de Cordoba
Staff Reporter of The Wall Street Journal

12/07/2000
The Wall Street Journal
A1
(Copyright (c) 2000, Dow Jones & Company, Inc.)

MIAMI BEACH, Fla. — For years, fashion photographer **Baruch Vega** jetted from Miami to Milan, shooting the industry's top models.

Few knew of Mr. Vega's off-the-books job, one that was far more lucrative — and dangerous. When he wasn't snapping collections for Versace or Valentino, Mr. Vega, a Colombian by birth and an engineer by training, was covertly meeting with some of the world's most-powerful drug traffickers, trying to persuade them to surrender to U.S. lawmen.

By most accounts, he was a star operative. "We regarded Vega as our principal weapon" in the battle against Colombia's drug cartels, says one former U.S. agent. "I think he was very successful," agrees retired cocaine kingpin Jorge Luis Ochoa, speaking by cellular phone from Colombia, where he recently completed a six-year prison term. "A lot of people got into his program and cooperated with him, and he with them."

So many, in fact, that a meeting brokered by Mr. Vega last year in a Panama hotel drew more than two dozen drug dealers or their representatives, according to Mr. Vega and the lawyer for one of the suspects. Rattled by a new Colombian policy permitting traffickers to h  extradited to the U.S., they met in marathon sessions with Drug Enforcement Administration agents, negotiating plea agreements that   .ld potentially net them reduced jail terms in exchange for providing information on drug shipments by other traffickers.

But in March, Mr. Vega's secret life unraveled. As he was unpacking from a photo shoot, agents from the Federal Bureau of Investigation burst into his penthouse and arrested him on money-laundering and obstruction-of-justice charges. In a criminal complaint filed in Miami federal court, the government accused him of receiving million-dollar fees from drug lords, in return for promising to use his influence with U.S. agents — and even bribes — to help them with their legal problems. The name he gave the operation, according to the complaint: "The Narcotics Traffickers Rehabilitation Program."

Mr. Vega, a trim 53-year-old who favors black T-shirts, readily admits he accepted the traffickers' money, which he says totaled about $4 million, but which others familiar with his midwifery put at as much as $40 million. Mr. Vega says he took the payments as part of his undercover persona, and that his law-enforcement handlers knew it. He also denies paying any bribes. "The agents I worked with used to joke: `Baruch, we trained to put people in jail, but with you, we get them out,'" he says.

However the case sorts out, Mr. Vega's story offers a rare look into the twilight world of the narcotics informant — and into the questionable relationships and accommodations U.S. authorities sometimes enter into as they pursue the global war on drugs. Already, it is proving an acute embarrassment to the DEA, which has placed two agents on paid leave pending an internal investigation of their relationship with Mr. Vega. And it comes at a delicate time, just as the U.S. government begins to implement a $1.3 billion program to fight the narcotics trade underpinning Colombia's bloody civil war.

Because of the highly secretive nature of undercover operations — and law enforcement's reluctance to disclose the details of cooperation agreements with drug suspects — it's impossible to answer the central question of whether traffickers who paid fees to Mr. Vega received special treatment from the U.S. justice system. No evidence has been presented that any agents accepted bribes. But what can be pieced together, through court documents and interviews with Mr. Vega and others involved in his career, suggests at the very least a highly unorthodox operation that took on a life of its own, fueled by piles of underworld cash.

In a brief statement, the DEA says it is "very concerned about the allegations . . . concerning the conduct of certain DEA agents." It declines to comment further, citing a continuing investigation. The Justice Department also declines to comment.

Mr. Vega became a law enforcement go-between almost by accident. He was working in New York City in 1976 as a structural engineer when a neighbor and fellow Colombian was arrested in a police raid. The neighbor's wife tearfully sought Mr. Vega's help. Mr. Vega, who was studying law at night, had befriended a fellow student then working at the FBI. According to Mr. Vega, his friend said the case against the neighbor appeared weak, and charges would probably be dropped soon. They were.

The grateful neighbor, who was indeed involved in the cocaine trade, gave Mr. Vega $20,000 for what he believed was a successful intervention. Word of Mr. Vega's supposed clout began to spread, and he soon met many of the future capos of Colombia's drug cartels, most of whom who were then living in New York.

By 1978, Mr. Vega was dividing his time between New York and Miami, which was immersed in the violence and decadence later made famous by the television show "Miami Vice." "There were the beautiful people, cocaine, models, the fast life," says Sgt. June Hawkins, now a supervisor in the homicide unit of the Miami-Dade police department. There were also lots of unsolved murders involving Colombians with false names. "They were who-isits, not who-dunnits," says Sgt. Hawkins.

After finding Mr. Vega's name and number in the phone book of one victim, police discovered he was often able to identify the who-isits.

At the time, Mr. Vega was married to the daughter of a real-estate tycoon who counted among , properties the Mutiny Hotel, then a favorite watering hole for many of the city's most-notorious characters.

Mr. Vega lived the Miami lifestyle, with a mansion off Miami Beach and a 78-foot yacht named the Abby Sue. "He was a real charmer," remembers Sgt. Hawkins, then a member of Centac 26, a joint federal, state and local police antidrug task force. "A wheeler-dealer extraordinaire who could sell snow to the Eskimos."

Mr. Vega's charm was enhanced by his willingness to fund his own activities, a welcome contrast to most informants, whom police tend to view as money-grubbing low-lifes. Former Centac commander Raul Diaz says Mr. Vega aided in one of the unit's biggest cases ever, at great personal risk, and "didn't get any money from us for his help."

By 1985, the Miami police introduced Mr. Vega to the FBI, where agents determined to make use of his access to the highest echelons of Colombia's drug circles. Mr. Vega – who prefers to be called a "mediator" rather than an informant – was perfect for the job of double agent. He had turned a lifelong interest in photography into a career as a fashion photographer and producer of fashion shows. That gave him access to the beautiful women and glamorous social circles that dazzled drug traffickers.

Meanwhile, a former U.S. official says federal agents helped concoct Mr. Vega's cover: a jet-setting playboy who for a price would exert his influence with U.S. law-enforcement agencies. To aid Mr. Vega's deception, the former official says, agents would make leniency recommendations to prosecuting attorneys and judges in the cases of drug traffickers working with Mr. Vega. The result: Colombia's drug barons believed Mr. Vega could do anything.

The official insists that defendants received no special favors, but that they truly rendered assistance in investigations and that prosecutors, using their broad discretion, argued for sentence reductions commensurate with the level of cooperation. This official and Mr. Vega add that the appearance of impropriety was part of the act — that hardened criminals were much more likely to take the first step ard cooperating if they thought the U.S. system was rigged in their favor.

Nevertheless, a senior federal agent familiar with the case says such an arrangement would likely have violated Justice Department guidelines. Allowing Mr. Vega to represent himself as someone with influence over U.S. prosecutors and other officials "is totally unacceptable," he says. He adds that informants shouldn't be in a position to accept cash from drug traffickers without supervision — although he allows that such oversight is hard to maintain when the case involves work in dangerous foreign countries.

Among the people Mr. Vega says he helped is Luis Javier Castano Ochoa, now a federal deputy in Colombia's Congress. In 1988, Mr. Castano Ochoa pleaded guilty to U.S. money laundering and drug charges and was sentenced to 16 years. But three years later, the same Miami judge who sentenced him let him off with time served. Mr. Vega says he met with Mr. Castano Ochoa in prison, charging him $40,000 to help him work out a cooperation agreement with the government.

Reached by telephone in Bogota, Mr. Castano Ochoa says he never paid Mr. Vega a cent, but knew him as a lawyer who visited prison "to ask Colombians for money to advise us." Mr. Castano Ochoa says he never cooperated with the U.S. government, and says he was freed because the judge "realized there was nothing against me."

That the drug dealers were paying Mr. Vega for his purported services was an open secret among the U.S. agents working with him, says one former official. Indeed, some saw it as a plus, given their tight budget. "The drug traffickers paid him to be their representative," says 'former official. "We didn't have to spend any government funds; we never could have afforded the level he was spending."

In any case, Mr. Vega's results seem to have outweighed any misgivings. In 1987, when cartel hit men almost killed a former Colombian attorney general, Mr. Vega was able to learn the names of the would-be assassins, says the former official. In 1989, the FBI asked Mr. Vega to look into reports that drug dealers were planning to blow up President George Bush's plane during a trip to Colombia, says the former U.S. official. The feedback: The hit was off.

Mr. Vega even lived the life of a country squire, courtesy of the U.S. government, which set him up from 1988 to 1991 in a fancy ranch in Eustis, Fla., that had been confiscated from a drug dealer. Renamed "El Lago," the ranch boasted Paso Fino show horses, highly prized as status symbols among Colombian drug dealers. In fact, the operation was really an undercover sting conducted by a task force composed of members of the Internal Revenue Service, the FBI and the Lake County Police Department.

During those years, Mr. Vega entertained a long stream of drug capos at El Lago. "Drug dealers used to drop off their horses and say, 'Train them for me, Baruch,'" says an active U.S. law-enforcement official. The task force mostly gathered intelligence, and Mr. Vega helped induce an important money launderer to cooperate with U.S. authorities, says a federal law-enforcement official.

"Baruch is a brave man," says retired Lake County Police Capt. Fred Johnson. "I think the world of this guy."

He was also industrious. Under Mr. Vega's management, the El Lago facility became one of the largest Paso Fino ranches in the U.S. The ranch remained government property, but Mr. Vega says he paid for numerous capital improvements, including new corrals and stables. During this time, Mr. Vega says he did receive about $70,000 as his percentage of the haul from money-laundering stings, but added that he also continued to receive fees from drug traffickers.

In 1997, Mr. Vega's work came to the attention of David Tinsley, a senior supervisor at the DEA's Miami office. People who know Mr. Tinsley describe the 27-year veteran of law enforcement to be a hyperkinetic, dedicated and sometimes zealous agent. With Mr. Tinsley,

an expert on drug-money laundering, Mr. Vega's work picked up considerably – especially so    er a Miami federal grand jury indicted 31 Colombian drug traffickers in October last year.

Billed as an enormous blow to Colombia's drug cartels, the so-called Millennium indictment came at a time of great confusion in the narcotics trade. Colombia's congress had recently changed the law to allow drug traffickers to be extradited to the U.S., where they couldn't readily pay off judges. A stampede of Colombians arrived at Mr. Vega's door; some had already been indicted and others feared they could be next. All sought the sort of edge that Mr. Vega purported to offer.

"There were 200 drug dealers who wanted to surrender to American justice and make a deal," says Mr. Vega.

For the DEA's Mr. Tinsley, the panic was a once-in-a-lifetime opportunity to strike a crushing blow against the drug trade, says Richard Sharpstein, his lawyer. "Tinsley believed they had the highest-level drug dealers in the world willing to cooperate at a level never seen before," says Mr. Sharpstein.

In the following months, Mr. Vega was constantly on an airplane, shuttling between Panama and Miami, brokering meetings between DEA agents and drug traffickers anxious to make their peace with the U.S., according to interviews with meeting participants and statements by lawyers for drug dealers submitted to the FBI. He was such a frequent flier that last November, he plunked down $250,000 toward the lease-purchase of a seven-passenger Hawker jet, Mr. Vega says.

Panamanian flight manifests show that on many occasions he was accompanied on his jet by DEA agent Larry Castillo of the agency's Miami office. Mr. Castillo has been placed on administrative leave with pay, pending the result of an internal DEA probe, along with Mr. Tinsley. Mr. Castillo's lawyer declines to comment.

The FBI complaint says that soon after the Millennium indictment, Mr. Vega orchestrated a meeting at Panama's Miramar Intercontinental   l between an alleged drug dealer and U.S. agents. "Vega told the CW [confidential witness] that he had U.S. officials in the hotel room next door and arranged for the CW to meet with them. The CW then met with four DEA agents and a Miami police officer."

During the meeting, the confidential witness – whom Mr. Vega and several other individuals familiar with the case say is Carlos Ramon, an alleged drug trafficker known as "the Doctor" – discussed with the agents the procedures for his possible surrender, the complaint says.

Mr. Ramon, under indictment in Miami for conspiracy to import and distribute cocaine, wasn't alone. More than two dozen Colombian traffickers or their representatives were locked in similar marathon meetings in a suite of rooms rented by Mr. Vega on various floors of the Miramar, according to meeting participants.

Four months later, Mr. Ramon surrendered to authorities in Miami, but only after a farewell dinner at the trendy China Grill, for which Mr. Vega says he picked up the $1,000 tab. After spending a month in jail, Mr. Ramon, who is cooperating with U.S. authorities, posted bail. He now lives in Miami Beach's luxury Portofino Tower, according to court papers.

Federal investigators are now trying to trace the path of the money Mr. Vega generated from traffickers. Mr. Vega says more than $5 million wound up with Daniel Forman, a well-respected Miami defense lawyer, as legal fees to represent Mr. Ramon and 18 other accused traffickers.

Mr. Forman appears to have played an important role in Mr. Vega's final months as an informant. The defense attorney was brought into the case at the insistence of the DEA's Mr. Tinsley, who needed someone who would move the plea negotiations along without raising a lot of objections, according to Mr. Vega. The informant says he quickly became "50-50 partners" with the defense attorney, with Mr. Vega herding in clients and splitting the fees with Mr. Forman. Flight manifests show that Mr. Forman flew several times from Panama to Florida in the company of Messrs. Vega and Castillo.

Mr. Forman, in an e-mail, strongly denied that Mr. Vega relayed legal fees to him, adding that "Mr. Vega is not, and has never been, my partner in any sense of the word." He declines to comment on his clients, except to say that the government didn't attempt to interfere with his representation of them.

Mr. Tinsley's lawyer, Mr. Sharpstein, says his client brought Mr. Forman into the case because he had worked with Mr. Forman when the latter was a federal prosecutor and then as a defense attorney. "He trusts Forman and still believes in him," says Mr. Sharpstein

As for the financial arrangements, Mr. Sharpstein says Mr. Tinsley had no idea Mr. Vega was receiving money from traffickers, and wouldn't have allowed it had he known. Mr. Tinsley's understanding was that Mr. Vega would receive a percentage of the value of assets seized by law enforcement, a more-traditional method of compensating informants, says Mr. Sharpstein. "Unfortunately," he adds, "it's not in writing."

Apart from the controversy over money, Mr. Vega's wheeling and dealing caused rising tension in the law-enforcement community. Under a 10-year-old program, all cooperation agreements with major drug traffickers are supposed to be cleared through the Justice Department's secretive "Blitz Committee" to ensure that criminals don't pit one agency or prosecutor against another in search of the best deal. A senior committee member declines to comment on Mr. Vega.

But federal agents outside Mr. Tinsley's small DEA group grew increasingly upset as Mr. Vega breezed through their turf. One was Ed

Kacerosky, a driven and highly decorated U.S. Customs agent known for his work leading to the ↓97 indictment of the Cali cocaine cartel

Now a supervisor in the agency's Miami office, Mr. Kacerosky didn't take it well when Mr. Vega tried to help the daughter of late Cali drug lord Jose Santacruz obtain U.S. resident visas for her family. At a meeting brokered by Mr. Vega and attended by Mr. Kacerosky and other U.S. officials, Sandra Santacruz offered to give the U.S. half of some $120 million her family held in accounts around the world in exchange for the visas, say U.S. officials. The U.S. turned down the offer.

Last year, Mr. Kacerosky became enraged upon learning that Mr. Vega had approached Miguel Rodriguez Orejuela, a former leader of the Cali cartel, in a Colombian prison. People familiar with the matter say Mr. Vega offered to help Mr. Rodriguez Orejuela's son William – under indictment in Miami on U.S. drug charges – in return for information on possible high-level Colombian police corruption.

Mr. Kacerosky, these people say, blames William Rodriguez for the brutal 1995 torture and killing of the wife of a key informant. After the prison meeting, these people say, Mr. Kacerosky wrote an eight-page memo to his superiors sparking the investigation of Mr. Vega.

Mr. Vega's activities also played into a growing feud between the DEA's Bogota detachment and Mr. Tinsley's Miami-based crew. The Colombia-based agents largely responsible for last year's Millennium indictment were unhappy that the alleged criminals they had long been stalking were working out deals with Miami-based agents appearing to poach on their turf with Mr. Vega's help.

Hearing on Oct. 21, 1999, that Bogota-based DEA agents were heading for Panama to crash the Miramar dealer summit, Mr. Vega says he and Mr. Tinsley cleared the traffickers out of the hotel for fear of their arrest.

"There's a common distrust between DEA Bogota and DEA Miami," says Mr. Sharpstein, Mr. Tinsley's lawyer. "The Bogota agents were jealous of Miami agents racking up these cases."

Today, Mr. Vega is officially off limits to U.S. law enforcement. When the FBI charged him in March, authorities froze a Miami bank account in his name containing $1.5 million. Though most condemn Mr. Vega's alleged illegal enrichment, some agents believe his fall is undeserved after such a long career in a world whose common coin is often a violent death.

As fear and controversy swirl around him, Mr. Vega sits in his Miami Beach penthouse, wearing an ankle monitoring device and fielding phone calls from models in Greece and designers in Paris. "I will be in Miami for the rest of the season. Same place, same apartment," he tells a model who calls to commiserate. "I have a bunch of pictures for you. They used the one with the bathing suit. It looks very nice."

..................................................................................................................

**U.S. Sought Help Of a Pariah Army, According to Vega**
By Jose de Cordoba

12/07/2000
The Wall Street Journal
A16
(Copyright (c) 2000, Dow Jones & Company, Inc.)

One of the more-intriguing cases worked by former DEA informant Baruch Vega involves a close associate of Carlos Castano, leader of a right-wing paramilitary force which human-rights activists blame for hundreds of extrajudicial killings in Colombia.

Mr. Vega's account, confirmed by others familiar with the case, provides new evidence that U.S. authorities have sought help from the warlord in the war on drugs -- despite the fact that the DEA has described Mr. Castano as a major drug trafficker himself. Such an overture would run counter to official U.S. policy of not dealing with Mr. Castano or his 7,000-strong United Self-Defense Forces of Colombia.

The case involves Nicolas Bergonzoli, a Colombian cattleman and crony of Mr. Castano who was indicted in Connecticut in 1991 for conspiracy to import and distribute 1,500 kilos of cocaine belonging to the late drug kingpin Pablo Escobar.

In December of 1998, says Mr. Vega, Mr. Bergonzoli flew to Fort Lauderdale on a jet chartered by Mr. Vega. After an initial appearance in a closed Miami federal courtroom, he was released on bond a day later. People close to the case say Mr. Bergonzoli is working out a plea agreement with U.S. officials. Mr. Vega says Mr. Bergonzoli paid him $200,000 for his help.

No direct meetings took place between Mr. Castano and U.S. officials, Mr. Vega says. Instead, the DEA sought to use Mr. Bergonzoli to persuade Mr. Castano to encourage drug traffickers operating in his territory to surrender to U.S. authorities. Mr. Vega says he acted as a translator in some of the discussions.

The DEA declines comment, but Richard Sharpstein, the lawyer for suspended DEA supervisor David Tinsley, confirms that various meetings between Messrs. Bergonzoli and Tinsley took place between December 1998 and February 2000 in Florida and Costa Rica.

Mr. Castano, who declined to answer written questions, told a Colombian television reporter in August that Mr. Bergonzoli asked him on behalf of the DEA to pressure drug dealers to surrender to U.S. officials through Mr. Vega. "I gave the drug dealers a sort of ultimatum," Mr. Castano said: to turn themselves in or become targets of war.

Gerardo Reyes, who has written extensively on the Vega case for Miami's Spanish-language El Nuevo Herald, says Mr. Castano told him that a delegation of U.S. officials was planning to meet with him somewhere on the Panama-Colombia border to further discuss the operation.

Joaquin Perez, who has represented Mr. Bergonzoli, says he believes Colombian traffickers were stampeding toward Mr. Vega mostly "because Carlos Castano was pushing them."

Mr. Castano is widely considered to be among Colombia's worst human-rights violators. Amnesty International asserts that about 75% of the estimated 3,500 political killings that took place in Colombia in 1999 are traceable to his men.

The DEA has also accused him of narcotics trafficking. In February, William E. Ledwith, the agency's chief of international operations, told a Congressional hearing that "the Carlos Castano organization, and possibly other paramilitary groups, appear to be directly involved in processing cocaine."

While calling himself "an enemy of drug trafficking," Mr. Castano himself has acknowledged that his movement receives much of its funds from drug traffickers and growers, who pay "war taxes" to operate in territory controlled by his militia.

A Big Score – and a Bust – Fashion Photographer Made Millions as Drug-Trafficking ...formant – A Guy 'Who Could Sell Snow to the Eskimos'
By Jose de Cordoba
Staff Reporter

12/08/2000
The Wall Street Journal Europe
25
(Copyright (c) 2000, Dow Jones & Company, Inc.)

MIAMI BEACH, Florida For years, fashion photographer **Baruch Vega** jetted from Miami to Milan, working with the industry's top models. Few knew of Mr. Vega's off-the-books job, one that was far more lucrative – and dangerous. When he wasn't photographing collections for Versace or Valentino, Mr. Vega, a Colombian by birth and an engineer by training, was covertly meeting with some of the world's most powerful drug traffickers, trying to persuade them to surrender to U.S. officials.

By most accounts, he was a star operative. "We regarded Vega as our principal weapon" in the battle against Colombia's drug cartels, says one former U.S. agent. "I think he was very successful," agrees retired cocaine kingpin Jorge Luis Ochoa, speaking from Colombia, where he recently completed a six-year prison term. "A lot of people got into his program and cooperated with him, and he with them."

So many, in fact, that a meeting brokered by Mr. Vega last year in a Panama hotel drew more than two dozen drug dealers or their representatives, according to Mr. Vega and the lawyer for one of the suspects. Rattled by a new Colombian policy permitting traffickers to be extradited to the U.S., they met in marathon sessions with agents of the U.S. Drug Enforcement Administration, negotiating plea agreements that would potentially net them reduced jail terms in exchange for providing information on drug shipments by other traffickers.

 in March, Mr. Vega's secret life unraveled. As he was unpacking from a photo shoot, agents from the U.S. Federal Bureau of Investigation burst into his penthouse and arrested him on charges of money laundering and obstruction of justice. In a criminal complaint filed in Miami federal court, the U.S. government accused him of receiving million-dollar fees from drug lords in return for promising to use his influence with U.S. agents – and even bribes – to help them with their legal problems. The name he gave the operation, according to the complaint: "The Narcotics Traffickers Rehabilitation Program."

Mr. Vega readily admits he accepted the traffickers' money, which he says totaled about $4 million (4.5 million euros), but which others familiar with his role put at as much as $40 million. Mr. Vega says he took the payments as part of his undercover persona, and that his law-enforcement handlers knew it. He also denies paying any bribes. "The agents I worked with used to joke: 'Baruch, we trained to put people in jail, but with you, we get them out,' " he says.

However the case sorts out, Mr. Vega's story offers a rare look into the twilight world of the narcotics informant, and into the questionable relationships and accommodations U.S. authorities sometimes enter into as they pursue the global war on drugs. Already, it is proving an acute embarrassment to the Drug Enforcement Administration, which has placed two agents on paid leave pending an internal investigation of their relationship with Mr. Vega. And it comes at a delicate time, just as the U.S. government begins to implement a $1.3 billion program to fight the narcotics trade underpinning Colombia's bloody civil war.

Because of the highly secretive nature of undercover operations, and law-enforcement officials' reluctance to disclose the details of peration agreements with drug suspects – it is impossible to answer the central question of whether traffickers who paid fees to Mr. Vega received special treatment from the U.S. justice system. No evidence has been presented that any agents accepted bribes. But what can be pieced together, through court documents and interviews with Mr. Vega and others involved in his career, suggests at the very least a highly unorthodox operation that took on a life of its own, fueled by piles of underworld cash.

In a brief statement, the Drug Enforcement Administration says it is "very concerned about the allegations . . . concerning the conduct of certain DEA agents." It declines to comment further, citing a continuing investigation. The U.S. Justice Department also declines to comment.

Mr. Vega became a law-enforcement go-between almost by accident. He was working in New York in 1976 as a structural engineer when a neighbor and fellow Colombian was arrested in a police raid. The neighbor's wife sought Mr. Vega's help. Mr. Vega, who was studying law at night, had befriended a fellow student then working at the FBI. According to Mr. Vega, his friend said the case against the neighbor appeared weak, and charges would probably be dropped soon. They were.

The grateful neighbor, who was indeed involved in the cocaine trade, gave Mr. Vega $20,000 for what he believed was a successful intervention. Word of Mr. Vega's supposed clout began to spread, and he soon met many of the future capos of Colombia's drug cartels, most of whom were then living in New York.

By 1978, Mr. Vega was dividing his time between New York and Miami, which was immersed in violence and decadence. "There were the beautiful people, cocaine, models, the fast life," says Sgt. June Hawkins, now a supervisor in the homicide unit of the Miami-Dade police department. There were also lots of unsolved murders involving Colombians with false names.

After finding Mr. Vega's name and number in the phone book of one victim, police discovered he was often able to identify the victims. At the time, Mr. Vega was married to the daughter of a real-estate tycoon who counted among his properties the Mutiny Hotel, then a favorite watering hole for many of the city's most notorious characters.

Mr. Vega lived the Miami lifestyle, with a mansion off Miami Beach and a yacht. "He was a real charmer," remembers Sgt. Hawkins, then a member of Centac 26, a joint federal, state and local police antidrug task force. "A wheeler-dealer extraordinaire who could sell snow to the Eskimos."

Mr. Vega's charm was enhanced by his willingness to fund his own activities, a welcome contrast to most informants, whom police tend to view as money-grubbing lowlifes. Former Centac commander Raul Diaz says Mr. Vega aided in one of the unit's biggest cases ever, at great personal risk, and "didn't get any money from us for his help."

By 1985, the Miami police introduced Mr. Vega to the FBI, where agents determined to make use of his access to the highest echelons of Colombia's drug circles. Mr. Vega – who prefers to be called a "mediator" rather than an informant – was perfect for the job of double agent. He had turned a lifelong interest in photography into a career as a fashion photographer and producer of fashion shows. That gave him access to the beautiful women and glamorous social circles that dazzled drug traffickers.

Meanwhile, a former U.S. official says federal agents helped concoct Mr. Vega's cover: a jet-setting playboy who, for a price, would exert his influence with U.S. law-enforcement agencies. To aid Mr. Vega's deception, the former official says, agents would make leniency recommendations to prosecuting attorneys and judges in the cases of drug traffickers working with Mr. Vega. Colombia's drug barons came to believe Mr. Vega could do anything.

The official insists that defendants received no special favors, but that they truly rendered assistance in investigations and that prosecutors, using their broad discretion, argued for sentence reductions commensurate with the level of cooperation. This official and Mr. Vega add that the appearance of impropriety was part of the act — that hardened criminals were much more likely to take the first step toward cooperating if they thought the U.S. system was rigged in their favor.

Nevertheless, a senior federal agent familiar with the case says such an arrangement would likely have violated Justice Department guidelines. Allowing Mr. Vega to represent himself as someone with influence over U.S. prosecutors and other officials "is totally unacceptable," he says. He adds that informants shouldn't be in a position to accept cash from drug traffickers without supervision, although he allows that such oversight is hard to maintain when the case involves work in dangerous foreign countries.

Among the people Mr. Vega says he helped is Luis Javier Castano Ochoa, now a federal deputy in Colombia's Congress. In 1988, Mr. Castano Ochoa pleaded guilty to U.S. money-laundering and drug charges and was sentenced to 16 years in jail. But three years later, the same Miami judge who sentenced him freed him. Mr. Vega says he met with Mr. Castano Ochoa in prison, charging him $40,000 to help him work out a cooperation agreement with the government.

Reached by telephone in Bogota, Mr. Castano Ochoa says he never paid Mr. Vega a cent, but knew him as a lawyer who visited prison "to ask Colombians for money to advise us." Mr. Castano Ochoa says he never cooperated with the U.S. government, and says he was freed because the judge "realized there was nothing against me."

That the drug dealers were paying Mr. Vega for his purported services was an open secret among the U.S. agents working with him, says one former official. Indeed, some saw it as a plus, given their tight budget.

"The drug traffickers paid him to be their representative," says the former official. "We didn't have to spend any government funds; we never could have afforded the level he was spending."

In any case, Mr. Vega's results seem to have outweighed his misgivings. In 1987, when cartel assassins almost killed a former Colombian attorney general, Mr. Vega was able to learn their names, says the former official. In 1989, the FBI asked Mr. Vega to look into reports that drug dealers were planning to blow up U.S. President George Bush's plane during a trip to Colombia, says the former U.S. official. The feedback: The hit was off.

Mr. Vega even lived the life of a country squire, courtesy of the U.S. government, which set him up from 1988 to 1991 in a fancy ranch in Eustis, Florida, that had been confiscated from a drug dealer. The ranch, renamed El Lago, boasted Paso Fino show horses, highly prized as status symbols among Colombian drug dealers. The operation was a sting conducted by a task force composed of members of the U.S. Internal Revenue Service, the FBI and the Lake County Police Department.

During those years, Mr. Vega entertained a long stream of drug capos at El Lago. "Drug dealers used to drop off their horses and say, 'Train them for me, Baruch,' " says an active U.S. law-enforcement official. The task force mostly gathered intelligence, and Mr. Vega helped induce an important money launderer to cooperate with U.S. authorities, says a federal law-enforcement official.

"Baruch is a brave man," says retired Lake County Police Capt. Fred Johnson. "I think the world of this guy."

He was also industrious. Under Mr. Vega's management, the El Lago facility became one of the largest Paso Fino ranches in the U.S. The ranch remained government property, but Mr. Vega says he paid for numerous capital improvements, including new corrals and stables. During this time, Mr. Vega says he received about $70,000 as his percentage of the haul from money-laundering stings, but he adds that he also continued to receive fees from drug traffickers.

In 1997, Mr. Vega's work came to the attention of David Tinsley, a senior supervisor at the DEA's Miami office. With Mr. Tinsley, an expert on drug-money laundering, Mr. Vega's work picked up considerably, especially after a Miami federal grand jury indicted 31 Colombian drug traffickers in October of last year.

Billed as an enormous blow to Colombia's drug cartels, the indictments came at a time of g     confusion in the narcotics trade. Colombia's Congress had recently changed the law to allow drug traffickers to be extradited to the U.S., where they couldn't readily pay off judges. A stampede of Colombians arrived at Mr. Vega's door; some had already been indicted and others feared they could be next. All sought the sort of edge Mr, Vega purported to offer.

"There were 200 drug dealers who wanted to surrender to American justice and make a deal," says Mr. Vega.

For the DEA's Mr. Tinsley, the panic was a once-in-a-lifetime opportunity to strike a crushing blow against the drug trade, says Richard Sharpstein, his lawyer. "Tinsley believed they had the highest-level drug dealers in the world willing to cooperate at a level never seen before," says Mr. Sharpstein.

In the following months, Mr. Vega was constantly on an airplane, shuttling between Panama and Miami, brokering meetings between DEA agents and drug traffickers anxious to make their peace with the U.S., according to interviews with meeting participants and statements by lawyers for drug dealers submitted to the FBI. He was such a frequent flier that in November he plunked down $250,000 toward the lease-purchase of a seven-passenger Hawker jet, Mr. Vega says.

Panamanian flight manifests show that on many occasions he was accompanied on his jet by DEA agent Larry Castillo of the agency's Miami office. Mr. Castillo has been placed on administrative leave with pay, pending the result of an internal DEA probe, along with Mr. Tinsley. Mr. Castillo's lawyer declines to comment.

The FBI complaint says that soon after the watershed indictments, Mr. Vega orchestrated a meeting at Panama's Miramar Intercontinental Hotel between an alleged drug dealer and U.S. agents. "Vega told the CW (confidential witness) that he had U.S. officials in the hotel room next door and arranged for the CW to meet with them. The CW then met with four DEA agents and a Miami police officer."

.ing the meeting, the confidential witness – whom Mr. Vega and several other individuals familiar with the case say is Carlos Ramon, an alleged drug trafficker – discussed with the agents the procedures for his possible surrender, the complaint says.

Mr. Ramon, under indictment in Miami for conspiracy to import and distribute cocaine, wasn't alone. More than two dozen Colombian traffickers or their representatives were locked in similar marathon meetings in a suite of rooms rented by Mr. Vega on various floors of the Miramar, according to meeting participants.

Four months later, Mr. Ramon surrendered to authorities in Miami, but only after a farewell dinner at the trendy China Grill, for which Mr. Vega says he picked up the $1,000 tab. After spending a month in jail, Mr. Ramon, who is cooperating with U.S. authorities, posted bail. He now lives in Miami Beach's luxury Portofino Tower, according to court papers.

U.S. investigators are now trying to trace the path of the money Mr. Vega generated from traffickers. Mr. Vega says more than $5 million wound up with Daniel Forman, a Miami defense lawyer, as legal fees to represent Mr. Ramon and 18 other accused traffickers.

Mr. Forman appears to have played an important role in Mr. Vega's final months as an informant. The defense attorney was brought into the case at the insistence of the DEA's Mr. Tinsley, who needed someone who would move the plea negotiations along without raising a lot of objections, according to Mr. Vega. The informant says he quickly became "50-50 partners" with the defense attorney, with Mr. Vega ᵗ⁻ʳding in clients and splitting the fees with Mr. Forman. Flight manifests show that Mr. Forman flew several times from Panama to Florida *he company of Messrs. Vega and Castillo.

Mr. Forman strongly denies that Mr. Vega relayed legal fees to him, saying that "Mr. Vega is not, and has never been, my partner in any sense of the word." He declines to comment on his clients, except to say that the government didn't attempt to interfere with his representation of them.

Mr. Tinsley's lawyer, Mr. Sharpstein, says his client brought Mr. Forman into the case because he had worked with Mr. Forman when the latter was a federal prosecutor and then as a defense attorney. "He trusts Forman and still believes in him," says Mr. Sharpstein

As for the financial arrangements, Mr. Sharpstein says Mr. Tinsley had no idea Mr. Vega was receiving money from traffickers, and wouldn't have allowed it had he known. Mr. Tinsley's understanding was that Mr. Vega would receive a percentage of the value of assets seized by law-enforcement officials, a more traditional method of compensating informants, says Mr. Sharpstein. "Unfortunately," he adds, "it's not in writing."

Apart from the controversy over money, Mr. Vega's wheeling and dealing caused rising tension in the law-enforcement community. Under a 10-year-old program, all cooperation agreements with major drug traffickers are supposed to be cleared through the Justice Department's secretive Blitz Committee to ensure that criminals don't pit one agency or prosecutor against another in search of the best deal. A senior committee member declines to comment on Mr. Vega.

But federal agents outside Mr. Tinsley's small DEA group grew increasingly upset as Mr. Vega breezed through their turf. One was Ed Kacerosky, a decorated U.S. Customs agent known for his work leading to the 1997 indictment of the Cali cocaine cartel.

Now a supervisor in the agency's Miami office, Mr. Kacerosky didn't take it well when Mr. Vega tried to help the daughter of late Cali drug lord Jose Santacruz obtain U.S. resident visas for her family. At a meeting brokered by Mr. Vega and attended by Mr. Kacerosky and other U.S. officials, Sandra Santacruz offered to give the U.S. half of some $120 million her family held in accounts around the world in

exchange for the visas, say U.S. officials. The U.S. turned down the offer.

Last year, Mr. Kacerosky became enraged upon learning that Mr. Vega had approached Miguel Rodriguez Orejuela, a former leader of the Cali cartel, in a Colombian prison. People familiar with the matter say Mr. Vega offered to help Mr. Rodriguez Orejuela's son William -- under indictment in Miami on U.S. drug charges -- in return for information on possible high-level Colombian police corruption.

Mr. Kacerosky, these people say, blames William Rodriguez for the 1995 torture and killing of the wife of a key informant. After the prison meeting, these people say, Mr. Kacerosky wrote an eight-page memo to his superiors sparking the investigation of Mr. Vega.

Mr. Vega's activities also played into a growing feud between the DEA's Bogota detachment and Mr. Tinsley's Miami-based crew. The Colombia-based agents largely responsible for the October 1999 watershed indictments were unhappy that the alleged criminals they had long been stalking were working out deals with Miami-based agents appearing to poach on their turf with Mr. Vega's help.

Hearing on Oct. 21, 1999, that Bogota-based DEA agents were heading for Panama to crash the Miramar dealer summit, Mr. Vega says he and Mr. Tinsley cleared the traffickers out of the hotel for fear of their arrest.

"There's a common distrust between DEA Bogota and DEA Miami," says Mr. Sharpstein, Mr. Tinsley's lawyer. "The Bogota agents were jealous of Miami agents racking up these cases."

Today, Mr. Vega is officially off-limits to U.S. law enforcement. When the FBI charged him in March, authorities froze a Miami bank account in his name containing $1.5 million. Though most condemn Mr. Vega's alleged illegal enrichment, some agents believe his fall is undeserved after such a long career in a world littered with violent deaths.

'ear and controversy swirl around him, Mr. Vega sits in his Miami Beach penthouse, wearing an ankle monitoring device and fielding ⎣...⎦one calls from models in Greece and designers in Paris. "I will be in Miami for the rest of the season. Same place, same apartment," he tells a model who calls to commiserate. "I have a bunch of pictures for you. They used the one with the bathing suit. It looks very nice."

*Copyright © 2000 Dow Jones & Company, Inc. All Rights Reserved.*

U S v F OCHOA. 99-CR-6153
MOTION TO DISMISS
EXHIBIT 10 PAGE 9

**Managers & Managing: Vega Says U.S. Sought Help of Pariah Army**
By Jose de Cordoba
Staff Reporter

12/08/2000
The Wall Street Journal Europe
28
(Copyright (c) 2000, Dow Jones & Company, Inc.)

One of the more intriguing cases worked by former U.S. Drug Enforcement Administration informant **Baruch Vega** involves a close associate of Carlos Castano, leader of a right-wing paramilitary force that human-rights activists blame for hundreds of extrajudicial killings in Colombia.

Mr. Vega's account, confirmed by others familiar with the case, provides new evidence that U.S. authorities have sought help from the warlord in the war on drugs -- despite the fact that the DEA has described Mr. Castano as a major drug trafficker himself. Such an overture would run counter to official U.S. policy of not dealing with Mr. Castano or his 7,000-strong United Self-Defense Forces of Colombia.

The case involves Nicolas Bergonzoli, a Colombian cattleman and crony of Mr. Castano who was indicted in Connecticut in 1991 for conspiracy to import and distribute 1,500 kilos of cocaine belonging to the late drug kingpin Pablo Escobar.

In December of 1998, says Mr. Vega, Mr. Bergonzoli flew to Fort Lauderdale, Florida, on a jet chartered by Mr. Vega. After an initial appearance in a closed Miami federal courtroom, he was released on bond a day later. People close to the case say Mr. Bergonzoli is working out a plea agreement with U.S. officials. Mr. Vega says Mr. Bergonzoli paid him $200,000 for his help.

No direct meetings took place between Mr. Castano and U.S. officials, Mr. Vega says. Instead, the DEA sought to use Mr. Bergonzoli to persuade Mr. Castano to encourage drug traffickers operating in his territory to surrender to U.S. authorities. Mr. Vega says he acted as a translator in some of the discussions.

The DEA declines comment, but Richard Sharpstein, the lawyer for suspended DEA supervisor David Tinsley, confirms that various meetings between Messrs. Bergonzoli and Tinsley took place between December 1998 and February 2000 in Florida and Costa Rica.

Mr. Castano, who declined to answer written questions, told a Colombian television reporter in August that Mr. Bergonzoli asked him on behalf of the DEA to pressure drug dealers to surrender to U.S. officials through Mr. Vega. "I gave the drug dealers a sort of ultimatum," Mr. Castano said: to turn themselves in or become targets of war.

Gerardo Reyes, who has written extensively on the Vega case for Miami's Spanish-language El Nuevo Herald, says Mr. Castano told him that a delegation of U.S. officials was planning to meet with him somewhere on the Panama-Colombia border to further discuss the operation.

Joaquin Perez, who has represented Mr. Bergonzoli, says he believes Colombian traffickers were stampeding toward Mr. Vega mostly "because Carlos Castano was pushing them."

Mr. Castano is widely considered to be among Colombia's worst human-rights violators. Amnesty International asserts that about 75% of the estimated 3,500 political killings that took place in Colombia in 1999 are traceable to his men.

The DEA has also accused him of narcotics trafficking. In February, William E. Ledwith, the agency's chief of international operations, told a U.S. congressional hearing that "the Carlos Castano organization, and possibly other paramilitary groups, appear to be directly involved in processing cocaine."

While calling himself "an enemy of drug trafficking," Mr. Castano has acknowledged that his movement receives much of its funds from drug traffickers and growers, who pay "war taxes" to operate in territory controlled by his militia.

# EXHIBIT "12"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on January 8, 2002

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| CARLOS CASTANO-GIL, | : | VIOLATIONS: |
| a/k/a El Senor, | : | |
| a/k/a El Patron, | : | Title 21 U.S.C. Section 963 |
| | : | (Conspiracy to import and to |
| | : | manufacture and distribute |
| | : | five kilograms or more of cocaine |
| | : | intending and knowing that the |
| SALVATORE MANCUSO-GOMEZ, | : | cocaine will be imported into |
| a/k/a El Mono, | : | the United States) |
| a/k/a Santander Lozada; | : | |
| | : | Title 21 U.S.C. Section 959 |
| and | : | (Manufacture and distribute five |
| | : | kilograms or more of cocaine |
| JUAN CARLOS SIERRA-RAMIREZ, | : | intending the importation |
| a/k/a El Tuso, | : | into the United States) |
| a/k/a El Primo, | : | |
| | : | Title 46, U.S.C. App. Sections 1903 |
| | : | (a), (j) |
| | : | (Conspiracy to possess with intent |
| | : | to distribute five kilograms or |
| Defendants. | : | more of cocaine on board a |
| | : | vessel subject to the jurisdiction of |
| | : | the United States) |
| | : | |
| | : | Title 46, U.S.C. App. Section |
| | : | 1903(a) |
| | : | (Possession with intent to |
| | : | distribute five kilograms or more |
| | : | of cocaine on board a |
| | : | vessel subject to the jurisdiction of |
| | : | the United States) |
| | : | |
| | : | Title 18 U.S.C. Section 2 |
| | : | (Aiding and Abetting) |
| | : | |
| | : | Title 21 U.S.C. Sections 853 and |
| | : | 970 |
| | : | Title 46 U.S.C. Section 1904 |
| | : | (Forfeiture) |

1

## INDICTMENT

The Grand Jury Charges that:

### Count 1

### The Conspiracy

From in or about January 1997, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including the date of the filing of this indictment, in the United States, the Republic of Colombia, and elsewhere, the defendants:

CARLOS CASTANO-GIL,

SALVATOR MANCUSO-GOMEZ,

and

JUAN CARLOS SIERRA-RAMIREZ,

did unlawfully, knowingly and intentionally combine, conspire, confederate and agree, with co-conspirators not indicted herein, and with others known and unknown to the Grand Jury, to commit the following offenses against the United States: (1) To unlawfully, knowingly and intentionally import five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, into the United States from the Republic of Colombia, a place outside the United States, in violation of Title 21, United States Code, Sections 952 and 960, and (2) To manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and

2

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 2, PAGE 2

knowing that such substance will be unlawfully imported into the United States in violation of Title 21, United States Code, Sections 959 and 960, and Title 18, United States Code, Section 2.

### Object Of The Conspiracy

It was the object of the conspiracy to manufacture and distribute cocaine in the Republic of Colombia, to transport the cocaine out of the Republic of Colombia, and to import large quantities of cocaine into the United States and other countries.

### Manner and Means of the Conspiracy

1. CARLOS CASTANO-GIL was a high ranking member in the Autodefensas Unidas de Colombia, known in English as the "United Self-Defense Forces of Colombia" (hereafter, "AUC"), a paramilitary force in the Republic of Colombia. CARLOS CASTANO-GIL used his positions in the AUC to obtain substantial proceeds for the AUC by permitting the cultivation of coca plants; by maintaining and protecting laboratory facilities for the manufacture of cocaine; by setting the base price of cocaine and standards for the quality of cocaine; by protecting cocaine markets for the sale and distribution of cocaine; by protecting shipments of cocaine during transport through Colombia to coastal areas for loading on maritime vessels; by causing the shipment of cocaine in maritime vessels from Colombia to the United States, Europe, and elsewhere; and by using force, violence, and intimidation to maintain authority and control over cocaine trafficking.

2. Through the use of his positions with the AUC, including commander and political director of the AUC, CARLOS CASTANO-GIL was able to control and protect cocaine production and distribution in the regions of Colombia controlled by members of the AUC.

3

3. SALVATORE MANCUSO-GOMEZ was a high ranking member and commander in the AUC. SALVATORE MANCUSO-GOMEZ used his position to obtain substantial proceeds for the AUC and personally by maintaining and protecting laboratory facilities for the manufacture of cocaine and by protecting shipments of cocaine during transport through Colombia to coastal areas for loading on maritime vessels.

4. JUAN CARLOS SIERRA-RAMIREZ was a member of the AUC. JUAN CARLOS SIERRA-RAMIREZ organized and supervised the transportation of multi-ton shipments of cocaine from Colombia to maritime vessels for transport through international waters to the United States, Spain, and elsewhere.

## Overt Acts

In furtherance of the aforesaid conspiracy and to effect the objects thereof, in the United States and elsewhere, one or more of the defendants committed and caused to be committed one or more of the following overt acts, among others:

1. On or about January 21, 1997, SALVATORE MANCUSO-GOMEZ entered the United States from Colombia in Miami, Florida with $11,350 in U.S. currency.

2. In or about the fall of 1997, SALVATORE MANCUSO-GOMEZ transported unindicted co-conspirators in a helicopter to a cocaine base laboratory which was protected by heavily-armed members of the AUC.

3. In or about January 1998, CARLOS CASTANO-GIL stationed members of the AUC at a cocaine processing laboratory near Yarumal, Colombia in order to control and protect the laboratory at that location.

4. In or about May 1998, CARLOS CASTANO-GIL stationed members of the AUC at a cocaine processing laboratory near Caucasia, Colombia in order to control and protect the laboratory.

5. In or about July 1998, CARLOS CASTANO-GIL conducted a meeting of the cocaine traffickers in the town of San Pablo, Colombia and established the base price for

4

cocaine, the standards for the quality of cocaine production, the fees assessed by the AUC for protection of the cocaine base laboratories, and the right of distributors to purchase and export cocaine.

6. On or about March 19, 1999, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ supplied approximately 1,000 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

7. On or about August 4, 1999, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ supplied approximately 500 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

8. On or about November 23, 1999, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ supplied approximately 500 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

9. In or about December, 1999, CARLOS CASTANO-GIL provided approximately 8,895 kilograms of cocaine in Colombia to JUAN CARLOS SIERRA-RAMIREZ for transport by the maritime vessel M/V Nativa.

10. In or about January 2000, CARLOS CASTANO-GIL provided approximately 300 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

11. On or about January 16, 2000, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ provided approximately 500 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

12. On or about March 4, 2000, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ provided approximately 500 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

13. On or about June 20, 2000, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ provided approximately 500 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

14. On or about September 12, 2000, CARLOS CASTANO-GIL and SALVATORE MANCUSO-GOMEZ provided approximately 800 kilograms of cocaine to an unindicted co-conspirator in Colombia for transport by maritime vessel to the United States.

15. In or about October 2000, unindicted co-conspirators murdered and decapitated a drug trafficker in Colombia in retribution for the failure to repay a debt in full owed to SALVATORE MANCUSO-GOMEZ for a cocaine shipment destined for the United States.

16. On or about April 30, 2001, CARLOS CASTANO-GIL caused an individual to be kidnapped by members of the AUC and transported under guard to an AUC camp for the purpose of extorting property from that individual.

17. On or about May 1, 2001, JUAN CARLOS SIERRA-RAMIREZ transported CARLOS CASTANO-GIL, a cargo of weapons and cocaine, and other individuals in a vehicle to a farm in Colombia.

18. On or about February 2, 2002, CARLOS CASTANO-GIL caused a member of the AUC to threaten an individual in Dade County, Florida.

19. On or about February 27, 2002, CARLOS CASTANO-GIL caused a member of the AUC to threaten an individual in Dade County, Florida.

All in violation of Title 21, United States Code, Sections 963 and 960, and Title 18, United States Code, Section 2.

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 2, PAGE 6

## Count 2

In or about February 2000, in the Republic of Colombia, and elsewhere, the defendant,

### CARLOS CASTANO-GIL,

did knowingly and intentionally distribute and cause the distribution of five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such cocaine would be unlawfully imported into the United States.

All in violation of Title 21, United States Code, Section 959 and Title 18, United States Code, Section 2.

---

## Count 3

### The Conspiracy

From on or about January 16, 2000, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including June 20, 2000, on the high seas and elsewhere, the defendants:

### CARLOS CASTANO-GIL,

### and

### JUAN CARLOS SIERRA-RAMIREZ,

did unlawfully, knowingly and intentionally combine, conspire, confederate and agree, with co-conspirators not indicted herein, and with others known and unknown to the Grand Jury, to possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States, that is, a vessel whose nation of registry, the Republic of Cape Verde, has consented to the

7

enforcement of United States law by the United States, in violation of Title 46, United States Code Appendix, Sections 1903 (a) and (j) and Title 18, United States Code, Section 2.

## Object Of The Conspiracy

It was the object of the conspiracy to possess and transport on board a vessel on the high seas a multi-ton quantity of cocaine produced and distributed in the Republic of Colombia for further distribution elsewhere.

## Manner and Means of the Conspiracy

1. CARLOS CASTANO-GIL was a high ranking member in the Autodefensas Unidas de Colombia, known in English as the United Self-Defense Forces of Colombia (hereafter, "AUC"), which is a paramilitary force in the Republic of Colombia. CARLOS CASTANO-GIL used his positions to obtain substantial proceeds for the AUC by supplying and agreeing to supply multi-ton quantities of cocaine; by protecting shipments of cocaine during transport through Colombia to coastal areas for loading on maritime vessels; and by transporting and causing the transport of multi-ton shipments of cocaine onboard maritime vessels from Colombia to Europe, and elsewhere.

2. JUAN CARLOS SIERRA-RAMIREZ was a member of the AUC. JUAN CARLOS SIERRA-RAMIREZ organized and supervised the transportation of multi-ton shipments of cocaine from Colombia onboard maritime vessels for transport through international waters to Europe, and elsewhere.

## Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, one or more of the defendants committed and caused to be committed one or more of the following overt acts, among others:

8

1. On or about January 16, 2000, JUAN CARLOS SIERRA-RAMIREZ held a meeting of drug traffickers in Medellin, Colombia and announced that the vessel M/V Nativa had been seized with 8,895 kilograms of cocaine on board by law enforcement authorities in Arica, Chile. JUAN CARLOS SIERRA-RAMIREZ also announced that he was planning another maritime shipment of cocaine to compensate for the seized cocaine shipment on board the M/V Nativa.

2. In or about February 2000, JUAN CARLOS SIERRA-RAMIREZ authorized the purchase of the vessel F/V Paul to be used for another cocaine shipment on the high seas to compensate for the cocaine shipment seized onboard the M/V Nativa.

3. In or about February 2000, JUAN CARLOS SIERRA-RAMIREZ provided an unindicted co-conspirator with a large amount of cash for the repair of the maritime vessel F/V Paul in the Republic of Cape Verde.

4. In or about May, 2000, CARLOS CASTANO-GIL provided approximately 2,287 kilograms of cocaine in Colombia to JUAN CARLOS SIERRA-RAMIREZ for transport by the maritime vessel F/V Paul on the high seas.

5. On or about June 9, 2000, JUAN CARLOS SIERRA-RAMIREZ, while in Colombia, conducted a telephone conversation with an unindicted co-conspirator in Portugal regarding, among other topics, the satellite telephone number for the speed boat delivering the cocaine from Colombia to the F/V Paul.

6. On or about June 14, 2000, JUAN CARLOS SIERRA-RAMIREZ, while in Colombia, conducted a telephone conversation with an unindicted co-conspirator in Portugal concerning the transfer of cocaine from the speed boat to the F/V Paul near the coast of Martinique.

7. On or about June 18, 2000, JUAN CARLOS SIERRA-RAMIREZ, while in Colombia, conducted a telephone conversation with an unindicted co-conspirator in Portugal about the location of the F/V Paul and the location of a meeting point off the coast of Martinique.

9


U.S. v. F. OCHOA  99-CR-6153
MOTION TO DISMISS
EXHIBIT 2, PAGE 9

8. On or about June 20, 2000, JUAN CARLOS SIERRA-RAMIREZ, while in Colombia, conducted a telephone conversation with an unindicted co-conspirator in Portugal concerning law enforcement surveillance of the F/V Paul near the coast of Martinique.

All in violation of Title 46, United States Code Appendix, Sections 1903(a) and (j), and Title 18, United States Code, Section 2.

**Count 4**

On or about June 19, 2000, on the high seas and elsewhere within the jurisdiction of the United States, the defendants:

CARLOS CASTANO-GIL,

and

JUAN CARLOS SIERRA-RAMIREZ,

did unlawfully, knowingly, and intentionally possess with the intent to distribute and cause the possession with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, on board a vessel subject to the jurisdiction of the United States, that is, a vessel whose nation of registry, the Republic of Cape Verde, has consented to the enforcement of United States law by the United States.

In violation of Title 46, United States Code Appendix, Section 1903(a), and Title 18, United States Code, Section 2.

**Forfeiture Allegation**

Upon conviction of the criminal violations alleged in Counts 1, 2, 3 and 4 of this Indictment, said offenses being punishable by imprisonment for more than one year, the defendants,

A.     With respect to Counts 1 and 2 shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all respective right, title, or

10

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 2 PAGE 10

interest which the defendants may have in:

(1)     any and all money and/or property constituting, or derived from,

any proceeds which said defendants obtained, directly or indirectly, as the result of the violations alleged in Counts 1 and 2 of this Indictment; and

(2)     and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the

(3)     violations alleged in Counts 1 and 2 of this Indictment, together with all interest and proceeds traceable thereto, in that said property constitutes or was derived from proceeds said defendants obtained as a result of the violations charged in Counts 1 and 2 of the Indictment, and is property which was used or intended to be used to facilitate said violations:

B.     With respect to Counts 3 and 4, the defendants shall forfeit to the United States, pursuant to Title 46, United States Code, Section 1904, any and all respective right, title, or interest which said defendants may have in any property described in Title 21, United States Code, Section 881 (a), that is used or intended for use to commit, or to facilitate the commission of, the knowing or intentional manufacture, distribution, or possession with intent to manufacture or distribute, a controlled substance.

C.     If any of the above described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

11

subdivided without difficulty,

It is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in paragraph A and B above.

All pursuant to Title 21, United States Code, Sections 853 and 970 and Title 46, United States Code Appendix, Section 1904.

A TRUE BILL:

_____
FOREPERSON.

Jodi L. Avergun, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530

By: _____
Ronald M. McNeil
Deputy Chief for Litigation
Narcotic and Dangerous Drug Section

By: _____
Daniel J. Cassidy
Senior Trial Attorney
Narcotic and Dangerous Drug Section
(202)514-0917

By: _____
James Byrne
Trial Attorney
Narcotic and Dangerous Drug Section

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 2, PAGE 12

12

**EXHIBIT "13"**

FROM : CENTRO ECUESTRE LA CABRIOL      PHONE NO. : 94 5410113           Jun. 16 2003 02:01PM P1



—---U.S. **Department of Justice**
*Drug Enforcement Administration*
www.dea.gov

## NEWS RELEASE

FOR IMMEDIATE RELEASE
September 24, 2002

### ATTORNEY GENERAL AND DEA DIRECTOR
### ANNOUNCE INDICTMENTS IN AUC DRUG TRAFFICKING CASE
### *United States Seeks Extradition of Colombian Paramilitary Leaders*

In a news conference today, Attorney General John Ashcroft and DEA Director Asa Hutchinson announced an indictment charging leaders of the United Self-Defense Forces of Colombia, or AUC, with trafficking over 17 tons of cocaine into the United States and Europe beginning in early 1997. The AUC is a right-wing paramilitary group in Colombia listed on the State Department's Foreign Terrorist Organization List.

Charged in the indictment are AUC leader Carlos Castano-Gil, AUC military commander Salvatore Mancuso, and AUC member Juan Carlos Sierra-Ramirez. According to the indictment, Carlos Castano-Gil directed cocaine production and distribution activities in AUC-controlled regions of Colombian. In addition, Castano-Gil, Mancuso, and Sierra-Ramirez used violence, force and intimidation as methods to maintain control of their cocaine trafficking activities.

"These indictments signal a new level of success in the fight against the international drug trade. We fully expect to bring these traffickers to justice, just as we did with FARC leader Carlos Bolas" said Director Hutchinson. "Whether it is the FARC or the AUC, we will track down violent drug trafficking groups that operate under the guise of so-called freedom fighters."

The indictments coincide with Colombian President Alvaro Uribe's visit to Washington, DC this week. They also shed light on the on-going problem faced by the Colombian government in battling paramilitary groups who earn profits on the Colombian cocaine industry.

"As today's indictment reminds us, the lawlessness that breeds terrorism is also a fertile ground for the drug trafficking that supports terrorism," stated Attorney General Ashcroft. "To surrender to either of these threats is to surrender to both."

For more information, please contact the DEA Office of Public Affairs at (202) 307-7977.

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment  (Edit Search)

  ↶Select for FOCUS™ or Delivery
🗋

*FDCH Political Transcripts September 24, 2002 Tuesday*

Copyright 2002 eMediaMillWorks, Inc.
(f/k/a Federal Document Clearing House, Inc.)
FDCH Political Transcripts

September 24, 2002 Tuesday

**TYPE:** NEWS CONFERENCE

**LENGTH:** 2944 words

**HEADLINE:** JOHN ASHCROFT HOLDS NEWS CONFERENCE

**SPEAKER:**
JOHN ASHCROFT, U.S. ATTORNEY GENERAL

**LOCATION:** WASHINGTON, D.C.

**BODY:**


U.S. ATTORNEY GENERAL JOHN ASHCROFT HOLDS NEWS CONFERENCE

SEPTEMBER 24, 2002

SPEAKERS: JOHN ASHCROFT
U.S. ATTORNEY GENERAL

ASA HUTCHINSON
DIRECTOR
DRUG ENFORCEMENT ADMINISTRATION



ASHCROFT: Good afternoon.

Today, the Department of Justice is unsealing an **indictment** charging the leader or leaders of the United Self-Defense Forces of Colombia, or AUC, with trafficking over 17 tons of cocaine into the United States and Europe since 1997. The AUC is a Colombian paramilitary group listed on the State Department's Foreign Terrorist Organization List.

The **indictment** charges AUC leader **Carlos Castano** Gil and two other AUC members with five counts of drug trafficking. Also named in the **indictment** are AUC military commander Salvatore Mancuso and AUC member Juan Carlos Sierra (ph) Ramirez. The United States has requested the extradition of all three of these defendants from the Republic of Colombia, one of our closest international law enforcement partners. These individuals face sentences up to life in prison if convicted of all charges.

On September 16th of this year, The Washington Post reported **Carlos Castano** as saying he

would, quote, "Go and face the U.S. justice system," close quote, if he were indicted by the United States. Today, we call upon **Carlos Castano** to stand by his statement and surrender to the United States authorities.

The **indictment** of these high-ranking AUC members marks, once again, the convergence of the two top priorities of the Department of Justice. These two of our top priorities are the prevention of terrorism and the reduction of illegal drug use.

These charges follow the **indictment** in March of several members of the FARC, or Fuerzas Armadas Revolucionarias de Colombia, a Colombia guerrilla group also listed on State Department's Foreign Terrorist Organization List.

Today's **indictment** charges AUC leaders, not as anti-FARC freedom fighters that they claim to be, but as criminals; violent drug traffickers who poison our citizens and threaten our national security.

According to the **indictment, Carlos Castano** directed cocaine production and distribution activities in AUC-controlled regions of Colombia, including protecting coca processing laboratories, setting quality and price controls for cocaine, and arranging for and protecting cocaine shipments both within and outside of Colombia.

ASHCROFT: Castano and his co-defendants used violence, force and intimidation to maintain this authority over cocaine trafficking activities. For example, the **indictment** alleges that Castano resorted to kidnapping and threats, and that Salvatore Mancuso caused the brutal murder of another Colombian drug trafficker as retribution for failing to pay a drug debt.

I want to thank DEA Administrator Asa Hutchison, I want to thank Michael Chertoff, the head of the Criminal Division here at the Justice Department, John Verone, the assistant commissioner for investigations with the U.S. Customs Service.

All of them are here today, and I thank them for their outstanding leadership. Today's **indictment** is a culmination of a two- and-a-half-year-long investigation, started under the responsibility of my predecessor, Ms. Reno, conducted by the Drug Enforcement Administration, that administration, working in cooperation with the Narcotic and Dangerous Drug Section of the Department of Justice.

Of course, I want to also to acknowledge the United States Customs Service, and the United States Coast Guard for having collaborated in our efforts.

I also want to thank our many foreign law enforcement partners, including Carabinieros de Chile, the Guardia Civil in Spain, the Judicial Police of Portugal, the Netherlands Coast Guard, and other agencies in Martinique.

The cooperation of Colombian authorities in particular has been invaluable to our efforts to bring drug traffickers to justice. Since 1997 there have been more than 50 extraditions of Colombian nationals to the United States.

I would especially like to thank the officers of the Colombian National Police for their tireless efforts in this investigation. The CNP's daily support to our agents and prosecutors was critical to our success in this case and others that target the drug traffickers who menace our hemisphere.

Let me also to take a moment to recognize the leadership and commitment of Colombian President Alvaro Uribe to proceed vigorously against drug traffickers and terrorists wherever they are found. That commitment and dedication is deeply appreciated.

The men named in the **indictment** today are accused of selling one of the most dangerous and addictive drugs: cocaine.

ASHCROFT: Cocaine, including its derivative form, and that's crack, remains the most frequently mentioned drug in 14 of the 20 cities in the Drug Abuse Warning Network. In addition, cocaine accounted for 50 percent of all drug-related episodes in emergency rooms between 1999 and 2000.

Today we see more clearly than ever the interdependence between terrorists that threaten American lives and the illegal drugs that threaten America's potential. As today's **indictment** reminds us, the lawlessness that breeds terrorism is also a fertile ground for the drug trafficking that supports terrorism.

To surrender to either of these threats is to surrender to both of them. We will not surrender. The Department of Justice is committed to victory over drug abuse, and victory over terrorism, and the protection of freedom and human dignity that both drug abuse and terrorism seek to destroy. Thank you.

And now, the director of the Drug Enforcement Administration.

Asa?

HUTCHISON: Thank you, Attorney General Ashcroft.

And I simply wanted to underscore a few facts in this **indictment.** This is the first time that leaders and members of the AUC have been indicted on drug trafficking charges. And let me emphasize, as the attorney general did, that it is our expectation and intent to have the defendants arrested and extradited to the United States, as required by law.

These drugs, in multi-ton quantities, were destined for the United States as well as Europe, and then the drug trade operated by the leaders of the AUC provided the means to equip and arm the para- military terrorists with the necessary weapons, cash and provisions. This **indictment** which charges Carlos Castana and two of his associates with conspiracy to distribute cocaine -- in this **indictment,** the object of the conspiracy was to accomplish up to 10 shipments of cocaine by maritime vessels over a two-year period destined for the United States or Europe. The means to accomplish conspiracy include the use of speedboats, sea-going vessels and satellite phones.

I think it's significant to note that we've been encouraged by a 9 percent reduction in cocaine purity in the United States over the last year. Hopefully the disruption of some of these large multi-ton shipments has had an impact in that regard.

It is clear that the para-military organization led by Carlos Castana was immersed for years in the illegal drug trade, from the taxing of the coca growers to the processing laboratories to the transportation of cocaine to the targeted country. Again it is a recognition of the combination between violence and terrorism and drug trafficking.

I want to join the attorney general in thanking the DEA agents and our counterparts in Columbia, Spain and Chile who conducted first- rate law enforcement work that led to the **indictment** of these terrorists and drug traffickers.

ASHCROFT: And this **indictment** is a first step along many steps in reducing the flow of cocaine coming into the United States.

I'll take some questions.

QUESTION: Mr. Ashcroft, are you concerned that the Colombians might take the opportunity to participate in the reorganization of the (inaudible) cartels? The Mexican authorities already found that some Colombians related with the FARC were working with the (inaudible) cartel. Are you concerned about this possibility, and the growing violence now in Monterrey?

ASHCROFT: We are very much committed to the proposition of interdicting the supply of illegal drugs to the United States and the flow of illegal drugs around the world. And we see as problematic any linkages that exist between drug organizations that would somehow strengthen them and give them greater reach.

We are deeply concerned about the nexus that frequently appears between narcotics and terrorism. In this particular case, again, we find those who have engaged in terrorist activities funding those terrorist activities with narcotics. And we think that that's a matter of great concern.

QUESTION: Sir, the 10 shipments that Mr. Hutchinson talked about, did they get through to the United States?

HUTCHISON: Those are outlined in the **indictment** and there are some that were intercepted, others we'll have to wait and see how the proof develops on those.

QUESTION: Sir, is this to indicate that the AUC has a larger distribution network than the FARC does in Colombia? How would you characterize the relative importance in size of the two organizations in terms of their involvement in drug trafficking?

ASHCROFT: Well, certainly this is not designed to be a time when we compare or evaluate these two organizations against each other.

Each of them has been the subject of **indictment** by this United States government. Each of them, we believe, has been engaged in terrorist activities and narcotics-related activities. And we believe that the activities as such are unacceptable, and as a result lead us to the **indictments.**

QUESTION: General Ashcroft, just to change the subject for a moment, earlier today, you and Governor Ridge lowered the threat advisory level. Do we read into that that the United States is any safer today than it was on September 10th? And then secondly, could you just talk about what role the arrests of the six Buffalo men played in your decision?

ASHCROFT: Well, we believe that the threat level should be at the -- what's called the elevated level. We believe that the -- an assessment of all the intelligence information, and the reporting that we have, indicates that that would be the appropriate place for that level.

ASHCROFT: We had raised that level -- and I think from this podium I indicated why -- as a result of an overall assessment based on intelligence data which factored in some very troublesome things, including, as well the anniversary of the September 11th date. Factored in were some threats overseas which were relatively specific and the inference that if Al Qaida was to be active in a variety of settings overseas, it might be likely that they would be active in the United States. Obviously, factored into that was the fact we also had an awareness of activity that demanded our attention in this country.

Now, since that time, we have asked the intelligence community on a regular basis, as we always do, as is our matter of course, daily to provide us with indications of what kind of traffic they are encountering and what kind of risk or threat there seems to be.

And it is clear that we have made arrests in Buffalo, we've made in arrests in Bahrain, we've made arrests in Pakistan, we had things that were disrupted in the Southeast Asia region.

And it was based on those kinds of incidents and the information provided by the intelligence community that led us to say to the American people, "We will return from a high risk assessment posture on an elevated."

And I want to emphasize that we are not saying there is no risk. We still think there is an elevated level of risk. We still believe that Al Qaida is an international network; that it still has the reach that makes it global in scope and nature; that we know from them that when we work hard we disrupt their activities, and when citizens are alert, we disrupt their activities.

We believe that based on the information, as I mentioned, the activities I mentioned, the intelligence provided to us by the intelligence community, that it was appropriate to recategorize the risk at the elevated level rather than the high level. And, yes, in part that's a result of the fact that we have been having some success in our pursuit of those individuals who have been associated with the international terrorist movement.

But I would just again, note that we consider the risk to still be an elevated risk. It's a very serious risk. And we ask for citizens to remain alert, and that people continue to try and work together with governments, not just ours, but around the world, to make sure that we minimize terrorist threats.

QUESTION: Attorney General, on that same topic, both you and Governor Ridge have said that the government believes there are sleeper cells of Al Qaida still waiting to go operational in the United States. Is that still true or has this recent activity disrupted that?

ASHCROFT: We have no reason to believe that the United States is absent Al Qaida-associated individuals. We believe that it is an organization which is still bent on injuring America and Americans, that it is worldwide in scope. We have not lost sight of the fact that tens of thousands of individuals were trained by Al Qaida and that they are associated with, obviously, other individuals who didn't find their way to training facilities of Al Qaida in the Middle East.

So I don't want anything that I have said to be misconstrued to indicate in any way somehow that there is an absence of Al Qaida threat in the United States. We don't believe that. We believe that it was appropriate to restate the threat based on the assessment of the current threat situation from a high threat to an elevated threat.

QUESTION: But do you still believe that there are sleeper cells in the United States waiting to go operational?

ASHCROFT: I believe that there are Al Qaida operatives in the United States who are assets to the Al Qaida network around the world. And if I, obviously, had specific information about an operation that they were about to carry out, believe me, I would be taking action in regard to those specific individuals.

QUESTION: Today we heard from the JIC regarding the FBI. They painted a fairly dismal picture of the FBI in the run-up to 9/11 of last year. Can you assure the American public that the necessary reforms have taken place at the FBI so they feel confident that the FBI and the Justice Department are doing as much as they can to combat Al Qaida and other terrorist organizations?

ASHCROFT: The walls that once separated the FBI from other intelligence agencies, for example, were walls created by the Congress and governmental entities quite some time ago. If you'll think back to when the Foreign Intelligence Surveillance Act was brought into existence in the 1970s, there was perhaps an unwarranted myth that somehow you could separate domestic matters from international matters and that intelligence gained in the

international arena wouldn't be relevant to things happening domestically and vice versa.

These walls that separated these agencies prohibited the kind of cooperation which we now know is essential. That's one of the reasons, in the very few days after September the 11th, we went to the Congress and said, "We must adjust this; we must pass the USA PATRIOT Act, which fosters communication across these agency lines."

I've personally gone beyond that to say about the FBI that, "No longer are you restrained from doing what other law enforcement agencies are doing; you have a responsibility to keep your ears open, your eyes open, if need be surf the web, go to public places. You don't have the authority to invade private spaces that are protected, but you must go to public places, and think carefully about what we can do to prevent terrorism."

Obviously, at the FBI, Director Mueller has stood up, has created a new intelligence analysis aspect of the FBI with this in mind.

So structurally the Congress has helped us take aside those walls which had been put in place congressionally in the 1970s.

Now, some of those things are still being worked out. As it relates to the full implementation of the PATRIOT Act, the Justice Department is appealing a judicial ruling that might impair some of the collaboration and cooperation that would exist between these agencies when it relates to the use of this information freely for both preventative work, to prevent terrorism, and prosecutorial work, to send those who might be involved in terrorism into detention or punishment.

We're going to continue to work that way as aggressively as we can. And I am grateful that the Congress has disassembled a wall once constructed in the Congress that provided a barrier or a blockage that kept the kind of information from flowing freely that we need to have flowing.

QUESTION: Do you support Senator Lieberman's proposal for a blue ribbon 9/11 commission?

ASHCROFT: The administration has indicated that it endorses the idea of a commission to review and find out if there are additional ways that we can learn from what happened in 9/11 so as to improve our capacity to prevent terrorism.

QUESTION: General, you mentioned the **indictment** of a member of the FARC last March. I'm wondering if he's ever been arrested or extradited or if progress has been made in this issue?

ASHCROFT: Carlos Bolas, I believe, was apprehended in Suriname, and he remains in the custody of the United States pursuant to the **indictments** that were announced I believe last March regarding FARC.

Thank you all very much.

END

**NOTES:**
[????] - Indicates Speaker Unknown
   [--] - Indicates could not make out what was being said. [off mike] - Indicates could not make out what was being said.

**PERSON:** JOHN DAVID ASHCROFT (97%); WILLIAM ASA HUTCHINSON (73%); JUAN

CARLOS I (68%); **CARLOS CASTANO** GIL (61%); **CARLOS CASTANO** (60%); JOHN
VERONE (56%);

**LOAD-DATE:** September 24, 2002


Source: <u>News & Business</u> > <u>News</u> > **News Group File, All** ⓘ
Terms: **carlos castano and indictment**  (<u>Edit Search</u>)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:40 PM EDT


<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright</u> © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Search - 185 Results - Carlos Casta... and indictment                    (                              Page 1 of 1

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment (Edit Search)

↙ Select for FOCUS™ or Delivery

*State Department September 24, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
State Department

September 24, 2002

**SECTION:** STATE DEPARTMENT PRESS RELEASES

**LENGTH:** 248 words

**HEADLINE:** U.S. **Indictment** of Colombian Paramilitaries

**TEXT:**
Richard Boucher, Spokesman

September 24, 2002

U.S. **Indictment** of Colombian Paramilitaries

We welcome the **indictment** of three paramilitary narco-terrorists, announced today by the U.S. Department of Justice. The **indictment** unsealed today is clear evidence of the depth of United Self-Defense Forces of Colombia (AUC) involvement in virtually every stage of the drug business. We will now see if paramilitary leader **Carlos Castano** will stand by his word and surrender to the appropriate authorities.

Like its counterparts the Revolutionary Armed Forces of Colombia (FARC) and the National Liberation Army (ELN), the United Self-Defense Forces of Colombia practices indefensible, illegitimate acts of terror. Last year Secretary of State Powell designated the United Self-Defense Forces of Colombia as a Foreign Terrorist Organization, and this **indictment** also illustrates the clear nexus between the narcotics trade and terrorism.

Colombian President Uribe has publicly stated that the Colombian authorities will pursue all criminals and human rights abusers who threaten the security of the Colombian people, including the illegal armed groups involved in the drug trade. We support President Uribe's commitment to take aggressive action against all three of Colombia's major illegal armed groups, and we will continue to work closely with the Uribe Administration to defend Colombia's democracy and human rights by bringing peace, security and prosperity to the Colombian people.

**LOAD-DATE:** September 25, 2002

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment (Edit Search)
View: Full
Date/Time: Tuesday, June 24 2003 - 3:40 PM EDT

Source: News & Business > News > News Group File, All (i)
Terms: carlos castano and indictment (Edit Search)

⌐ Select for FOCUS™ or Delivery

*Deutsche Presse-Agentur, September 24, 2002*

Copyright 2002 Deutsche Presse-Agentur
Deutsche Presse-Agentur

September 24, 2002, Tuesday
22:19 Central European Time

**SECTION:** Politics

**LENGTH:** 440 words

**HEADLINE:** U.S. indicts paramilitary chief; requests extradition

**DATELINE:** Washington/Bogota

**BODY:**
The U.S. government on Tuesday unsealed an **indictment** charging the chief of the Colombian right-wing paramilitary with drug trafficking, the top American law enforcement officer announced.

U.S. authorities have levied five counts of drug smuggling against **Carlos Castano** and two other ranking members of the outlawed United Self Defence Forces of Colombia (AUC). The U.S. government has also requested their extradition, accusing them of smuggling more than 17 tonnes of cocaine into the United States. The AUC is known for its brutal methods while waging war against the leftist Revolutionary Armed Forces of Colombia (FARC), and has been tied to the drug trade and massacres of civilians.

"Today's **indictment** charges AUC leaders not as anti-FARC freedom fighters that they claim to be, but as criminals, violent drug- traffickers who poison our citizens and threaten our national security," U.S. Attorney General John Ashcroft said.

After the Colombian government on Tuesday announced U.S. plans to request the extradition of Castano, as well as Salvatore Mancuso and Juan Carlos Sierra Ramirez, Castano said he would turn himself in to U.S. authorities to prove his innocence.

In a letter addressed to U.S. authorities read on Colombian radio, Castano said he was willing to face trial in the United States to show he has no ties with the drug trade.

"I will make the pertinent adjustments within my professional and obligations and family life to proceed to arrange before you my willing submission to justice," Castano said in the letter.

"I inform my organization and the country of my total separation from the AUC until all suspicion about my participation in the banc of drug trafficking disappears," he said.

A source at the U.S. Embassy, however, told Deutsche Presse- Agentur dpa Tuesday afternoon that it had not received the letter.

Colombian Interior Minister Fernando Londono confirmed early Tuesday that the United States was to file an extradition request seeking custody of Castano.

Ashcroft said he hoped Castano would live up to his previous pledges to turn himself over to U.S. authorities.

The **indictments** were unsealed on the same day Colombian President Alvaro Uribe was in Washington lobbying for more aid to fight the FARC rebels and the illegal drug trade. The rebels have also been tied to cocaine trafficking.

Uribe, who took office in August, has escalated the military campaign against the leftist FARC, which consists of about 17,000 soldiers and has waged civil war for decades. Uribe, however, has been criticized for being lenient with the AUC. dpa am mm

**LOAD-DATE:** September 25, 2002

Source:  News & Business > News > News Group File, All ⓘ
Terms:  **carlos castano and indictment**  (Edit Search)
View:  Full
Date/Time:  Tuesday, June 24, 2003 - 3:41 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source:  News & Business > News > News Group File, All ⓘ
Terms:  carlos castano and indictment  (Edit Search)

⌐ Select for FOCUS™ or Delivery

*Associated Press Worldstream September 24, 2002 Tuesday*

Copyright 2002 Associated Press
Associated Press Worldstream

September 24, 2002 Tuesday

**SECTION:** INTERNATIONAL NEWS

**DISTRIBUTION:** Europe; Britian; Scandinavia; Middle East; Africa; India; Asia; England

**LENGTH:** 616 words

**HEADLINE:** U.S. officials unseal **indictment** of Colombian paramilitary leader

**BYLINE:** PETE YOST; Associated Press Writer

**DATELINE:** WASHINGTON

**BODY:**
The federal government unsealed an **indictment** alleging **Carlos Castano** and two members of his feared right-wing paramilitary group in Colombia brought 17 tons of cocaine into the United States and Europe since 1997.

Attorney General John Ashcroft on Tuesday said the government will seek extradition of the men, who are part of the outlawed United Self-Defense Forces of Colombia.

Ashcroft said the **indictments,** handed up in U.S. District Court in Washington, mark the convergence of two top Justice Department priorities: prevention of terrorism and reduction of illegal drug use.

Castano, his military commander Salvatore Mancuso and group member Juan Carlos Sierra-Ramirez are violent drug traffickers who "threaten our national security," Ashcroft told a news conference where he and Asa Hutchinson, administrator of the Drug Enforcement Administration, disclosed the charges.

Castano's headquarters are in the mountains of northwest Colombia, where he has led a war against leftist rebels. He has tried to distance his group from drug trafficking, and told reporters recently that if the United States sought his extradition he would surrender and willingly go to the United States.

"That is the best way to defend myself. I prefer to clarify there, rather than respond here, for things I haven't done," Castano told a Colombian journalist earlier this month.

Colombian Interior Minister Fernando Londono said the Colombian government would analyze the U.S. extradition request.

There was confusion about Castano's whereabouts Tuesday. A Castano aide who goes by the nom de guerre Duncan first told The Associated Press that Castano already had departed for the United States. Later, he said Castano still was in Colombia, meeting with his high command.

U.S. drug agents in Colombia refused to comment.

Meanwhile, Colombian President Alvaro Uribe, making his first official visit to Washington, promised an all-out effort to put drug traffickers out of business.

Speaking Tuesday to a gathering sponsored by six private research groups, Uribe said a tough stand against illegal armed groups is the best hope for an eventual negotiated settlement.

"We can no longer allow the terrorist groups to threaten our people," he said.

Uribe, who meets Wednesday with President George W. Bush, reaffirmed his offer to open a dialogue with the groups on the condition they agree to a cease fire. He also pledged efforts to end Colombia's role as the world's largest producer and distributor of cocaine.

While Colombia and the United States have strong relations, the presence of the paramilitaries in Colombia's 38-year civil war has been nettlesome.

Human rights groups accuse the paramilitaries of widespread abuses, and they operate with impunity in many areas where Colombian army and police are present. Whether Colombian security forces succeed in capturing Castano could be a test of how deeply the Colombian government is committed to battling the paramilitaries.

Castano's group, known by its initials in Spanish as the AUC, has waged war against rebels and has killed numerous civilians suspected of collaborating with the insurgents. It began its fight in the 1980s and was funded by rural landowners who sought protection from rebel kidnappings and extortion.

Castano is a former Colombian army scout whose father was kidnapped and killed by rebels in 1980.

Uribe's government insists it is waging war against the paramilitaries but the militia - many of whose members are former Colombian army soldiers - often coordinates its attacks with the Colombian security forces.

The United Sates considers the AUC, and Colombia's two rebel armies, as terrorist groups.

**LOAD-DATE:** September 25, 2002

Source: News & Business > News > **News Group File, All** (i)
 Terms: **carlos castano and indictment**  (Edit Search)
  View: Full
Date/Time: Tuesday, June 24, 2003 - 3:41 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# The Miami Herald

WEDNESDAY, SEPTEMBER 25, 2002 ▸ FINAL EDITION

www.miami.com

For home delivery, call 305 350-2000

35 Cents

100 YEARS

## Colombian paramilitary chief facing drug charges in U.S.

BY TIM JOHNSON
tjohnson@herald.com

WASHINGTON — The U.S. government on Tuesday accused outlaw paramilitary leader Carlos Castaño and two other members of his powerful anti-guerrilla army in Colombia of smuggling 17 tons of cocaine to the United States and Europe over the past five years.

Attorney General John Ashcroft, noting that Castaño recently said he wanted to "face the U.S. justice system," called on the sought-after paramilitary leader to "surrender to United States authorities."

Within an hour of the federal indictment announcement, uncon-



**WANTED:** Carlos Castaño is accused of smuggling 17 tons of cocaine.

AP FILE

▸ **COLOMBIAN PRESIDENT TARGETS RIGHTISTS, 7A**

▸ PLEASE SEE CASTAÑO, 6A



**FROM THE FRONT PAGE**

# U.S. indicts Colombian paramilitary leader on drug charges

## CASTANO, FROM 1A

Informed news reports said Castaño, 36, had fled to his troops in the mountains of northern Colombia and was preparing to surrender. A spokesman for Castaño later denied the reports.

Castaño's Miami attorney, Joaquin Perez, said he could not confirm Castaño's whereabouts.

Justice Department and Drug Enforcement Administration agents in Miami and Washington said they did not know if Castaño planned to surrender.

### CAUTIONS RELATIONS

The indictments of Castaño, fellow paramilitary chief Salvatore Mancuso and paramilitary member Juan Carlos Sierra-Ramirez came at a critical juncture in U.S.-Colombia relations and as President Alvaro Uribe visited Washington seeking sustained economic and military assistance to regain control of his homeland.

"Human rights monitors blame the 11,000 or so members of Castaño's paramilitary forces for the vast majority of atrocities and massacres in Colombia in recent years. Even so, Castaño has significant support among Colombians, some of whom view his armed group, the United Self-Defense Forces of Colombia, or AUC, as fighting harder to stand up to leftist guerrillas than the conventional army.

### TWO PRIORITIES

Ashcroft said the investigation began 2½ years ago. A grand jury in the District of Columbia returned the indictment, and, if captured, Castaño would presumably be tried in Washington.

"The indictment of the paramilitary leaders marked "the convergence of two of the top priorities of the Department of Justice: the prevention of terrorism and the reduction of illegal drug use," Ashcroft said.

"The State Department formally labeled Castaño's group a terrorist organization last year. Tuesday's indictment was the first lodged against the group. In March, U.S. prosecutors charged several members of the leftist insurgency, the Revolutionary Armed Forces of Colombia, or the FARC, with drug trafficking. One alleged Febel was captured in Suriname in June, and extradited to the United States for trial.

In the past half-decade, Castaño has emerged as a high-flying-rod figure, both hailed and despised. His rappy voice, scraggly beard and personal story are widely known. He and his crusade against leftist guerrillas began where Uribe was once government. The same year, Castaño rebels kidnapped and killed his father in 1990.

"Ashcroft called Castaño and the two others "violent drug traffickers who poison our citizens and threaten our national security." He said convictions on all five counts of drug trafficking could cost them life in prison.

The 12-page indictment said Castaño oversaw a gamut of drug-related activities, from protecting cocaine-processing laboratories in the jungles and setting quality and price controls for cocaine, to managing shipments from coastal Colombia to maritime vessels. It details a series of narcotics shipments to the United States and Europe using routes through Martinique in the Caribbean and the Cape Verde Islands in the Atlantic Ocean off the coast of Africa.

"The indictment says Castaño ordered paramilitary troops to guard cocaine-processing laboratories near Yarumal and Caucasia, towns in Antioquia state where Uribe was once governor. The same year, Castaño gathered traffickers in the town of San Pablo, where he brokered protection fees and sold "the right of distribution to purchase and export cocaine," it says.

"Castaño provided shipments of cocaine to other traffickers 10 times, including a nearly nine-ton shipment in December 1999 stowed aboard the freighter M/V Nativa, it says. The ship was seized a month later in Arica, Chile.

"In October 2000, unindicted co-conspirators of Mancuso, one of Castaño's confidantes, murdered and decapitated a drug trafficker in Colombia in retribution for the failure to pay a "debt" to Mancuso, the

U.S. v. F. OCHOA 99-CR-6153
MOTION TO DISMISS
EXHIBIT 11, PAGE 2

indictment says. It adds that Mancuso traveled to Miami in 1997 carrying $11,350 in cash.

Without detail, the indictment says Castaño ordered a member of his group "to threaten an individual" in Miami-Dade County on Feb. 2 and 27 of this year.

Sierra-Ramírez, who goes by the nickname "El Tuso," is accused of a series of cocaine dealings to compensate for the capture of cocaine aboard the ship. It says he provided an unnamed person with cash to repair a ship in the Cape Verde Islands in early 2000. The ship was brought near the coast of Martinique, where a speedboat was to take 2.2 tons of cocaine from coastal Colombia to the ship, the indictment says.

Pérez, Castaño's attorney, said the paramilitary leader "can categorically deny that he has been directly involved" in drug trafficking.

Moreover, Pérez said, Castaño has cajoled major Colombian drug traffickers to get out of narcotics smuggling and turn themselves over to U.S. prosecutors in pursuit of lenient treatment.

In February, Castaño presided over a meeting of more than 60 drug traffickers in the city of Cartago and urged them to abandon the drug trade, Pérez said. Among those at the meeting were Víctor Patiño Fomeque, a former Cali cartel leader, and Hernando Gómez, a trafficker from the North Valley cartel, he said.

"He made it clear that the AUC will not tolerate this type of activity and he wanted people to submit to justice," Pérez said.

Castaño's apparently ambiguous attitude toward drug trafficking may have contributed to a squabble among paramilitary forces earlier this year that led to a fissure in the group, and prompted Castaño to briefly retire. He repeatedly said in recent news interviews that cocaine trafficking is to blame for his nation's ills.

*Herald staff writer Larry Lebowitz in Miami contributed to this report.*

U.S. v F. Ochoa 99-CR-6153
MOTION TO DISMISS
EXHIBIT 11, PAGE 3

Source:  News & Business > News > News Group File, All ⓘ
Terms:  carlos castano and indictment  (Edit Search)

↲ Select for FOCUS™ or Delivery

*The Washington Post, September 25, 2002*

Copyright 2002 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

September 25, 2002, Wednesday, Final Edition

**SECTION:** A SECTION; Pg. A16

**LENGTH:** 1204 words

**HEADLINE:** U.S. Indicts Three in Colombia Paramilitary

**BYLINE:** Karen DeYoung, Washington Post Staff Writer

**BODY:**

Attorney General John D. Ashcroft yesterday unsealed drug-trafficking **indictments** against three members of Colombia's violent right-wing paramilitary forces, including paramilitary chief **Carlos Castano,** in an announcement U.S. officials said was timed to coincide with new Colombian President Alvaro Uribe's first official visit to Washington.

Ashcroft said at a news conference that the paramilitary United Self-Defense Forces of Colombia, or AUC, were not the "freedom fighters they claim to be" but "criminals . . . who poison our citizens and threaten our national security." He noted that the AUC was on the State Department's Foreign Terrorist Organization list, and praised Uribe's "leadership and commitment . . . to proceed vigorously against drug traffickers and terrorists wherever they are found."

All three of the indictees remain at large in Colombia, although Castano yesterday sent a letter to the U.S. Embassy in Bogota repeating an earlier offer to surrender to U.S. authorities to prove his innocence. The **indictment,** issued in U.S. District Court in Washington, charges Castano, AUC military commander Salvatore Mancuso and group member Juan Carlos Sierra-Ramirez with bringing more than 17 tons of cocaine into the United States and Europe since 1997, and alleges that Castano himself participated in kidnapping and threats and used violence to maintain direct control over both production and distribution. News of the **indictments** provided Uribe with ammunition for use during a visit yesterday to Capitol Hill, where lawmakers have raised questions in the past about ties between the paramilitary forces and the Colombian Army in a joint fight against leftist guerrillas. Leading human rights organizations have long criticized those ties and called for U.S. military assistance to Colombia to be withheld.

But as the United States enters its third year of major funding and participation in Colombia's guerrilla and drug wars, such criticism has far less impact than it did as recently as last summer, when both Republicans and Democrats raised the specter of U.S. involvement in

"another Vietnam" in Colombia's mountains and jungles. Even as the aid and the fighting continue, Colombia is last year's war, replaced in both urgency and attention with events in Iraq, Afghanistan and the Middle East.

Uribe, who will have lunch today with President Bush and meet with a number of Cabinet officials, is hoping to gin up more U.S. interest in helping his country's flailing economy, and to speed up implementation of promised new intelligence sharing and military training programs, according to Colombian and U.S. officials.

In a televised speech to Colombians on Sunday night, Uribe warned that the government could move into significant deficit territory this year. Noting that the first payments of a new, 1.2 percent "war surtax" on upper-middle-class and wealthy Colombians are due this week, Uribe said the government had cut back on official trips, vehicles and even cell phones, and that he had ordered the closure of 14 embassies and 10 consulates abroad.

Included on his wish list for Washington are some form of subsidy for Colombian coffee farmers, whose business has been devastated by the freefall in international coffee prices, and a possible bilateral trade agreement with the United States along the lines of one being negotiated with Chile. Administration officials said there was little to no interest in such initiatives here, although there may be willingness to help Colombia restructure its mounting debt and receive new funding from international banks.

Colombia also seeks movement on the Andean Trade Preference Act, passed as part of last summer's trade promotion authority bill but still not implemented pending administration "certification" that outstanding U.S. public and private company trade disputes with Colombia have been settled.

The United States has spent more than $ 2 billion on Colombia since Congress first approved funding for Plan Colombia in 2000. At the time, the military component was outlined as only one part of an overall plan to solve Colombian problems, all of which were tied by U.S. officials to Washington's concern over Colombia's drug exports. Officials estimate that Colombia supplies more than 90 percent of the cocaine and more than half the heroin used in this country.

Military training equipment, along with shared intelligence and extensive aerial fumigation to destroy coca and opium poppy crops, was to be restricted to Colombia's southernmost coca-growing region, where leftist guerrillas of the Revolutionary Armed Forces of Colombia, or FARC, were said to tax drug cultivators and traffickers in exchange for protection. Separate plan components called for major U.S. investment in alternative agriculture development for small-scale coca farmers, and for "institution building" to help Colombia develop a legal and social services system that was more responsive.

But "beginning in the summer of 2001, this administration began taking a hard look at Colombia policy," said a senior administration official, and it launched a review leading to a new emphasis on counterterrorism that developed more urgency after Sept. 11. The administration sought, and received, new congressional authority to provide more equipment and training and to target insurgents beyond the southern drug region. Increased intelligence sharing was authorized -- although officials from both countries say none of the new provisions has yet been activated. The administration has asked for about $ 450 million in new assistance for Colombia during fiscal 2003, more than 60 percent of it for the security forces.

U.S. officials have largely scrapped the initial alternative development plan after deciding it was unworkable. Despite a massive increase in U.S.-funded aerial fumigation, the estimated amount of coca under cultivation throughout Colombia has increased. Assessments of the "institution building" leg differ vary widely, with the U.S. and Colombian governments saying

significant progress has been made, and human rights organizations and others charging that the judicial system and legal protections for Colombian citizens have, if anything, gotten worse over the past year.

Overall, the senior administration official said, "I'd give us a 'C.' "

Hopes have been raised by Uribe, who promised to spend more of Colombia's money on the war, to significantly increase the size of the army's fighting capability, and to present a much tougher front to the FARC than his predecessor, Andres Pastrana, did. But restrictions on civil liberties Uribe has imposed in the name of counterterrorism, along with proposed cutbacks in the operations of government human rights officials, have raised concerns. Although he consistently has pledged otherwise, questions have long been raised here and in Colombia over alleged Uribe ties with the AUC paramilitaries.

Yesterday's **indictments** appeared to provide a valuable counterbalance for both the Bush administration and Uribe. Human Rights Watch, among the fiercest administration critics on Colombia, called them an "extremely positive development."

**LOAD-DATE:** September 25, 2002

Source: News & Business > News > News Group File, All (i)
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:42 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment  (Edit Search)

⌐ Select for FOCUS™ or Delivery
—

*Voice of America News September 25, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
Voice of America News

September 25, 2002

**SECTION:** AMERICAS

**LENGTH:** 450 words

**HEADLINE:** Colombian Warlord Says He Will Face Charges In US

**BYLINE:** Greg Flakus, Bogota

**TEXT:**
Filed: 03:28 UTC

A rightwing paramilitary leader who the United States has accused of drug trafficking has bid his troops farewell and has said he will voluntarily go to face the charges in a U.S. court. It is still not clear when and where **Carlos Castano** will turn himself in.

In a letter reportedly sent to the U.S. embassy here in Bogota late Tuesday, rightwing warlord **Carlos Castano** said he has decided to turn himself over to authorities and go to the United States to defend himself in court. This followed an announcement in Washington earlier Tuesday by Attorney General John Ashcroft that the United States was seeking the extradition of Mr. Castano and two of his associates on drug smuggling charges.

Colombian Interior Minister Fernando Londono Hoyos says the legal process will begin as soon as Mr. Castano is in custody. He says law enforcement authorities will begin the process by apprehending the men being sought and that the case will then go to the Colombian Supreme Court where extradition cases are given final approval.

The U.S. **indictment** charges the Colombian paramilitary men with smuggling cocaine to both the United States and Europe. Mr. Castano has rejected such accusations in the past and has long said that he would go to a U.S. court to prove his innocence if he were ever formally charged. However, in an interview with the Washington Post in March, 2001, Mr. Castano admitted that in some areas where coca crops are the base of the economy his forces have been financed by the trade. This was a reference to "war taxes" imposed by both the paramilitaries and the leftist rebel groups on cocaine producers. Such activity is likely to be viewed by the U.S. government as direct involvement in drug trafficking.

Mr. Castano heads the 8,000 fighters of the United Self Defense Forces of Colombia, known for its Spanish initials AUC. The group has been accused of wide-ranging human rights abuses and is considered a terrorist group by the U.S. government.

Mr. Castano began his life as a paramilitary fighter in the early 1980's after leftist guerrillas kidnapped and murdered his father. The AUC was, at first, dedicated to protecting wealthy ranchers from guerrilla kidnappings and assaults, but over time the group became a well-armed anti-insurgent force that sometimes operated with tacit approval of the Colombian military.

Colombia's new president, Alvaro Uribe, has said he will bring such illegal groups under control while at the same time pursuing a stronger military response to leftist rebel groups.

Mr. Uribe is currently in Washington seeking more support for his policies from both the Bush administration and U.S. congressional leaders.

**LOAD-DATE:** November 5, 2002

Source: News & Business > News > **News Group File, All** (i)
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:42 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment  (Edit Search)

☞ Select for FOCUS™ or Delivery

*Associated Press Worldstream September 25, 2002 Wednesday*

Copyright 2002 Associated Press
Associated Press Worldstream

September 25, 2002 Wednesday

**SECTION:** INTERNATIONAL NEWS

**DISTRIBUTION:** Europe; Britian; Scandinavia; Middle East; Africa; India; Asia; England

**LENGTH:** 557 words

**HEADLINE:** Colombian paramilitary leader says he will surrender to the U.S. under certain conditions

**BYLINE:** ANDREW SELSKY; Associated Press Writer

**DATELINE:** BOGOTA, Colombia

**BODY:**
Right-wing paramilitary chief **Carlos Castano,** wanted by the United States for drug trafficking, insisted Wednesday he is innocent but imposed conditions for his surrender to U.S. authorities.

Colombian authorities, meanwhile, called on the United States to seek the extradition of leaders of the rebel Revolutionary Armed Forces of Colombia, or FARC, if Washington is serious about fighting drug trafficking.

The appeal came a day after the U.S. government said it wanted to extradite Castano, leader of a paramilitary force that has been battling rebels, who also profit from drug trafficking.

"If there is coherence in U.S. policy ... it seems to me that in a few hours we will be receiving extradition requests for all the leaders of the FARC," Interior Minister Fernando Londono told parliament.

Castano said during a nationwide broadcast that his main condition for surrender was that his children be moved to the United States "because here in Colombia they will certainly be killed."

Colombian authorities indicated they would approve Washington's extradition request if Castano, who has two sons and whose wife is pregnant, is detained.

The leader of the United Self-Defense Forces of Colombia, or AUC, also said he wanted to be judged impartially, which he said he expects will happen in the United States.

"There, I will demonstrate my innocence, because I can rely on the impartiality of the American justice system," Castano told RCN television and radio. He said he was speaking on a mobile phone while traversing rugged terrain on horseback and crossing a river by canoe.

Castano - who did not give a time frame for any surrender - insists he has not personally

been involved in drug trafficking, although he freely admits to committing and ordering numerous killings of suspected rebel collaborators.

The U.S. Embassy in Bogota said it was not aware of any negotiations between the U.S. government and Castano for his surrender.

Castano recently mounted a campaign to distance the AUC from profiting from cocaine production in Colombia, the world's main supplier of the drug. But U.S. authorities said he was deeply involved in many facets.

Since 1997, Castano and two other indicted paramilitary figures fixed prices up the production chain and arranged to haul tons of cocaine by ship to the United States and Europe, according to the **indictment** unveiled Tuesday by the U.S. District Court in Washington.

The AUC said earlier this month it would limit itself to taxing growers of coca, the raw material of cocaine. Factions of the AUC, believed to number some 10,000 combatants, splintered over the new position, with some complaining it had not completely rejected cocaine production and others deciding to remain in the drug business.

On Sept. 13, the Colombian navy seized a speedboat with 4 tons of cocaine allegedly belonging to the paramilitaries.

In an e-mail to The Associated Press on Sept. 16, Castano lashed out at the paramilitaries involved.

"It is regrettable that this front ... which belongs to the AUC, is seen involved in drug trafficking matters, when days earlier we committed ourselves to not being involved in the dirty business of drug trafficking," he wrote.

He said continued drug trafficking constituted "a grave situation that threatens the unity and future of the AUC."

**LOAD-DATE:** September 26, 2002

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment** (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:43 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News Group File, All ⓘ
Terms: **carlos castano and indictment** (Edit Search)

↳ Select for FOCUS™ or Delivery

*Agence France Presse September 25, 2002 Wednesday*

Copyright 2002 Agence France Presse
Agence France Presse

September 25, 2002 Wednesday

**SECTION:** International News

**LENGTH:** 334 words

**HEADLINE:** Ex-paramilitary chief ready to turn himself over to authorities, in Colombia

**DATELINE:** BOGOTA, Sept 25

**BODY:**
Former Colombian paramilitary chief **Carlos Castano,** whose extradition is being sought by the United States on drug trafficking charges, said in a television interview Wednesday that he would turn himself in to authorities in Colombia.

"The US government will get me in Colombia when the conditions are there for me to turn myself in," Castano, the former leader of the right-wing United Self-Defense Forces of Colombia (AUC) paramilitaries, told RCN television, declining to specify when this might happen.

Castano, who in July stepped aside as the leader of the AUC, had said in Bogota on Tuesday that he would surrender to US authorities to show that he has lived a life "free from ties with drug trafficking." He said his lawyer, Joaquin Perez, was in Washington preparing for his surrender.

"My conscience is clean," Castano told RCN, announcing that he will "face US legal authorities" and prove his innocence.

Castano is accused of shipping some 17 tonnes of cocaine to the United States and Europe since 1997, a charge he denies.

During an official visit to Washington by Colombian President Alvaro Uribe, US Justice Department officials on Tuesday requested the extradition of Castano and two other paramilitary leaders, Salvatore Mancuso and Juan Carlos Sierra.

Attorney General John Ashcroft said in Washington that the **indictment** by a US federal grand jury marks the "convergence of two of the top priorities of the Department of Justice: the prevention of terrorism and the reduction of illegal drug use."

Uribe, in Washington since Monday on a three-day official visit, was to meet with President George W. Bush at the White House later Wednesday.

The AUC figures on the US State Department's list of terrorist organizations and is the sworn enemy of the country's leftist guerrillas, whom the department also views as terrorists.

The two sides, along with the Colombian military, have been locked in a 38-year civil war

that has killed more than 200,000 people.

**LOAD-DATE:** September 26, 2002

Source:    News & Business > News > **News Group File, All** ⓘ
Terms:    **carlos castano and indictment**   (Edit Search)
View:    Full
Date/Time:    Tuesday, June 24, 2003 - 3:44 PM EDT

About LexisNexis ׀ Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

THE NEW YORK TIMES **INTERNATIONAL** *THURSDAY, SEPTEMBER 26, 2002*

## Colombian Seeking a Deal in U.S. Drug Case

BOGOTÁ, Colombia, Sept. 25 (Reuters) — Colombia's most powerful right-wing paramilitary boss, Carlos Castaño, said today that he was negotiating a surrender to the United States, demanding protection for his children and a fair trial to defend himself on drug charges.

Mr. Castaño, whose paramilitary group is blamed for some of Colombia's most gruesome killings, was indicted on Tuesday in Washington along with two of his deputies for smuggling more than 17 tons of cocaine into the United States and Europe since 1997.

Mr. Castaño, who denies involvement in drug trafficking, said his lawyer was meeting with American officials in Washington.

"The only thing I would ask are that my children live in the United States because they will be killed here in all certainty, and that they try me in an impartial manner, without the Colombia stigma," said Mr. Castaño, who spoke in a radio interview from an undisclosed location. He has two children, and his wife is expecting to give birth in December.

The State Department said the government had not spoken directly with Mr. Castaño, who announced his intention to surrender in a letter on Tuesday just after the indictment was announced.

In Washington, President Bush met with Colombia's president, Al-

varo Uribe, and pledged to hold Mr. Castaño responsible for his actions. "The United States, which has spent $5.5 billion in Colombia's drug war, calls Mr. Castaño's group, the United Self-Defense Forces of Colombia, a terrorist organization.

With his knowledge of Colombia's underground, Mr. Castaño could provide important testimony on the country's cocaine trade, the largest in the world.

Lawyers in Colombia said they expected that Mr. Castaño would try to negotiate a deal with the United States. He said today that he would be willing to identify paramilitary groups involved in the drug trade.

U.S. v. F. OCHOA  99-CR-6153
MOTION TO DISMISS
EXHIBIT 11  PAGE 4

# N E W S   E X T R A

THURSDAY, SEPTEMBER 28, 2002 **The Herald 3A**

# Colombian outlaw vows to surrender

BY TIM JOHNSON
tjohnson@herald.com

WASHINGTON — Claiming his innocence, Colombian paramilitary leader Carlos Castaño said Wednesday he would surrender to U.S. authorities to battle federal drug trafficking charges once his lawyer works out the terms of his detention.

"I will turn myself over to U.S. judges because I am a man of my word," Castaño told Colombia's RCN radio and television. "I am not a drug trafficker, . . . I am not a bandit."

Castaño's whereabouts remained a mystery. The outlaw commander spoke by cellular telephone to the Colombian network, saying he was in wilderness terrain.

His Miami lawyer, Joaquín Pérez, said he would encourage Castaño to delay his surrender to iron out "logistical details" of any U.S. prosecution. Castaño and two associates were

---

**Paramilitary leader Carlos Castaño said he is innocent of drug charges.**

---

charged Tuesday with smuggling more than 17 tons of cocaine to Europe and the United States since 1997.

A prominent scholar, meanwhile, pondered what would happen if Castaño leaves the leadership of his illegal army, the United Self-Defense Forces of Colombia, or AUC, which the State Department listed last year as a terrorist organization.

"There's a great danger that the AUC will Balkanize, will fragment, and I fear that their regional commanders will become more like regional warlords," Bruce Bagley, a Univer-

sity of Miami expert on the narcotics trade, said in an interview from Mexico City, where he is on sabbatical.

In Washington, President Bush and President Alvaro Uribe of Colombia cast efforts to bring Castaño to justice as part of a worldwide war on terror.

"We will hold people to account. If they're a terrorist, we're going to hold them to account," Bush said with Uribe at his side in the Oval Office. "So the guy who got indicted yesterday made a decision to be a terrorist. We made a decision to hold him to account."

Uribe praised Bush for his "very effective example of the way we need to go on to fight and to defeat terrorism."

In his radio remarks, Castaño said his surrender depended on conditions.

"The only things I would ask are that my children live in the United States because they will

be killed here in all certainty, and that they try me in an impartial manner," Castaño said.

Castaño, 36, is believed to have two children.

"I am certain that I will prove my innocence, and I trust in the seriousness of U.S. judges," Castaño said in the interview.

Castaño is no foreigner to the U.S. justice system. According to several accounts, Castaño has encouraged at least a dozen Colombian traffickers to strike plea bargains with U.S. prosecutors in South Florida.

Bagley said he believed Castaño would assert that renegade members of the AUC might have engaged in drug trafficking — against his counsel.

He also said Castaño may look to strike his own deal with U.S. prosecutors, hoping to return one day to a political career in Colombia.

U.S. v. F. OCHOA  99-CR-6153
MOTION TO DISMISS
EXHIBIT 11  PAGE 5

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment  (Edit Search)

↙ Select for FOCUS™ or Delivery

*Voice of America News September 26, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
Voice of America News

September 26, 2002

**SECTION:** AMERICAS

**LENGTH:** 403 words

**HEADLINE:** Colombian Warlord Ready to Turn Himself to US Authorities

**BYLINE:** Greg Flakus, Bogota

**TEXT:**
Filed: 01:39 UTC

In Colombia, rightwing paramilitary warlord **Carlos Castano** says he is preparing to turn himself over to U.S. authorities to stand trial on drug smuggling charges. The fugitive guerrilla commander is also setting some conditions for his voluntary surrender.

In a telephone interview with Colombian radio station RCN, Mr. Castano again insisted he is innocent and expressed confidence that he would be able to prove his innocence if given a fair trial.

The flamboyant warlord also asked for equal treatment for other insurgents accused of drug-trafficking.

He said that if there is no extradition request for the leaders of leftist guerrilla groups, then he will have to assume his own **indictment** is the result of a deal struck between the United States and the main rebel group, the Armed Forces of Colombia, known as the FARC.

Both the FARC and another smaller leftist rebel group have used the drug trade to finance their military operations. Mr. Castano admits that some rightist paramilitary groups have also engaged in drug smuggling, but he says he has opposed it.

Colombia's Interior Minister, Fernando Londono says he believes the United States will also seek the arrest of FARC leaders.

He says that if U.S. policy is to be coherent, then he would expect, very soon, a request for extradition for the FARC commanders and the entire secretariat of the rebel group.

Unlike Mr. Castano, however, it is unlikely the FARC commanders would surrender and agree to be extradited. They have been engaged in a civil war against the Colombian central government for 38 years. Attempts to end the war through a negotiated settlement broke down in February and frustration with the war was cited as a prime reason voters chose tough-talking Alvaro Uribe in May's presidential election.

In the radio interview Wednesday, **Carlos Castano** said he is negotiating the terms of his surrender and asking for protection for his two children, who he said would be at risk if they

remain behind in Colombia. Mr. Castano's second wife is pregnant and is expecting to give birth in December.

Mr. Castano said his attorney is meeting with U.S. officials in Washington to work out the specific details of his surrender. However, the State Department says it has not been contacted by the Colombian warlord's representatives and Justice Department officials have scoffed at Mr. Castano's claims of innocence.

**LOAD-DATE:** November 5, 2002

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:44 PM EDT

About LexisNexis ¦ Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source:  News & Business > News > News Group File, All ⓘ
Terms:  carlos castano and indictment  (Edit Search)

  ⌐ Select for FOCUS™ or Delivery

*National Public Radio (NPR) September 30, 2002 Monday*

Copyright 2002 National Public Radio (R). All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to National Public Radio. This transcript may not be reproduced in whole or in part without prior written permission. For further information, please contact NPR's Permissions Coordinator at (202) 513-2000.
National Public Radio (NPR)

**SHOW:** Morning Edition (10:00 AM ET) - NPR

September 30, 2002 Monday

**LENGTH:** 707 words

**HEADLINE:** US **indictment** of right-wing leader **Carlos Castano** for drug trafficking gets mixed reaction

**ANCHORS:** BOB EDWARDS

**REPORTERS:** STEVEN DUDLEY

**BODY:**
BOB EDWARDS, host:

Last week, the Justice Department indicted Colombian right-wing paramilitary leader **Carlos Castano,** one fellow commander and another alleged paramilitary leader on charges of shipping as much as 16 tons of cocaine to the United States. The department is seeking their extradition. There's little hope Colombian authorities will capture Castano but some say he may turn himself in. Reporter Steven Dudley found the paramilitary leader in his jungle hideout.

STEVEN DUDLEY reporting:

Since the **indictment** came down, Castano hasn't stopped doing what he does.

(Soundbite of men speaking in foreign language)

DUDLEY: At a paramilitary camp in the jungles of northern Colombia, teen-age recruits emerge from a water-logged tunnel, then crawl through the mud beneath barbed wire at the behest of their trainers.

(Soundbite of men speaking in foreign language)

DUDLEY: Just a few feet away, Castano observes the action and comments to his fellow commanders.

Mr. **CARLOS CASTANO** (Right-Wing Paramilitary Leader): (Foreign language spoken)

DUDLEY: These days, the head of the loosely knit paramilitary alliance is at a pain to keep up appearances. It's hard. The US **indictment** has all but destroyed his dream of defeating his arch-enemies, the leftist guerillas, on the battlefield. His paramilitary alliance, known as the

AUC, is in tatters, his leadership of the group in question. The AUC grew exponentially under his command to include close to 15,000 men. The AUC also successfully pushed the rebels from many of their former strongholds and became the government's de facto ally in the war. But much of the AUC's finances came from drug trafficking, a fact that Castano admits tore his group apart and put him in the eye of the US justice system. On this day, he didn't want to talk into the microphone about his possible extradition. But a few weeks earlier, as rumors swirled of the pending **indictment,** the paramilitary leader said he would turn himself over to US authorities.

Mr. CASTANO: (Foreign language spoken)

DUDLEY: 'I would be willing to go there to face trial,' he said. 'There wouldn't be anything else to do because my conscience is clean.'

The US decision to request Castano's extradition sent shock waves through Colombia. The AUC leader has spent the last year trying unsuccessfully to clean the paramilitary's image of that of drug-trafficking mercenaries. He was also working hard to start peace and disarmament talks with the government. Analysts like National University political scientist Mauricio Romero say without Castano to pull together the dangerous and desperate paramilitary factions operating around the country, Colombia's war will get worse.

Mr. MAURICIO ROMERO (Political Scientist, National University): (Foreign language spoken)

DUDLEY: 'They were looking to negotiate or lay down their weapons,' Romero says, 'and now that's going to be impossible because the government can't negotiate with criminals, with people who are up for extradition.' Castano's situation may also complicate the war effort. The paramilitaries could dissolve if he faces trial in the US and the Colombian government could lose a critical component of its counterinsurgency plan.

But others applauded the US decision. Colombian and US human rights groups said it was a chance to try Castano on the multiple massacres and assassinations they say he's responsible for. Castano runs a ruthless war in which unarmed civilians suspected of aiding the guerillas fall under the paramilitary sword more than the armed rebels themselves. Carlos Rodriguez(ph) works for the Colombian Commission of Jurists in Bogota.

Mr. CARLOS RODRIGUEZ (Colombian Commission of Jurists): (Foreign language spoken)

DUDLEY: 'We want him to be tried for war crimes and crimes against humanity,' Rodriguez says, 'and I want reparations for the victims' families.'

In the meantime, Castano said he would continue fighting the guerrillas and training others to do the same. As darkness settles in the jungle, Castano, along with some of his teen-age recruits, sings the paramilitary's hymn, aptly titled, "Die Rebels." For NPR News, I'm Steven Dudley in the jungles of northern Colombia.

**LOAD-DATE:** March 18, 2003

Source: News & Business > News > News Group File, All ⓘ
Terms: carlos castano and indictment (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:44 PM EDT

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment** (Edit Search)

↙ Select for FOCUS™ or Delivery

*CNN LIVE EVENT/SPECIAL 13:08 November 6, 2002 Wednesday*

Content and programming copyright 2002 Cable News Network Transcribed under license by eMediaMillWorks, Inc. (f/k/a Federal Document Clearing House, Inc.). Formatting Copyright 2002 eMediaMillWorks, Inc. (f/k/a Federal Document Clearing House, Inc.). All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to Cable News Network. This transcript may not be copied or resold in any media.

CNN

**SHOW:** CNN LIVE EVENT/SPECIAL 13:08

November 6, 2002 Wednesday

Transcript # 110633CN.V54

**SECTION:** News; International

**LENGTH:** 1025 words

**HEADLINE:** Ashcroft Announces New Arrests

**BYLINE:** Martin Savidge

**HIGHLIGHT:**
Attorney General John Ashcroft outlines what apparently are two major busts on the part of federal investigators

**BODY:**
MARTIN SAVIDGE, CNN ANCHOR: We are going to go now and listen in to a news conference coming in from John Ashcroft.

JOHN ASHCROFT, U.S. ATTORNEY GENERAL: ... for anti-aircraft missiles which they said they intended to sell to Al Qaida forces in Afghanistan.

Today, because U.S. law enforcement officers have put their lives and their personal safety on the line, narcoterrorists from South America to Southeast Asia are less able to threaten American lives and American security.

In Houston, we have charged four men in a drugs-for-weapons plot, a plot to deliver some $25 million worth of weaponry to the United Self Defense Forces of Colombia, known by its Spanish acronym, AUC.

In the custody of Costa Rican and U.S. authorities this afternoon are the following individuals: Carlos Ali Romeros Verella (ph), an associate of the AUC leadership and a Houston resident; Hughey Jenson (ph), a naturalized U.S. citizen living in Houston; and Cezar Lopez (ph) and Commandant Emilio (ph), both high- ranking AUC leaders.

These defendants are charged with conspiracy to distribute cocaine and conspiracy to provide material support to a foreign terrorist organization.

Romeros (ph) and Jenson (ph) sought to broker the drugs-for- weapons exchange with AUC operatives Lopez (ph) and Emilio (ph). If convicted on all charges, each defendant faces up to life in prison.

Operation, quote, "White Terror," close quote, was a skillfully executed 13-month joint investigation under the Organized Crime Drug Enforcement Task Force by special agents of the Federal Bureau of Investigation and the Drug Enforcement Administration.

The AUC, whose leader **Carlos Castano**-Gil was charged with five counts of drug trafficking in September. That organization is an 800,000-man Colombian paramilitary group listed on the State Department's foreign terrorist organization list.

The Colombian police estimate that the AUC is responsible for 804 assassinations, 203 kidnappings, 75 massacres with 507 victims during the first 10 months of the year 2000.

**Carlos Castano**-Gil has boasted that 70 percent of his group's financing comes from drug trafficking.

The complaint filed against the defendant details how Romeros (ph) and Jenson (ph) arranged with an undercover law enforcement officer to purchase five shipping containers full of Russian and Eastern European made weaponry for the AUC.

Among the weaponry the defendants are charged with attempting to acquire are shoulder-fired anti-aircraft missiles and approximately 53 million rounds of various types of ammunition, 9,000 assault rifles, including AK-47s, sub-machine guns and sniper rifles, rocket-propelled grenade launchers and almost 300,000 grenades and an additional 300 pistols.

Copies of the complaint, which are being made available provide a more complete listing of the weaponry negotiated for purchase.

In a simultaneous strike against the terrorism, drug-trafficking nexus, an **indictment** was unsealed this morning in San Diego charging two Pakistani nationals and one United States citizen with conspiring to provide Stinger anti-aircraft missiles to anti-U.S. forces in Afghanistan.

Sayad Mustajub Shah (ph), Mohamed Abed Afridi (ph) and Ilias Ali (ph) are charged with conspiring to distribute heroin and hashish and conspiracy to provide material support to Al Qaida.

The **indictment** alleges the defendants arranged to exchange 600 kilograms of heroin and 5 metric tons of hashish for cash and four Stinger anti-aircraft missiles.

The **indictment** charges the defendants, who are currently in the custody of Hong Kong authorities, said that they intended to sell the anti-aircraft missiles to Al Qaida forces in Afghanistan.

If convicted on all counts, the defendants face up to -- terms of imprisonment of up to life.

Both of these successful investigations were the result of literally thousands of hours of complex and, I might add, often very dangerous work by law enforcement officials.

In the Houston case, undercover agents met with the defendants to negotiate the drugs-for-weapons deal in London, the Virgin Islands and Panama City, Panama. In the Virgin Islands, agents met with AUC members at an undercover warehouse to inspect some of the weaponry

involved in the negotiations.

These meetings were video and audio taped, exacerbating the risks to the agents involved.

Likewise, in the San Diego case, undercover law enforcement officials met with the defendants and recorded their negotiations for weapons and drugs.

Some of these meetings took place in Hong Kong. It was in one such meeting with undercover agents that the defendants stated that they intended to sell Stinger missiles to Al Qaida.

I want to thank Deputy Attorney General Larry Thompson for his pivotal role in the Organized Crime Drug Enforcement Task Force. This concept, which oversaw the Houston investigation with the FBI and the DEA, is an important component in our law enforcement arsenal.

And Larry, your reinvigoration of OCDETF is something for which I am grateful and I know America is grateful.

He was one of the originators, one of the original prosecutors that spearheaded this organization when it was created back in the 1980s and has sought to reinvigorate it and revitalize it as the centerpiece of our illegal drug supply reduction strategy.

SAVIDGE: You've been listening to U.S. Attorney General John Ashcroft as he outlines what apparently are two major busts on the part of federal investigators, one of them involving a narco-weapons ring that was operating apparently in Colombia, designed to use drugs to try to buy a massive amount of weaponry to be used against the Colombian government in drug wars there. The other apparently involving an attempt by certain drug people to use drugs to buy weapons in return, in this case stinger missiles, for those fighting against Operation Enduring Freedom in the war in Afghanistan. And there are a number of people under arrest in both of those cases. TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

**LOAD-DATE:** November 7, 2002

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:45 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved

Source: News & Business > News > News Group File, All ⓘ
Terms: **carlos castano and indictment** (Edit Search)

⌐ Select for FOCUS™ or Delivery
⌐

*FDCH Political Transcripts November 6, 2002 Wednesday*

Copyright 2002 eMediaMillWorks, Inc.
(f/k/a Federal Document Clearing House, Inc.)
FDCH Political Transcripts

November 6, 2002 Wednesday

**TYPE:** NEWS CONFERENCE

**LENGTH:** 3899 words

**HEADLINE:** JOHN ASHCROFT HOLDS NEWS CONFERENCE ON A CRIMINAL MATTER

**SPEAKER:**
JOHN ASHCROFT, U.S. ATTORNEY GENERAL

**LOCATION:** WASHINGTON, D.C.

**BODY:**

U.S. ATTORNEY GENERAL JOHN ASHCROFT AND FBI DIRECTOR ROBERT
MUELLER HOLD NEWS CONFERENCE ON A CRIMINAL MATTER

NOVEMBER 6, 2002

*** Elapsed Time 00:00, Eastern Time 01:07 ***

SPEAKERS: JOHN ASHCROFT
U.S. ATTORNEY GENERAL

ROBERT MUELLER
FBI DIRECTOR

LARRY THOMPSON
DEPUTY ATTORNEY GENERAL

ASA HUTCHINSON
ADMINISTRATOR, DRUG ENFORCEMENT ADMINISTRATION

MICHAEL SHELBY
U.S. ATTORNEY IN HOUSTON

ASHCROFT: Good afternoon, and thank you for coming. I'm pleased today to have with me a
number of individuals whose importance will become apparent as we continue with the news
conference: Larry Thompson, the deputy attorney general; Asa Hutchinson, the administrator
of the Drug Enforcement Administration; of course, Robert Mueller, the director of the FBI;

and Michael Shelby who is the U.S. attorney in Houston.

Over the past 24 hours, in separate law enforcement actions in two U.S. cities, the war on terrorism has been joined with the war on illegal drug use. In Houston, Texas, four men have been charged in a $25 million drugs-for-weapons scheme. In San Diego, three individuals have been indicted for conspiring to trade heroin and hashish for anti-aircraft missiles which they said they intended to sell to Al Qaida forces in Afghanistan. Today, because U.S. law enforcement officers have put their lives and their personal safety on the line, narcoterrorists from South America to Southeast Asia are less able to threaten American lives and American security.

In Houston, we have charged four men in a drugs-for-weapons plot, a plot to deliver some $25 million worth of weaponry to the United Self Defense Forces of Colombia, known by its Spanish acronym, AUC.

ASHCROFT: In the custody of Costa Rican and U.S. authorities this afternoon are the following individuals: Carlos Ali Romeros Verella (ph), an associate of the AUC leadership and a Houston resident; Hughey Jenson (ph), a naturalized U.S. citizen living in Houston; and Cezar Lopez (ph) and Commandant Emilio (ph), both high- ranking AUC leaders.

These defendants are charged with conspiracy to distribute cocaine and conspiracy to provide material support to a foreign terrorist organization.

Romeros (ph) and Jenson (ph) sought to broker the drugs-for- weapons exchange with AUC operatives Lopez (ph) and Emilio (ph). If convicted on all charges, each defendant faces up to life in prison.

Operation, quote, "White Terror," close quote, was a skillfully executed 13-month joint investigation under the Organized Crime Drug Enforcement Task Force by special agents of the Federal Bureau of Investigation and the Drug Enforcement Administration.

The AUC, whose leader **Carlos Castano**-Gil was charged with five counts of drug trafficking in September. That organization is an 800,000-man Colombian paramilitary group listed on the State Department's foreign terrorist organization list.

The Colombian police estimate that the AUC is responsible for 804 assassinations, 203 kidnappings, 75 massacres with 507 victims during the first 10 months of the year 2000.

**Carlos Castano**-Gil has boasted that 70 percent of his group's financing comes from drug trafficking.

The complaint filed against the defendant details how Romeros (ph) and Jenson (ph) arranged with an undercover law enforcement officer to purchase five shipping containers full of Russian and Eastern European made weaponry for the AUC.

ASHCROFT: Among the weaponry the defendants are charged with attempting to acquire are shoulder-fired anti-aircraft missiles and approximately 53 million rounds of various types of ammunition, 9,000 assault rifles, including AK-47s, sub-machine guns and sniper rifles, rocket-propelled grenade launchers and almost 300,000 grenades and an additional 300 pistols.

Copies of the complaint, which are being made available provide a more complete listing of the weaponry negotiated for purchase.

In a simultaneous strike against the terrorism, drug-trafficking nexus, an **indictment** was unsealed this morning in San Diego charging two Pakistani nationals and one United States

citizen with conspiring to provide Stinger anti-aircraft missiles to anti-U.S. forces in Afghanistan.

Sayad Mustajub Shah (ph), Mohamed Abed Afridi (ph) and Ilias Ali (ph) are charged with conspiring to distribute heroin and hashish and conspiracy to provide material support to Al Qaida.

The **indictment** alleges the defendants arranged to exchange 600 kilograms of heroin and 5 metric tons of hashish for cash and four Stinger anti-aircraft missiles.

The **indictment** charges the defendants, who are currently in the custody of Hong Kong authorities, said that they intended to sell the anti-aircraft missiles to Al Qaida forces in Afghanistan.

If convicted on all counts, the defendants face up to -- terms of imprisonment of up to life.

Both of these successful investigations were the result of literally thousands of hours of complex and, I might add, often very dangerous work by law enforcement officials.

In the Houston case, undercover agents met with the defendants to negotiate the drugs-for-weapons deal in London, the Virgin Islands and Panama City, Panama. In the Virgin Islands, agents met with AUC members at an undercover warehouse to inspect some of the weaponry involved in the negotiations.

ASHCROFT: These meetings were video and audio taped, exacerbating the risks to the agents involved.

Likewise, in the San Diego case, undercover law enforcement officials met with the defendants and recorded their negotiations for weapons and drugs.

Some of these meetings took place in Hong Kong. It was in one such meeting with undercover agents that the defendants stated that they intended to sell Stinger missiles to Al Qaida.

I want to thank Deputy Attorney General Larry Thompson for his pivotal role in the Organized Crime Drug Enforcement Task Force. This concept, which oversaw the Houston investigation with the FBI and the DEA, is an important component in our law enforcement arsenal.

And Larry, your reinvigoration of OCDETF is something for which I am grateful and I know America is grateful.

He was one of the originators, one of the original prosecutors that spearheaded this organization when it was created back in the 1980s and has sought to reinvigorate it and revitalize it as the centerpiece of our illegal drug supply reduction strategy.

Our thanks and gratitude also go to Director Robert Mueller and to the many agents of the Federal Bureau of Investigation who put themselves at high personal risk in order to secure these arrests, thank you very much.

And to the DEA Administrator Asa Hutchinson for his work and the work of his team, the dedicated agents of the Drug Enforcement Administration. Their courage and dedication were central to severing the deadly, mutually reinforcing connection between drug trafficking and terrorism in these cases.

ASHCROFT: And I also recognize and commend two dedicated U.S. attorneys at the center of these cases. One of those attorneys is here today, U.S. Attorney Michael Shelby of Houston,

Texas, a distinguished individual who has worked hard to make sure that American security is what it ought to be, and I'm grateful for your presence.

Additionally on the San Diego case was U.S. Attorney Carol Lamb (ph) who lead the team in San Diego in obtaining the **indictment** that was unsealed today regarding that case. She is to be commended, and I am grateful to her, and I look forward to thanking her in person.

Both of these individuals deserve our commendation and thanks.

I thank as well the following special agents in charge: Rich Garcia (ph) and Kevin Waley (ph) in Houston; and William Gore (ph) and Michael Vehil (ph) of San Diego.

Terrorism and drug trafficking thrive in the same conditions. They feed off of each other. They support each other. This afternoon, the citizens of our country are safer. Our citizens are more secure because a group of dedicated public servants has broken the link in two instances at least between terrorism and drug trafficking. They've earned our admiration and our respect and our gratitude.

I'd like to call upon FBI Director Robert Mueller at this time, and then I'll come back and take some questions.

MUELLER: Afternoon everyone. The **indictments** and arrests that were announced today are the result of extraordinary investigative efforts of FBI and DEA agents in San Diego, in Houston and at the FBI's legal attache office in Hong Kong. And I'd also like to take a moment to express my appreciation to our international colleagues, the Hong Kong police force, for their cooperation and assistance with our investigation in Asia.

In cases such as this, law enforcement depends on collaboration with our partners, whether it be domestic collaboration or collaboration with our international partners. And this case is a success story. It shows what can be accomplished when we all work together, with DEA working with FBI and with both of us working together overseas.

As I stated over the past year, fighting terrorism is the FBI's top priority. And those who support terrorists or engage in acts of terrorism will be brought to justice. I want to assure the American people that the FBI will continue to take all necessary steps to ensure the safety and security of the citizens of the United States.

Thank you.

ASHCROFT: Asa?

HUTCHINSON: Thank you, General Ashcroft, Director Mueller. We stood together in this room six weeks ago to announce for the first time the **indictment** of leaders and members of the AUC on drug trafficking charges as well.

HUTCHINSON: All of this following the FARC **indictments** previously rendered against Thomas Milenas (ph) and Carlos Bolus (ph). So the Colombian terrorists who were arrested yesterday in this million dollar cocaine for arms deal is yet another example of the convergence of violence and terrorism with drug trafficking. We have learned, and we have demonstrated that drug traffickers and terrorists work out of the same jungle, they plan in the same cave, and they train in the same desert.

I would express my thanks to the attorney general for his leadership, and Larry Thompson for his extraordinary support of the OCDETF program, Director Mueller for his partnership demonstrating that the FBI and the DEA can work together so cooperatively in cases that link the terrorism and drugs nexus.

And I want to express appreciation to the United States Attorney Miachel Shelby for his leadership in Houston. I want to turn the podium over to Mike.

SHELBY: Thank you, General.

I wanted to take just a moment to thank the men and women of the Drug Enforcement Administration and the FBI in Houston, Texas, and their colleagues all throughout the world that helped in our case.

We literally had agents from Spain, Portugal, attaches in Panama, and all over the place, that combined themselves together to go after the significant terrorist organization.

And I think that this case, to reiterate what the general has told you, this case shows very clearly that drugs are the currency of terrorists. This is the medium of terrorism in the 21st Century, and the men and women with the DEA and at the FBI, and at the U.S. Attorney's Office and certainly within the Department of Justice, are committed to flushing out those links and to destroying those organizations. Thank you.

ASHCROFT: Yes?

QUESTION: General Ashcroft, on the **indictment** in Paragraph Five, it says that the suspects in the San Diego case wanted to try and sell Stingers to the Taliban. And this is last month, and obviously the Taliban has pretty much disbanded at this point. Doesn't this suggest that these men either were not very well connected to Al Qaida or were not really that serious about following through with this sale?

ASHCROFT: Well, I'm not going to comment on the evidence in the case at this time. The complaint, I think, speaks for itself. And it alleges what those individuals had alleged in their negotiations.

Yes sir?

QUESTION: Do we have any other information linking them to Al Qaida outside of their own statements?

ASHCROFT: I'm not going to comment on evidence in this case outside those items that are presented clearly in the complaint.

QUESTION: Attorney General, is this the first investigation of this importance conducted with the government of China between the United States and the government of China?

QUESTION: I can't remember that type of cooperation being all that common.

ASHCROFT: Well, first of all, it is an interesting question. And it raises issues about the nature of the independent status or the separate and different status that Hong Kong and its territory exercises as compared to China generally.

I would just say this that at this time that the FBI Director Mueller expressed our appreciation to Hong Kong authorities and that they -- I conferred with them personally about this matter. And I had an opportunity to directly be involved in commending them for their cooperation on this matter during my recent trip to the Far East. And they did cooperate with us at a very, effective level, and for which we are grateful. To say further would be beyond what I should say at this time.

QUESTION: General, you must be feeling pretty good about the election results, especially in

your home state? Can you tell us your reaction?

ASHCROFT: Well, in my view, the president provided the nation with a clear agenda, and it was an agenda of leadership. And I believe that the American people have responded. The job of the Justice Department is to do what it -- everything it can to secure the process of elections.

And months ago, we began our plans to provide a program which would assure the right kind of access to the polling places for individuals and would also seek to reinforce the integrity of the voting process. And we had hundreds -- 300 or 400 hundred people from -- closer to 400 people from the Justice Department assigned to counties in about 14 different jurisdictions in order to try and assure the kind of integrity and access in this election that would restore confidence of the American people.

And the first thing I want to do is to commend the people from the Justice Department. The FBI was involved in that. I know when I asked every U.S. attorney -- Michael, you were a part of that -- to work together with other agencies including the FBI to establish a working relationship with local governments to secure the access and integrity of every voting place. And I think, overall, yesterday's elections appear to have been conducted quite well.

And there are some -- I'm going to be a while on this, so I'll try and remember you in a minute. Pardon me, but I'm just getting wound up here.

(LAUGHTER)

And I want to commend the individuals of the Justice Department for being involved in helping conduct elections that I think were conducted with large -- high degrees of success.

I think you asked me about my home state. And I think the people expressed themselves very clearly there. And obviously, the president's agenda -- which is a very important agenda, including the ability to pass laws that would protect the United States in terms of the reorganization of our homeland defense effort, the ability to have a judicial system that acts promptly by providing a forum in which judges and justices of the Supreme Court could be confirmed in a reasonable way -- the people acted clearly to do that.

I know that Jim Talent was elected in my home state. I have been associated with him in government service before, he as a member of the Congress and I as a member of the United States Senate. He is a minority leader of the Missouri House of Representatives during my time to serve as governor.

ASHCROFT: I have never met a person of greater integrity or more capable insight than he has. And I obviously am glad to see individuals of that quality and character be a part of the American governmental scene.

Next, go ahead.

(LAUGHTER)

QUESTION: I was just going to ask, the situation in Yemen with the CIA operation there, can you tell us your assessment -- and Director Mueller as well, if you could -- of the effect this is going to have on counterterrorism in general, the apparent shift in strategy? And does this change the way you go about law enforcement tactics with this new trend in targeted killing?

ASHCROFT: I believe that the war on terrorism is a war which we will continue to wage around the world. I believe it is being waged successfully. And for me to comment on specifics would probably take me into an area that would be inappropriate. I don't know

whether the director wants to jump into (inaudible) or not.

(CROSSTALK)

ASHCROFT: Thank you.

QUESTION: You correlated the relationship between drugs and terrorism, but in the year after 9/11 the FBI largely moved away from drug cases, in fact, I think at one point moving 400 agents over to the DEA. Is this something you're going to reconsider?

MUELLER: I'll be glad to answer that.

ASHCROFT: He wants to answer this question, and I'm going to let him in a minute, but I want to make it very clear that we have as a high priority of this department the curtailment of the supply of drugs in the United States. And we view that as our responsibility to curtail the availability and the inflow of drugs into this marketplace.

That's the goal of the OCDETF program. It's been undertaken with tremendous energy, supervised by the deputy attorney general. We are working in cooperation with the White House drug czar to make the right baseline estimates, so we can know when we make progress.

The president has indicated his desire to reduce the amount of drugs available in two years by 10 percent and in five years by 25 percent. We are committed to achieving those goals by working hard against those individuals at the highest levels of the drug supply chain that we can.

It is more than proverbial street sweeping, where you just go and pick up a lot of people who might be on drugs and get the numbers of prosecutions up. It is an effort to curtail the availability.

And I just would like to be on record and clear that we have not abandoned that. Today's **indictments** indicate that we are pursuing it with intensity. Look at the volumes that are involved simply in these transactions today.

ASHCROFT: And I would call upon Director Mueller to make any further remarks or corrections as he sees fit.

MUELLER: I think the two cases that we discussed today and for which we're holding this conference is a testimony to our continued participation in the war on drugs. It is very important for us as the FBI to stay in investigations, bringing what we can to the table.

We will be more focused in our efforts, but the cases they indicate are a sustained commitment to addressing international narcotics trafficking, doing it in a coordinated fashion with the DEA and within the United States not only with the DEA, but also with state and local law enforcement. But we will be more focused because, as I have said before, our principle -- our first priority is terrorism.

QUESTION: General, can you make a statement yet in the sniper case prosecution?

ASHCROFT: We are working toward a decision together with those individuals who are working on this investigation. This is a continuing investigation. I think it's fair to say that it is nationwide. The FBI, as part of the Justice Department, the Criminal Division of the Justice Department, as another part of the Justice Department, together with U.S. attorneys are working with state and local authorities in Washington state, in Louisiana, in Alabama, in Arizona, in Washington, D.C., in Virginia, in Maryland, and we're not ruling out the possibility

of other situations that might be related to this set of circumstances.

And I feel that Chief Moose presided over a very successful integrated coalition of law enforcement officials who successfully developed an investigation, and we want the same kind of cooperative spirit to characterize what we do by way of moving forward on charges and the right sequencing of charges, if that would be the best way for me to say it. I don't think in most circumstances the fact that someone moves forward on charges would deprive other jurisdictions of charges. It's a matter of sequencing.

I met with the FBI yesterday. We'll meet again today to discuss these matters. This will be a fact-driven analysis. We're still in the process of evaluating the facts which are still being developed, the applicable law which is obviously in place but is being assembled so that we have a good idea that can provide a basis for a decision.

ASHCROFT: I expect there to be a consensus among the jurisdictions involved to move forward, first in the jurisdiction which provides the best law and the best facts to bring individuals to swift and sure justice with appropriate penalties.

And, of course, I think it's well-understood on my part that I believe appropriate penalties for the kinds of atrocities that have been committed to include the ultimate sanction of the death penalty.

QUESTION: You are reported to be quite close to reaching a decision. I wonder if you'd have a time frame in mind that could tell us how soon you may announce this.

ASCHCROFT: Well, I remember when Mark Twain, I think it was, who escaped from peril and said that rumors of his demise had been greatly exaggerated, and some of the rumors of the proximity of this decision may have been at least previously, like yesterday, exaggerated because, obviously, I heard that same rumor, and I asked myself if it was true and I found that it wasn't, I wasn't...

(LAUGHTER)

So, this is going to be fact-driven, and there, as a matter of fact, if circumstances change at any moment, if additional evidence would necessitate our adjustment at any moment, we will be prepared to do so.

This is a process that's been a cooperative process, a collaborative process, and it will remain so. So it's with that in mind that we will make this decision, obviously with as much as dispatch as reason and prudence will allow.

And I think that's what it's fair for me to say about that at this time.

QUESTION: Looks like what you described the Houston arms deal was a much larger arms deal and you were dealing with individuals directly a part of the terrorist organization.

Was that deal a much bigger threat, direct threat to the U.S. public than the San Diego, Hong Kong deal?

ASHCROFT: I think both of these measures are significant. When you talk about anti-aircraft missiles being in the negotiations, you're talking about the the kinds of things that could be very dangerous and threaten the safety and security of large numbers of individuals.

And I don't think it's a good idea for me to speculate on the size of the transaction or what might have been the destination of the missiles in one case versus the destination of the missiles in another.

These are both very serious matters, they both demand our attention, and by interrupting each of these transactions, I believe we have helped secure the safety of the American citizen.

Thank you very much.

END

**NOTES:**
[????] - Indicates Speaker Unknown
  [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**PERSON:** JOHN DAVID ASHCROFT (96%); WILLIAM ASA HUTCHINSON (71%); HUGHEY JENSON (61%); AL QAIDA (61%);

**LOAD-DATE:** November 7, 2002

Source: News & Business > News > **News Group File, All** ⓘ
 Terms: **carlos castano and indictment**  (Edit Search)
  View: Full
Date/Time: Tuesday, June 24, 2003 - 3:45 PM EDT

About LexisNexis | Terms and Conditions


Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc  All rights reserved

Source:  News & Business > News > News Group File, All ⓘ
Terms:  carlos castano and indictment  (Edit Search)

↙ Select for FOCUS™ or Delivery

*The New York Times, November 14, 2002*

Copyright 2002 The New York Times Company
The New York Times

November 14, 2002, Thursday, Late Edition - Final

**SECTION:** Section A; Page 12; Column 1; Foreign Desk

**LENGTH:** 1108 words

**HEADLINE:** U.S. Strategy in Colombia Connects Drugs and Terror

**BYLINE:** By JUAN FORERO

**DATELINE:** LIMA, Peru, Nov. 13

**BODY:**
The United States' war on drugs in Colombia is rapidly being subsumed in the campaign against terror, according to Bush administration officials.

The **indictments** of three leaders of the Marxist Revolutionary Armed Forces of Colombia, or FARC, announced today in Washington by the United States attorney general, John Ashcroft, are just the latest in a series of American **indictments** against the leaders of the country's two major insurgent groups. **Carlos Castano,** the head of the right-wing Self-Defense Forces, was indicted on drug-trafficking charges in Washington in September, and four other men linked to the paramilitary group were indicted on drug-related charges in Houston this month.

The **indictment** unsealed today in federal court in Washington accuses three FARC military leaders, including Jorge Briceno Suarez, widely considered the second most powerful man in the rebel organization, of kidnapping and drug trafficking. Eight other, lower-ranking FARC members were charged with the same offenses.

According to administration officials, the **indictments** are part of a developing United States strategy of using the tactics of the drug war to help the new Colombian government of President Alvaro Uribe to combat both the right-wing paramilitaries and the Marxist guerrillas who have been waging a 38-year civil conflict, fueled primarily with drug money.

"This is a two-pronged approach," said an aide to Mr. Ashcroft. "We're going after the drug traffickers and the terrorist groups at the same time."

The **indictments** are seen by the administration as the best, and perhaps only, way for Washington to put direct pressure on the FARC and the Self-Defense Forces, known as the A.U.C. Both groups are included on the administration's list of terrorist organizations.

"Castano's sins are many and multiple and they're not just drug trafficking; they're also rape, pillage and plunder," said a high-ranking Bush administration official involved in shaping Colombia policy. "In terms of crimes against the United States and U.S. law, drug trafficking is the most salient and the one we could get an **indictment** on."

The **indictments** also acknowledged implicitly that Colombia's justice system, long criticized as weak and ineffectual, could not be trusted to bring Mr. Castano and his associates to trial.

"Since it is extremely unlikely that he would be prosecuted in Colombia, this **indictment** is a very positive step," said Jose Miguel Vivanco, the director of the Americas Division for Human Rights Watch, which vigorously supported the drug **indictments** against the paramilitaries. "We should never forget they got Al Capone on tax evasion charges."

The new American tactics seem to be producing results even though Mr. Castano and the FARC leaders remain at large, with little immediate prospect of their being arrested. Because it was singled out first by the Bush administration, the effects are most evident among the Self-Defense Forces, a confederation with at least 12,000 fighters that carries out mass killings and assassinations to erode support for the rebels.

The **indictments** have deepened divisions within the group, paramilitary commanders in Medellin and the surrounding countryside said in recent interviews, as commanders weigh how involved in the drug trade their factions should remain. They say that Mr. Castano, who has denied direct links to drug trafficking, is trying to rein in those commanders who are heavily involved in it.

Paramilitary commanders have long argued over the advisability of getting involved in the drug trade. Politically, some felt it sent the wrong message for groups that were supposedly defending the law against left-wing insurgents to be breaking the law themselves. Practically speaking, many feared exactly what has happened -- that the involvement in drugs would make them vulnerable to prosecution.

The **indictments** have caused "a very bad uneasiness" among top paramilitary leaders, said Piolin, , a commander in Medellin who works for Adolfo Paz, who leads a powerful faction within the A.U.C. considered to have some of the closest ties to drug trafficking. They worry that Washington, with its aggressive campaign against terrorism, could take drastic action to capture or kill Mr. Castano and other paramilitary commanders, Piolin said.

"We are talking about the United States," he added. "We are not talking about just any country."

Infighting between commanders over the drug issue has become such a serious problem that two factions are openly fighting, the paramilitary leaders say, and alliances between others are in tatters.

In an interview in his mountain camp far outside Medellin, a top commander once closely allied to Mr. Castano said that he and the 1,500 men he leads in the so-called Metro Bloc had split from the A.U.C. because they oppose the close ties other factions have with drug trafficking. His group is openly fighting forces controlled by Mr. Paz.

"In the Self-Defense Forces the great majority are involved directly with narco-trafficking," said the commander, who uses the alias Rodrigo.

American officials are reluctant to claim credit for the new antiterror strategy or even to admit that it exists. But they are clearly pleased with the unrest it has created.

"If indeed the **indictment** had the impact of further splintering the A.U.C. and further calling into question the leadership of those who from our point of view are tied to drug trafficking, so much the better," the Bush administration official said.

After the removal of Congressional restrictions on American aid to antidrug programs, the Bush administration is also training specialized commando units and helping establish a

reliable system of intelligence gathering that the units would use in pursuing insurgent commanders.

American troops will soon train a special 400-man commando unit that will track paramilitaries and rebels, with an emphasis on hunting down leaders. The American Congress is also considering legislation to provide $5 million for the training of a Colombian Army unit dedicated to pursuing paramilitary chiefs.

Those close to Mr. Castano said the **indictment** had blindsided him because the paramilitaries have always viewed themselves as allies of the Colombian Army in their war against the rebels.

On his Web site and in e-mail messages to associates, Mr. Castano has called the **indictment** "totally erroneous," and charged that the rebels have manipulated the United States government. In e-mail messages to a confidant, he has also expressed fears that the United States could bomb his camp.

http://www.nytimes.com

**GRAPHIC:** Photos: **Carlos Castano,** above, the head of a far-right group, and Jorge Briceno of a left-wing rebel group, below, have been indicted on drug charges. (Reuters); (Agence France-Presse)

**LOAD-DATE:** November 14, 2002

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:46 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News Group File, All (i)
Terms: carlos castano and indictment (Edit Search)

⌐ Select for FOCUS™ or Delivery

*State Department December 2, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
State Department

December 2, 2002

**SECTION:** SECRETARY OF STATE PRESS RELEASES

**LENGTH:** 1783 words

**HEADLINE:** Interview by Sergio Gomez Maseri of El Tiempo (Colombian Newspaper)

**TEXT:**
Interview by Sergio Gomez Maseri of El Tiempo

Secretary Colin L. Powell

December 2, 2002

MR. MASERI: -- your basic interest on the trip to Colombia and especially one which was mentioned by the spokesman last week about Colombia being the president of the Security Council now in December, which is a crucial month and especially because Iraq is there.

What would you expect from Colombia as president of the Security Council this month?

SECRETARY POWELL: December could be a very important month in the Security Council as the Iraqi declaration comes in, and I expect Colombia would be an active chair, would do an excellent job in making sure that the Council deliberates with utmost seriousness on the elements of the declaration.

Colombia was very helpful in the work that we conducted over the past two months to get the Iraqi resolution, and I stayed in close touch with my Colombian colleagues and I'm confident that would be the case for the month ahead.

Chairing the Security Council is an important responsibility, but I think it's something that Colombia has demonstrated it can do and do well. And all we would ask is Colombia not to show favor to any side, but to do what is required, especially with respect to Iraq, under 1441 to evaluate, along with other Security Council members, and as head of the Council, Iraqi compliance with 1441.

MR. MASERI: In terms of the visit, Mr. Secretary, two times: one canceled; one other time was planned but never took place. What's the message you want to take to Colombia in this opportunity?

SECRETARY POWELL: It's a message of solidarity. It's a message of support for President Uribe. I feel very badly that twice I've had to postpone a trip to Colombia. The first time everybody understands. It was the day of 11 September when I was heading to Colombia later that very same day when I had to come home. And then there was another emergency the next time I planned to visit it.

So this time I am coming. I am coming because I want to show United States support for President Uribe, his administration, for the new national security strategy and for our joint efforts to find narcotrafficking and narcoterrorism and those terrorist elements within Colombian society who are trying to destroy the dream of the Colombian people to have a democracy that gives them a society that is safe, a society that is developing in a way that will make Colombia a contributing member of the international community.

I also want to visit for the purpose of gaining an assessment of the situation so that I am better able to come back to the United States and present Colombia's case within the administration, but also on Capitol Hill; as we get ready for hearings next year I defend the funds we'll be requesting for that part of the world, and especially for Colombia to support Plan Colombia.

MR. MASERI: You mentioned those terrorist elements that are threatening Colombia. One of those terrorist elements, the paramilitary forces, has announced their intentions to go through negotiations with the government. They already have a unilateral ceasefire that is taking place. President Uribe has acknowledged that the contacts are taking place.

What do you think about that first contact?

SECRETARY POWELL: Well, it's certainly encouraging. Any time you see that kind of a ceasefire announcement, it's encouraging that maybe those elements in AUC have decided that this is not the way to go, this does not help our country, this does not help our people, this gives us a bad human rights reputation in the world and we should stop it. But now it remains to be seen whether it is a true ceasefire and whether it leads to a process that will end the difficulties that have existed with AUC. And I will be interested to hear President Uribe's response to what he has heard.

MR. MASERI: In terms of the fact they are a Foreign Terrorist Organization, according to the State Department, what them or any other organization have to do in order to eventually be removed from that list and be --

SECRETARY POWELL: Well, what they have now done does not get them off the terrorist list. It is merely a statement of a ceasefire.

We will see whether or not they fully renounce and reject these kinds of extralegal, unconstitutional actions and whether they are prepared to be integrated into a society that is based on democracy, and respect for human rights, and the rights of individual men and women, and the rule of law. And if that turns out to be the case at the end of the process and the Colombian Government believes that they have been integrated into society, then we would take all that into account.

We only keep on our list those organizations that have been participating in terrorist activity.

MR. MASERI: In terms of the US has been very aggressive pursuing, this year especially, leaders from those organizations. In the case of the AUC, **Carlos Castano** is in extradition request and also an **indictment** here. Do you think that fact that the US is pursuing that organization should become an obstacle for those contacts that have been taking place between both government and the AUC?

SECRETARY POWELL: I can't really speak to that. It's up to President Uribe to decide who he, you know, wishes to have contact with as a way of moving forward. But the leader remains indicted under US law and we would like to bring him to justice, and the AUC will remain a terrorist organization until it demonstrates that it is no longer a terrorist organization.

MR. MASERI: Mr. Secretary, two recent actions from the US that involve militaries in

Colombia, one, the position of the recommendation of Ambassador Patterson to decertify the unit that has been involved in human rights, and the other one the decision to remove the visa from not a general, an almirante which has nexus with narcotics.

What's the message there in those two actions? I mean --

SECRETARY POWELL: In the case of the general, there are specific issues that are under the purview of the Justice Department that caused the visa to be lifted. And in the case of the First Command, I think you're referring to --

MR. MASERI: Yeah.

SECRETARY POWELL: Their Combat Command, the incident that caused us concern is still under review and investigation.

The message, though, is that people have to be held accountable for their actions, especially if the actions are seen to violate universally accepted standards of human rights and how you operate with a democratic system. And so we will always continue to uphold these principles and the rule of law, and bringing people to justice, I think, is an essential element of the democratic system.

And Colombia has suffered from elements within it -- the AUC, the FARC and ELN -- who have been trying to damage Colombia's democracy, and narcotraffickers who are undercutting Colombian democracy are hurting people who would like to be living in a country where democracy flourishes, where economic development is taking place, where the rule of law applies to all. These kinds of activities are seen as totally undemocratic, totally unconstitutional, and have to be dealt with and have to be fought and people have to be brought to account.

And I think that's one of the things that the Colombian people were expecting from President Uribe and he seems to be leading in that direction.

MR. MASERI: The position of the decertification of that unit has already been --

SECRETARY POWELL: To my knowledge. I can make a check on it, but I don't think the unit has yet been decertified. But I'll let Ambassador Boucher be precise.

MR. MASERI: Okay.

SECRETARY POWELL: The recommendations were made, but then I think we went back to get more information. So I don't know if the actual decision has been made so let me not answer and Richard will get you the answer.

MR. MASERI: Going to the program, the interdiction flight program has been delayed for the last one-year and a half. What's the status on that? Do you have any --

SECRETARY POWELL: All of the retraining is underway now and when the retraining has been accomplished and we have taken the issue back to the President for his certification, then we will start it again. I don't want to give a specific date because I might be wrong. I am anxious to get it started as soon as possible. I've been pressing my staff for the longest time to get this finished.

But we had to be very careful because we want to make sure that the air bridge denial program is run in a way that makes sure that innocent people are safe flying in the airways, and for that reason we had to go through retraining, recertification, making sure we knew what we were doing, putting in place the right procedures and processes so we didn't have a

repeat of what happened a few years ago.

And for that same reason -- I mean, it applies both to Colombia and to Peru -- we're working hard, but I want to get it started again.

MR. BOUCHER: I hate to cut this off. Can we do one more question?

SECRETARY POWELL: We've got a swearing-in.

MR. MASERI: Yeah. There's a big movement of Colombians here and US citizens also here that have been requesting the State Department to grant eventually a TPS or Temporary Protection Status for millions of Colombians that are already here. You know this.

SECRETARY POWELL: Yeah, it continues to be under review. It's really a judgment that the Attorney General makes, with the advice and participation of the Secretary of State. But I don't have an answer for you now except to say it continues to be under review and I'm not expecting a decision in the immediate future.

I think that's the right -- that's where we have it at the moment, Richard. We understand the need for such status and we know that a number of nations who would like to have that status accorded to them also present their cases to us. But we have to use that authority as it currently exists with some discretion so that it isn't seen as a way of getting around our other immigration policies. So we'll have it under review.

We are anxious to do everything we can to help Colombia at this time. That's why we are pressing forward with our requests for money in the Congress. That's why we have gotten authority so that we can do more for Colombia with respect to intelligence, with respect to the kind of support that we can give to different parts of the Colombian Government. Colombia is threatened. Its democracy is threatened. And I'm pleased that President Uribe is leading in a way that will deal with these challenges and the United States wants to show its support of the president and his administration, which is why I'm taking this trip.

MR. MASERI: Thank you.

**LOAD-DATE:** December 3, 2002

Source:  News & Business > News > News Group File, All ⓘ
Terms:  **carlos castano and indictment**  (Edit Search)
View:  Full
Date/Time:  Tuesday, June 24, 2003 - 3:46 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: News & Business > News > News Group File, All (i)
Terms: carlos castano and indictment (Edit Search)

⌐ Select for FOCUS™ or Delivery

*Voice of America News December 3, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
Voice of America News

December 3, 2002

**SECTION:** AMERICAS

**LENGTH:** 352 words

**HEADLINE:** Powell Heads to Colombia for Talks on Aid, Narcotics Trafficking

**BYLINE:** David Gollust, Washington

**TEXT:**
Filed: 21:02 UTC

Secretary of State Colin Powell is enroute to Colombia for talks spanning two days with President Alvaro Uribe and other senior officials in Bogota.

Mr. Powell will spend about 24 hours in Colombia on a trip that was originally scheduled for September of last year but had to be postponed because of the terrorist attacks in New York and Washington.

In a pre-departure interview with the Colombian newspaper El Tiempo, Mr. Powell said he sees the visit as a "message of solidarity" for President Uribe in his efforts to fight narco-trafficking and what he termed "terrorist elements" trying to deny the Colombian people's dream for democracy and a safe society.

He also said he is making the trip for an assessment of conditions in the troubled country so as to be better able to defend the aid requests the Bush administration will be making for Colombia early next year.

The United States has provided that country with more than $1 billion in aid since 2000. The aid had been restricted to counter-narcotics programs, but the Bush administration won congressional authorization this year for U.S. funds to also support counter-insurgency efforts by the Bogota government.

Colombia's two main leftist insurgent groups, FARC and the ELN, are on the State Department's list of foreign terrorist organizations as is the rightist paramilitary group, the AUC, which Sunday announced it would respect a ceasefire and enter peace talks with the government.

In his El Tiempo interview, Secretary Powell welcomed the ceasefire but said it was not nearly enough to remove the AUC from the U.S. terrorism list.

He also said the Bush administration will continue to press for the extradition of AUC leader **Carlos Castano**, who is under **indictment** in the United States for cocaine trafficking.

After talks Wednesday with President Uribe and other government officials, Mr. Powell is to

tour counter-narcotics facilities and meet with local human rights groups.

Colombia is the fourth Latin American country Mr. Powell has visited since taking office, after Mexico, Peru and El Salvador.

**LOAD-DATE:** December 4, 2002

Source:  News & Business > News > **News Group File, All** ⓘ
Terms:  **carlos castano and indictment**  (Edit Search)
View:  Full
Date/Time:  Tuesday, June 24, 2003 - 3:47 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source:  News & Business > News > News Group File, All ⓘ
Terms:  carlos castano and indictment  (Edit Search)

↙ Select for FOCUS™ or Delivery

*State Department December 3, 2002*

Copyright 2002 Federal Information and News Dispatch, Inc.
State Department

December 3, 2002

**SECTION:** SECRETARY OF STATE PRESS RELEASES

**LENGTH:** 670 words

**HEADLINE:** Interview on RCN TV with Sandra Vergara (Colombian TV)

**TEXT:**
Interview on RCN TV with Sandra Vergara

Secretary Colin L. Powell

December 3, 2002

MS. VERGARA: Good morning, Mr. Secretary.

SECRETARY POWELL: Good morning.

MS. VERGARA: The US Government has been supportive of the Colombian Government in helping to fight narcoterrorism. Is there any other way, maybe more aggressive, to show that support to the Colombians to help stop violence and terrorism?

SECRETARY POWELL: Well, we are going to do everything we can. We are firmly committed to President Uribe and his new national security strategy. We are going to work with our Congress to provide additional funding for Colombia. We have gotten some authority from our Congress so we can not only help with narcotrafficking, but narcoterrorism as well.

We want to do everything we can to make President Uribe successful in his efforts to defeat these threats to the Colombian people, these threats to Colombian democracy.

MS. VERGARA: Now, Mr. Secretary, what is the US position on the possible negotiation between the Colombian Government and the paramilitaries? What is your opinion on the AUC's unilateral ceasefire proposal?

SECRETARY POWELL: Well, it was noteworthy that the AUC has decided upon a unilateral ceasefire, and I look forward to talking to Colombian leaders on my trip tomorrow and get their reaction to it and how serious is it. It's one thing to declare a ceasefire; it's another thing to actually bring it into place. But I think this is a positive development. I think it perhaps shows some understanding of the commitment that President Uribe has made to dealing with these kinds of organizations.

The AUC is considered a terrorist organization on our part and we believe that we have to have respect for human rights, we have to use the democratic and constitutional process in a democratic nation such as Colombia to deal with the problems in the country and not use violent paramilitary organizations.

MS. VERGARA: The AUC has demanded that the US Government stop any legal process against its members, such as **Carlos Castano** and Salvatore Mancuso. Is the US Government willing to accept these as a sign of supporting the Colombian Government?

And let me ask you something else. Is there any possibility of the US taking off the international foreign terrorist list if they made the commitment to stop the violence?

SECRETARY POWELL: Well, let's see what happens. All we have right now is a statement. But the individuals who are still under **indictment** and wanted here in the United States will remain under **indictment.** And all we have had so far is a declaration, a unilateral declaration of a ceasefire. Let's see whether or not AUC actually starts to break up and does it return to its proper place, that the members of the AUC and the organizations within the AUC return to its proper place within a democratic society.

For those individuals under **indictment,** of course, I do not have any authority to waive those **indictments.**

MS. VERGARA: So will this stop their extradition?

SECRETARY POWELL: I've answered the question.

MS. VERGARA: All right. Mr. Secretary, I just wanted a last message to Colombian people. What is your message?

SECRETARY POWELL: I look forward to visiting Colombia very much. This will be my third try. I was going to visit Colombia on the 11th of September 2001, and you know what happened on that terrible day and I couldn't go from Lima to Bogota. And then another time I was hoping to visit, but a crisis emerged.

But this time I am going to visit Colombia. I want to meet with President Uribe and the other leaders and I want to make my own assessment so that I come back and present what I see to our Congress and to the President to gather more support for the new administration in Colombia and to gather more support from the United States for the Colombian people to help them with their dream of living in peace and security, and investing in their nation and investing in their people, and getting rid of narcotrafficking and narcoterrorism.

**LOAD-DATE:** December 3, 2002

Source: News & Business > News > **News Group File, All** ⓘ
Terms: **carlos castano and indictment** (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:47 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved

Source: News & Business > News > News Group File, All (i)
Terms: **carlos castano and indictment**  (Edit Search)

↰ Select for FOCUS™ or Delivery
☐

*Federal Document Clearing House Congressional Testimony May 20, 2003 Tuesday*

Copyright 2003 FDCH e-Media, Inc.
(f/k/a Federal Document Clearing House, Inc.)
Federal Document Clearing House Congressional Testimony

May 20, 2003 Tuesday

**SECTION:** CAPITOL HILL HEARING TESTIMONY

**LENGTH:** 8046 words

**COMMITTEE:** SENATE JUDICIARY

**HEADLINE:** NARCO-TERRORISM

**TESTIMONY-BY:** MR. STEVEN W. CASTEEL, ASSISTANT ADMINISTRATOR FOR INTELLIGENCE

**AFFILIATION:** DRUG ENFORCEMENT ADMINISTRATION

**BODY:**
Statement of Mr. Steven W. Casteel Assistant Administrator for Intelligence Drug Enforcement Administration

Committee on Senate Judiciary

May 20, 2003

Prior to September 11, 2001, the law enforcement community typically addressed drug trafficking and terrorist activities as separate issues. In the wake of the terrorist attacks in New York City, Washington, DC, and Pennsylvania, these two criminal activities are visibly intertwined. For the Drug Enforcement Administration (DEA), investigating the link between drugs and terrorism has taken on renewed importance. More importantly, it has heightened the visibility of DEA's mission - one that was present even before September 11th. Throughout history, a broad spectrum of the criminal element - from drug traffickers to arms smugglers to terrorists - have used their respective power and profits in order to instill the fear and corruption required to shield them from the law. Perhaps the most recognizable illustration of this linkage is the expansion of Traditional Organized Crime in the United States during the early 20th century. Whether a group is committing terrorist acts, trafficking drugs or laundering money, the one constant to remember is that they are all forms of organized crime. The links between various aspects of the criminal world are evident because those who use illicit activities to further or fund their lifestyle, cause, or fortune often interact with others involved in related illicit activities. For example, organizations that launder money for drug traffickers often utilize their existing infrastructure to launder money for arms traffickers, terrorists, etc. The link between drugs and terrorism is not a new phenomenon.

Globalization has dramatically changed the face of both legitimate and illegitimate enterprise. Criminals, by exploiting advances in technology, finance, communications, and transportation in pursuit of their illegal endeavors, have become criminal entrepreneurs. Perhaps the most alarming aspect of this "entrepreneurial" style of crime is the intricate manner in which drugs

and terrorism may be intermingled. Not only is the proliferation of illegal drugs perceived as a danger, but the proceeds from the sale of drugs provides a ready source for funding for other criminal activities, including terrorism.

Chairman Hatch, Ranking Member Leahy and distinguished members of the committee, it is my distinct pleasure to appear before you in my capacity as the Assistant Administrator for Intelligence of the DEA. Before I begin, Mr. Chairman, I would like to recognize you and the members of the committee for your outstanding support of DEA's mission and the men and women who serve it.

The DEA does not specifically target terrorists or terrorist organizations. It is DEA's mission to investigate and prosecute drug traffickers and drug trafficking organizations. However, some of the individuals and/or organizations targeted by the DEA may be involved in terrorist activities. In fact, fourteen (or 39 percent) of the State Department's current list of 36 designated foreign terrorist organizations have some degree of connection with drug activities. Due to DEA's global presence and the strong relationship with local law enforcement through the DEA Task Force Program, it is only natural, that in the course of drug investigations and intelligence collection, DEA would develop intelligence and information concerning terrorist organizations.

Defining Narco-Terrorism

According to 22 U.S.C.S.2656f(d)(2)), terrorism is the premeditated, politically motivated violence against noncombatant targets by sub-national groups or clandestine agents. International terrorism involves citizens, or territory, of more than one country. A terrorist group is any group practicing, or that has significant sub-groups that practice, international terrorism.

Historically, DEA has defined narco-terrorism in terms of Pablo Escobar, the classic cocaine trafficker who used terrorist tactics against noncombatants to further his political agenda and to protect his drug trade. Today, however, governments find themselves faced with classic terrorist groups that participate in, or otherwise receive funds from, drug trafficking to further their agenda. Consequently, law enforcement may seek to distinguish whether narco-terrorists are actual drug traffickers who use terrorism against civilians to advance their agenda, or principally terrorists who out of convenience or necessity, use drug money to further their cause. Our analysis suggests that the label of narco-terrorist may be equally applicable to both groups.

DEA defines a narco-terrorist organization as "an organized group that is complicit in the activities of drug trafficking in order to further, or fund, premeditated, politically motivated violence perpetrated against noncombatant targets with the intention to influence (that is, influence a government or group of people)."

The Pablo Escobar Example

One of the most infamous "narco-terrorists" was Pablo Escobar. As leader of the Medellin cocaine cartel in Colombia, he became one of the wealthiest and most feared men in the world. At the height of his success, Escobar was listed in Forbes Magazine as being among the world's wealthiest men. While on the surface, he was nothing more than a street thug who became successful by trafficking in cocaine, Escobar had political aspirations and strove to project the appearance of legitimacy, claiming his wealth was the result of real estate investments. Escobar had a penchant for violence. He wreaked havoc on Colombia while attempting to persuade the government to change its extradition policy. Due to the numerous assassinations of politicians, presidential candidates, Supreme Court justices, police officers, and civilians, as well as a number of bombings culminating in the bombing of an Avianca commercial airliner in 1989, Escobar enraged both Colombia and the world. These

actions resulted in a massive manhunt and his death in 1993. Escobar was a drug trafficker who used drug-related violence and terrorism to further his own political, personal, and financial goals. He was the classic narco-terrorist; his cause was simply himself.

South America

One does not have to go to the Middle East to find active terrorist groups - they exist right in our hemisphere. The U.S. State Department has officially designated the National Liberation Army (ELN), the Revolutionary Armed Forces of Colombia (FARC), and the United Self-Defense Groups of Colombia (AUC) as Foreign Terrorist Organizations. These organizations, all based in Colombia, were responsible for some 3,500 murders in 2002. As in years past, Colombia endured more kidnappings last year than any other country in the world, roughly 3,000. Overall, the AUC, ELN, and FARC all benefit and derive some organizational proceeds from the drug trade, as well as other illegal activities such as kidnapping, extortion, and robbery.

DEA is actively building cases on members of these groups who have been identified as engaging in drug-trafficking related activities, which are summarized below:

- March 7, 2002, FARC 16th Front Commander Tomas Molina-Caracas and several of his Colombian and Brazilian criminal associates were indicted in the District of Columbia for conspiring to manufacture and distribute cocaine with the intent and knowledge that it would be illegally imported into the United States. In June 2002, Surinamese authorities detained DEA fugitive Carlos Bolas; a Colombian national and FARC member who was named in the March 2002 **indictment.** Shortly thereafter, DEA agents transported Bolas from Suriname to the Washington D.C. area for arraignment in U.S. District Court. This marked the first time that the U.S. indicted and arrested a member of a terrorist organization involved in drug trafficking.

- On September 24, 2002, the U.S. Government announced an **indictment** charging leaders of the AUC with trafficking over seventeen tons of cocaine into the United States and Europe beginning in early 1997. Charged in the **indictment** are AUC leader **Carlos Castano**-Gil, AUC military commander Salvatore Mancuso, and AUC member Juan Carlos Sierra-Ramirez. According to the **indictment, Carlos Castano**-Gil directed cocaine production and distribution activities in AUC-controlled regions of Colombia.

- In November 2002, U.S. Attorney General John Ashcroft announced the takedown of Operation White Terror with the arrests of Fernando Blanco-Puerta, Elkin Arroyave-Ruiz, Uwe Jensen, and Carlos Ali Romero-Varela for their involvement in a multi-million dollar cocaine-for-arms deal. Fernando Blanco-Puerta and Elkin Arroyave-Ruiz were allegedly AUC commanders. All four defendants are charged with conspiracy to distribute cocaine and conspiracy to provide material support and resources to a foreign terrorist organization. This Operation was an Organized Crime Drug Enforcement Task Force (OCDETF) investigation conducted by the Houston offices of the Federal Bureau of Investigation and DEA.

- On November 13, 2002, the U.S. Government announced that Jorge Briceno-Suarez was named in a superseding **indictment** for his narcotics trafficking activities. Jorge Briceno-Suarez commands the Eastern Bloc of the FARC and is a member of the FARC Secretariat. As Eastern Bloc Commander, Briceno-Suarez (direct superior of Tomas Molina-Caracas) is responsible for the activities of four FARC Mini-Blocs that operate in the vast eastern plains of Colombia.

Revolutionary Armed Forces of Colombia

The FARC, the largest of Colombia's terrorist organizations, uses its relationships with international smuggling organizations to purchase weapons and other equipment on the

international black market to be used in the FARC's war against the Colombian government. In some cases, the FARC directly trades cocaine for weapons and in other instances funds weapons purchased with cash derived from cocaine sales.

The FARC are by far the most visibly violent of Colombia's terrorist organizations and have repeatedly demonstrated their willingness to utilize violence to further their agenda. The FARC intensified its terrorist offensive throughout 2002 and 2003 and steadily moved its attacks from the countryside to the cities.

- On August 7, 2002, Colombian President Alvaro Uribe was inaugurated amid a FARC mortar attack on the Presidential Palace in the heart of Bogota. One errant mortar killed 21 residents of an impoverished Bogota neighborhood.

- On February 7, 2003, a car bomb exploded at Club El Nogal, a popular social club on the north side of Bogota near many residences of U.S. Embassy personnel. Thirty-five persons were killed including several children. The investigation by Colombian authorities revealed that the FARC was responsible for this terrorist act.

- On May 5, 2003, Antioquia Governor Guillermo Gaviria and Gilberto Echeverri, former defense minister and peace adviser, were assassinated by the FARC near Urrao Municipality, Antioquia Department. The two officials were murdered along with eight non- commissioned officers and soldiers.

- On May 8, 2003, twenty-eight occupants of a Satena Airline aircraft were terrorized, but otherwise unharmed, when FARC members shot at the aircraft as it was getting ready to land on the runway in La Macarena, Meta (formerly part of the demilitarized zone).

United Self Defense Forces of Colombia And the National Liberation Army

The AUC, commonly referred to as autodefensas or paramilitaries, is an umbrella organization of approximately 13 self-defense groups. The AUC is supported by economic elites (cattle ranchers, emerald miners, coffee plantation owners), drug traffickers, and local communities lacking effective government security, and claims as its primary objective the protection of sponsors from insurgent attacks. The AUC now asserts itself as a regional and national counter-insurgent force. It is adequately equipped and armed, and reportedly pays its members a monthly salary. In 2000, AUC leader **Carlos Castano** claimed 70 percent of the AUC's operational costs were financed with drug-related earnings, with the balance coming from sponsor donations.

AUC operations vary from assassinating suspected insurgent supporters to engaging guerrilla combat units. Colombian National Police reported the AUC conducted 804 assassinations, 203 kidnappings, and 75 massacres with 507 victims during the first 10 months of 2000. The AUC claims the victims were guerrillas or sympathizers. Combat tactics consist of conventional and guerrilla operations against main force insurgent units. AUC clashes with military and police units are increasing, although the group has traditionally avoided confrontation with government security forces. The paramilitaries have not yet taken action against US personnel.

The ELN -- like the FARC -- continues to pursue its favored terrorist methods of kidnapping and infrastructure bombing. There are currently no formal or informal peace talks between the ELN and the Colombian government. On March 5, 2003, a car bomb exploded in a shopping center in the northeastern city of Cucuta, killing seven people and injuring more than 50. Military and police sources attributed the Cucuta attack to ELN guerrillas operating in the city.

Spill-Over Into Central America

DEA reporting indicates that persons affiliated with the AUC, and to a lesser extent the FARC, are working with Mexican and Central American trafficking organizations to facilitate cocaine transshipments through the region. Consistent with these reports, a Government of Mexico official recently stated that members of the AUC and the FARC are carrying out drug-trafficking activities in Mexico. There have been numerous instances of drugs-for- weapons exchanges occurring in the region, particularly in Central America, that are exemplified by the November 2002 takedown of Operation White Terror which resulted in the dismantling of an international arms and drug trafficking network linked to the AUC. DEA continues to work with Host Nation Counterparts in Latin America to pursue and disrupt the drug trafficking activities of these vast traditional criminal networks providing financial support to the AUC and the FARC.

Panama

- July 22, 2002 - After arrests involving the seizure of 10 kilograms of heroin, intelligence revealed that additional drugs were to be located at the beach house of one of the arrested. The police returned to the beach house to find an additional 6 kilograms of heroin, 300 kilograms of cocaine, and 260 kilograms of marijuana. Also discovered were 139 AK-47s, 11 Dragonov sniper rifles, 1 Fal 7.62 rifle, 2 .45 caliber submachine guns, 247 AK- 47 ammunition clips and 598 rounds of 7.62 bullets.

- November 6, 2002 - After establishing surveillance at a location where a number of seizures had recently been made, local authorities observed several men carrying large burlap bags. A fire fight occurred after the police approached the men. The police captured one suspect while several others escaped. Subsequently, six additional suspects were apprehended by means of road blocks. The abandoned bags contained 316 kilograms of cocaine, 57 packets of heroin, 410 heroin pellets, and 1,134 small cylinders containing heroin. The next day the police found a cache of AK-47 rifles and other assorted small arms and ammunition in an abandoned pick-up truck that one of the suspects had rented. This seizure like several others in Panama suggest that significant drug transaction orchestrated by Colombian paramilitary groups are often simultaneously accompanied by a significant arms shipment.

DEA intelligence indicates that due to the political and economic crisis in Venezuela, the FARC and AUC are increasingly utilizing Venezuela as a transit zone to smuggle drugs, arms, chemicals and monies to and from Colombia. The declining economy and inability by the Government of Venezuelan (GOV) to effectively control the VZ/CB border has resulted in increased drug trafficking, kidnapping and corruption within in the region as a whole. Reporting indicates that some of this activity is directly attributed to the FARC and AUC, as well as other criminal organizations based within the region.

Ecuadorian security forces have worked to reduce the smuggling of arms destined for Colombian terrorist groups and have limited travel at a key border crossing to daytime hours. Nevertheless, armed violence on the Colombian side of the border has contributed to increased lawlessness in Ecuador's northern provinces.

HAMAS & Hizballah in the Tri-Border Area

The two major terrorist organizations that exist in the Tri- Border Area of Paraguay, Argentina, and Brazil are Hizballah and the Islamic Resistance Movement known as HAMAS. The members of these organizations often assimilate into the local culture and typically become merchants in shopping centers to conceal their illegal activities. Intelligence indicates that Islamic fundamentalist terrorist cells operate out of strongholds in the Tri-Border Area of Paraguay, Brazil and Argentina. They generate significant income by controlling the sale of various types of contraband in these areas, including drugs, liquor, cigarettes, weapons, and forged documents. Intelligence suggests that a large sum of the earnings from these illegal

# EXHIBIT "14"

CLOSED

U.S. District Court
District of Connecticut (New Haven)

CRIMINAL DOCKET FOR CASE #: 95-CR-144-ALL

USA v. Bergonzoli                                          Filed: 10/03/95
Dkt# in other court: None

Case Assigned to: Judge Peter C. Dorsey

NICHOLAS BERGONZOLI (1)
      defendant
  [term  03/12/99]


Pending Counts:

    NONE


Terminated Counts:                        Disposition

21:963=CI.F ATTEMPT/CONSPIRACY    RULE 20 Transfer to Southern
- CONTROLLED SUBSTANCE -          District of Florida
IMPORT/EXPORT                     (1)
(1)


Offense Level (disposition): 4



Complaints:

    NONE


U. S. Attorneys:

   NONE




Docket as of May 8, 2002 3:44 pm                  Page 1

U.S. v F OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 18, PAGE 1

```
Proceedings include all events.
 :95cr144-ALL USA v. Bergonzoli
                                                           CLOSED
10/3/95   1      INDICTMENT returned in Bridgeport before HBF    as to
                 Nicholas Bergonzoli (1) count 1. Direct assign to PCD,
                 related to Kakalaetris 5:92cr41. GJB94-1. Bench Warrant to
                 issue (ctb) [Entry date 10/05/95]

10/3/95   --     Bench WARRANT issued as to Nicholas Bergonzoli (ctb)
                 [Entry date 10/05/95]

3/12/99   2      Consent to Transfer Jurisdiction (Rule 20) to Southern
                 District of Florida as to Nicholas Bergonzoli Counts
                 closed: Nicholas Bergonzoli (1) count(s) 1   Certified
                 copy of docket sheet and file sent to Southern District of
                 Florida (vjj) [Entry date 03/18/99]

3/26/99   3      Acknowledged Receipt of file, to FL: case #99-00196crDAVIS,
                 MJ Bandstra as to Nicholas Bergonzoli (vjj)
                 [Entry date 03/29/99]

7/28/00   4      MARSHAL'S RETURN of service on Arrest Warrant executed as
                 to Nicholas Bergonzoli on 3/12/99 (vjj)
                 [Entry date 07/31/00]
```

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 18, PAGE 2

# CRIMINAL COVER SHEET

**Place of Offense**

**Related Case Information**

Superseding Indictment _____ Docket Number 3:95CR.1441
Same Defendant _____ New Defendant _____

STAMFORD, CT _____ City

Magistrate Case Number _____

FAIRFIELD _____ County

Search Warrants Case No. _____
R 20 / R 40 from District of _____

---

### Defendant

Defendant Name    Nicholas Bergonzoli

Alias Names       None

Address           Medelin, Colombia

Birth Date        4/29/62

SS Number _____         Male   X _____    Female _____

---

☐ Complaint

☐ Information

☒ Indictment

U.S. Attorney    Christopher F. Droney     Bar # CT00020
AUSA             Theodore B. Heinrich      Bar # CT07222
AUSA             _____                     Bar # _____

**Where Witnesses Reside:** (note beside each town the number of witnesses who reside there, i.e. Hartford - 3)

1-New Haven

---

## U.S.C. CITATIONS

TOTAL NUMBER OF COUNTS    1

|       | INDEX KEY/CODE | Description of Offense Charged | COUNT(S) |
|-------|----------------|-------------------------------|----------|
| set 1 | 21:963=CI.F    | CONT. SUBSTANCE-IMPORTATION/EXPORTATION | 1 |
| set 2 |                |                               |          |
| set 3 |                |                               |          |

(MAY BE CONTINUED ON SECOND SHEET)

☐ Petty        ☐ Misdemeanor        ☒ Felony

## LOCATION STATUS

Arrest Date _____

U.S. v F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 18, PAGE 3

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT Oct 3  11 07 AM '95

UNITED STATES OF AMERICA    :    CRIMINAL NO. : 3:95CR144 PCD
                            :
          v.                :    VIOLATIONS:
                            :    21 U.S.C. § 963 (Conspiracy
NICHOLAS BERGONZOLI         :    to Import Cocaine)

I N D I C T M E N T

The Grand Jury charges:

COUNT ONE

From sometime in or about August, 1991, the exact date to the grand jury unknown, to on or about December 7, 1991, in the District of Connecticut and elsewhere, the defendant, **NICHOLAS BERGONZOLI**, together with unindicted co-conspirators Paul Kakaletris, Dino Mandarino, and Diego Narvaez, did knowingly and intentionally conspire and agree together, and with others to the grand jury known and unknown, to import into the United States from a place outside thereof, more than 5 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 952(a), 960(a)(1) and 960(b)(1)(B).

All in violation of Title 21, United States Code, Section 963.

A TRUE BILL

_____
FOREPERSON

_____
CHRISTOPHER F. DRONEY
UNITED STATES ATTORNEY

_____
THEODORE B. HEINRICH
ASSISTANT UNITED STATES ATTORNEY

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 18, PAGE 4

No.

# UNITED STATES DISTRICT COURT

District of ___ CONNECTICUT ___

___ Division

## THE UNITED STATES OF AMERICA

vs.

NICHOLAS BERGONZOLI

# INDICTMENT

ONE COUNT

21 United States Code, Section 963 (Conspiracy to Import Cocaine)

A true bill.

_____
Foreman

Filed in open court this _____ day,

of _____ A.D. 19 _____

_____
Clerk

Bail, $ _____

FORM DBD-34
JUN. 63

# United States District Court

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

NICHOLAS BERGONZOLI

## WARRANT FOR ARREST

CASE NUMBER: 3:95cr144PCD

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   Nicholas Bergonzoli
                                                              Martin

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment  ☐ Information  ☐ Complaint  ☐ Order of court  ☐ Violation Notice  ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Controlled substance-importation/exportation; as further mentioned in the certified copy
of the indictment attached hereto:

in violation of Title _____21_____ United States Code, Section(s)_____963_____

Kevin F. Rowe
Name of Issuing Officer

Catherine Bordley
Signature of Issuing Officer     Catherine Bordley Deputy Clerk

Clerk
Title of Issuing Officer

Bridgeport, 10/3/95
Date and Location

Bail fixed at $ _____ by _____
                                                                    Name of Judicial Officer

| RETURN |
|--------|

This warrant was received and executed with the arrest of the above-named defendant at _____

_____

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---------------|-------------------------------------|--------------------------------|
| DATE OF ARREST | | |

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS

In the United States District Court

for the _____ District of CONNECTICUT

FILED

MAR 12   2 35 PM '99

U.S. DISTRICT COURT
NEW HAVEN, CONN

United States of America

v.

NICHOLAS BERGONZOLI

Criminal No. 3:95CR144 (PCD)

Consent to Transfer of Case

for Plea and Sentence

(*Under Rule 20*)

I, _Nicholas Bergonzoli_, defendant, have been informed that a _indictment_____ (*indictment,*

*information, complaint*) is pending against me in the above designated cause. I wish to plead _guilty_____

(*guilty, nolo contendre*) to the offense charged, to consent to the disposition of the case in the _Southern_____

District of _Florida_____ in which I _am under arrest_____ (*am under arrest, am held*) and to waive

trial in the above captioned District.

Dated: __February 15__, 19_99_ at _____

_____
(*Defendant*)

_____
(*Witness*)

_____
(*Counsel for Defendant*)

Approved

_____
United States Attorney for the

_____ District of

CONNECTICUT

_____
United States Attorney for the

SOUTHERN_____ District of

FLORIDA

FORM USA-153
SEP 82

U.S. v. F. OCHOA, 99-CR-6153
MOTION TO DISMISS
EXHIBIT 18, PAGE 7

March 18, 1999

Carlos Juenke, Clerk
USDC
Federal Courthouse Square
301 North Miami Avenue
Miami, FL 33128-7788

Dear Clerk,

**99 - 00196 CR-DAVIS**

Enclosed please find certified copies of docket sheet, Indictment and Rule 20 papers

in case number 3:95cr144 (PCD).

MAGISTRATE JUDGE
BANDSTRA

Please sign and return the copy of this letter in the enclosed prepaid envelope.

Thank you,

**V. J. Jefferson, Deputy Clerk**

AO 442 (Rev. 12/85) Warrant for Arrest

# United States District Court

DISTRICT OF __CONNECTICUT__

UNITED STATES OF AMERICA
v.

NICHOLAS BERGONZOLI

## WARRANT FOR ARREST

CASE NUMBER: 3:95cr144PCD

RECEIVED
UNITED STATES MARSHAL
DISTRICT OF
CONNECTICUT
95 OCT 4  P12:37

To: The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest __Nicholas Bergonzoli__

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment  ☐ Information  ☐ Complaint  ☐ Order of court  ☐ Violation Notice  ☐ Probation Violation Petition

charging him or her with (brief description of offense)

Controlled substance-importation/exportation; as further mentioned in the certified copy of the indictment attached hereto:

violation of Title ____21____ United States Code, Section(s) ____963____

Kevin F. Rowe
Name of Issuing Officer

Clerk
Title of Issuing Officer

Signature of Issuing Officer/Barbara Borosky Deputy Clerk

Bridgeport, 10/3/95
Date and Location

Bail fixed at $ _____ by _____
Name of Judicial Officer

JUL 28  2:15 PM '00
U.S. DISTRICT COURT
S DIST OF NEW YORK
FILED

### RETURN

This warrant was received and executed with the arrest of the above-named defendant at

Miami, FL  Rule 20 to S/FL from D/CT

| DATE RECEIVED 10/5/95 | NAME AND TITLE OF ARRESTING OFFICER T.D. HAMMON Jr. | SIGNATURE OF ARRESTING OFFICER T.D. Hammon |
|---|---|---|
| DATE OF ARREST 3/12/99 | U.S.M.S  S/FL | |

EXHIBIT "15"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY_____ D.C.

03 MAY -2 PM 4: 09

CLARENCE HADDOX
CLERK U.S. DIST. CT.
S.D. OF FL - MIAMI

CASE NO. 99-6153 CR-MOORE

UNITED STATES OF AMERICA )
Plaintiff, )
)
v. )
)
FABIO OCHOA-VAZQUEZ, et al., )
Defendant. )
_____ )

COPY FOR JUDGE

## MOTION TO QUASH WRIT OF HABEAS CORPUS
## AD TESTIFICANDUM AND INCORPORATED
## MEMORANDUM OF LAW

Nicolas Bergonzoli, by and through undersigned counsel, pursuant to Rule

17[1] of the Federal Rules of Criminal Procedure, moves for the entry of an order

quashing the Writ of Habeas Corpus Ad Testificandum directed to Nicolas

Bergonzoli. The grounds for this Motion are as follows:

1. Counsel for Defendant Fabio Ochoa-Vasquez sought a Writ of Habeas

Corpus Ad Testificandum for Nicolas Bergonzoli ("the Writ") in connection with

Defendant's motion to dismiss indictment, suppress witness testimony, disqualify

attorneys and unseal pleadings. The Writ was entered on January 6, 2003 ordering

---

[1] Rule 17 of the Federal Rules of Criminal Procedure governs the applications for writ of habeas corpus ad testificandum. U.S. v. Rinchack, 820 F. 2d 1557, 1567 (11th Cir. 1987); U.S. v. Garmany, 762 F.2d 929, 934 n.4 (11th Cir. 1985)("[a]lthough Rule 17 does not by its terms authorize a court to compel the attendance of an inmate-witness, when read together, the habeas corpus statute, 28 U.S.C. § 2241(c)(5) and the All Writs Act, 28 U.S.C. § 1651(a), provide the federal courts with this power."). Similarly, Rule 17 provides no procedures for quashing either writs of habeas corpus ad testificandum or subpoenas ad testificandum. Nonetheless, motions to quash such writs/subpoenas are granted and upheld in federal courts. In re grand Jury Matter No. 91-01386, 969 F. 2d 995 (1992); U.S. v. Gurney, 393 F. Supp. 683, 684 (M.D. Fla. 1974); U.S. Pitts, 569 F.2d 343, 348 (5th Cir. 1978).

Mr. Bergonzoli's appearance at the hearing on February 3, 2003. Mr. Bergonzoli was subsequently transported from the Federal Correctional Institute in Lorreto, his designated institution, to the Federal Detention Center in Miami ("FDC-Miami").

2. In Defendant's Motion to Dismiss, Defendant sought to preclude Nicolas Bergonzoli from testifying at trial on a variety of theories. However, Mr. Bergonzoli was not called as a witness in connection with the Motion to Dismiss and this Court ultimately denied Defendant's Motion to Dismiss.

3. Considering the great lengths the Defendant has gone to in an attempt to prevent Mr. Bergonzoli from testifying against him and the fact that the Government has expressly stated that it is not going to call Mr. Bergonzoli as a witness, there is simply no reason why Mr. Bergonzoli cannot be transported back to the Federal Correctional Institute in Lorreto. *See Gurney,* 393 F. Supp. at 684 (quashed writ of habeas corpus where the basis for issuing the writ no longer exists).

4. Additionally, due to the large number of witnesses in this matter, the Federal Detention Center in Miami has had to make special arrangements to handle not only the sheer number of witnesses, but also the security issues. As a result of these issues, a rotational system has had to be devised whereby the witnesses in the instant matter are rotated every two weeks from the FDC-Miami to Special Housing.

## MEMORANDUM OF LAW

Motions to quash subpoenas ad testificandum are reviewed under the same analysis as a court's refusal to issue a subpoena requested by an indigent defendant. Vol. 25 *Moore's Federal Practice,* § 617.07[3]; *see also U.S. v. Oberle*, 136 F.3d 1414, 1419-20 (10th Cir. 1998). Court's have held that a defendant's right to a subpoena derives from the Sixth Amendment and is thus limited to witnesses whose testimony is both material and ***favorable*** to the defendant. *U.S. v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)("[T]he Sixth Amendment does not by its terms grant to a criminal defendant the right to obtain the attendance and testimony of any and all witnesses; it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'")(emphasis in the original); *Pitts*, 569 F.2d at 348; *U.S. v. Robaina*, 39 F.3d 858, 862 (8th Cir. 1994); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 509 (9th Cir. 1994).

As noted above, the Defendant went to great lengths in seeking to suppress Nicolas Bergonzoli's testimony. From the Defendant's Motion to Dismiss it is abundantly clear that Mr. Bergonzoli's testimony would not be favorable to the defense. The original basis for the issuance of the Writ, attendance at the hearing on the Motion to Dismiss, is no longer present as the Court has denied Defendant's Motion. Accordingly, there is no longer any reason for Mr. Bergonzoli to remain at the FDC-Miami. In addition to creating a hardship for Mr. Bergonzoli, under the present circumstances, keeping him at FDC-Miami is simply adding to the housing

3

and security issues created by the sheer number of material witnesses that have been transferred to there in connection with this matter.

## CONCLUSION

Based upon the foregoing, Joaquin Perez respectfully request that this Court enter an order quashing the Writ of Habeas Corpus Ad Testificandum directed to Nicolas Bergonzoli.

Respectfully submitted,

Joaquin Perez, Esq.
Counsel for Nicolas Bergonzoli
6780 Coral Way
Miami, Florida  33155
Tel.:  305-261-4000
Fax:  305-662-4067
Email:

By: *Amy Charley for*
Joaquin Perez
Florida Bar No. 335339

4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via facsimile, this 2nd day of May, 2003 to:

Richard Gregorie, Esq.
Assistant U.S. Attorney
99 N.E. 4th Street
Miami, Florida 33132

Manuel Gonzalez, Jr., Esq.
782 N.W. 42nd Avenue
Suite 440
Miami, Florida 33126

Edward Ryan, Esq.
Assistant U.S. Attorney
500 East Broward Blvd, Suite 700
Ft. Lauderdale, Florida 33394

Neal R. Lewis, Esq.
9130 S. Dadeland Blvd
Suite 1690
Miami, Florida 33156

Roy Black, Esq.
Black, Srebnick, Kornspan
   & Stumpf, P.A
201 S. Biscayne Blvd., Suite 1300
Miami, Florida 33131

Mauricio Aldazabal, Esq.
2655 LeJeune Road
Suite 1001
Coral Gables, Florida 33134

Richard Docobo, Esq.
1571 N.W. 13th Court
Miami, Florida 33125

John Bergendahl, Esq.
701 Brickell Avenue
Suite 2080
Miami, Florida 33131

Martin Raskin, Esq.
Raskin & Raskin, P.A.
2937 S.W. 27th Avenue
Suite 206
Miami, Florida 33133

Michael Matters, Esq.
2929 S.W. Third Avenue
Suite 410
Miami, Florida 33129

_Amy Charley_ for
Joaquin Perez

MIA1 #1222581 v1

5

# EXHIBIT "16"

Docket as of June 4, 2003 11:11 pm                          Web PACER (v2.4)

# U.S. District Court

# U.S. District Court for the District of Arizona (Phoenix)

# CIVIL DOCKET FOR CASE #: 01-CV-763

# USA v. Gulfstream No 96080, et al

Filed: 04/30/01
Assigned to: Judge James A Teilborg
Jury demand: Defendant
Demand: $0,000
Nature of Suit: 690
Lead Docket: None
Jurisdiction: US Plaintiff
Dkt# in other court: None
Cause: 21:0801 Violation of Controlled Substances Act

UNITED STATES OF AMERICA
    pla

Reid Charles Pixler, Esq
FAX (602)514-7694
[COR LD NTC -]
US Attorney's Office
2 Renaissance Sq
40 N Central
Ste 1200
Phoenix, AZ 85004-4408
(602)514-7500

================================

GULFSTREAM, SERIAL NO. 96080
1985 COMMANDER 1000 AIRCRAFT
MODEL 695A, United States
Registration No. N960AC
    dft

================================

AIRCRAFT ENGINE, MODEL NO. TPE
331-10-511K, Part No. 3102190-
2, Serial No. P-38337
    dft

================================

ASIA CARGO & TRADING CO., S.A.
aka

Lawrence A Hammond, Esq
FTS 640-9361

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

Asia Cargo Panama                    FAX (602)640-6076
        claimant                     [COR LD NTC ret]
                                     Maureen Beyers
                                     FTS 640-9305

                                     FAX (602)664-2053
                                     [COR LD NTC ret]
                                     Osborn Maledon PA
                                     2929 N Central Ave
                                     Ste 2100
                                     Phoenix, AZ 85012-2794
                                     (602)640-9000

                                     Alan S Fine
                                     FAX (305)424-2401
                                     [COR LD NTC ret]
                                     Fine & Martinez
                                     The Colonnade
                                     2333 Ponce de Leon Blvd
                                     Ste 710
                                     Coral Gables, FL 33134
                                     (305)424-2400


===========================

ASIA CARGO TRADING OF U.S.A.,        Lawrence A Hammond, Esq
INC., a Florida corporation          FTS 640-9361
aka                                  FAX (602)640-6076
Asia Cargo Florida                   [COR LD NTC ret]
        claimant                     Maureen Beyers
                                     FTS 640-9305
                                     FAX (602)664-2053
                                     [COR LD NTC ret]
                                     Osborn Maledon PA
                                     2929 N Central Ave
                                     Ste 2100
                                     Phoenix, AZ 85012-2794
                                     (602)640-9000

                                     Alan S Fine
                                     FAX (305)424-2401
                                     [COR LD NTC ret]
                                     Fine & Martinez
                                     The Colonnade
                                     2333 Ponce de Leon Blvd
                                     Ste 710
                                     Coral Gables, FL 33134
                                     (305)424-2400


# DOCKET   PROCEEDINGS

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857 9090 · FAX (305) 854-2103

http://pacer.czd.uscourts.gov/dc/cgi-bin/pace-740.pl                            6/11/2003

DATE    #         DOCKET    ENTRY


4/30/01  1        COMPLAINT filed. Scheduling Order for forfeiture/penalty
                  forwarded to presiding judge this date. (ms)
                  [Entry date 05/01/01]

4/30/01  2        MOTION to transfer case to Judge Robert C Broomfield
                  pusuant to Local Rule 1.2(g) by pla USA [2-1] (ms)
                  [Entry date 05/01/01]

5/1/01   --       WARRANT  For Arrest issued as to Dft No 2 (copy placed left
                  side of file) (ms) [Entry date 05/01/01]

5/1/01   --       WARRANT Issued as to Dft No 1 (copy placed left side) (ms)
                  [Entry date 05/01/01]

5/2/01   3        FORFEITURE/PENALTY SCHED ORDER ( Judge James A. Teilborg ):
                  1) Disc ddl is due 6 mths from dte case is at issue; 2)
                  Disp mtns due 7 mths from dte case is at issue; 3) If
                  matter is stayed pending related criminal proceedings, a
                  written joint stat rpt s/be due every 6 mths from dte of
                  Stay Order. [cc: all cnsl] (ms) [Entry date 05/02/01]

5/30/01  4        ORDER by Judge Robert C. Broomfield  granting  motion to
                  transfer case to Judge Robert C Broomfield pusuant to Local
                  Rule 1.2(g) by pla USA [2-1]  Case reassigned  to Judge
                  Robert C. Broomfield (cc: all counsel, JAT) (dmt)
                  [Entry date 05/30/01]

5/30/01  5        RETURN OF SERVICE of by pla USA  on Holly Skolnich by
                  certified mail of summons and notice of complaint for
                  forfeiture (Gulfstream Commander 1000) (jrh)
                  [Entry date 05/31/01]

6/15/01  6        NOTICE by pla USA of arrest (of dft 1985 Gulfstream
                  Commander 1000 aircraft, serial number 96080, US
                  registration number N960AC and dft aircraft engine, model
                  number TPE 33110-511K, part number 3102190-2, serial number
                  P-38337) (ld) [Entry date 06/20/01]

6/20/01  7        MOTION for admission pro hac vice as to Alan S Fine, atty
                  for claimant Asia Cargo & Trading, claimant Asia Cargo
                  Trading of USA [7-1] (Alan S Fine, Fine & Martinez, 2333
                  Ponce de Leon Blvd, Ste 710, Coral Gables, FL 33134; phone:
                  (305) 424-2400) (attorney added to case, address submitted
                  to atty maint) (ld) [Entry date 06/25/01]

6/21/01  9        VERIFIED NOTICE OF CLAIM re: dft properties by Asia Cargo &
                  Trading Co SA (ld) [Entry date 06/25/01]

6/25/01  8        VERIFIED NOTICE OF CLAIM re: aircraft and engine by Asia
                  Cargo Trading of USA Inc (ld) [Entry date 06/25/01]

6/27/01  10       ORDER  by Judge Robert C. Broomfield  granting  motion for
                  admission pro hac vice as to Alan S Fine, atty for claimant
                  Asia Cargo & Trading, claimant Asia Cargo Trading of USA
                  [7-1] (Alan S Fine, Fine & Martinez, 2333 Ponce de Leon

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 • TEL. (305) 857-9090 • FAX (305) 854-2103

http://pacer.and.uscourts.gov/dc/cgi-bin/pacer-740.nl                    6/11/2003

Blvd, Ste 710, Coral Gables, FL 33134; phone: (305) 424-2400) (cc: all counsel) (ld) [Entry date 06/27/01]

6/28/01  11  RETURN OF SERVICE EXECUTED summons/complaint upon dft Gulfstream #96080, dft Aircraft Engine #TPE by publication on 6/4/01, 6/11/01 and 6/18/01 (ld) [Entry date 07/03/01]

7/5/01  12  MOTION to dismiss (verified complaint) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [12-1] (ld) [Entry date 07/11/01]

7/6/01  13  MOTION for return of (seized) property for lack of probable cause by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [13-1] (ld) [Entry date 07/11/01]

7/6/01  14  MOTION to vacate order granting motion to transfer (reassign) case [4-1], [4-2] by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [14-1] (ld) [Entry date 07/11/01]

7/6/01  15  NOTICE OF ORAL ARGUMENT by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o setting motion to dismiss (verified complaint) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [12-1] at 11:00 10/15/01, setting motion return of (seized) property for lack of probable cause by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [13-1] at 11:00 10/15/01, setting motion to vacate order granting motion to transfer (reassign) case [4-2] by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [14-1] at 11:00 10/15/01 (ld) [Entry date 07/11/01]

7/20/01  16  NOTICE by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o  of filing on 6/20/01 a motion for an order pursuant to Fed.R.Crim.P in the US Dist Court for the District of Oklahoma for the return of the dft 1985 Gulfstream Commander 1000 Aircraft (jrh) [Entry date 07/24/01]

7/24/01  17  MOTION for enlargement of time within which to respond to motions filed by claimants by pla USA [17-1] (proposed responses not provided) (ld) [Entry date 07/26/01]

7/31/01  18  ORDER  by Judge Robert C. Broomfield  granting  motion for enlargement of time within which to respond to motions filed by claimants by pla USA [17-1] (proposed responses not provided); ORDERED that pla shall have until close of business on 8/3/01 to file responsive pleadings to the motion to vacate order granting motion to transfer (reassign) case [4-1], [4-2] by claimant Asia & Trading, claimant Asia Cargo Trading [14-1], the motion for return of (seized) property for lack of probable cause by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [13-1] and the motion to dismiss (verified complaint) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [12-1] (cc: all counsel) (ld) [Entry date 07/31/01]

8/3/01  19  RESPONSE by pla USA  to motion for return of (seized) property for lack of probable cause by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [13-1] (ld) [Entry date 08/07/01]

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 • TEL. (305) 857-9090 • FAX (305) 854-2103

http://pacer.szd.uscourts.gov/dc/cgi-bin/pacer740.pl                                    6/11/2003

8/3/01    20      RESPONSE by pla USA to motion to vacate order granting
                  motion to transfer (reassign) case [4-1], [4-2] by claimant
                  Asia Cargo & Trading, claimant Asia Cargo Trading o [14-1]
                  (1d) [Entry date 08/07/01]

8/3/01    21      RESPONSE by pla USA to motion to dismiss (verified
                  complaint) by claimant Asia Cargo & Trading, claimant Asia
                  Cargo Trading o [12-1] (1d) [Entry date 08/07/01]

8/3/01    23      DECLARATION of Reid C Pixler re dflt - appl and entry of
                  default by clerk [22-1] by pla USA (1d)
                  [Entry date 08/07/01]

8/3/01    24      MOTION for partial default judgment against Gulfstream
                  #96080, Aircraft Engine #TPE as to all persons except for
                  Asia Cargo Trading Co SA and Asia Cargo Trading of USA Inc
                  by pla USA [24-1] (1d) [Entry date 08/07/01]

8/7/01    22      Application for entry of partial default as to interest in
                  dft Gulfstream #96080, dft Aircraft Engine #TPE except for
                  the interest of claimants Asia Cargo & Trading Co, SA and
                  Asia Cargo Trading of the USA Inc - DEFAULT ENTERED by
                  Deputy Clerk (cc: all counsel/RCB) (cc: all counsel) (1d)
                  [Entry date 08/07/01]

8/9/01    25      MOTION for enlargement of time to reply to responses (to
                  claimants' motions) by claimant Asia Cargo & Trading,
                  claimant Asia Cargo Trading o [25-1] (proposed replies not
                  provided) (1d) [Entry date 08/13/01]

8/15/01   26      ORDER by Judge Robert C. Broomfield granting motion for
                  enlargement of time to reply to responses (to claimants'
                  motions) by claimant Asia Cargo & Trading, claimant Asia
                  Cargo Trading o [25-1] (proposed replies not provided);
                  ORDERED that claimants shall have until 8/23/01 to file
                  their replies to motion to dismiss (verified complaint) by
                  claimant Asia Cargo & Trading, claimant Asia Cargo Trading
                  o [12-1], motion for return of (seized) property for lack
                  of probable cause by claimant Asia Cargo & Trading,
                  claimant Asia Cargo Trading o [13-1] and motion to vacate
                  order granting motion to transfer (reassign) case [4-1],
                  [4-2] by claimant Asia Cargo & Trading, claimant Asia Cargo
                  Trading o [14-1] (cc: all counsel) (1d)
                  [Entry date 08/15/01]

8/23/01   27      REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
                  Trading o to response to motion to vacate order granting
                  motion to transfer (reassign) case [4-1], [4-2] by claimant
                  Asia Cargo & Trading, claimant Asia Cargo Trading o [14-1]
                  (1d) [Entry date 08/27/01]

8/23/01   28      REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
                  Trading o to response to motion to dismiss (verified
                  complaint) by claimant Asia Cargo & Trading, claimant Asia
                  Cargo Trading o [12-1] (1d) [Entry date 08/27/01]

8/23/01   29      REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
                  Trading o to response to motion for return of (seized,

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 • TEL. (305) 857-9090 • FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc/cgi-bin/pacer740.pl                                     6/11/2003

property for lack of probable cause by claimant Asia Cargo
& Trading, claimant Asia Cargo Trading o [13-1] (ld)
[Entry date 08/27/01]

9/19/01  30   PARTIAL DEFAULT JUDGMENT entered by Judge Robert C.
              Broomfield granting motion for partial default judgment
              against Gulfstream #96080, Aircraft Engine #TPE as to all
              persons except for Asia Cargo Trading Co SA and Asia Cargo
              Trading of USA Inc by pla USA [24-1]; ORDERED, ADJUDGED AND
              DECREED that the interest of Luis Guillermo Angel Restrepo
              and the interest of all persons EXCEPT for the interest of
              Asia Cargo & Trading Co., S.A. of Panama and Asia Cargo
              Trading of USA, Inc of Florida in dfts aircraft and
              aircraft engine described herein are hereby forfeited to
              the USA in accordance with 21 USC section 881(a)(6) and in
              accordance with 18 USC section 981(a)(1)(A) (cc: all
              counsel/jgm drawer) (ld) [Entry date 09/19/01]

10/15/01 31   MINUTE ENTRY: before Judge Robert C. Broomfield.  Crt Rptr:
              R.Huckaby-Cotton - ECR:  Reid Pixler for Pla; Alan
              Fine/Maureen Beyers for Claimant: taking under advisement
              on 1/15/01 the following motions: motion to vacate order
              granting motion to transfer (reassign) case [4-1], [4-2] by
              claimant Asia Cargo & Trading, claimant Asia Cargo Trading
              o [14-1]; motion for return of (seized) property for lack
              of probable cause by claimant Asia Cargo Trading, claimant
              Asia Cargo Trading o [13-1]; and, motion to dismiss
              (verified complaint) by claimant Asia Cargo & Trading,
              claimant Asia Cargo Trading o [12-1]  [31-1]  (bl)
              [Entry date 10/18/01]

10/15/01 32   EXHIBIT LIST as to claimants (sd) [Entry date 10/24/01]

10/17/01 33   Transcript Ordering Form (by Bethany Bonomolo c/o Osborn
              Maledon) re Pretrial Proceeding of 10/5/01. (sd)
              [Entry date 10/24/01]

10/30/01 34   ORDER  by Judge Robert C. Broomfield  granting  motion to
              vacate order granting motion to transfer (reassign) case
              [4-1], [4-2] by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading [14-1]; vacating order [4-1] [4-2];
              Case reassigned to Judge James A. Teilborg (cc: all
              counsel/ JAT) (ld) [Entry date 10/30/01]

10/31/01 35   TRANSCRIPT of motions hearing by Court Reporter: Rose
              Huckaby-Cotton for the following date(s): 10/15/01 (BULKY
              DOCUMENT) (ld) [Entry date 11/02/01]

11/6/01  36   NOTICE by claimant Asia Cargo & Trading, claimant Asia
              Cargo Trading o of filing transcript (of 10/15/01 motions
              hearing before the Honorable Robert C Broomfield)
              (transcript attached to this notice) (ld)
              [Entry date 11/14/01]

12/7/01  37   POST-HEARING MEMORANDUM by claimant Asia Cargo & Trading,
              claimant Asia Cargo Trading o re (ld) [Entry date 12/14/01]

2/6/02   38   NOTICE (of attached order enter by US Mag Judge Doyle W
              Argo in the Western District of Oklahoma under case no M
              01-40 AR re dft 1) by pla USA (ld) [Entry date 02/08/02]

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 • TEL. (305) 857-9090 • FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc-cgi-bin/pacer740.pl                                    6/11/2003

2/14/02  39   ORDER  by Judge James A. Teilborg  denying motion to
              dismiss (verified complaint) by claimant Asia Cargo &
              Trading, claimant Asia Cargo Trading o [12-1] denying
              motion for return of (seized) property for lack of probable
              cause by claimant Asia Cargo & Trading, claimant Asia Cargo
              Trading o [13-1] (cc: all counsel) (ld)
              [Entry date 02/14/02]

2/28/02  40   STIPULATED MOTION  by claimants for enlargement of time
              until 3/22/02 to answer the complaint by claimant Asia
              Cargo & Trading, claimant Asia Cargo Trading  [40-1] (jrh)
              [Entry date 03/04/02]

3/5/02   41   ORDER  by Judge James A. Teilborg  granting  motion  by
              claimants for enlargement of time until 3/22/02 to answer
              the complaint by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading [40-1]; ORDERED that claimants shall
              have until 3/22/02 within which to file their answer to the
              complaint [1-1] (cc: all counsel) (ld) [Entry date 03/05/02]

3/21/02  42   FIRST AMENDED VERIFIED COMPLAINT FOR FORFEITURE IN REM by
              pla USA ; [1-1] ; (sat) [Entry date 03/22/02]

3/21/02  43   NOTICE of Service of First Amended Complaint by pla USA (sat)
              [Entry date 03/22/02]

3/21/02  44   NOTICE of service of discovery by pla USA . (sat)
              [Entry date 03/22/02]

3/22/02  45   MOTION to remove this case from the expedited track by
              claimant Asia Cargo & Trading, claimant Asia Cargo Trading
              [45-1] (ld) [Entry date 03/25/02]

3/28/02  46   Stipulated MOTION for Enlargement of Time until 4/15/02 to
              Answer First Amended Complaint [42-1] by claimant Asia
              Cargo & Trading, claimant Asia Cargo Trading o [46-1] (sat)
              [Entry date 04/01/02]

4/3/02   47   ORDER  by Judge James A. Teilborg  granting  motion for
              Enlargement of Time until 4/15/02 to Answer First Amended
              Complaint [42-1] by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading o [46-1]; ORDERED that claimants shall
              have until 4/15/02 within which to file their answer to the
              1st amended complaint (cc: all counsel) (ld)
              [Entry date 04/03/02]

4/4/02   48   RESPONSE by pla USA  to motion to remove this case from the
              expedited track by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading [45-1] (jrh) [Entry date 04/05/02]

4/9/02   49   REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
              Trading o  to response to motion to remove this case from
              the expedited track by claimant Asia Cargo & Trading,
              claimant Asia Cargo Trading [45-1] (ld)
              [Entry date 04/16/02]

4/15/02  50   ANSWER to complaint (amended) [42-1] by claimant Asia Cargo
              & Trading, claimant Asia Cargo Trading of (ld)

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.flsd.uscourts.gov/db/cgi-bin/pacer-740.pl                                  6/11/2003

(

[Entry date 04/18/02]

4/15/02  51    NOTICE of service of discovery by claimant Asia Cargo &
               Trading, claimant Asia Cargo Trading of (ld)
               [Entry date 04/18/02]

4/17/02  52    Supplemental RESPONSE by pla USA to motion to remove this
               case from the expedited track by claimant Asia Cargo &
               Trading, claimant Asia Cargo Trading [45-1] (sat)
               [Entry date 04/19/02]

4/22/02  53    MOTION to compel discovery (based upon requests served by
               pla on or about 3/12/02) by pla USA [53-1] (ld)
               [Entry date 04/25/02]

4/22/02  54    MOTION for protective order (staying any supplemental
               response from claimants to pla's reqests to admit until
               this Court has determined claimant's motion to remove this
               case from the expedited track and their motion for
               bifurcated discovery) by claimant Asia Cargo & Trading,
               claimant Asia Cargo Trading o [54-1] (ld)
               [Entry date 04/25/02]

4/22/02  55    MOTION for bifurcated discovery by claimant Asia Cargo &
               Trading, claimant Asia Cargo Trading o [55-1] (ld)
               [Entry date 04/25/02]

4/22/02  56    MOTION for hearing (on motion to remove case from
               expedited track, motion to bifurcate discovery and motion
               for protective order) by claimant Asia Cargo & Trading,
               claimant Asia Cargo Trading o [56-1] (ld)
               [Entry date 04/25/02]

4/25/02  57    MINUTE ORDER IT IS ORDERED setting a telephonic conference
               on Wednesday, May 1, 2002 at 10:30 a.m. to discuss
               Plaintiff's motion to compel discovery (based upon requests
               served by pla on or about 3/12/02) [53-1].   Counsel are
               directed to contact the court at 602-322-7560.   (cc: all
               counsel) [57-2] (tb) [Entry date 04/25/02]

4/29/02  59    RESPONSE by claimant Asia Cargo & Trading, claimant Asia
               Cargo Trading o  to motion to compel discovery (based upon
               requests served by pla on or about 3/12/02) by pla USA
               [53-1] (ld) [Entry date 05/02/02]

5/1/02   58    MINUTE ENTRY before Judge James A. Teilborg . Crt Rptr:
               David German. Appearances:  Reid C. Pixler for pla. Maureen
               Beyers for claimant. Alan S. Fine telephonically for
               claimant. Status conference held.  Motions are argued to
               the Court.  Status conference having been set this date, IT
               IS ORDERED granting motion for hearing by claimant Asia
               Cargo & Trading, claimant Asia Cargo Trading [56-1].  IT IS
               ORDERED taking under advisement on 5/1/02 the following
               motions: motion for bifurcated discovery by claimant Asia
               Cargo & Trading, claimant Asia Cargo Trading [55-1], motion
               for protective order (staying any supplemental response
               from claimants to pla's reqests to admit until this Court
               has determined claimant's motion to remove this case from
               the expedited track and their motion for bifurcated
               discovery) by claimant Asia Cargo & Trading, claimant Asia

Cargo Trading [54-1], motion to compel discovery (based upon requests served by pla on or about 3/12/02) by pla USA [53-1], and motion to remove this case from the expedited track by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [45-1]. [cc: JAT] [58-2] (tb) [Entry date 05/01/02]

5/2/02   61   Transcript Designation and Ordering Form re pretrial proceedings of 5/1/02 before Judge James A Teilborg by Bethany Bonomolo (dmt) [Entry date 05/06/02]

5/6/02   60   ORDER by Judge James A. Teilborg denying motion to remove this case from the expedited track by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [45-1]; however, within 15 days of this order, parties may file a joint motion to modify scheduling order, denying motion for protective order (staying any supplemental response claimants to pla's reqeusts to admit until this Court has determined claimant's motion to remove this case from the expedited track and their motion for bifurcated discovery) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [54-1], denying motion for bifurcated discovery by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [55-1], granting motion to compel discovery (based upon requests served by pla on or about 3/12/02) by pla USA [53-1] , claimants shal respond to pla's requests for admissions within 10 days of date of this order; status conference set for 11:45 8/5/02 (cc: all counsel) (dmt) [Entry date 05/06/02]

5/8/02   63   DEMAND for jury trial by claimant Asia Cargo & Trading, claimant Asia Cargo Trading of USA (mm) [Entry date 05/09/02]

5/9/02   62   TRANSCRIPT of Status Conference re discovery by Court Reporter: DGerman for the following date(s): 5/1/02 (jrh) [Entry date 05/09/02]

5/10/02   64   NOTICE of service of discovery by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o . (ld) [Entry date 05/14/02]

5/14/02   65   Transcript Designation and Ordering Form by pla USA re 5/1/02 hearing re motion to compel discovery (ld) [Entry date 05/17/02]

5/16/02   66   NOTICE of service of discovery by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o . (ld) [Entry date 05/21/02]

5/21/02   67   MOTION to strike claimants' Jury Demand [63-1] by pla USA [67-1] (ld) [Entry date 05/23/02]

5/24/02   68   MOTION to strike answer to complaint [50-1], claim [8-1] of claimant Asia Cargo & Trading Company SA by pla USA [68-1] (ld) [Entry date 05/28/02]

6/4/02   69   NOTICE by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o OF TAKING DEPO OF Patrick E Dawson on the following date(s): 7/2/02 at 9 am (ld) [Entry date 06/06/02]

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc-cgi-bin/pacer740.pl     6/11/2003

6/4/02    70    STIPULATION to withdraw  Jury Demand [63-1], motion to
                strike claimants' Jury Demand [63-1] by pla USA [67-1] by
                pla USA, claimant Asia Cargo & Trading, claimant Asia Cargo
                Trading o (ld) [Entry date 06/06/02]

6/4/02    71    NOTICE of service of discovery by claimant Asia Cargo &
                Trading, claimant Asia Cargo Trading o (ld)
                [Entry date 06/06/02]

6/4/02    72    AMENDED NOTICE by claimant Asia Cargo & Trading, claimant
                Asia Cargo Trading o OF TAKING DEPO OF Patrick E Dawson on
                the following date(s): 7/2/02 at 9 am (ld)
                [Entry date 06/06/02] [Edit date 06/06/02]

6/11/02   73    ORDER by Judge James A. Teilborg referring this matter to
                US Mag Judge David K Duncan for resolution of a discovery
                dispute; FURTHER ORDERED counsel is directed to place a
                conference call to Judge Duncan's office at (602) 322-7630
                within 5 business days from the date of this order to
                schedule a date and time for a hearing on the discovery
                dispute (cc: all counsel/DKD) re: order filed [73-1] (ld)
                [Entry date 06/11/02]

6/11/02   74    ORDER  by Judge James A. Teilborg  granting  stipulation to
                withdraw  Jury Demand [63-1], motion to strike claimants'
                Jury Demand [63-1] by pla USA [67-1] by pla USA, claimant
                Asia Cargo & Trading, claimant Asia Cargo Trading o
                withdrawing Jury Demand, withdrawing motion to strike
                claimants' Jury Demand [63-1] by pla USA [67-1]; FURTHER
                ORDERED that due to the location of counsel and witnesses,
                the trial in this matter will be conducted in blocks of at
                least 4 consecutive trial days (cc: all counsel) (ld)
                [Entry date 06/11/02]

6/11/02   75    RESPONSE by claimant Asia Cargo & Trading  to motion to
                strike answer to complaint [50-1], claim [8-1] of claimant
                Asia Cargo & Trading Company SA by pla USA [68-1] (ld)
                [Entry date 06/17/02]

6/11/02   76    2ND AMENDED NOTICE by claimant Asia Cargo & Trading,
                claimant Asia Cargo Trading o OF TAKING DEPO OF Patrick E
                Dawson on the following date(s): 7/15/02 at 9 am (ld)
                [Entry date 06/17/02]

6/13/02   77    NOTICE of service of discovery by claimant Asia Cargo &
                Trading, claimant Asia Cargo Trading o . (ld)
                [Entry date 06/17/02]

6/17/02   78    ORDER by Magistrate Judge David K. Duncan that the
                undersigned recuses from any further action in the above-
                captioned case; ORDERED that this matter will be reassigned
                by lot to another Mag Judge for the District of Arizona;
                FURTHER ORDERED that this matter has been reassigned by
                random lot to the Honorable Stephen L Verkamp for
                resolution of a discovery dispute; FURTHER ORDERED that
                counsel is to contact the chambers of Judge Verkamp at
                (928) 774-2566 within 5 days from the date of this order to
                schedule a date and time for a hearing on the discovery

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.azd.uscourts.gov/d/cgi-bin/pacer740.pl                                    6/11/2003

dispute (cc: all counsel/SLV) re: order filed [78-1] (ld)
[Entry date 06/17/02]

6/20/02    79    ORDER  by Mag Judge Stephen L. Verkamp telephonic hearing
re discovery dispute set for 3:00 7/2/02,  before Mag
Judge Stephen L. Verkamp (cc: all counsel) (ld)
[Entry date 06/20/02]

6/20/02    80    REPLY by pla USA  to response to motion to strike answer to
complaint [50-1], claim [8-1] of claimant Asia Cargo &
Trading Company SA by pla USA [68-1] (ld)
[Entry date 06/26/02]

6/20/02    81    MOTION on discovery issues (for an order requiring pla to
set forth in written form more than 10 days prior to the
hearing of 7/2/02 the specific matters it intends to argue
at said hearing, permitting claimants to serve the 33
additional interrogatories attached, requiring pla to serve
its answers to claimants 1st set of interogatories within a
reasonable time and granting such other relief as the Court
deems just and proper) by claimant Asia Cargo & Trading,
claimant Asia Cargo Trading o [81-1] (ld)
[Entry date 06/26/02]

6/24/02    82    MOTION (REQUEST) for oral argument on pla's motion to
strike Asia Cargo Trading Co SA's claim and answer) by
claimant Asia Cargo & Trading, claimant Asia Cargo Trading
of [82-1] (ld) [Entry date 06/26/02]

6/26/02    83    ORDER by Mag Judge Stephen L. Verkamp that pla shall
provide dfts (claimants) with a copy of the 6/7/02
memorandum to Grace Wen of Judge Teilborg's chambers on or
before Wednesday, 6/26/02 (cc: all counsel) (received
6/25/02; OK to send per SLV's Chambers) re: order filed
[83-1] (ld) [Entry date 06/26/02]

6/26/02    85    NOTICE by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o of filing proposed order re Claimants'
motion on discovery issues (jrh) [Entry date 07/01/02]

6/27/02    86    RESPONSE by pla USA  to motion on discovery issues (for an
order requiring pla to set forth in written form more than
10 days prior to the hearing of 7/2/02 the specific matters
it intends to argue at said hearing, permitting claimants
to serve the 33 additional interrogatories attached,
requiring pla to serve its answers to claimants 1st set of
interrogatories within a reasonable time and granting such
other relief as the Court deems just and proper) by
claimant Asia Cargo & Trading, claimant Asia Cargo Trading
o [81-1] (jrh) [Entry date 07/01/02]

7/1/02     84    MINUTE ORDER IT IS ORDERED granting motion (request) for
oral argument on pla's motion to strike Asia Cargo Trading
Co SA's claim and answer by claimant Asia Cargo & Trading,
claimant Asia Cargo Trading of [82-1]. Accordingly, IT IS
ORDERED setting oral argument on pla's' motion to strike
[68-1] at 10:00 a.m., 10/21/02.  To assist the court
reporter, the parties shall prepare and bring to the oral
argument a Table of Authorities, in alphabetical order,
which includes all of the authorities on which the parties

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc/cgi-bin/pacer740.pl                                    6/11/2003

will rely at oral argument.  The Table of Authorities shall
not exceed the scope of the parties pleadings. (cc: all
counsel) [84-1] (tb) [Entry date 07/01/02]

7/1/02    87    RESPONSE by pla USA regarding request for oral argument
                filed by claimants (jrh) [Entry date 07/03/02]

7/8/02    88    NOTICE of service of discovery by pla USA . (ld)
                [Entry date 07/10/02]

7/9/02    90    NOTICE by pla USA OF TAKING DEPO OF Cynthia Dawn Oldham on
                the following date(s): 8/21/02 at 9 am (ld)
                [Entry date 07/15/02]

7/9/02    91    NOTICE by pla USA OF TAKING DEPO OF William Chavarriaga
                Velez on the following date(s): 8/21/02 at 1 pm (ld)
                [Entry date 07/15/02]

7/9/02    92    NOTICE by pla USA OF TAKING DEPO OF Luis Guillermo Angel
                Restrepo on the following date(s): 8/22/02 at 9 am (ld)
                [Entry date 07/15/02]

7/9/02    93    NOTICE by pla USA OF TAKING DEPO OF Maria Isabel Posada on
                the following date(s): 8/22/02 at 9 am (ld)
                [Entry date 07/15/02]

7/9/02    94    NOTICE by pla USA OF TAKING DEPO OF Roberto Gomez Guevara
                on the following date(s): 8/22/02 at 1 pm (ld)
                [Entry date 07/15/02]

7/11/02   89    MINUTE ORDER by Mag Judge Stephen L Verkamp denying as moot
                the motion on discovery issues (for an order requiring pla
                to set forth in written form more than 10 days prior to the
                hearing of 7/2/02 the specific matters it intends to argue
                at said hearing, permitting claimants serve the 33
                additional interrogatories attached, requiring pla to serve
                its answers to claimants 1st set of interrogatories within a
                reasonable time and granting such other relief as the Court
                deems just and proper) by Asia Cargo & Trading, claimant
                Asia Cargo Trading o [81-1]; FURTHER ORDERED that
                claimants' motion to permit claimants to serve 33
                additional interrogatories on pla is denied; FURTHER
                ORDERED that pla shall serve its answers to claimants' 1st
                set of interrogatories on or before 8/1/02 and pla shall
                serve any objections to claimants' 1st set of
                interrogatories on or before 7/5/02 (received 7/10/02; OK
                to sent per SLV's Chambers) (cc:  all counsel) [89-1] (ld)
                [Entry date 07/11/02]

8/2/02    96    NOTICE of service of discovery by pla USA (ld)
                [Entry date 08/09/02]

8/2/02    97    NOTICE of service of discovery by pla USA (ld)
                [Entry date 08/09/02]

8/2/02    98    NOTICE of service of discovery by pla USA (ld)
                [Entry date 08/09/02]

8/5/02    95    MINUTE ENTRY before Judge James A. Teilborg .  Crt Rptr:
                David German. Appearances:  Reid C. Pixler for pla. Maureen

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.nnd.uscourts.gov/do/cgi-bin/pacer740.pl                                    6/11/2003

Beyers, Lawrence A. Hammond and Alan S. Fine (telephonic)
for dfts. Status hearing and hearing on discovery disputes
held.  The parties are directed to meet and prepare
proposed discovery schedule and stipulated order for the
Court.  In the meantime, if there are issues that cannot be
resolved, counsel are to contact the Court for resolution.
As to depositions of the 4-5 individuals discussed, the
Court is inclined to order that they be taken in Phoenix,
Arizona, not outside the United States. Same is discussed
by Court and counsel. [cc: JAT] [95-2] (tb)
[Entry date 08/05/02]

8/12/02  99   NOTICE of service of discovery by claimant Asia Cargo &
              Trading, claimant Asia Cargo Trading o (ld)
              [Entry date 08/15/02]

9/23/02  100  MOTION to strike answer to complaint [50-1], claim [8-1]
              of Asia Cargo Trading of USA Inc by pla USA [100-1] (ld)
              [Entry date 09/26/02]

9/23/02  101  STATEMENT OF FACTS by pla USA  re motion to strike answer
              to complaint [50-1], claim [8-1] of Asia Cargo Trading of
              USA Inc by pla USA [100-1] (BULKY DOCUMENT) (ld)
              [Entry date 09/26/02]

10/1/02  102  MINUTE ORDER IT IS ORDERED that the October 21, 2002
              hearing on Plaintiff's Motion to Strike Claim and Answer of
              Asia Cargo Trading of USA, Inc. [68-1] is VACATED. IT IS
              FURTHER ORDERED setting a hearing for Monday, February 10,
              2003, at 11:00 a.m. on Plaintiff's Motions to Strike Claim
              and Answer of Asia Cargo Trading of USA, Inc. (Documents
              68-1 and 100-1]. (cc: all counsel) [102-1] (tb)
              [Entry date 10/01/02]

10/1/02  103  MOTION for partial summary judgment on FAA counts against
              engine by claimant Asia Cargo & Trading, claimant Asia
              Cargo Trading [103-1] (ld) [Entry date 10/03/02]

10/1/02  104  STATEMENT OF FACTS by claimant Asia Cargo & Trading,
              claimant Asia Cargo Trading o of undisputed material facts
              in support of motion for partial summary judgment on FAA
              counts against engine by claimant Asia & Trading, claimant
              Asia Cargo Trading [103-1] (ld) [Entry date 10/03/02]

10/2/02  105  MOTION to strike government's new argument for striking
              claim and answer by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading o [105-1] (ld) [Entry date 10/03/02]

10/10/02 106  MOTION for hearing on motion for partial summary judgment
              (on 2/10/03) by claimant Asia Cargo & Trading, claimant
              Asia Cargo Trading [106-1] (ld) [Entry date 10/15/02]

10/15/02 107  RESPONSE by pla USA  to motion to strike government's new
              argument for striking claim and answer by claimant Asia
              Cargo & Trading, claimant Asia Cargo Trading o [105-1] (ld)
              [Entry date 10/16/02]

10/15/02 108  MOTION to substitute page 5 of reply in support of motion
              to strike claim and answer of Asia Cargo & Trading Co, SA
              (to reflect correct hanger 10) by pla USA [108-1] (proposed

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 · TEL. (305) 857-9090 · FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc/cgi-bin/pacer740.pl                    6/11/2003

substitute page 5 not provided) (ld) [Entry date 10/16/02]

10/15/02 109    NOTICE by pla USA of filing original signature page of
Eileen M Moynahan exhibit #14 (attached) (ld)
[Entry date 10/16/02]

10/15/02 111    STIPULATION to extend time for claimants to respond to
motion to strike government's new argument for striking
claim and answer by claimant Asia Cargo & Trading, claimant
Asia Cargo Trading [105-1] (until 10/25/02) by pla USA,
claimant Asia Cargo & Trading, claimant Asia Cargo Trading o
(proposed response not provided) (ld) [Entry date 10/17/02]
[Edit date 10/17/02]

10/17/02 110    MINUTE ORDER IT IS ORDERED granting motion for hearing on
motion for partial summary judgment (on 2/10/03) by
claimant Asia & Trading, claimant Asia Cargo Trading
[106-1]. IT IS ORDERED setting oral argument on motion for
partial summary judgment on FAA counts against engine by
claimant Asia Cargo & Trading, claimant Asia Trading
[103-1] and motion to strike government's new argument for
striking claim and answer by claimant Asia Cargo & Trading,
claimant Asia Cargo Trading [105-1] at 11:00 a.m., 2/10/03,
to be heard along with already scheduled motions [68-1] and
[100-1]. (cc: all counsel) [110-1] (tb)
[Entry date 10/17/02]

10/21/02 112    ORDER  by Judge James A. Teilborg  granting  stipulation to
extend time for claimants to respond to motion to strike
government's new argument for striking claim and answer by
claimant Asia Cargo & Trading, claimant Asia Cargo Trading
[105-1] (until 10/25/02) by pla USA, claimant Asia Cargo &
Trading, claimant Asia Cargo Trading o (proposed response
not provided) (cc: all counsel) (ld) [Entry date 10/21/02]

10/21/02 113    ORDER  by Judge James A. Teilborg  granting  motion to
substitute page 5 of reply in support of motion to strike
claim and answer of Asia Cargo & Trading Co, SA (to reflect
correct hanger 10) by pla USA [108-1] (amended substitute
page 5 attached to this order) (cc: all counsel) (ld)
[Entry date 10/21/02]

10/25/02 114    MOTION for summary judgment regarding the interest of Asia
Cargo Trading of USA Inc and Asia Cargo and Trading Company
SA by pla USA [114-1] (ld) [Entry date 10/26/02]

10/28/02 115    RESPONSE by pla USA  to motion for partial summary judgment
on FAA counts against engine by claimant Asia Cargo &
Trading, claimant Asia Cargo Trading [103-1] (ld)
[Entry date 10/29/02]

10/28/02 116    STATEMENT OF FACTS by pla USA in response to motion for
partial summary judgment on FAA counts against engine by
claimant Asia & Trading, claimant Asia Cargo Trading
[103-1] (ld) [Entry date 10/29/02]

11/12/02 117    MOTION to strike 10/24/02 affidavit of Patrick E Dawson
(in support of response to motion for partial summary
judgment) by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o [117-1] (affidavit is not on the docket;

LAW OFFICES G. RICHARD STRAFER, P.A., 2400 S. DIXIE HIGHWAY, SUITE 200, MIAMI, FL 33133 • TEL. (305) 857-9090 • FAX (305) 854-2103

http://pacer.azd.uscourts.gov/dc/cgi-bin/pacer740.pl                                              6/11/2003

it may be attached as an exhibit to the response) (ld)
[Entry date 11/14/02]

11/12/02 118   REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
Trading o  to response to motion for partial summary
judgment on FAA counts against engine by claimant Asia
Cargo & Trading, claimant Asia Cargo Trading [103-1] (ld)
[Entry date 11/14/02]

11/22/02 119   STIPULATED MOTION for enlargement of time to respond to
pla's motion for partial summary judgment (until 1/2/03) by
claimant Asia Cargo & Trading, claimant Asia Cargo Trading
o [119-1] (proposed reponse not provided) (ld)
[Entry date 11/27/02]

12/2/02  120   ORDER  by Judge James A. Teilborg  granting  motion for
enlargement of time to respond to pla's motion for partial
summary judgment (until 1/2/03) by claimant Asia Cargo &
Trading, claimant Asia Cargo Trading o [119-1] (proposed
reponse not provided) (cc: all counsel) (ld)
[Entry date 12/02/02]

12/2/02  121   RESPONSE by pla USA  to motion to strike 10/24/02 affidavit
of Patrick E Dawson (in support of response to motion for
partial summary judgment) by claimant Asia Cargo & Trading,
claimant Asia Cargo Trading o [117-1] (ld)
[Entry date 12/04/02]

12/11/02 122   MOTION w/attached exhibits to supplement affidavit of
Patrick E. Dawson [121-1], [117-1] [117-1] by pla USA
[122-1] (Affidavit of Patrick E. Dawson not on docket) (ild)
[Entry date 12/12/02]

12/12/02 123   REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo
Trading o  to response to motion to strike 10/24/02
affidavit of Patrick E Dawson (in support of response to
motion for partial summary judgment) by claimant Asia Cargo
& Trading, claimant Asia Cargo Trading o [117-1] (ld)
[Entry date 12/17/02]

12/19/02 124   MOTION to supplement the report of expert David Hobza
(attached as exhibit to statement of facts in support of
motion to strike calim and answer of Asia Cargo Trading of
USA Inc [101-1]) by pla USA [124-1] (supplement attached as
part of this motion) (ld) [Entry date 12/23/02]

12/23/02 125   RESPONSE by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o  to motion to supplement affidavit of
Patrick E. Dawson [121-1], [117-1] [117-1] by pla USA
[122-1] (Affidavit of Patrick E. Dawson not on docket) (ld)
[Entry date 12/24/02]

12/26/02 126   NOTICE OF SUBSTITUTION OF FACSIMILE SIGNATURE PAGE
(AFFIDAVIT of George Trivino in support of motion to
supplement affidavit of Patrick E. Dawson [121-1], [117 1]
[117-1] by pla USA [122-1] (Affidavit of Patrick E. Dawson
not on docket)) by pla USA (ld) [Entry date 12/30/02]

1/2/03   127   MOTION to strike certain "factual material" submitted (in
statement of facts [101-1]) in support of motion to strike

claim and answer of Asia Cargo Trading of USA Inc by
claimant Asia Cargo & Trading, claimant Asia Cargo Trading
o [127-1] (ld) [Entry date 01/06/03]

1/2/03   128   MOTION (REQUEST) for oral argument (on motion to strike
certain "factual material" (in statement of facts)
submitted by pla in support of motion to strike claim and
answer) by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o [128-1] (ld) [Entry date 01/06/03]

1/2/03   129   RESPONSE by claimant Asia Cargo Trading of (Asia Cargo
Florida) to motion for summary judgment regarding the
interest of Asia Cargo Trading of USA Inc and Asia Cargo and
Trading Company SA by pla USA [114-1] (ld)
[Entry date 01/06/03] [Edit date 01/06/03]

1/2/03   130   RESPONSE by claimant Asia Cargo & Trading (Asia Cargo
Panama) to motion for summary judgment regarding the
interest of Asia Cargo Trading of USA Inc and Asia Cargo and
Trading Company SA by pla USA [114-1] (ld)
[Entry date 01/06/03] [Edit date 01/06/03]

1/2/03   131   STATEMENT OF FACTS by claimant Asia Cargo & Trading,
claimant Asia Cargo Trading of in opposition to motion for
summary judgment regarding the interest of Asia Cargo
Trading of Inc and Asia Cargo and Trading Company SA by pla
USA [114-1] (ld) [Entry date 01/06/03]

1/9/03   132   NOTICE by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o of filing original signature page of Luis
Guillermo Angel Restrepo (ld) [Entry date 01/10/03]

1/9/03   133   NOTICE by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o of filing original signature page of
Roberto Gomez (ld) [Entry date 01/10/03]

1/9/03   134   NOTICE by claimant Asia Cargo & Trading, claimant Asia
Cargo Trading o of filing original signature page of Carlos
Fernando Quiroz (ld) [Entry date 01/10/03]

1/10/03   135   REPLY by pla USA  to response to motion to supplement
affidavit of Patrick E. Dawson [121-1], [117-1] [117-1] by
pla USA [122-1] (Affidavit of Patrick E. Dawson not on
docket) (ld) [Entry date 01/13/03]

1/14/03   136   STIPULATION to extend time (until 1/10/03) to reply to
motion to supplement affidavit of Patrick E. Dawson
[121-1], [117-1] by pla USA [122-1] (Affidavit of Patrick
E. Dawson not on docket) [122-1] by pla, claimants
(proposed reply not provided) (ld) [Entry date 01/16/03]

1/16/03   137   ORDER  by Judge James A. Teilborg  granting  stipulation to
extend time (until 1/10/03) to reply to motion to
supplement affidavit of Patrick E. Dawson [121-1], [117-1]
by pla USA [122-1] (Affidavit of Patrick E. Dawson not on
docket) [122-1] by pla, claimants (proposed reply not
provided) (cc: all counsel) (received 1/16/03) (ld)
[Entry date 01/16/03]

1/21/03   138   ORDER  by Judge James A. Teilborg  granting  motion to

supplement the report of expert David Hobza (attached as exhibit to statement of facts in support of motion to strike calim and answer of Asia Cargo Trading of USA Inc [101-1]) by pla USA [124-1] (supplement attached as part of this motion) (cc: all counsel) (ld) [Entry date 01/21/03]

1/21/03   140   REPLY by pla USA to response to motion for summary judgment regarding the interest of Asia Cargo Trading of USA Inc and Asia Cargo and Trading Company SA by pla USA [114-1] (ld) [Entry date 01/23/03]

1/21/03   141   REPLY STATEMENT OF FACTS by pla USA re motion for summary judgment regarding the interest of Asia Cargo Trading of Inc and Asia Cargo and Trading Company SA by pla USA [114-1] (ld) [Entry date 01/23/03]

1/22/03   139   MINUTE ORDER IT IS ORDERED that the Government's Motion to Strike Claim and Answer of Asia Cargo Trading of USA, Inc. [100-1] is DENIED as moot. IT IS FURTHER ORDERED that Claimants' Motion to Strike Government's new argument for striking claim and answer by claimant Asia Cargo & Trading, S.A. [105-1] is DENIED as moot. IT IS FURTHER ORDERED that Claimants' motion/request for oral argument (on motion to strike certain "factual material" (in statement of facts) by pla in support of motion to strike claim and answer) [128-1] is GRANTED. IT IS ORDERED setting oral argument on said motion [127-1] at 11:00, 2/10/03, along with the other motions scheduled to be heard at that date and time. Counsel is advised that the combined oral argument on ALL motions will last no longer than one (1) hour. (cc: all counsel) [139-1] (tb) [Entry date 01/22/03]

1/22/03   142   REPLY by pla USA to response to motion for summary judgment regarding the interest of Asia Cargo Trading Panama of USA Inc and Asia Cargo and Trading Company SA by pla USA [114-1] (kg) [Entry date 01/28/03]

1/22/03   143   RESPONSE IN OPPOSITION by pla USA to motion to strike certain "factual material" submitted (in statement of facts [101-1]) in support of motion to strike claim and answer of Asia Cargo Trading of USA Inc by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [127-1] (kg) [Entry date 01/28/03]

1/24/03   144   CORRECTED motion (ERRATA) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o to motion to strike certain "factual material" submitted (in statement of facts [101-1]) in support of motion to strike claim and answer of Asia Cargo Trading of USA Inc by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [127-1] (jrh) [Entry date 01/28/03]

1/29/03   145   REPLY by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o to response to motion to strike certain "factual material" submitted (in statement of facts [101-1]) in support of motion to strike claim and answer of Asia Cargo Trading of USA Inc by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [127-1] (dmt) [Entry date 01/31/03]

2/3/03   146    MINUTE ORDER IT IS ORDERED that at the February 10, 2003 Hearing, the Court will hear oral argument on only the following two motions: (1) Plaintiff's Motion to Strike Claim and Answer of Asia Cargo & Trading Co., S.A. (Doc. #68); and (2) Plaintiff's Motion for Summary Judgment (Doc. #114). The Court finds oral argument unnecessary on Claimants' Motion to Strike Certain "Factual Material" Submitted by Plaintiff in Support of [Motion for Summary Judgment] (Doc. #127). If necessary, the Court will set a hearing date and rule on Claimants' Motion for Partial Summary Judgment on FAA Counts Against Engine (Doc. #103) and the related motions regarding the Affidavit of Patrick E. Dawson (Doc. #117 & Doc. #122) after the Court rules on Plaintiff's (1) Motion to Strike Claim and Answer, and (2) Motion for Summary Judgment. (cc: all counsel) [146-1] re: order (minute) [146-1] (tb) [Entry date 02/03/03]

2/3/03   147    MOTION (REQUEST) for oral argument (on motion to strike Dawson affidavit (doc #117)) by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [147-1] (ld) [Entry date 02/04/03]

2/4/03   148    MINUTE ORDER Based on the Court's February 3, 2003 Order [146-1], IT IS ORDERED that Claimants' motion for oral argument (on their motion to strike Dawson affidavit (doc #117)) [147-1] is DENIED as moot. (cc: all counsel) [148-1] (tb) [Entry date 02/04/03]

2/7/03   150    NOTICE OF FILING AFFIDAVIT of Robert Reid in support of motion for summary judgment regarding the interest of Asia Cargo Trading of Inc and Asia Cargo and Trading Company SA by pla USA [114-1] by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o (ld) [Entry date 02/10/03]

2/10/03   149    MINUTE ENTRY before Judge James A. Teilborg . Crt Rptr: David German. Appearances:  Reid Charles Pixler for pla. Maureen Beyers and Alan S. Fine for claimants. IT IS ORDERED taking under advisement on 2/10/03 the motion to strike answer to complaint [50-1], claim [8-1] of claimant Asia Cargo & Trading Company SA by pla USA [68-1], and motion for summary judgment regarding the interest of Asia Cargo Trading of Inc and Asia Cargo and Trading Company SA by pla USA [114-1]. If either counsel believes the Court should recuse itself in this case, they are directed to contact the Courtroom Deputy by 12:00 noon, 2/12/2003. (cc: JAT) [149-3] (tb) [Entry date 02/10/03]

2/10/03   151    Transcript Designation and Ordering Form by claimant Asia Cargo & Trading, claimant Asia Cargo Trading re 2/10/03 argument on motions (ld) [Entry date 02/11/03]

2/12/03   152    MOTION for leave to file post-hearing memorandum on issue raised in pla's rebuttal hearing by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [152-1] (UNSIGNED proposed memorandum attached) (ld) [Entry date 02/13/03]

2/14/03   153    MINUTE ORDER IT IS ORDERED that the motion for leave to file post-hearing memorandum on issue raised in pla's rebuttal hearing by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [152-1] is DENIED. (cc: all counsel)

|         |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                       |
|---------|-----|---|
|         |     | [153-1] (tb) [Entry date 02/14/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                     |
| 2/21/03 | 154 | ORDER by Judge James A. Teilborg granting motion to strike answer to complaint [50-1], claim [8-1] of claimant Asia Cargo & Trading Company SA by pla USA [68-1] ; striking answer to complaint [50-1], striking claim [8-1]; denying motion for summary judgment regarding the interest of Asia Cargo Trading of USA Inc and Asia Cargo and Trading Company SA by pla USA [114-1]; denying as moot the motion to strike certain "factual material" submitted (in statement of facts [101-1]) in support of motion to strike claim and answer of Asia Cargo Trading of USA Inc by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [127-1]; setting motion for partial summary judgment on FAA counts against engine by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [103-1] at 11:00 4/7/03 (cc: all counsel) (ld) [Entry date 02/21/03] |
| 2/28/03 | 155 | TRANSCRIPT of motions hearing by Court Reporter: David C German for the following date(s): 2/10/03 (BULKY DOCUMENT) (ld) [Entry date 03/03/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| 3/5/03  | 156 | MOTION for limited consideration of order of 2/21/03 (as to arguments which would support award of summary judgment in favor of pla even absent a factual determination of th alter ego/intent issue) by pla USA [156-1] (ld) [Entry date 03/10/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| 3/5/03  | 157 | MOTION for reconsideration of order striking claim by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [157-1] and in the alternative for entry of final judgment by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [157-2] (ld) [Entry date 03/10/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                         |
| 3/7/03  | 158 | Transcript Designation and Ordering Form by pla USA re 2/10/03 oral argument (ld) [Entry date 03/11/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                 |
| 3/10/03 | 159 | MOTION to strike affidavit of Robert Reid [150-1] by pla USA [159-1] (ld) [Entry date 03/12/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                        |
| 3/26/03 | 160 | MINUTE ORDER IT IS ORDERED resetting motion for partial summary judgment on FAA counts against engine by claimant Asia Cargo & Trading, claimant Asia Cargo Trading [103-1] from 4/7/03 to Wednesday, 4/9/03 at 11:00 a.m. before Judge Teilborg (Courtroom 503). IT IS ORDERED, pursuant to Local Rule 1.10(p), (1) Claimant Asia Cargo Panama shall file a Response to Plaintiff's Motion for Limited Reconsideration [156-1] by Tuesday, April 1, 2003, and (2) Plaintiff shall file a Response to Claimant Asia Cargo FLorida's Motion for Reconsideration [157-1] by Tuesday, April 1, 2003. (cc: all counsel) [160-1] (tb) [Entry date 03/26/03]                                                                                                                                                                                       |
| 3/27/03 | 161 | CROSS-MOTION for leave to file testimony under seal by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o [161-1] (proposed sealed testimony not provided) and RESPONSE to motion to strike affidavit of Robert Reid [150-1] by pla USA [159-1] by claimant Asia Cargo & Trading, claimant Asia Cargo Trading o (ld) [Entry date 03/28/03]                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| 3/31/03 | 163 | Stipulated MOTION to Continue Oral Arguments (scheduled                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |

for 4/9/03) by pla [163-1] (sat) [Entry date 04/02/03]

4/1/03   164    RESPONSE by claimant Asia Cargo & Trading, claimant Asia
                Cargo Trading o  to motion for limited consideration of
                order of 2/21/03 (as to arguments which would support award
                of summary judgment in favor of pla even absent a factual
                determination of th alter ego/intent issue) by pla USA
                [156-1] (ld) [Entry date 04/02/03]

4/1/03   165    RESPONSE by pla USA  to motion for reconsideration of order
                striking claim by claimant Asia Cargo & Trading, claimant
                Asia Cargo Trading o [157-1] (ld) [Entry date 04/02/03]

4/2/03   162    MINUTE ORDER The Court is in receipt of Stipulation to
                Continue Oral Argument filed 4/1/03.  IT IS ORDERED
                resetting oral argument on motion for partial summary
                judgment on FAA counts against engine by claimant Asia
                Cargo & Trading, claimant Asia Cargo Trading [103-1] from
                April 9, 2003 to Friday, May 9, 2003 at 9:00 a.m. (cc:
                counsel) [162-1] (tb) [Entry date 04/02/03]

4/7/03   166    REPLY by pla USA  to response to motion to strike affidavit
                of Robert Reid [150-1] by pla USA [159-1] (ld)
                [Entry date 04/09/03]

4/14/03  167    NOTICE of service of discovery by claimant Asia Cargo &
                Trading, claimant Asia Cargo Trading o (ld)
                [Entry date 04/16/03]

5/2/03   168    ORDER  by Judge James A. Teilborg  denying motion for
                limited consideration of order of 2/21/03 (as to arguments
                which would support award of summary judgment in favor of
                pla even absent a factual determination of th alter
                ego/intent issue) by pla USA [156-1]; denying as moot the
                motion to strike affidavit of Robert Reid [150-1] by pla
                USA [159-1]; granting motion for reconsideration of order
                striking by claimant Asia Cargo & Trading, claimant Asia
                Cargo Trading o [157-1]; FURTHER ORDERED that the portion
                of the Court's 2/21/03 order [154-1] granting pla's motion
                to strike claim and answer of Asia Cargo Panama [68-1] is
                reinstated, denying motion to strike answer to complaint
                [50-1], claim [8-1] of claimant Asia Cargo & Trading
                Company SA by pla USA [68-1]; denying as moot the motion
                for entry of final judgment by claimant Asia Cargo &
                Trading, claimant Asia Cargo Trading o [157-2]; FURTHER
                ORDERED that (1) pla may file a motion for summary
                judgment, as set forth in this order and pursuant to
                Federal Rule of Civil Procedure 56 and Local Rule 1.10, by
                Friday, 5/23/03; (2) claimant Asia Cargo Panama may file a
                response by Friday, 6/20/03; and (3) pla may file a reply
                by Friday, 6/7/03 (cc: all counsel) (ld)
                [Entry date 05/02/03]

5/9/03   169    MINUTE ENTRY before Judge James A. Teilborg .  Crt Rptr:
                David German. Appearances:  Reid C. Pixler for pla. Maureen
                Beyers and Lawrence Hammond for claimants. Alan S. Fine
                appears telephonically for claimants. Motion hearing held.
                IT IS ORDERED taking under advisement on 5/9/03 the motion
                for partial summary judgment on FAA counts against engine
                claimant Asia Cargo & Trading, claimant Asia Cargo Trading

# EXHIBIT "17"

MOTO CRACHO KOLCHOR P.A.

SEP 2 4 2002

1  PAUL K. CHARLTON
   United States Attorney
2  District of Arizona

3  Reid C. Pixler
   Assistant U.S. Attorney
   Arizona State Bar No. 12850
4  Two Renaissance Square
   40 North Central, Suite 1200
5  Phoenix, Arizona 85004-4408
   Telephone: (602) 514-7500

6              UNITED STATES DISTRICT COURT

7                 DISTRICT OF ARIZONA

8  UNITED STATES OF AMERICA,

9          Plaintiff,

10      v.                                    CIV-01-6763-PHX-JAT

11 1985 Gulfstream Commander 1000 aircraft,   GOVERNMENT'S STATEMENT OF
   model 695A, serial number 96080, United    FACTS IN SUPPORT OF MOTION
12 States registration number N968AC and      TO STRIKE CLAIM AND ANSWER
   Aircraft engine, model number TPE 331-     OF ASIA CARGO TRADING OF
13 10-511K, part number 3102190-2, serial     USA, INC.
   number P-38337,
14
15         Defendants.

16     NOW COMES Plaintiff, United States of America, by and through its attorney, PAUL K.

17 CHARLTON, United States Attorney for the District of Arizona, and Reid C. Pixler, Assistant

18 United States Attorney, and respectfully present a Statement of Facts in support of the above

19
20 motion.

21
22             STATEMENT OF FACTS

23     1.      On November 9, 1999, the defendant aircraft one 1985 Gulfstream Commander

24 1000, serial number 96080, then displaying Colombia tail number HK-3284-W, arrived at Ft.

25 Lauderdale, Florida, from Cartagena, Colombia. *Dawson Aff. Ex # 13*

26     2.      The aircraft was piloted by WILLIAM CHAVARRIAGA-VELEZ and Roberto

27 GOMEZ-Guevara. During the arrival clearance process with U.S. Customs, the owner of the

28

1   aircraft was identified as CARLOS FERNANDO QUIROZ Y CIA with the address of Calle 6

2   No. 65 E-58, Hangar 10, Medellin, Colombia. *Dawson Aff. Ex #13*

3         3.    The listed ownership of this aircraft to CARLOS FERNANDO QUIROZ Y CIA

4   was corroborated by virtue of Colombian aircraft registry records. *Dawson Aff. Ex #13*

5         4.    However, the address was determined to actually correspond to HELICARGO

6   S.A., which is controlled by Luis Guillermo ANGEL RESTREPO, but owned on paper by

7   immediate family members, and close associates. *Dawson Aff. Ex #13*

8         5.    After arriving in the United States an application was filed with the FAA seeking

9   the issuance of a U.S. or "N" registration number in the name of ASIA CARGO TRADING OF

10   USA, INC., a Florida Corporation. *Ex # 11*

11         6.    The defendant aircraft was flown to Downtown Airpark Inc. in Oklahoma City,

12   Oklahoma, by WILLIAM CHAVARRIAGA and ROBERTO GOMEZ on February 18, 2001,

13   for the purposes of maintenance. *Downes aff, Ex # 9, ¶ 3. Amis Aff. Ex # 10, ¶ 3.*

14         7.    The person who made all decisions regarding the aircraft was LUIS GUILLERMO

15   ANGEL RESTREPO. All decisions made by WILLIAM CHAVARRIAGA and/or ROBERTO

16   GOMEZ usually involved prior telephonic communications with ANGEL RESTREPO. *Downer*

17   *aff Ex #9, ¶ 5. Amis Aff. Ex #10, ¶ 5.*

18         8.    When Downes advised WILLIAM CHAVARRIAGA that law enforcement had

19   seized the defendant aircraft, CHAVARRIAGA stated that he would have to contact the owner

20   "GUILLERMO ANGEL" to let him know of the seizure. *Downes aff Ex #9, ¶ 8.*

21         9.    Downes received an e-mail message from ANGEL RESTREPO regarding the

22   seizure of the aircraft and that an attorney would be hired to handle the matter. A copy of the

23   e-mail message was provided to Special Agent Dawson. *Downes aff Ex #9, ¶ 11.*

24     Due to the lates (sic) events on wich (sic) the US Magistrate has decided to isue (sic) a

25     forfiture (sic) warrant against the airplane in mention, all I have to say is that it came as a
      surprise to me in way.

26     But anyway I am sure that every thing is going to be clarify (sic), we are going to be on

27     bussiness (sic) as usual, we have already contacted a Lawyer in Miami that is going to
      be in charge to clarify this situation, her name is Holly Schoink (sic), pardon me if the
      spelling does not correspond.

28

1  I would like to at this point request excuses for any inconvenient (sic) that the situation,
2  has cause (sic) you if any, or the same to Raul whose only desire has been to get thru
   a quick clean deal on regards to your company's roll (sic) on selling the aircraft.

3  As you can see from now on until this embarrasing (sic) situation is clarify (sic) it will
   be recomended (sic) that any comunication (sic) between you or any of the company's
4  representatives of the owner of the aircraft be conducted thhru (sic) the attorney.

5  Sincerily (sic) YOURS

6  Luis G. Angel
   General Manager
7  Helicargo S.A.

8  Ex # 20.

9      10.   Defendant two, one of the original engines of the aircraft, was discovered at a
10  Honeywell repair facility in Phoenix, Arizona. The TPE Program manager for Honeywell at this
11  facility, Ms Carole Wright, indicated that the owner of the engine was Captain Angel of
12  Helicargo in Medellin, Colombia. *Dawson aff. Ex #13; Ex #16  ROI 32 ¶3.*

13     11.   George Trivino, a field service engineer for Honeywell, who had been previously
14  based in Bogota, Colombia, stated that he had made the acquaintance of Captain Luis Angel,
15  who had asked Trivino to determine the source of the problem with this specific engine. Trivino
16  was the person who established the original work order for the engine.   *Dawson aff. Ex #13,*
17  *Ex #16  ROI 32 ¶4.*

18     12.   According to Herrera Lizcano, the individuals involved in drug trafficking in
19  Colombia never have their names associated with the enterprises they own and control. Rather
20  they use family members or trusted colleagues to conceal their ownership interest. *Ex # 41 16.*

21

22                              **HELICARGO.**

23     13.   On March 3, 2000, William CHAVARRIAGA-Velez made an application with
24  the INS for asylum in the United States. The documentation attached to his application indicated
25  that CHAVARRIAGA-Velez was cargo agent and legal representative for AEROATLAS which
26  became HELICARGO. *Ex # 19.*

27

28

                                    3

14.   In January 1988 AEROATLAS, S.A. and AEROLINEAS ESPECIALES, S.A. had the same address and the same national tax identification number, indicating they were the same company. *ROI # 17, Dawson aff. Ex # 13.*

15.   Colombian records also demonstrate that during 1991 the name of AEROATLAS S.A./AEROLINEAS ESPECIALES S.A. was changed or shortened to AEROES LTDA. Thereafter, a number of the helicopters operated by the company changed registrations to reflect the name of AEROES LTDA. *Dawson aff Ex #13*

16.   Prior to May 4, 1993, a group of former associates of Pablo Escobar who felt threatened or intimidated by the increasingly violent behavior of Escobar, began to cooperate with the Colombian National Police and Office of the Colombian Attorney General, seeking the capture of Escobar. *Nicholas Bergonzoli aff. Ex #15, ¶4, 5.*

17.   The spokesperson for this group was LUIS GUILLERMO ANGEL RESTREPO. *Dawson aff. Ex #13, Ex #18 TWX 40-41.*

18.   ANGEL RESTREPO has admitted to numerous individuals, including Mark Bowden (the Author of *Killing Pablo*) that he was an associate of Pablo Escobar and therefore knew a substantial amount about the operation of the criminal enterprise directed by Escobar, particularly related to aircraft. *Dawson, Aff Ex #13; Ex #1, Admission # 1; 3.*

19.   ANGEL RESTREPO advised the Colombian National Police that helicopter HK 3081, serial number 7006 and registered to AEROES LTDA, was the property of PABLO ESCOBAR. *Ex # 18, TWX 40-41*

20.   On or about May 4, 1993, the helicopter was located at Guymaral Airport between Hangar 48 and the Hangar of AEROLINEAS ESPECIALES by the Colombian National Police and it was seized. *Ex # 18, TWX 40-41*

21.   ANGEL RESTREPO also identified HERMAN EMILIO SEPULVEDA RODRIGUEZ as the person who was in charge of maintaining the aircraft, mostly helicopters, of PABLO ESCOBAR. *Ex # 18, TWX 40-41*

22.   The Colombian investigation revealed that SEPULVEDA RODRIGUEZ also cooperated against the interest of ESCOBAR. SEPULVEDA RODRIGUEZ indicated that he

4

1  and WILLIAM JESUS PEREZ and RAUL RUBIANO BERMUDEZ received funding from

2  ESCOBAR'S right hand man, GUSTAVO GAVIRIA to form AEROLINEAS ESPECIALES,

3  which was created in or about July, 1988. *Ex # 18, TWX 40-41*

4      23.  The name on the corporate documents was changed in 1991 to AEROES LTDA

5  and the names of those associated with the company also changed.  SEPULVEDA

6  RODRIGUEZ remained, however, PEREZ and BERMUDEZ were replaced by RODRIGO

7  RAMIREZ and HENRY SEPULVEDA. *Ex # 18, TWX 40-41*

8      24.  SEPULVEDA RODRIGUEZ also identified four helicopters associated with

9  AEROLINEAS ESPECIALES/AEROES LTDA which were purchased and owned by

10  ESCOBAR/GAVIRIA: HK 1260; HK 2588; HK 2679; registered to AEROES LTDA; and HK

11  2196; registered to JOSE HUMBERTO HOYOS CANO. *Ex # 18, TWX 40-41*

12      25.  The company is now called HELICARGO, but has been previously called

13  AERODALAS; AEROATLAS, AEROLINEAS ESPECIALES, and AEROES LTDA, and was

14  created with funds from the criminal enterprise of Pablo Escobar. *Ex # 18, TWX 40-41*

15      26.  Once Pablo Escobar and his associates involved in this company were killed or

16  captured, it appears ANGEL RESTREPO assumed the ownership and control of the company

17  which is now called HELICARGO, S.A. *Dawson Aff, Ex #13*

18      27.  ANGEL RESTREPO was granted the equivalent of transactional immunity for

19  certain prior illegal acts by the government of Colombia in 1993. *Ex #1 Admission #4.*

20      28.  ANGEL RESTREPO is listed as the General Manager of HELICARGO, S.A. on

21  the e-mail dated February 24, 2001, directed to representatives of Downtown Airpark, where the

22  defendant aircraft was seized. *Ex #20.*

23      29.  In response to plaintiff's Request For Admission #10, as amended, claimants

24  admitted that ANGEL RESTREPO controls Helicargo, S.A. *Ex #3, Fine letter June 28, 2002.*

25      30.  CYNTHIA DAWN OLDEAM, the present wife of ANGEL RESTREPO, is listed

26  as an officer, member of the Board, and, until August 2000, was the alleged owner of a majority

27  of the stock of HELICARGO. *Oldham affidavit, Ex # 4, Ex # 2, Admissions 21 -22.*

28

5

31.   In August 2000 CYNTHIA DAWN OLDHAM SIEGERT conveyed the stock in her name to the children of ANGEL RESTREPO, born of CYNTHIA DAWN OLDHAM SIEGERT and MARIA ISABEL POSADA RAMOS. *Ex #2, admissions 5-25; Oldham affidavit, Ex # 4; Posada affidavit Ex #5.*

32.   As the result of his association with Pablo Escobar and the statements he has made regarding the ownership and application of the assets, ANGEL RESTREPO is aware of the criminal origin of this company.   *Ex #18, TWX 40-41*

33.   William CHAVARRIAGA-Velez continues to be listed as a representative and employee of HELICARGO.  *Dawson Aff, Ex # 13*

34.   William CHAVARRIAGA-Velez  is listed as the president of Asia Cargo and Trading of U.S.A., Inc. a Florida corporation. *Ex #1, Admissions # 6; 7.*

35.   William CHAVARRIAGA-Velez also has received a form of a power of attorney to act on behalf of MARIA ISABEL POSADA RAMOS to act on behalf of ASIA CARGO & TRADING, S.A. of Panama. *Ex # 5*

### ASIA CARGO AND TRADING, S.A. of Panama

36.   ANGEL RESTREPO has denied that he owns ASIA CARGO AND TRADING, S.A. OF PANAMA. *Ex #1, Admission #8;*

8. Admit that LUIS GUILLERMO ANGEL RESTREPO owns ASIA CARGO AND TRADING S.A., a Panamanian Corporation.

If you deny this request produce a list of the shareholders and their addresses and telephone numbers together with copies of the stock certificates and the stock ledger book of the corporation, which discloses the records of stock ownership of the corporation.

RESPONSE: Claimants deny request No. 8. The shares of Asia Cargo and Trading S.A. are issued to the bearer and are not memorialized in a stock transfer ledger. The shares and the only power of attorney are held by Maria Isabel Posada. The witnesses are: Maria Isabel Posada, a resident of Bogota, Colombia, and Luis Guillermo Angel, both of whom may be contacted though counsel for the Claimants.

6

37.   ANGEL RESTREPO admitted that he controlled both ASIA CARGO AND TRADING S.A., a Panamanian Corporation, and the aircraft and engine. *Ex# 1, Admission #9:*

> 9. Admit that LUIS GUILLERMO ANGEL-RESTREPO controls ASIA CARGO AND TRADING S.A., a Panamanian Corporation, and its assets including defendants #1 and #2, more particularly described as one 1985 Gulfstream Commander 1000 aircraft, model 695A, serial number 96080, United States registration number N960AC and Aircraft engine, model number TPE 331-10-511K, part number 3102190-2, serial number P-38337.
>
> If you deny that LUIS GUILLERMO ANGEL-RESTREPO controls ASIA CARGO AND TRADING S.A., then describe the reason for the involvement of LUIS GUILLERMO ANGEL-RESTREPO in the attempt to liquidate the aircraft with Downtown Airpark, Inc.
>
> RESPONSE: Claimants object because this request seeks information which is neither relevant nor material to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of admissible evidence. If this objection is overruled, Claimants would admit that Mr. Angel is one of the persons who control ASIA CARGO AND TRADING S.A. and said assets. (Claimant declines to identify the others who control the corporation.)

38.   In the Affidavit of MARIA ISABEL POSADA, dated August 23, 2002, she has admitted that she holds the stock certificates for the children of ANGEL RESTREPO, two with her and two with his second wife, Oldham. These are the same children identified as *owning* a controlling interest in HELICARGO, S.A. *Posada Affidavit, Ex #5.*

39.   MARIA ISABEL POSADA alleges that the business of ASIA CARGO & TRADING, S.A., includes the leasing of aircraft to Helicargo, S.A., a Colombian corporation in the aircraft charter business. *Posada Affidavit, Ex #5.*

40.   MARIA ISABEL POSADA also admitted that she has no control over any aspect of this company; attends no shareholder's or director's meetings; and has nothing to do with the normal business operations other than to sign whatever papers Guillermo Angel delivers to her for her signature.   *Posada Affidavit, Ex #5.*

41.   MARIA ISABEL POSADA also admitted that she had nothing whatever to do with the transaction in which the defendant aircraft was purchased, and knows nothing about how the aircraft was acquired nor how it was to be used. She did execute special power of attorney attached to her affidavit.   *Posada Affidavit, Ex #5.*

7

42. The special power of attorney executed by POSADA on or about April 28, 2000 in Medellin, Colombia, was on stationery with the following letterhead: ASIA CARGO & TRADING C.O., Edificio Bancomer Piso 18 Calle 50, Panama Republica de Panama, P.O. Box 55 - 2278 Panilla, Telefono: 223 27 27 Fax 223 27 29 Panama. *Ex # 5.*

43. Plaintiff attempted to serve a Summons and Complaint by DHL courier upon ASIA CARGO & TRADING at the above address. The package was returned as undeliverable. *Dawson aff Ex # 13, Moynahan Aff Ex #14.*

44. On August 15, 2001, and again on September 16, 2002, Eileen Moynahan called the number of the stationery, 223 27 27. The call was answered by a receptionist for another company, a law firm, who had never heard of Asia Cargo & Trading. *Moynahan Aff Ex #14.*

45. Eileen Moynahan determined that the law firm of Jovane Bieberach & Valdes Roca was the Resident agent for ASIA CARGO & TRADING in Panama, and attempted to serve the Summons and Complaint upon Attorney Antonio Valdes-Roca. Mr. Valdes-Roca declined to accept the service of process and indicated he would contact the Colombian owners for direction as to an address for service. *Moynahan Aff. Ex #14.*

46. On August 21, 2001, Valdes-Roca contacted Moynahan and advised that the package should be sent to the attorney in Miami who was fully authorized to handle the matter, Maria Isabel Posada Ramos. De Colomado: Suite 710, 2333 Ponce de Leon Blvd., Coral Gables, Florida 30124, Tel: (305) 424-2400. *Moynahan Aff. Ex #14.*

47. This is the same address as appears for Alan Fine on the Verified Notice of Claim form filed with the Court on or about June 25, 2001. *See Claim Form filed with the Court.*

48. In mid-July 2002, Antonio Valdes Roca advised Moynahan that he generally spoke with MARIA POSADA RAMOS once a year, and had no contact with any other representative of the company. *Moynahan Aff. Ex #14.*

49. Antonio Valdes Roca also advised Moynahan that all of the officers and directors of ASIA CARGO & TRADING which were publicly listed were actually employees of the law firm of Jovane Bieberach & Valdes Roca. This is apparently an accepted business practice in Panama. *Moynahan Aff. Ex #14.*

8

50.   Antonio Valdes Roca also advised Moynahan that his firm had incorporated two additional entities for Posada Ramos and the people she represents: ASIA CARGO & HOLDING CORPORATION and ASIA CARGO ENGINEERING CONSULTING INC. *Moynahan Aff. Ex #14.*

51.   Valdes Roca stated that his firm did not open any bank accounts for ASIA CARGO & TRADING, but did orchestrate the purchase of one helicopter on behalf of his client. *Moynahan Aff. Ex #14.*

52.   Moynahan determined that an Ecureuil As 350 B2 helicopter did appear on the Panamanian registry of aircraft on January 7, 2001, registered to ASIA CARGO & HOLDING CORPORATION.  *Moynahan Aff. Ex #14.*

53.   Moynahan determined that the 1985 Gulfstream Commander 1000 aircraft, model 695A with serial number 96080, had never been registered in the official registry of aircraft in Panama. *Moynahan Aff. Ex #14.*


## ASIA CARGO TRADING, INC. of Florida

54.   Claimant ASIA CARGO TRADING, INC. admitted that no shares of stock were ever issued, but asserts that one shareholder owned the company. *Ex # 1, Admission #5.*

5.  Admit that there are no shareholders and stock certificates issued for ASIA CARGO TRADING OF USA, Inc.

RESPONSE: Claimants admit that no stock certificates were issued for Asia Cargo Trading of USA, Inc. Claimants deny that there are no shareholders. The only shareholder is Cynthia Dawn Oldham who can be contacted through counsel for the Claimants.

55. Claimant ASIA CARGO TRADING, INC. asserted that when the company was formed William CHAVARRIAGA became President and CYNTHIA DAWN OLDHAM became Treasurer. *Ex # 1, Admission #6.*

6.  Admit that Roberto Gomez is Registered Agent for ASIA CARGO TRADING OF USA, INC. but no other officers appointed.

RESPONSE: Claimant admit that Roberto Gomez was the initial registered agent of Asia Cargo Trading of USA, Inc., but deny the remainder of request No. 6. The witnesses that "no other officers were appointed" are Roberto Gomez, whose contact information is in the Complaint, William CHAVARRIAGA,

9

Cynthia Dawn-Oldham, Luis Guillermo Angel and Juan Carlos Restrepo. Each of them would testify that when Asia Cargo Trading of USA, Inc. was formed William CHAVARRIAGA became President and Secretary and Cynthia Dawn Oldham became Treasurer. The requested documents, AC0001-AC0018, are attached in lieu of being identified. All witnesses, other than Mr. Gomez, may be contacted through Claimants' counsel.

56.   In an affidavit obtained from CYNTHIA DAWN OLDHAM, dated August 22, 2002, she denied that she had any involvement in the formation, ownership, or day to day management of the corporation. She indicated that in approximately June, 2002, she had been advised by her husband ANGEL RESTREPO that he had named her to be the Treasurer of ASIA CARGO TRADING of USA, INC. and that he had intended to make her the sole shareholder of the corporation. However, she had been issued no share and did not claim an ownership interest in the company or its assets specifically including the defendant aircraft and engine. *Oldham affidavit Ex #4.*

57.   The Florida Corporate records indicate that ASIA CARGO TRADING OF USA, INC., was incorporated on June 22, 2000. It was made inactive for failure to file required corporate reports and reactivated by the new registered agent, Alan Fine. *Ex # 6.*

58.   Claimants admitted that ASIA CARGO TRADING OF USA, INC. was formed to take title to aircraft acquired in the name of ASIA CARGO AND TRADING, S.A. of Panama. *Ex # 2, Admission 27.*

59.   Plaintiff alleges that it has previously litigated money laundering and drug trafficking allegations related to the acquisition and maintenance of aircraft held in the name of companies which act as fronts or straw parties controlled by LUIS GUILLERMO ANGEL RESTREPO. However, during the litigation GUILLERMO ANGEL used the false name of RUBEN OSORIO. The following facts must be considered as uncontested because they are taken from the published opinion in that case where the Court determined that GUILLERMO ANGEL was the real party in interest who operated through front or straw companies which he controlled. *United States v. 1 Basler Turbo 67 DC-3 Aircraft,* 906 F.Supp 1332, (Az Dist Ct 1995). Exhibit numbers greater than 4000 are numbers assigned to exhibits which were attached to the summary judgment pleadings filed with the Court in the *U.S. v. 1 Basler Turbo* action and

1  upon which summary judgment was granted.  The original exhibits are on file in that case.

2  Copies are filed herewith with the same exhibit number.

3     60.   Burton Golb approached the manufacturer of this aircraft in 1988, inquiring about

4  the purchase of the proposed aircraft.  Golb stated that his brother-in-law, Roberto Franco, had

5  contact with a company called AIR COLOMBIA.  RUBEN OSORIO, was represented to be the

6  principal of AIR COLOMBIA, and interested in the project to convert DC-3s.  Id. 1335.

7     61.   In November 1988, Basler met in Colombia with Golb, Franco, Osorio, and

8  Antonio Reyes-Garzon.  Basler's impression was that Franco was the manager of a company

9  called AIR CARIBE and that Reyes-Garzon was the manager of a company called AIR

10  COLOMBIA, Ltda.  Basler also concluded that OSORIO was the man with the money.  Id.

11  1335.

12     62.   At this time, Reyes-Garzon was the manager of AIR COLOMBIA, Ltda. and had

13  been since about May or June of 1988.  AIR COLOMBIA, Ltda. was formed in 1980 as an

14  airfreight company and, at the time of the November 1988 meeting, was allegedly owned by

15  Joaquin Fernandez (Duque) and Roberto Franco's wife, Maria Amparo Carrillo Perez.

16  According to the records produced by the company, OSORIO was not an owner of the company

17  and never had been.  His ownership interest was concealed.  Id. 1335.

18     63.   It is undisputed that AIR COLOMBIA, Ltda. from its own resources, did not have

19  the ability to pay for the planes as of December 12, 1988.  Any funds for the construction of

20  prototype aircraft would have to come from another source.  Id. 1335.

21     64.   According to the deposition testimony of Reyes-Garzon and documents which he

22  produced, on December 20, 1988, AIR COLOMBIA, Ltda. entered into contracts with three

23  investor companies:  Antilles and Carribean Petroleum Services ("Antilles"), Perforacion y

24  Mantenimiento De Pozos, Ltda. ("Pozocol"), and Transportes Petroleros, Ltda. ("Transportes").

25  The Antilles and Transportes contracts each required the contribution of approximately

26  $3,000,000 for the construction of one DC-3 which would be exchanged for stock in the new

27  corporation.  Pozocol could either pay for the aircraft and exchange it for stock or keep the

28  aircraft and contribute other capital.  Id. 1335.

65.   On December 12, 1988, AIR COLOMBIA, Ltda. entered into four contracts for the construction of modified DC-3 aircraft.   AIR COLOMBIA, Ltda. was not a contracting party:  the contracts were signed by Teresa Franco, Roberto Franco's sister and Burton Golb's wife, on behalf of AIR COLOMBIA, S.A., a company which was not yet formed.  Id. 1335.

66.   Upon the evidence and arguments submitted, the court found AIR COLOMBIA, S.A. did not exist and never existed, a fact which AIR COLOMBIA, S.A. conceded.  Id. 1334.

67.   In conjunction with the execution of these three contracts, AIR COLOMBIA, Ltda. executed promissory notes in favor of each company, allegedly secured by the assets of AIR COLOMBIA, Ltda.   However, it is undisputed that AIR COLOMBIA, Ltda. did not have sufficient assets to secure the notes or repay the proceeds in any manner.  Id. 1335.

68.   Reyes-Garzon alleged that on February 8, 1990, a fourth contract and promissory note was entered into between AIR COLOMBIA, Ltda. and Corporacion Petroleros Colombiana, S.A. ("Corpetrol"), which was very similar to the Pozocol contract and note.  Id. 1335.

69.   Neither the investor companies nor AIR COLOMBIA, Ltda. paid funds directly to Basler or Innovair during 1988 or 1989.  Instead, the investor companies allegedly delivered money to Colombian money exchange businesses – known as cambistas – which then sent dollars to Burton Golb in the United States.  Golb then forwarded the funds in furtherance of the AIR COLOMBIA, Ltda. contracts.   Golb forwarded $639,500 in 1988 and another $3,937,831 in 1989.  Id. 1336-7.

70.   Thereafter, funds were sent to AIR COLOMBIA's attorney, Robert Geiger, in Miami, Florida, who forwarded payments approximating $1.7 million.   Thus, a total of approximately $6.3 million was sent for the construction of the aircraft on behalf of the alleged four investor companies.  Id. 1337.

71.   Robert Geiger had personal contact with an identified by William Moran as RUBEN OSORIO, who retained him as counsel for both AIR COLOMBIA and a related company, AIR CARIBE.  Geiger testified the man he knew as OSORIO was the owner of both AIR CARIBE and AIR COLOMBIA and Reyes-Garzon was simply an employee/manager.  Id. 1337.

12

72.   The seizure of all the defendant assets stemmed from the government's investigation of Burton Golb.   In 1990, Golb was indicted on numerous charges of money laundering in the District of Arizona.   The District Court of Arizona presided over Golb's trial where he was convicted of numerous acts of money laundering.   (The conviction was affirmed by the Ninth Circuit.)   The evidence adduced at Golb's trial, in conjunction with the jury's findings, establishes that all the money received on behalf of the contracts in the name of AIR COLOMBIA, S.A., other than the letter of credit, were the proceeds of illegal drug or money laundering transactions.   No party disputed that the $63 million received as payments on the aircraft was tainted money forfeitable to the government in the absence of a valid defense. *Id.* 1337.

73.   On April 25, 1995, the United States filed a motion to Strike the Claim and Answer of AIR COLOMBIA, Ltda. supported by an affidavit from Luis Carlos Herrera-Lizcano, a Colombian convicted of money laundering for his role in the acquisition of aircraft intended to be used to transport cocaine into the United States.   Herrera appears to qualify as an expert in the fields of financial money laundering as well as the aircraft industry in Colombia. *Id.* 1337.

74.   Herrera Lizcano stated he personally knew the man who provided the money for the operation of AIR COLOMBIA, Ltda. and who was the actual source of control of the company, GUILLERMO ANGEL.   ANGEL had acquired his substantial wealth as the result of his lengthy and lucrative participation with the Cali drug cartel in the trafficking of cocaine from Colombia into the United States. *Id.* at 1336-7.

75.   Herrera Lizcano was present near the AIR COLOMBIA, Ltda. hanger when Reyes-Garzon reported to GUILLERMO ANGEL regarding his trip to Phoenix, Arizona, in August, 1992, for the purpose of giving testimony in this action.   Reyes- Garzon reported the details of the deposition to his boss, ANGEL. *Id.* at 1337.

76.   Despite his sworn testimony, including the production of a substantial number of records pursuant to government interrogatories, in which Antonio Reyes-Garzon repeatedly

13

stated he was the majority owner and manager of AIR COLOMBIA, Ltda., it was clear to Herrera-Lizcano that Reyes-Garzon was merely an employee of ANGEL. *Id.* at 1337.

77.   ANGEL explained to Herrera-Lizcano about the modified DC-3 aircraft he was having constructed, about the delays in the construction and the considerable expenses incurred and why he preferred this aircraft for use in his air trafficking enterprise. *Id.* at 1337.

78.   Angel indicated he had hired lawyers and would do whatever it took to get the airplanes returned to him. Angel told Herrera-Lizcano that he had to use "testaferros" or straw owners like Reyes- Garzon, because he could not come forward due to his involvement in cocaine trafficking. *Id.* at 1337.

79.   Based upon these observations, the government alleged that the real identity of RUBEN OSORIO was GUILLERMO ANGEL. *Id.* at 1337.

80.   The court also took judicial notice of the fact that William Moran, the Miami attorney who first obtained extensions of time within which the AIR COLOMBIA group could file a claim and answer and who introduced OSORIO/ANGEL to attorney Robert Geiger, was indicted in Miami for his participation in a criminal enterprise with the founders of the Cali drug cartel. *Id.* at 1337.

81.   Herrera-Lizcano also supported the expert testimony offered by the government regarding the narcotics proceeds or funds involved in the Colombian Black Market. Herrera-Lizcano agreed with Dr. Grosse that the source of the U.S. currency in the Black Market is narcotics dollars. Further, it is common knowledge in the Colombian economy that the Black Market not only contains narcotics dollars supplied by the cartel, but this financial exchange is a technique by which the drug cartels launder their illegal proceeds. *Id.* at 1337.

82.   Herrera-Lizcano refuted the allegation, presented both by hearsay testimony of Reyes-Garzon and by affidavits executed by representatives of each of the four "investor" companies under penalty of perjury of the laws of the United States of America, that contributions of capital for the construction contracts of the Basler Turbo 67 aircraft were made by delivering billions of pesos to a cambista named "Betty and Associates" in Colombia for conversion to dollars and transfer to the United States. *Id.* at 1337.

14

83.    It is remarkably easy to obtain false or perjured documents from Colombia for a price, according to Herrera-Lizcano.  The government alleged that there simply is no fear of perjury because a Colombian citizen cannot be extradited from Colombia to face criminal prosecution in the United States. *Id.* at *1337*.

84.    The government relied upon a series of photographs of the alleged addresses of the investor companies.  Either the addresses did not exist, the business at the address had no relationship to the alleged investor company or the facility was an obvious sham, such as the office for two of the investor companies found by a DEA Special Agent.  The Agent was able to obtain official stationery from the office only when the attendant removed blank typing paper from a desk drawer and stamped the name and address of the investor company on the paper with an ink pad. *Id.* at 1337-8.

85.    Herrera-Lizcano observed the financial documents, including the alleged tax forms provided by Reyes-Garzon and the investor companies during discovery.  Herrera-Lizcano recognized the documents as falsified tax forms which were not the legitimate forms.  The fake forms were not filed with the appropriate authority.  The financial statements submitted appeared to be similar to falsified forms Herrera-Lizcano had obtained for one of his fake companies. *Id.* at 1338.

86.    The government demonstrated in its motion for summary judgment that the financial statements of the front companies, when adjusted for inflation, conclusively established that the companies did not generate the currency required to provide the capital for the construction of the aircraft.  The funds for the construction of the aircraft did not originate with the front companies nor did the funds pass through the accounts of the companies.  The financial analysis provided by the government established that the substantial increase in the accounts receivable for all four companies actually consumed any excess cash, it did not provide a source of cash with which to make the alleged payments. *Id.* at 1338.

87.    Plaintiff presented uncontradicted evidence now submitted by plaintiff, it has been established that the real party in interest in the AIR COLOMBIA forfeiture action was GUILLERMO ANGEL. *Id.* at 1338.

15

88.    The government established the defendant aircraft were intended to be used to transport cocaine and facilitate the transportation, sale, receipt, possession and concealment of cocaine.  *Id.* at 1338.

89.    RUBEN OSORIO was the hidden owner and real source of control of both AIR COLOMBIA, LTDA. and AIR CARIBE.   AIR CARIBE has repeatedly lost aircraft either to crash or seizure while in the act of transporting thousands of kilograms of cocaine destined for market in the United States.  *Id.* at 1338.

90.    The AIR CARIBE aircraft are seldom, if ever, reported as lost.  Rather, the DEA investigation disclosed that a lost aircraft is replaced with a "twin" or a clone.  The data plate of the original aircraft is removed and the tail number falsified prior to a flight involving the transportation of cocaine.  *Id.* at 1338.

91.    If the aircraft is lost, a replacement aircraft is obtained by corrupt aircraft brokers in the United States and made to resemble the aircraft lost, including the re-attachment of the original data plates and tail number. *Id.* at 1338.

92.    This practice has become so common in Colombia that even an untrained eye can detect the metal fatigue in the area where the data plates are repeatedly pried off and replaced. The falsification of data plates, tail numbers, log books, safety inspections and records, coupled with the rugged use of these aircraft on unimproved landing strips, creates an arduous if not life threatening circumstance to all who come in contact with these aircraft during their operation in general aviation.  *Id.* at 1338.

93.    In addition, the government has established through the unrefuted evidence of Herrera-Lizcano that GUILLERMO ANGEL caused the Basler aircraft to be constructed with the laundered proceeds of his drug trafficking empire for the intended purpose of more efficiently transporting cocaine. *Id.* at 1338.

94.    The United States established, without contradiction, the real party in interest who provided the funds for the construction of the aircraft was GUILLERMO ANGEL.    *Id.* at 1338.

95.   The claims and answers in this action by Antonio Reyes- Garzon by and on behalf of AIR COLOMBIA, LTDA., AIR COLOMBIA, S.A., and the four false investor companies all failed to truthfully identify GUILLERMO ANGEL as the real party in interest.   *Id.* at 1338.

96.   The claim failed to recite that the action by his agent, Reyes-Garzon, was authorized by GUILLERMO ANGEL.   *Id.* at 1338.

97.   The claim and answer filed by Antonio Reyes-Garzon did not meet the requirement of Rule C(6), Supplemental Rules For Certain Admiralty and Maritime Claims and was stricken. *Id.* at 1338.

98.   LUIS GUILLERMO ANGEL RESTREPO has admitted that he used the name RUBEN OSORIO when he was involved in the administration of contracts in the name of AIR COLOMBIA, LTDA and AIR COLOMBIA, S.A. *Ex #2, Admission # 28.*

99.   LUIS GUILLERMO ANGEL RESTREPO has admitted that he used the name RUBEN OSORIO when he became involved with Robert Geiger in financial transactions and contracts in Miami. *Ex #2, Admission # 30.*

100.   LUIS GUILLERMO ANGEL RESTREPO has admitted that he contacted William Moran regarding contracts of the construction of Basler Turbo-67 aircraft. *Ex #2, Admission # 31.*

101.   LUIS GUILLERMO ANGEL RESTREPO admitted that he used the name RUBEN OSORIO when he was involved in financial transactions regarding AIR CARIBE with Burton Golb, dba Air North Aviation. *Ex #2, Admission # 29.*

102.   RUBEN OSORIO (GUILLERMO ANGEL) owned and controlled both AIR COLOMBIA and AIR CARIBE according to testimony previously obtained from Warren Basler, Burton Golb, Robert Geiger, Shirley Key, Jon Barrera. *Ex #4078, pp.1-6, pp8-9.*

103.   A Scottsdale, Arizona resident, Daniel Morales, in the presence of his attorney, made statements to DEA agents on August 4, 1989, in an attempt to cooperate with the government, retrieve his seized property, and avoid indictment.   Morales was subsequently indicted, convicted, and sentenced to prison for his role in acquiring and selling aircraft,

17

1  including Gulfstream Commanders to individuals he knew to be drug traffickers in Colombia.
2  Ex #4078, pp23-25.

3       104.   Morales identified a Lear Jet 35 worth approximately $2,500,000, as being the
4  property of Miguel Felix Gallardo, a huge Mexican drug trafficker, who was in prison in Mexico
5  at that time.  Based upon evidence taken from the business records of Daniel Morales, the
6  investigation disclosed the aircraft was registered to a Mexican company controlled by a close
7  associate and fellow trafficker named Baltazar Diaz Vega.  (Baltazar Diaz Vega has since been
8  shot to death in a gun battle with the Mexican Police.)  Based upon this information, the aircraft
9  was seized in Tucson, Arizona, and subsequently forfeited.  Ex #4078, pp23-25.

10      105.   Morales also identified ROBERTO FRANCO as a client who was in the process
11  of acquiring four DC-3 aircraft, which would be specially modified to transport cocaine from
12  Colombia.  Ex #4078, p25.

13      106.   Maria Amparo Carrillo Perez (the wife of Roberto Franco) who appears on paper
14  to have been an owner of both AIR COLOMBIA and AIR CARIBE, stated in the claim form
15  she filed through her attorney in the AIR COLOMBIA civil forfeiture action that these were
16  related companies.  Ex #4078, p6; Ex#7, p5.

17      107.   Teresa (Tete) Franco (Burton Golb's wife and sister of Roberto Franco) stated in
18  the claim form she filed in the AIR COLOMBIA civil forfeiture action that AIR COLOMBIA
19  and AIR CARIBE were related companies.  Ex #4078, p6; Ex #8, p5.

20      108.   Correspondence between Teresa (Tete) Franco and Antonio Reyes demonstrates
21  that RUBEN OSORIO (GUILLERMO ANGEL) was responsible for payment for the repair and
22  rental of aircraft motors in the name of AIR CARIBE.  The AIR CARIBE legal matter was
23  referred to RUBEN'S lawyer in Miami, Robert Geiger.  Ex #4078, pp9-11.

24      109.   DEA Special Agents Alex Romero, William Martin, and Gary Hartman provided
25  testimony about the seizure of four Gulfstream Commanders, also referred to as Turbo
26  Commanders or Aero Commanders.  All four of the Commanders were identified as AIR
27  CARIBE aircraft.  One was seized in Mexico in August 1989, the second in Mexico in

28

1  December 1990; the third in Colombia in April 1991; and the fourth in Mexico in August 1991.

2  *Ex #4078, pp11-12.*

3      110.  RUBEN OSORIO (GUILLERMO ANGEL) contracted with WSI, a very

4  specialized weather service available to operators of aircraft by computer modem, in the name

5  of AIR CARIVE [sic] to acquire weather reports for the northern Mexico and Southern United

6  States. The advantage of this service was the pilots flying loads of cocaine from Colombia to

7  northern Mexico did not have to contact control towers in route, thereby calling attention to

8  themselves. *Ex #4078, p15.*

9      111.  Paul Hallee from WSI testified in the criminal trial of Burton Golb that the original

10  contract, dated April 26, 1988 was signed by RUBEN OSORIO, on behalf of AIR CARIVE

11  [sic]. Invoices in the name of AIR CARIVE were paid by checks written from CLARA INEX

12  BRAUS, who has no obvious connection with AIR CARIVE or AIR CARIBE, but was used to

13  avoid disclosure of the financial accounts used by AIR CARIBE and RUBEN OSORIO

14  (GUILLERMO ANGEL). *Ex #4078, p16.*

15      112.  On or about February 15, 1989, a new WSI contract was executed by BURTON

16  GOLD (aka Golb often used the name of GOLD) on behalf of AIR CARIVE. Invoices were

17  then captioned "AIR CARIVE c/o AIR NORTH. AIR NORTE was the business name in which

18  BURTON GOLB conducted his business. *Ex #4078, p17.*

19      113.  After the seizure of the financial accounts of GOLB and AIR NORTH, the WSI

20  invoices were not paid and WSI was required to seek collection of the outstanding debt. WSI

21  employed a Colombian attorney who attempted to locate AIR CARIVE and RUBEN OSORIO.

22  Neither could be found in Colombia. *Ex #4078, p17.*

23      114.  AIR COLOMBIA advertised that it was affiliated with two other companies,

24  AVESCA, LTDA and RUTAS AEREAS DE FLORENCIA, and could provide aircraft of

25  different classes, including two Convair 580's and one Curtiss C-46 registered to AVESCA, HK-

26  750 a Curtiss C-46 and HK-3627 a DC-6 both registered to RUTAS AEREAS DE

27  FLORENCIA. *Ex #4078, p17; Ex#4011*

28

115.   The Curtiss C-46 registered to RUTAS AEREAS DE FLORENCIA, crashed and burned in a banana plantation in Guatemala in the fall of 1991. Five burned corpses were recovered along with several thousand kilos of cocaine. *Ex #4078, p18.*

116.   HK-3627 the DC-6 registered to RUTAS AEREAS DE FLORENCIA was seized in Chihuahua, Mexico, in the fall of 1991 with 3.5 tons of cocaine on board. *Ex #4078, p18.*

117.   AVESCA, LTDA is the name of a Colombian company partially owned and operated by Luis Carlos Herrera Lizcano. Herrera Lizcano admitted that he used aircraft, specifically including Convair 580s to fly loads of cocaine from Colombian into Northern Mexico. *Ex #4116, ¶3; 4; 5; 6; 15; 16; 17; 19; 27.*

118.   HK-3616 a Convair 580 registered to AVESCA, LTDA, was seized in Sinaloa, Mexico, on August 13, 1991, along with two Aero Commanders (Gulfstream Commanders). One of the Commanders was registered to AIR CARIBE. A total of about 1.5 tons of cocaine was seized along with the three aircraft. *Ex #4078, p19; Ex #4116, ¶5.*

119.   At the direction of the hidden owner of AVESCA, LTDA, JUAN MANUEL POSADA, a replacement aircraft was acquired in Miami to replace the aircraft which had been seized in Mexico. Convair 580 with serial number 119 was purchased and its identity changed to appear as HK-3616 in Colombia. This aircraft continued to fly multi ton loads of cocaine until May 26, 1992, when it was seized in northern Mexico. *Ex #4116, ¶6.*

120.   AVESCA purchased another Convair with serial number 11 and made it appear to be HK-3616. That aircraft was eventually seized in Casey, Quebec, Canada, with approximately four tons of cocaine on board. *Ex #4116, ¶7.*

121.   As a result of the analysis the government established that RUBEN OSORIO (GUILLERMO ANGEL) directed and controlled the financial interests of at least the following companies: AIR COLOMBIA, LTDA; AIR COLOMBIA, S.A.; TRANSPORTES PETROLEROS LTDA (TRANSPORTES); ANTILLES AND CARIBEAN PETROLEUM SERVICES, CO., N.V. (ANTILLES); PERFORACION Y MANTENIMIENTO DE POZOS LTDA (POZOCOL); CORPORACION PETROLERA COLOMBIANA S.A. (CORPETROL); AIR CARIBE; GRUPO AVIO TURBO, despite the fact that his name and interest never appears

20

1  in any documents of record.  These companies existed only to conceal the ownership, source,

2  and control of the funds needed to operate the drug trafficking and transportation enterprise

3  directed by RUBEN OSORIO (GUILLERMO ANGEL).  Ex #4078, pp.25-27.

4      122.  Despite the allegation that these four companies in Colombia had become

5  associated with AIR COLOMBIA due to their need of air services, the records provided

6  disclosed no business relationship between the five companies.  Ex #4078, pp.19-20.

7      123.  The addresses provided for the four front companies in the documents submitted

8  by GUILLERMO ANGEL (RUBEN OSORIO) in support of his claim to the Basler Aircraft did

9  not relate to any business location or establishment which appeared to be related in any way to

10  the purchase of the aircraft.  Ex # 4079, ¶¶ 5-9. EX # 4099, ¶¶ 25, 26.

11      124.  The addresses given for both TRANSPORTES & ANTILLES were identified as

12  a side door into a fruit juice company.  Ex # 4079, ¶¶ 9; 14; Ex #4080, ¶ 2.

13      125.  The POZOCOL address did not exist.  Ex # 4079, ¶¶ 10; 14; Ex #4080, ¶ 3; Ex

14  # 4099, ¶¶ 27; 30.

15      126.  Another address for TRANSPORTES was found to be a house where an attendant

16  stamped the name of the company and its address on blank paper with an ink stamp, but refused

17  to identify the owner of the company.  Ex # 4079, ¶¶ 11; 14; Ex #4080, ¶ 6; Ex # 4099, ¶¶ 28;

18  29 and 30.

19      127.  This same house was found to be another address for ANTILLES.  Ex # 4079, ¶¶

20  12; 14; Ex #4080, ¶ 4; Ex # 4099, ¶¶ 28; 29; and 30.

21      128.  The address for the offices of CORPETROL, as it appeared in the documents

22  could not be located.  Ex # 4079, ¶¶ 13; 14; Ex #4080, ¶ 5; Ex # 4099, ¶ 30.

23      129.  GUILLERMO ANGEL (RUBEN OSORIO) on behalf of AIR COLOMBIA

24  tendered an affidavit by a legal advisor named JAIRO VALDERRAMA-CASTRO, claiming that

25  he had been to the four offices of the four companies, and provided the addresses and photos.

26  Ex # 4099, ¶ 26.

27

28

1    130.   DEA agent Polimine returned to these addresses and determined only one existed

2    in the name of the company identified and it was a very small office with three rooms and six

3    employees. Ex # 4099, ¶¶ 25-30; Ex # 4098.

4         131.   GUILLERMO ANGEL concealed other of his aircraft by registering the aircraft

5    in the name of individuals. Herrera Lizcano stated that GUILLERMO ANGEL owned the only

6    Short Brothers Skyvan, a unique aircraft with twin tails, registered in Colombia. Ex # 4116, ¶

7    26.

8         132.   Dan Kelly searched the Colombian Aircraft Registry and determined that only one

9    Short Brothers Skyvan was registered in Colombia to Alex Ricardo Bedoya Arango, with tail

10   number HK-3011P. Dan Kelly then observed a Short Brothers Skyvan with tail number HK-

11   3011P parked outside of the AIR COLOMBIA/AIR CARIBE facility and next to one of the

12   AIR COLOMBIA DC-3 aircraft. Ex # 4115, pp4-5.

13        133.   Herrera Lizcano stated that from personal conversations with GUILLERMO

14   ANGEL, Herrera Lizcano learned that GUILLERMO ANGEL owned both AIR COLOMBIA

15   and AIR CARIBE, including all of the Commander aircraft. Ex # 4116, ¶¶ 20; 21, and 26.

16        134.   Herrera Lizcano stated that from personal knowledge drug traffickers who own

17   and operate front companies, like GUILLERMO ANGEL, never have their names associated

18   with the ownership of the company to avoid government inquiry and licensing issues.   Ex #

19   4116, ¶¶ 8; 9; 19-21, 23-29; 32; and 37.

20        135.   Herrera Lizcano stated that from personal conversations with GUILLERMO

21   ANGEL, he learned that GUILLERMO ANGEL obtained his wealth from trafficking in cocaine.

22   Ex # 4116, ¶ 10.

23        136.   During the relevant time period AIR CARIBE had at least three aircraft seized

24   while in the act of transporting illegal controlled substances in Mexico. Each of these planes had

25   identifying numbers and data plates removed in an effort to prevent the aircraft from being

26   identified and therefore identifying the company to which it was registered. These aircraft were

27   eventually identified by field inspection as displaying serial numbers 95046, 96004 and 96059,

28

all of which were identified with an HK or Colombian registration number for an aircraft registered to AIR CARIBE. Ex #4078, pp11-12.

137. To conceal the loss of these aircraft, replacement aircraft were obtained, the aircraft repainted to look like the "twin" of the lost aircraft. Thereafter the removed data plates from the lost aircraft could be restored on the replacement aircraft and the registration number applied to make the twin appear to be the aircraft which was actually lost. Ex #4078; Ex #4116.

138. Luis Carlos Herrera Lizcano identified Angel Restrepo, as the owner of both AIR CARIBE and AIR COLOMBIA and married to Cynthia Oldham. Herrera Lizcano is personally aware of the activities of Angel Restrepo and spoke with Angel Restrepo about activities involved in the air transportation of cocaine, and the source of his wealth as having come from drug trafficking activities. The conversations included the fact that false testimony and evidence would be presented in Phoenix, Arizona by and on behalf of Angel Restrepo in the name of AIR COLOMBIA in an attempt to retrieve the Basler Turbo-67 aircraft which had been seized and were subject to forfeiture in the District of Arizona. Ex #4116.

139. David Hobza, an expert regarding Gulfstream Aero Commander aircraft, concluded that the aircraft had been "sanitized" based upon visible observations of abnormal characteristics of this aircraft which are consistent with the use made of aircraft involved with the illegal transportation of contraband substances.

1. The data plate had been removed and reattached. The rivets did not appear to be factory rivets.

2. All of the serialized airframe component placards had been removed.

3. All of the factory serial number grease markings were missing.

4. Nose gear structure had been damaged and repaired.

5.   Bottom of the fuselage aft of the nose gear wheel showed indications of dents from stones, indicating the aircraft had been operated on rough runways or unimproved strips.

*Hobza Aff. Ex # 12.*

Respectfully submitted this _21_ day of September, 2002.

PAUL K. CHARLTON
United States Attorney
District of Arizona

REID C. PIXLER
Assistant U.S. Attorney

Original filed and copy of the foregoing
mailed this 23rd day of September, 2002 to:

by: _Regina M. Ashlock_

Alan S. Fine
Fine & Marison, P.A.
The Colonnade, Suite 303
2333 Ponce de Leon Boulevard
Coral Gables, Florida 33134

Maureen Beyers
Osborn Maledon, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona 85012-2794

26

Index of Exhibits

Exhibit 1      Claimants Response to Discovery 5/16/02

Exhibit 2      Claimants Response to Second Request for Admissions and
               Request for Production of Documents

Exhibit 3      Claimants Response to Amendment #10

Exhibit 4      Oldham Affidavit

Exhibit 5      Posada Affidavit, Includes Special Power of Attorney

Exhibit 6      Corporate record of Florida

Exhibit 7      Carrillo Claim Form

Exhibit 8      Franco Claim Form

Exhibit 9      Downes Affidavit

Exhibit 10     Annis Affidavit

Exhibit 11     FAA Form Axis Cargo

Exhibit 12     Bobza Letter

Exhibit 13     Dawson Affidavit

Exhibit 14     Moynahan Affidavit

Exhibit 15     Bergonzoli Affidavit

Exhibit 16     ROI 32

Exhibit 17     ROI Regarding the Identity of AEROATLAS & AEROLINEAS ESPECIALES

Exhibit 18     TWX 40-41

Exhibit 19     Request of William Chavarriaga for Political Asylum

Exhibit 20     E-mail to Pat Downes from Luis G. Angel

Exhibit 4011   Letter from Air Columbia General Manager Antonio Reyes Garzon

Exhibit 4078   Declaration of Daniel Kelly

Exhibit 4080   Declaration of Thomas R. Polimino

Exhibit 4099   Second Supplemental Declaration of Daniel Kelly

Exhibit 4115   Supplemental Declaration of Dan Kelly

Exhibit 4116   Affidavit of Luis Carlos Herrera Lizcano

## AFFIDAVIT OF NICHOLAS BERGONZOLI

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the following is true and correct.

1.      I, Nicholas Bergonzoli, am a convicted defendant as the result of Federal charges lodged against me in the State of Connecticut. These charges were based on my having introduced during the early nineties a Colombian source of supply for cocaine named Jose Fernando Posada-Fiero to a group of buyers in the United States. At the time, Posada-Fiero was an important member of the Pablo Escobar Cavilla organization. The amount of cocaine involved was 1,250 kilograms, which was delivered from Colombia via Venezuela to Connecticut. This shipment of cocaine was concealed within aluminum ingots and transported aboard a maritime vessel that arrived in New York City, New York. The cocaine was in turn delivered to Stamford, Connecticut, where it was intercepted by Federal law enforcement.

2.      I am a native of Medellin, Colombia, where I was born and raised. Throughout my adult life, I have known the city of Medellin to be greatly influenced by narco-trafficking and the cocaine business. The business activities related to cocaine trafficking are so dominant that residents of Medellin speak about of it freely and openly. Over the past decade or so, nothing has changed in Medellin to diminish these influences.

3.      During the period of 1990 through 1992, I worked on behalf of Posada-Fiero in furtherance of his drug trafficking activities. For instance, on several occasions I arranged for the pick up and delivery of hundreds of thousand of U.S. dollars in cash from New York or Miami, Florida, to Colombia. This cash was proceeds obtained from the sale of cocaine in the United States. Posada-Fiero subsequently turned himself in to



Colombian authorities, specifically on February 28, 1993, due to the fact that he continued to support Pablo Escobar-Gaviria during the turbulent period and became under threat of Los Pepes. In his cooperation with the Colombian government, he made false statements indicating that it was in fact me who was the principal financier for Escobar-Gaviria. This information was later published in the El Tiempo newspaper on March 30, 1993.

4.     During the period of 1992 and 1993, there was a conflict that emerged within the Medellin drug trafficking organizations, particularly with regard to Pablo Escobar-Gaviria. At that time, Escobar-Gaviria began a campaign of violence against the Colombian government as well as against rival drug trafficking organizations. A group called Los Pepes starting to target Escobar-Gaviria, his family and close associates, in retribution.

5.     Another high-level drug trafficker in Medellin named Luis Guillermo Angel-Restrepo had been very upset when he learned of the kidnapping and killing of Angela Ochoa's husband, which occurred during the late eighties. Angel-Restrepo is a close associate of the well-known Ochoa drug cartel of Medellin. It was believed that Pablo Escobar-Gaviria was responsible for this murder. Shortly thereafter, Angel-Restrepo fled Medellin, possibly fearing for his own safety. As such, Angel-Restrepo became an enemy of Escobar-Gaviria and established ties with the rival Cali-based drug trafficking organizations that were targeting Escobar-Gaviria.

6.     At one point, it was widely known that Angel-Restrepo, as well as several others, cooperated with the Colombian government in order to provide information regarding Pablo Escobar-Gaviria. As a result, those providing the information were given

3

consideration regarding their own criminal activities and past.  The Fiscal de la Nation
Gustavo de Greff was involved in this process.

    7.    When the conflicts with Pablo Escobar-Gaviria escalated, he became
increasingly suspicious of his own associates and their loyalties.  In order to avoid
becoming a victim of his paranoia, I left Colombia and traveled to the United States, and
then onto Toronto, Canada.  I stayed in Toronto for several months.  Then, I was able to
make telephonic contact with Jose Santacruz-Londono.  During this contact, I made it
known that I was no longer on the side of Pablo Escobar-Gavira.  Santacruz Londono
asked me to return to Colombia, and to meet with him and other members of the Cali
cartel to discuss this further.  In September of 1993, I traveled to Cali and met with
Santacruz-Londono, Elmer "Pacho" Herrera, Gilberto Rodriguez-Orejuela and Miguel
Rodriguez-Orejuela.  This meeting took place in a residential house located in a
neighborhood called Ciudad Jardin, situated in the south part of Cali.  At the conclusion
of this meeting, I was told by Miguel Rodriguez-Orejuela to stay in contact with Herrera.
Eventually, I became the coordinator on behalf of Herrera responsible for the
transportation of cocaine via aircraft from Colombia to Mexico destined for New York,
and through the Bahamas destined for south Florida.

    8.    In 1994-5, my brother Sergio Bergonzoli was kidnapped for ransom by the
Ejercito de Liberacion Nacional (ELN), a left-wing guerilla group.  I believe that the
reason the ELN targeted my brother was due to press accounts in Colombia claiming that
I was the financier behind Pablo Escobar-Gavira.  In response to the kidnapping, the
Colombian National Police began searching for my brother.  At the same time, Elmer
"Pacho" Herrera suggested that I contact Luis Guillermo Angel-Restrepo because he

possessed communications interception and tracking equipment that could be used to triangulate the radio traffic of the ELN and possibly help in locating my brother. However, I did not contact Angel-Restrepo for this assistance, since Colombian authorities also had this type of equipment. Despite their efforts, two years later my brother was found dead in Tamesis, in the state of Antioquia. It was determined that he had been killed within a month of being kidnapped by the ELN.

9.      During the period 1994 through 1998, I was employed in the Elmer "Pacho" Herrera cocaine trafficking organization. Herrera had already established both air and marine routes for transporting cocaine from Colombia to the United States via Mexico. I was placed in charge of coordinating the air movements of cocaine, and was engaged in this activity on a regular and continual basis. As such, I lost touch with the activities of Luis Guillermo Angel-Restrepo and his organization. This was due in large part because I resided and worked in a secluded jungle area of Colombia called Caucasia, in the state of Antioquia, where aircraft would arrive on clandestine airstrips to be loaded with cocaine.

10.     In 1998, I decided to turn myself in to the U.S. Government. I had learned from my first cousin Diego Narvaez Bergonzoli, who was arrested in Connecticut in relation to the 1,250-kilogram cocaine seizure, that he had cooperated with authorities and provided information about me. Therefore, I knew that there was a case against me in the United States. I contacted my attorney, whom I knew through a friend and informed him of this case. I was advised that I would probably have to serve time in prison. Nevertheless, I was committed to getting out of the cocaine trafficking business for my own safety and other personal reasons.

(5)

11. After returning to the United States, I began cooperating with the DEA in Miami. I pled guilty to the charges against me in the United States, and was released pending sentencing. During this period, the idea of having a group surrender of the highest-level drug traffickers in Colombia to U.S. authorities was contemplated. I was chosen to communicate this idea to Carlos Costano, the leader of the Autodefensas Unidas de Colombia (AUC). The reason this idea had merit, was due to the fact that self-surrender and accepting a judicial settlement could not be assured in Colombia due to _____ to the government.

12. Shortly thereafter, I returned to Colombia and stayed at a location near Monteria, in the state of Cordova. I had numerous face-to-face meetings with Costano regarding this issue. Costano indicated to me that he hated narco-traffickers, and was supportive of having them terminate their activities that had caused so much of the conflict in Colombia. However, during late 1999 early 2000, Costano told me that when Luis Guillermo Angel-Restrepo was proposed this solution he refused to accept. Other traffickers had accepted to attempt this solution, and it was determined logical that they do this on neutral territory, specifically in Panama. Some of these other traffickers included Hernando Gomez aka Rasguno, Juan Gabriel Usuga, Luis Bernardo Sanchez, Carlos Ramon, and Oscar Campusane. Most of these individuals eventually did turn themselves in to U.S. authorities, and their respective cases were adjudicated.

13. I acknowledge that I can read and understand English to a limited extent. However, this document was translated into Spanish for me by DEA special agent Joan Taylor.

September   JB.  ⑤

Executed at _Worth PA_____ on this _3_ day of ~~August~~, 2002.

_____
Declarant

_____
Witness

_____
Witness

# EXHIBIT "18"

Source: News & Business > News > News Group File, All ⓘ
Terms: **carlos castano and indictment**  (Edit Search)

  ⌒ Select for FOCUS™ or Delivery
  ⸽ ⸽

*The Associated Press June 12, 2003, Thursday, BC cycle*

The Associated Press

The materials in the AP file were compiled by The Associated Press. These materials may not be republished without the express written consent of The Associated Press.

June 12, 2003, Thursday, BC cycle

**SECTION:** International News

**LENGTH:** 465 words

**HEADLINE:** U.S. Embassy official reportedly meets in secret with Colombian paramilitary emissary

**BYLINE:** By ANDREW SELSKY, Associated Press Writer

**DATELINE:** BOGOTA, Colombia

**BODY:**
A U.S. Embassy official secretly met with an emissary to the leader of a feared paramilitary group, branded as a terrorist organization by Washington, according to a memo made available Thursday.

U.S. Embassy political officer Alexander Lee told the emissary that Washington would keep pushing for the capture and extradition of paramilitary leaders Salvatore Mancuso and **Carlos Castano,** who are wanted for drug trafficking, according to the memo.

The emissary, identified only as Pablo, wrote the document for Mancuso to summarize the encounter. Pablo also sent the memo to President Alvaro Uribe's peace envoy, Luis Carlos Restrepo, and a copy was obtained by the newspaper El Colombiano and The Associated Press.

Lee also told the emissary that the paramilitary leaders might receive leniency if they cooperate once in custody, according to the memo. It said the meeting happened May 3 and lasted for three hours.

U.S. Embassy spokesman Jim Foster refused to comment on whether the meeting occurred, but said that if it had, it was not a negotiation.

"Our position hasn't changed," Foster said. "We don't negotiate with terrorists. There was no negotiation."

Mancuso is military chief of the United Self-Defense Forces of Colombia, known as the AUC, and Castano is its political chief. They are charged with smuggling 17 tons of cocaine into the United States and Europe.

The AUC has been battling leftist rebels in Colombia's civil war, which has dragged on for almost 40 years. Human right groups accuse the AUC of massacres and summary executions of suspected rebel collaborators.

U.S. Attorney General John Ashcroft announced drug-trafficking **indictments** against Mancuso, Castano and fellow militia member Juan Carlos Sierra-Ramirez in September. He described them as violent drug traffickers who "threaten our national security."

In December, the AUC declared a unilateral cease-fire and is engaged in exploratory peace talks with the Colombian government.

Washington's desire to see Mancuso, Castano and Sierra-Ramirez captured and brought to the United States for trial is a sensitive one because the Colombian government wants to negotiate peace with the AUC's leaders.

If the paramilitary leaders, who are in hiding, emerge for peace talks, attempts by U.S. drug agents to arrest them or to pressure the Colombian government to detain them would complicate and possibly derail the talks.

According to the memo, Lee said the State Department believes that peace negotiations in Colombia should take priority over efforts to have the paramilitary leaders captured and brought to the United States for trial. But Lee warned that the demands of U.S. justice officials and U.S. drug agents would also have to be considered, according to the memo.

**LOAD-DATE:** June 13, 2003

Source: News & Business > News > News Group File, All ⓘ
Terms: **carlos castano and indictment**  (Edit Search)
View: Full
Date/Time: Tuesday, June 24, 2003 - 3:14 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved

El Espectador.com

**UOL**   Chat_   Buscador_   Mail_   Deportes   UOL News   Entretenimiento   Actualis



# El Espectador

**Domingo**

Bogotá - Colombia 8 de junio de 2003



**Máxima Calificación**

Deportes

## Once Caldas nuevo campeón del torneo apertura

El conjunto Once Caldas de Manizales derrotó por 1-0 al
Junior de Barranquilla y se coronó campeón del Torneo
Apertura del Campeonato Colombiano, sumando un
segundo título en su historia después de 53 años.
**más información >**



## La oferta de la CIA

De acuerdo con fuentes de inteligencia nacionales, a lo
largo de dos meses, entre marzo y mayo de 2003, tres
emisarios que actuaron a nombre de la Central de
Inteligencia de Estados Unidos con sede en Colombia
realizaron seis contactos directos con los jefes de las Auc.



**Cómprela n
$ 1.00
en kioscos, sup
y puntos de**

Un

### Presidente argentino
### recibe el martes a Co

El presidente argentino, Nésto
el próximo martes en Buenos
de Estado norteamericano, C
antes de viajar a Brasil para r
homólogo, Luiz Inacio Luia D



**¡Inscríbe
TU MUNDO IDEAL E**

### Fallece otro militar es
### en Iraq
Un miembro del Cuerpo de la
estadounidense murió hoy po
pieza de artillería en el centro
anunció un portavoz militar n



**BBC MUN**

Caracol Radio
Canal Caracol
Radio Nei
Cromos
Shock
Vea
UOLColombia

**Radio Nederlar
Wereldomroe**





El Espectador.com








Carlos Castaño y Salvatore Mancuso. El objetivo: lograr una fórmula de acuerdo para desmovilizar a los principales jefes paramilitares y entregar información sobre el negocio del narcotráfico y las Farc. A cambio de ello, ofrecieron trasladar a Estados Unidos a los jefes paramilitares y a sus familias. Al final todo quedó en una propuesta porque no hubo acuerdo entre las partes.

**más información >**

Otras notas:

❖ "Reinserción hizo nuevo en las Farc"

**Paz**
### Carta de Uribe para la paz
El Espectador revela el primer borrador del proyecto de ley que otorgará beneficios a miembros de grupos armados al margen de la ley que se desmovilicen. La iniciativa del presidente Uribe incluye la suspensión condicional de la condena por medio de penas alternativas como la privación del derecho a residir en determinados lugares, la inhabilitación para el ejercicio de funciones públicas o prisión en el municipio de residencia. Esto ligado a fórmulas de reparación a las víctimas.
**más información >**

Internacional
### "La violencia no es el camino": Fidel Castro
En un diálogo de dos horas con periodistas de Clarín de Argentina, que reproduce hoy en exclusiva para Colombia El Espectador, el líder cubano Fidel Castro asegura que las recientes ejecuciones en la isla fueron muy dolorosas "pero legales". Cree que Cuba corre el riesgo de sufrir una acción militar directa de Estados Unidos. Y sobre Colombia señala que el único camino que tiene el país es la paz. "No debe haber una guerra, porque eso no resuelve nada".
**más información >**

Otras notas:

❖ La página negra de 'The New York Times'

Secuestro
Envíales un mensaje a los sec
Colombia





| Informe Especial |

## Las sotanas de la paz

A lo largo del conflicto armado, la Iglesia ha jugado un papel protagónico en busca reconciliación. Esta es la historia de 14 obispos que le han entregado sus vidas a la Colombia, en momentos en que uno de ellos, monseñor José Luis Serna, es investig



Bogotá - Colombia 8 de junio de 2003                 **Domingo**

## La oferta de la CIA



Corría la segunda semana del mes de marzo. Los cuarteles de la CIA ubicados en la sede de la embajada de los Estados Unidos en Bogotá, estaban en alerta roja. Se había dado comienzo a una delicada y trascendental misión clasificada bajo el rótulo de ultrasecreta.

Cinco agentes de la más connotada agencia de inteligencia estadounidense habían diseñado el plan y sobre sus hombros estaba la responsabilidad del éxito o el fracaso. En cualquiera de los dos escenarios, los hombres de la CIA tenían en claro que no se podía dejar rastro alguno de lo que estaba planificado.

La misión estaba dividida en tres frentes: Bogotá, Medellín y Montería, cada uno de ellos bajo la responsabilidad de un agente estadounidense. Cada frente cumpliría objetivos específicos para que, a la hora de armar el rompecabezas, las piezas encajaran perfectamente.

La operación consistía en buscar un acercamiento directo con los jefes de las Autodefensas Unidas de Colombia. Tanto con Salvatore Mancuso, jefe militar, como con Carlos Castaño, jefe político de la organización. Esos contactos deberían ser individuales y sin que ninguno de los dos se enterara del acercamiento exploratorio que se estaba dando.

Esos primeros contactos se llevarían a cabo por intermedio de emisarios, quienes mantendrían una comunicación permanente con los agentes de la CIA. Los emisarios tenían la misión concreta de entregar un mensaje claro a los jefes de las Auc.

A partir de ese momento se abrirían dos canales más de comunicación: telefónico y por correo electrónico. Todo bajo control en los cuarteles de la CIA. También se acordó que ninguna autoridad colombiana podría conocer el plan que se había diseñado por los agentes estadounidenses, quienes reportarían directamente a Washington.

En plata blanca, la CIA tenía una oferta concreta para Salvatore Mancuso y Carlos Castaño, los dos principales comandantes de las Autodefensas Unidas de Colombia.

¿En qué consistía ese ofrecimiento? El Espectador conoció en detalle aspectos de la operación encubierta que realizó la CIA y cómo sus agentes se movieron como pez en el agua en Montería, Medellín y Bogotá. Igualmente, este semanario estableció que los organismos de inteligencia

del Estado se enteraron del desarrollo de la operación que adelantó la
agencia de inteligencia de los Estados Unidos.

"No era la primera vez que la CIA trataba de buscar una conexión con las
Auc. A diferencia del pasado, en esta oportunidad se jugaron el todo por el
todo, antes de que el gobierno del presidente Uribe lograra avanzar en un
acuerdo de desmovilización con los paras", señaló una de las fuentes de
inteligencia que conoció en detalle la operación adelantada por la CIA.

Los contactos

El 17 de marzo se dio inicio a la ambiciosa operación que diseñaron los
agentes de la CIA. A lo largo de los siguientes dos meses los hombres al
servicio de la inteligencia estadounidense realizaron importantes
acercamientos y contactos con las Auc. En total se dieron seis
comunicaciones directas con los jefes de las Auc. Esos contactos estuvieron
a cargo de los tres emisarios de la CIA. Tres personas de total confianza de
ambas partes y quienes fueron los portadores de la propuesta que hizo la
agencia de inteligencia estadounidense tanto a Salvatore Mancuso como a
Carlos Castaño.

Fuentes de inteligencia colombiana, que conocieron pormenores de la
operación, señalaron que además hubo conversaciones telefónicas de los
agentes de la CIA con Mancuso y Castaño. En todas esas conversaciones se
buscó aclarar cada una de las dudas que tenían los jefes de las
autodefensas en relación con la propuesta que llevaron los emisarios.

Esa era la primera fase de la operación, que además contemplaba una serie
de reuniones directas con los jefes de la Auc. Esos encuentros se realizarían
siempre y cuando Castaño y Mancuso aceptaran, individualmente, la
propuesta que abiertamente hacían los hombres de la CIA.

¿Por qué fueron individuales esas propuestas? Esa es una de las preguntas
que todavía flotan en el aire. Para los hombres de los organismos de
inteligencia de Colombia, sólo había una razón de fondo: que cada uno
pudiera dar su opinión sobre los puntos que contemplaba la oferta, sin que
el uno incidiera sobre la decisión del otro.

La zanahoria

La oferta que elaboraron los hombres de la CIA y que fue transmitida a los
jefes de las Auc contemplaba tres puntos clave: el primero relacionado con
el narcotráfico, el segundo sobre subversión y un tercero sobre la
desmovilización de otros importantes comandantes de las Auc.

Como en el pasado reciente, la CIA pretendía que tanto Salvatore Mancuso
como Carlos Castaño soltaran la lengua en relación con el negocio de
narcotráfico, rutas, lavado de activos y nuevos jefes de esa organización
delictiva.

En el campo de la guerrilla, los hombres de la agencia de inteligencia
estadounidense estaban convencidos de que no hay nadie más en Colombia
que conozca a las Farc por dentro que Castaño y Mancuso.

Sobre la entrega de otros comandantes de las Auc, la CIA pretendía armar

el rompecabezas de las organizaciones de narcotraficantes ubicadas en distintas regiones del país. Y ese trabajo de desmantelamiento sólo se lograría a través de información y para ello los hombres de las Auc cuentan con la mejor red de informantes, que facilitaría ese trabajo.

El sueño americano

¿Toda esta ayuda de Castaño, Mancuso y su gente, a cambio de qué? Los tres emisarios de la CIA lo explicaron en detalle: entrega de Mancuso y Castaño a las autoridades estadounidenses. Ubicación de los jefes paramilitares y sus familias en Estados Unidos, para empezar una nueva vida.

Nada distinto a lo que había ofrecido la DEA en épocas del embajador Curtis Kamman, a finales de los noventa, cuando la agencia antidrogas hizo una tentadora oferta a Castaño para lograr el desmantelamiento de las organizaciones de drogas, que para la época eran totalmente desconocidas para las autoridades estadounidenses.

Fueron dos largos meses de contactos. De mensajes. De ires y venires por parte de los emisarios de la CIA. Pero a lo largo de ese tiempo hubo un silencio total por parte de Mancuso y Castaño.

Los esfuerzos de los agentes de la CIA por concretar una respuesta a la oferta que habían hecho fueron estériles.

Mientras tanto, en el campamento de las Auc hubo un largo debate sobre la propuesta. Un selecto grupo de asesores de Castaño y Mancuso estudiaron a fondo la oferta.

"Pero había muchas dudas. Mientras la CIA ofrecía mano tendida para los jefes de las Auc, el presidente Bush insistía en solicitar su extradición para condenarlos por terrorismo", señaló una de las fuentes de inteligencia, que conoció en detalle la operación.

Tanto para Castaño como para Mancuso, mientras que no hubiera claridad sobre el planteamiento del presidente estadounidense no había ninguna posibilidad de acercamiento y mucho menos un contacto directo con los agentes de la CIA. Finalmente, y por medio de los emisarios, los dos jefes dejaron saber a los agentes de la CIA que no había ninguna posibilidad de contemplar la oferta que les hacían. Y mucho menos cuando los acercamientos con el gobierno del presidente Álvaro Uribe marchaban por buen camino.

Consultado sobre el tema de la oferta hecha por la CIA, el jefe político de las Auc, Carlos Castaño, fue enfático en afirmar: "Un emisario de Mancuso buscó cita en la embajada americana hace unos dos meses. Lo hizo para hacer una presentación del proceso de negociación de las Auc y buscar un respaldo a ese proceso. Nos enviaron un mensaje que nunca entendí".

Castaño señaló que al no entender el mensaje de la embajada americana decidió a través de un emisario de confianza adelantar las consultas pertinentes para tener claridad sobre el asunto.

"Le contestó una persona que se identificó como James, miembro de la

El Espectador.com

DEA, quien le dijo: —De estos señores sólo esperamos su sometimiento a la justicia para que respondan por los cargos que el Departamento de Justicia les ha hecho". El jefe político de las Auc no hizo ninguna otra referencia y mucho menos sobre la oferta de la CIA.

Como las Auc metieron al congelador la propuesta que llevaron los emisarios, que también se movieron entre Montería, Medellín y Bogotá, los agentes de la CIA decidieron finalizar la operación a mediados de mayo.

Se cortó cualquier posibilidad de comunicación e igualmente se les pidió absoluta reserva a los tres emisarios que realizaron las gestiones de acercamiento.

Unos días después, los jefes en Washington conocieron en detalle el trabajo que se había realizado en la oferta que la CIA presentaba a las Auc bajo "el principio de la defensa nacional y el interés social en beneficio de los ciudadanos estadounidenses". A partir de ese momento los agentes con sede en Colombia comenzaron a borrar cualquier rastro que permitiera armar las piezas de la conexión que pretendía la CIA con las Auc o, como ellos las llaman, la "contra" colombiana.

© Comunican S.A., 2003. Todos los derechos reservados.

EL ESPECTADOR  Sunday, June 8, 2003

The contacts lasted two months.

# The CIA's offer

The State's intelligence sources managed to establish that by means of three emissaries, the CIA made the Auc ("*Autodefensas Unidas de Colombia*" – a paramilitary group in Colombia) leaders, Carlos Castaño and Salvatore Mancuso, an offer seeking demobilization. This is the story.

It was the second week of March.  The CIA's quarters located at the United States Embassy en Bogotá, had been put on red alert. A delicate and transcendental mission, classified as ultra-secret, had begun.

Five agents from the most distinguished intelligence agency in the United States had designed a plan and were entirely responsible for its success or failure. In either scenario, the CIA men were certain that no trace whatsoever could be left of what they were planning.

The mission was divided into three fronts: Bogotá, Medellin and Monteria each one of them under the responsibility of a US agent. Each front was to meet specific objectives so that, when the time came to put the puzzle together, the pieces would fit perfectly.

The operation consisted of searching for a direct approach to the heads of the "*Autodefensas Unidas de Colombia*"-Auc, both Salvatore Mancuso, military chief, and Carlos Castaño, the organization's political chief.  Those contacts were to be individual and without either of them discovering the exploratory approach that was being carried out.

Those first contacts accomplish through emissaries  who maintained permanent communication with the CIA agents. The emissaries had the precise mission of delivering clear messages to the Auc leaders.

(

2

From that moment on, two other communication channels were opened, one by telephone and the other through email. Everything was being monitored from CIA quarters.

In reality, the CIA had a solid offer for Salvatore Mancuso and Carlos Castaño, the two main commanders of the "*Autodefensas Unidas de Colombia.*"

What was the offer? **The Espectador** found out in detail, aspects of the secret operation carried out by the CIA and how its agents moved about like fish in water in Monteria, Medellin and Bogotá. Similarly, this weekly newspaper learned that the State's intelligence organization discovered the undergoing operation the US agency had executed.

"It was not the first time the CIA sought to establish connections with the Auc. Contrary to what has occurred in the past, this time they played all their cards before Uribe's government could advance in an agreement to demobilize with the paramilitaries," declared one of the intelligence sources who has fully informed of the operation being carried out by the CIA.

### The contacts

The ambitious operation designed by CIA agents was launched on March 17. During the course of the next two months, the men working for US intelligence established important approaches and contacts with the Auc. In total, six direct communication sessions were held with Auc leaders. The three CIA emissaries were in charge of those contacts. Those three people were considered trustworthy by both parties and therefore delivered the proposal made by the US intelligence agency both to Salvatore Mancuso and Carlos Castaño.

Colombian intelligence sources, who were completely informed of every detail of the operation, pointed out that telephone conversations were held between CIA agents and Mancuso and Castaño. The objective of these conversations was the clarification of each doubt the paramilitary leaders had with relation to the proposal offered by the emissaries.

That was the first phase of the operation which also included a series of direct meetings with the Auc heads. Those encounters were accomplished if and

only when Castaño and Mancuso individually accepted the proposal openly being made by the CIA agents

Why were those proposals made individually? That is one of the questions that are still up in the air. For the agents from Colombian intelligence organizations, there was only one background reason: that each one of them would be able to voice their opinion about the points contemplated by the offer, without influencing each other's decision.

### The carrot

The offer that had been elaborated by the CIA agents and that was transmitted to the Auc leaders contemplated three key points: the first was related to drug trafficking; the second one to subversion; and the last one was about demobilization of the important Auc commanders.

Just like in the recent past, the CIA hoped that both Carlos Castaño and Salvatore Mancuso would speak about drug trafficking, routes, asset laundering and new heads of that illegal organization.

In the guerrilla field, the US intelligence agency's men were convinced that there is no one else in Colombia who knows the FARC as well as Castaño and Mancuso.

With the regards to the surrender of other Auc commanders, the CIA had the intention of putting together the pieces of the puzzle of the drug trafficking organizations' located in different regions of the country. This dismantling project could only be accomplished by means of information and to obtain it, the Auc men have the finest network of informants which to facilitate work.

### The American Dream

The assistance of Castaño, Mancuso and their people in exchange for what? The three CIA emissaries explained it in detail: turning in Castaño and Mancuso to US authorities.  Resettlement of paramilitary leaders and their families in the United States to start a new life

Not much different from what had been offered by the DEA at the time when Curtis Kamman was around  towards the end of the nineties when the antidrug

4

agency made Castaño a tempting offer to dismantle drug organizations. US authorities were completely unaware of those organizations at that time.

It was a long two months of contacts, messages, of coming and going for the CIA emissaries. But during that time, Mancuso and Castaño were completely silent.

The CIA agents' attempts to obtain a precise response to their offer were completely sterile.

## During the course of two months, the CIA made six contacts with Auc leaders

Meanwhile, there was a long debate over the proposal at the Auc camp. A select group of Castaño and Mancuso's consultants studied the offer in detail.

"But there were a lot of doubts. While the CIA offered a helping hand to the Auc heads, President Bush would insist on their extradition in order to condemn them for terrorism," one of the intelligence sources who was fully informed of every detail of the operation pointed out.

Both Castaño and Mancuso would agree that as long as there was no clarity as to where the US President stood on the matter, there would be no possibility of approaching and much less so of direct contact with CIA agents. In the end, and through emissaries, the two leaders informed the CIA agents that there was no possibility of contemplating the offer they were being made. And much less so since the negotiations with President Alvaro Uribe's Government were on the right track.

When asked about the subject of the CIA's offer, the political leader of the Auc, Carlos Castaño, emphatically affirmed, "One of Mancuso's emissaries tried to make an appointment at the US Embassy about two months. He did so in order to offer a presentation of the Auc negotiation process and to seek support for this process. They sent us a message that I never understood."

Castaño pointed out that because he was unable to understand the Embassy's message he decided to use a trustworthy emissary to make the necessary consultations to clear up the matter.

5

"He received an answer from a person by the name of James, member of the DEA, who told him: 'We are only expecting the surrender of these gentlemen to justice in order to answer for the charges made by the Department of Justice.' The Auc political leader made no other reference and even less so with regards to the offer made by the CIA.

Since the proposal made by emissaries, who had also moved between Monteria, Medellin and Bogotá, had been frozen by the Auc, CIA agents decided to terminate the operation at the end of May.

Any possibility of communication was then cut off and the three emissaries who had carried out the contacts were asked to maintain complete reserve.

A few days later, the heads in Washington were informed in detail of the work that had been accomplished regarding the CIA's offer to the Auc under "the principle of national defense and social interest to benefit the citizens of the United States." From that moment on, the agents stationed in Colombia began to erase any trace that would enable putting together the pieces of the puzzle of the connection the CIA had attempted with the Auc, or, as they call them, the "counter" Colombian.





Edición impresa de **Internacional**

**miércoles** 11 de junio de 2003

LOQUEO / MEDIDA PRETENDE PONERLE FIN AL
LANQUEO' DE DINEROS
arc y Auc incluidas en la lista Clinton

gobierno Bush advirtió que cualquier
mpresa o particular que negocie o tenga
elación comercial con estos grupos armados
odrá ir a la cárcel o ser sancionado con
illonarias multas.



Carlos Castaño, líder paramilitar.
Jaime García / EL TIEMPO

n un nuevo intento por bloquear las
tividades ilícitas de los grupos de
itodefensas colombianos y de la guerrilla de las Farc, Estados Unidos decidió
cluirlos en la llamada lista Clinton.

decisión -que se produce una semana después de haberlos incluido en la lista de
andes narcotraficantes- tiene como principal fin evitar que estas organizaciones
ntinúen blanqueado sus dineros en empresas de ese país o a través de filiales de
npresas colombianas, como ha venido sucediendo.

emás del blanqueo, E.U. pretende cerrarles también el paso a personas y empresas
e colaboran con estas organizaciones o las financian de alguna manera.

diferencia con la lista Clinton es que esa era una orden ejecutiva, una orden
esidencial de 1999 y este nuevo listado es una ley aprobada por el Congreso de E.U.
e se aplica en el ámbito mundial", le dijo a este diario un oficial del Departamento
Tesoro de E.U.

la nueva lista, elaborada con base en la información de cinco agencias de
eligencia y seguridad estadounidenses, aparecen los mexicanos Juan José
arragoza Moreno, José Albino Quintero Meraz y Héctor Luis Palma Salazar, así
no el brasileño Leonardo Dias Mendoca y el grupo ilegal *United Wa State Army*, de
mania.

uestro propósito es mostrar el hecho de que las Farc y las Auc son grupos
cotraficantes y a la misma vez grupos terroristas. La importancia de esa
ualización es poner en claro a qué se dedican esas organizaciones", sostuvo el
ial.

egó que los ciudadanos estadounidenses que violen esta disposición podrán ser
alizados con multas de hasta un millón de dólares y diez años de cárcel.

el caso de las empresas de ese país o extranjeras que tengan sucursales en Estados
os y que contravengan esta ley, podrán recibir una multa de 10 millones de
res y 30 años de cárcel para los directores ejecutivos

n la designación de estos grupos ahora podemos sancionar a las personas de cuello

blanco que están apoyando de alguna forma las operaciones financieras de los grupos", precisó el oficial.

De otro lado, la DEA bloqueó el pasado mes de febrero 59 empresas colombianas y españolas que, según sus investigaciones, estaban sirviendo de pantalla para blanquear dinero procedente del narcotráfico, según una investigación del diario *El Mundo* de Madrid.

Las empresas, según la publicación, pertenecen al clan de los hermanos Miguel y Gilberto Rodríguez Orejuela, del cartel de Cali, y están controladas en España por sus hijos. Las investigaciones norteamericanas se han centrado en Humberto y Jaime Rodríguez Mondragón, hijos de Gilberto y socios de empresas colombianas.

El desembarco empresarial del clan de los Rodríguez Orejuela en España se sustenta en la nacionalidad española que tienen seis miembros de su familia.

Las actividades empresariales de las sociedades de los Rodríguez Orejuela en España y Colombia son muy variadas: laboratorios farmacéuticos, distribución de películas y revistas, inversiones, administración de bienes raíces y distribución de diferentes productos.

COPYRIGHT © 2003 CASA EDITORIAL EL TIEMPO S.A.

Prohibida su reproducción total o parcial, así como su traducción a cualquier idioma sin autorización escrita de su titular.
Reproduction in whole or in part, or translation without written permission is prohibited. All rights reserved.

El Tiempo Wednesday, June 11, 2003

MEASURE / TRYING TO PUT AN END TO 'WHITENING'

# FARC and Auc are included in 'Clinton's List'

As part of a new attempt to obstruct Colombian paramilitary groups' illegal activities as well as those of the guerrilla group, FARC, the United States has decided to include them in the 'Clinton List'.

The decision – made a week after having included them in the list of the greatest drug traffickers – has the main objective of keeping these organizations from laundering (whitening) their profits in the country's companies or through associated Colombian companies, as they have been doing so far.

Besides laundering, the US plans to close off the passage for people and companies that assist these organizations or somehow finance them.

'The difference is that the Clinton List was an executive order, a Presidential order made in 1999 and this new list is a law that has been approved by US Congress and is applied worldwide," said an officer from the US Department of Treasury.

On the new list, designed based on the information provided by five US intelligence and security agencies, the Mexicans Juan Jose Esparragoza-Moreno, Jose Albino Quinter-Meraz and Hector Luis Palma-Salazar appeared as well as the Brazilian Leonardo Dias-Mendoza and the illegal group, 'United Way State Army' from Birmany.

"Our objective is to demonstrate the fact that the FARC and the Auc are drug trafficking groups and at the same time terrorist groups. The importance of that actualization is to make it clear what those organizations do," affirmed the officer.

He also added that US citizens violating this disposition may be penalized with fines of up to a million dollars and a ten-year sentence.

If national or foreign companies with branch offices in the United States break that law, they may be fined 10 million dollars and executive directors could be sentenced to 30 years of prison.

"With the designation of these groups we can now sanction the white collar people that are somehow supporting the groups' financial operations," said the officer.

On the other hand, the DEA blocked 59 Colombian and Spanish companies last February that, according to their investigation, were acting as a façade for laundering drug trafficking money, according to an investigation carried out by the 'El Mundo' newspaper in Madrid.

According to the article, the companies belonging to the Miguel and Gilberto Rodriguez-Orejuela clan from the Cali Cartel are being run by their children in Spain. The investigations being carried out in the US have focused on Humberto and Jaime Rodriguez-Mondragon, sons of Gilberto and the companies' Colombian partners.



CANALES        SERVICIOS                    Buscar                          terra

Colombia, martes 17 de junio de 2003                    Inicio    Paute aqui    Aviso legal

# EL COLOMBIANO

  Rumbo

Inicio                                                              Viernes 1
pinion                                                             Actualizac
ntioquia
olombia
az y D.H.                                                              La ser
olítica
conomicas
ternacional
eportes            ## E.U. espera a Carlos Castaño
ma del Dia
na Urbana          • Aunque haya acuerdo con las Auc, el gobierno de E.U.
mpaña Cívica         lo requiere con Mancuso.
ormes Comerciales  • Segunda parte del informe secreto de contacto entre
e y Cultura          Auc y gobierno de E.U.
ía y Sociedad
                   **Por Carlos Alberto Giraldo M.**
e y Televisión     **Medellín**
ítica de cine
escopo
ot                 Aunque las Autodefensas Unidas de Colombia (Auc) lleguen a un acuerdo final de
 crucigramas       desmovilización con el gobierno del presidente Álvaro Uribe, los máximos jefes de esa
                   organización ilegal, Carlos Castaño y Salvatore Mancuso, deberán presentarse ante
mas Noticias       autoridades de Estados Unidos para afrontar los cargos que ese gobierno les imputa por su
nomática           supuesto vínculo con el narcotráfico.
erías
                   Así se desprende del informe confidencial redactado por un emisario de las Auc que se
                   entrevistó el pasado 3 de mayo con representantes del gobierno de los Estados Unidos.
ones Entrevistas
iones
queñas             En el punto quinto del documento, de cuatro páginas y divulgado desde ayer por este diario, el
oriales Gráficos   emisario de las Auc le expresó a "Manuel" (Salvatore Mancuso, según lo identificó una fuente
es                 de las autodefensas), que "las consecuencias de los pedidos de extradición continuarán
ieras Páginas      operando hasta que no haya una presentación formal de Manuel (Mancuso) y de Carlos ante
 especiales        la Justicia de E.U.".

                   En contraste con el contenido de este informe secreto, redactado por el emisario de las Auc
motores            que habló con los funcionarios de Estados Unidos, Salvatore Mancuso respondió al comienzo
cía                de esta semana a la agencia de noticias AP que "no existió de mi parte ningún contacto directo
cación             con la CIA ni mucho menos con el Departamento de Estado".
amilia
olombianito        Ayer, un portavoz de la Embajada de Estados Unidos, en Bogotá, le dijo a la AP que "no
s y Cultivos       negociamos con terroristas. No hubo negociación".
mática
a Economía         Consultado si en efecto hubo reunión, el vocero indicó que "no tengo comentarios, no puedo
ario Dominical     confirmarlo".
r Ambiente
mer semana:        De acuerdo con lo que se concluyó en el documento, el contacto formal de los jefes de las
oo Nacional        autodefensas con el gobierno de E.U. podría darse mediante "diversas fórmulas -
                   prácticamente todas vinculadas con la cooperación- para que el hecho judicial pueda ser
is                 superado favorablemente a los interesados"
emporáneos
rio                **Los delitos graves**
                   Sobre quienes pesan sindicaciones y procesos por delitos de lesa humanidad, e
                   representante del gobierno de E.U. le dijo al emisario de las Auc que su gobierno
res vía e-mail     recomendaría "un período de detención en unidades especialmente acondicionadas"
uperencias
                   Se especificó que Estados Unidos propondría en estos casos "que exista algún tipo de



Emisarios de las Auc y del gobierno
de E.U. sostuvieron varias
reuniones. Archivo









Más espe





reparación, por lo realizado, dado que no se puede transmitir la sensación de una impunidad total", sin reparación ante la justicia.

El emisario de las Autodefensas le reporta a "Manuel" (Mancuso) la posición de las Auc que él planteó al representante del gobierno de Estados Unidos, respecto de las condenas al accionar militar del grupo armado ilegal.

"Sostuve que se está negociando con la expectativa de que no existirá cárcel para ningún miembro de las Autodefensas, aunque sí se aceptaría a título colectivo un tipo de reparación, que pase por la entrega de propiedades (...) que pudieran ser entregadas (...) para emprendimientos comunitarios de bien social", una vez se haya alcanzado un acuerdo de paz con el gobierno colombiano.





### Más titulares
> Llaman a los ilegales a desmovilizar menores
> Extradición, traba en negociaciones
> Opinión especial
> Se debe tratar antes de la negociación
> La guerra y la paz
> Retornó fluido eléctrico a Arauca



Copyright © 2003 EL COLOMBIANO LTDA. & CIA. S.C.A.     Correo electrónico | Aviso Legal
Para visualizar nuestro sitio recomendamos utilizar navegador Explorer 4.0 o superior y una resolución mínima de 800 x 600

El Colombiano Friday June 13, 2003

# The US awaits Carlos Castaño

- ALTHOUGH THERE is an agreement with the Auc, the US Government has requested it be done with Mancuso.
- THE SECOND PART of the secret report about contact between the Auc and the US Government

Even if the *Autodefensas Unidas de Colombia'* (Auc) come to a final agreement about demobilization with President Alvaro Uribe's Government, the leaders of that organization, Carlos Castaño and Salvatore Mancuso, must turn themselves in to US authorities to face charges which that government accuses them of for their alleged involvement in drug trafficking.

This is a summary of the confidential report written by an Auc emissary who met on May 3rd with representatives from the US Government.

On the fifth point of the four-page document, which was published yesterday by this newspaper, the Auc emissary expressed to "Manuel" (Salvatore Mancuso, as identified by an Auc source) "the consequences of the requests for extradition are still operational until there is no longer a **formal presentation** from Manuel (Mancuso) and Carlos before US Justice."

Contrary to the contents of this secret report, written by an Auc emissary that spoke to US officials, Salvatore Mancuso answered earlier this week to the AP news agency, "there was no direct contact on my behalf with the CIA and much less so with the Department of State."

Yesterday, a spokesperson from the US Embassy in Bogotá told AP that "we do not negotiate with terrorists. There was no negotiation."

When asked if there indeed had been a meeting, "I have no comments, I cannot confirm it."

According to what is concluded in the document, a formal contact between the US Government and Auc leaders could be accomplished through "diverse

formulas – all them practically linked to cooperation – so that the judicial act may be favorably overcome by the interested parties."

Photograph

Auc emissaries and the US Government held several meetings

**Serious crimes**

For those facing accusations and processes for crimes against humanity, the US Government representative told the Auc emissary that his/her government would recommend "a detention period in specially conditioned units."

It was specified that the US would propose, in such cases, "that some type of repair exist for what has been done, since in no way can such crimes go totally unpunished," without repair before justice.

The Auc emissary reported to "Manuel" (Mancuso) the position of the Auc he had presented to the US Government representative, regarding the sentences given as a result of the actions of the illegal armed group:

"I sustained that we are negotiating with the expectation that there would be no prison sentence for any Auc members although some type of collective repair would be accepted by means of turning in property (…) that could be turned in (…) for the purpose of social community use," once a peace agreement has been accomplished with the Colombian Government."

# EXHIBIT "19"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Unsealed _____

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
Defendant.
_____/

**UNDER SEAL**

## GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY JOHN BERGENDAHL

The United States of America, through the undersigned Assistant United States Attorneys, files this motion to disqualify attorney John Bergendahl from representation of defendant Augusto Guillermo Falcon. Mr. Bergendahl previously represented Luis Valverde, a co-defendant in this case, at trial. Defendant Valverde was convicted and is now cooperating with the government.

### I.  SUMMARY OF ARGUMENT

(1)   Mr. Bergendahl's representation of defendant Falcon would violate the duty of loyalty that Mr. Bergendahl owes to defendant Valverde. Rule 4-1.9 of the Rules Regulating the Florida Bar and supporting case law prohibits an attorney who has previously represented a client in a matter: (a) to subsequently represent a second client in a related matter when the second client's interests are materially adverse to those of the first client, or (b) to use confidential information obtained from the first client to that client's disadvantage in the representation of the second client. Because defendant Valverde is now cooperating and seeking to maximize his value to the government in this

prosecution, any steps Mr. Bergendahl would take in representing defendant Falcon necessarily would seek to undermine the evidentiary value of defendant Valverde's testimony; the inferences and associations that flow from defendant Valverde's testimony; and the evidentiary value, inferences and associations of any leads developed from defendant Valverde's cooperation. Similarly, Mr. Bergendahl's representation of defendant Falcon well may risk the continuing confidentiality of defendant Valverde's privileged attorney-client communications with him. These dangers exist regardless whether Mr. Bergendahl agrees to segregate himself from the cross-examination of defendant Valverde. Because defendant Falcon's lead counsel has represented him for close to 18 months in this case, the balance of equities tilt decidedly against accommodating defendant Falcon's desire to add Mr. Bergendahl to his defense team. Because defendant Valverde will testify against defendant Falcon regardless whether defendant Falcon is severed from defendant Magluta, this motion does not support the grounds for defendant Falcon's motion for severance.

(2)     Rule 4-1.6 of the Rules Regulating the Florida Bar prohibits an attorney from disclosing confidential information relating to representation of a client. Because the information that Mr. Bergendahl obtained in confidence from defendant Valverde may seep in any number of ways into the formation of defendant Falcon's defense strategy, Mr. Bergendahl's representation of defendant Falcon unacceptably risks the confidentiality of these communications.

(3)     Defendant Valverde is expected to testify that prior to cooperating he approached defendant Salvador Magluta regarding his inability to pay $100,000 in fees owed to Mr. Bergendahl and that defendant Magluta agreed to take care of the payment of these fees. This testimony would show defendant Magluta's continuing efforts to influence co-conspirators through funding their attorneys. The testimony would put Mr. Bergendahl in the position of an "unsworn witnesses" under

2

the Second Circuit's holding in <u>United States</u> v. <u>Locascio</u>, 6 F.3d 924 (2d Cir. 1993), <u>cert. denied</u>, 511 U.S. 1070 (1994), and thus would add to the grounds calling for his disqualification.

## II. BACKGROUND

On August 18, 1999, a federal grand jury returned the initial indictment in this case against a number of defendants, including defendants Falcon and Magluta, although not defendant Valverde. On August 19, 1999, federal law enforcement officers executed a search warrant at defendant Valverde's home at 8401 S.W. 78th Street in Miami. The search yielded evidence including $6.1 million of Magluta-Falcon organization cash drug proceeds stored in nine boxes in the attic.

The search also yielded various documents showing how Valverde had been helping Magluta and Falcon launder drug proceeds to finance a large team of lawyers to represent Magluta, Falcon, and other members of their organization who had withheld their cooperation from law enforcement. These documents included the following evidence directly associated with money laundering for the benefit of defendant Falcon: (1) two copies of <u>pro forma</u> cover letters sent to an attorney representing Falcon that claimed that the checks sent along with the letters derived from untainted funds that were not associated with Magluta or Falcon, <u>see</u> <u>Exhibit 1</u>; (2) a copy of a cover letter and a copy of a third party Mexican check sent to a second attorney representing Falcon, <u>see</u> <u>Exhibit 2</u>; and (3) certified mail receipts for envelopes containing fee checks sent to three attorneys representing Falcon, including some purportedly from "Piedad Garcia, P.O. Box 502, 256 S.W. 8 Street, Miami, FL 33130," <u>see</u> <u>Exhibit 3</u>, which was a phantom nominee at a phantom address used to conceal Magluta's and Falcon's connection to the fee payments. The seized documents corresponded with

3

the types of letters and envelopes within the records retained by several of defendant Falcon's attorneys. See Exhibits 4 and 5.

Five and one-half months prior to the seizure of the cash and documents from Valverde's house, agents conducted a controlled transaction in which defendant Richard Passapera delivered a box containing $950,000 in organization drug proceeds to Tony Garcia, a long-time Magluta associate who was cooperating with law enforcement. When coupled with other evidence, this evidence further tied defendant Falcon to defendant Valverde's money laundering activities. Analysis of the exterior of the box by a fingerprint analyst yielded defendant Valverde's palmprint on the top flap that is used to close the box. In a second controlled transaction on April 14, 1999, Garcia met in the New York area with Harry Kozlik and delivered $850,000, plus another $12,500 representing Kozlik's fee. Since the early 1990s, Kozlik had been laundering Magluta-Falcon organization cash drug proceeds through overseas financial institutions to pay lawyers representing Magluta and Falcon. Since 1996, Kozlik had been relying upon nominee accounts at the Israel General Bank for this purpose, resulting in at least several payments to one of Falcon's attorneys. See Exhibit 6.

On August 19, 1999, following the seizure of the $6.1 million in cash from his attic, agents arrested defendant Valverde. He was charged by complaint on August 20, 1999, and the next week was added to the indictment in the above-captioned case. By the fourth superseding indictment, the charges against defendant Valverde consisted of Count 1 (conspiring to violate 18 U.S.C. §1503, by obstructing the due administration of justice, in violation of 18 U.S.C. §371), Count 2 (conspiring to launder the proceeds of narcotics trafficking, in violation of 18 U.S.C. §1956(h)); and Count 49 (laundering the proceeds of narcotics trafficking, in violation of §1956(a)(1)(B)(i)).

4

Mr. Bergendahl entered an appearance for defendant Valverde at the time of his arraignment and represented him through trial, which started in mid-July 2000. On September 13, 2000, the jury returned a verdict convicting defendant Valverde of the three counts against him. On September 18, 2000, the jury then returned a special verdict that forfeited Valverde's interest in assets that included: (1) the $6.1 million in cash seized from his attic on August 19, 1999; (2) another $56,685 in cash, $12,334 in blank money orders and blank travelers' checks, and $1,963 in coins, all seized on August 19, 1999, from the living area of the house; (3) $175,000 in cash seized from 4 safe deposit boxes; (4) 14 bank and financial accounts worth approximately $348,000; (5) a ranch in west Dade County; (6) two vacation cabins in Wisconsin; (7) two parcels of property in Levy County, Florida; (8) seven snowmobiles; (9) two snowmobile trailers; (10) a 1997 Chevrolet Silverado; and (11) a 1993 Chevrolet Suburban. Based upon the PSI, defendant Valverde appears presently to score out to a level 35 prior to any departures, which translates to a term of imprisonment between 168-210 months.[1]

On or about November 6, 2000, and while defendant Valverde was pending sentencing, Mr. Bergendahl filed a notice of appearance as co-counsel for defendant Falcon. Since either September or October 1999, Attorney Ken Kukec has served as lead counsel for defendant Falcon.

After several continuances, the Court scheduled a hearing pursuant to Garcia v. United States, 517 F.2d 272 (5th Cir. 1975), for December 18, 2000, two days before defendant Valverde's

---

[1]The PSI presently recommends a level 36, or 188-235 months. That recommendation includes a two-level upward adjustment for obstruction of justice under U.S.S.G. §3C1.1. Because that adjustment was based upon immunized grand jury testimony, it likely is erroneous. When considered alongside the application of the grouping provisions of the guidelines, U.S.S.G. §3D1.4, the resulting adjustment in the PSI likely would yield a one-level decrease in the total offense level.

scheduled sentencing. On December 18, new attorneys appeared on defendant Valverde's behalf, and defendant Valverde discharged Mr. Bergendahl. The Court postponed defendant Valverde's sentencing. Defendant Valverde has now agreed to cooperate and will be a witness against defendants Falcon and Magluta.

The Court initially ordered the government to file any motion to disqualify Mr. Bergendahl by January 22, 2001. In ex parte and sealed orders, the Court continued the date until April 10, 2001.

## III.  ARGUMENT

### A.  *The Sixth Amendment Does Not Guarantee a Defendant an Unqualified Right to Counsel of Choice*

Wheat v. United States, 486 U.S. 153 (1988), is the leading Supreme Court case defining the authority of trial courts to prevent conflicts posed by a defendant's choice of counsel from undermining the judicial system's overriding interest in safeguarding the public perception of the fairness of the administration of justice. Wheat involved a situation in which Wheat attempted to proceed to trial represented by Attorney Iredale, who also had represented two of his co-conspirators. The District Court disqualified Iredale, finding that his prior representation posed irreconcilable conflicts that could not be cured even if Wheat and the two co-conspirators all waived their rights to conflict-free counsel. See id. at 156-57. The Court of Appeals affirmed. See id. at 157.

The Supreme Court affirmed. The Court explained that a defendant's Sixth Amendment right to counsel focuses upon the defendant's right to effective assistance of counsel as opposed to the defendant's right of counsel of his choice.

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each

6

> criminal defendant rather than to ensure that a defendant will
> inexorably be represented by the lawyer whom he prefers.

Id. at 159.

The Court noted the various practical limitations upon a defendant's ability to retain his

preferred counsel, such as rules requiring that practicing attorneys be members of the bar, price

considerations that limit a defendant's ability to retain an attorney that he cannot afford, and the

longstanding rule prohibiting a defendant from retaining an attorney associated with the government.

See id. The Court then dismissed Wheat's contention that conflict waivers from him and his co-

defendants cleansed the impurities in his representation arrangement.   In so doing, the Court

recognized that courts similarly may regulate representation schemes that threaten the judicial

system's independent interest in fair and just verdicts.

> Petitioner insists that the provision of waivers by all affected
> defendants cures any problems created by the multiple representation.
> But no such flat rule can be deduced from the Sixth Amendment
> presumption in favor of counsel of choice.  Federal courts have an
> independent interest in ensuring that criminal trials are conducted
> within the ethical standards of the profession and that legal
> proceedings appear fair to all who observe them. . . . Not only the
> interest of a criminal defendant but the institutional interest in the
> rendition of just verdicts in criminal cases may be jeopardized by
> unregulated multiple representation.

Id. at 160.

The Court added that courts necessarily cannot forecast how the ramifications of a conflict-

laden representation arrangement will unfold at trial.

> Unfortunately for all concerned, a district court must pass on the issue
> whether or not to allow a waiver of a conflict of interest by a criminal
> defendant not with the wisdom of hindsight but in the murkier pre-
> trial context when relationships between parties are seen through a
> glass darkly.  The likelihood and dimensions of nascent conflicts of

7

> interest are notoriously hard to predict, even for those thoroughly
> familiar with criminal trials.

Id. at 162-63. For these reasons, the Court held that trial courts have substantial discretion in refusing to permit a defendant's chosen representation arrangement when faced with a showing of actual conflict, or even potential conflict. See id. at 164.

Courts evaluating disqualification issues in light of Wheat have recognized that Wheat allows the Court to give considerable weight to whether potential conflicts might undermine the public perception of the system of justice. See, e.g., United States v. Register, 182 F.3d 820, 832 (11th Cir. 1999) (affirming District Court ruling disqualifying defense counsel and relying upon in part and quoting Wheat, 486 U.S. at 160, for proposition that "the courts' [have an] 'independent interest in ensuring . . . that legal proceedings appear fair to all who observe them'"), cert. denied, 120 S. Ct. 2703 (2000); United States v. Williams, 81 F.3d 1321, 1324 (4th Cir. 1996) (describing holding in Wheat to stand for proposition "that the Sixth Amendment right to counsel has more to do with ensuring the fairness and integrity of the adversarial process generally than with vindicating a defendant's desire to have the particular lawyer that she or he most wants"); United States v. Ross, 33 F.3d 1507, 1522-24 (11th Cir. 1994) (affirming District Court's disqualification of counsel based in part upon counsel's prior representation of government witness and recognizing courts' "independent interest in ensuring that the integrity of the judicial system is preserved and that trials are conducted within ethical standards"), cert. denied, 515 U.S. 1132 (1995); United States v. Miranda, 936 F. Supp. 945, 951 n.6 (S.D. Fla. 1996) (disqualifying defense counsel based upon prior representation of government witness and observing that public perception "is also a factor in this analysis").

8

**B.**   *Particular Grounds for Disqualification Relevant to this Case*

1.   **Mr. Bergendahl's Representation of Defendant Falcon Would Violate His Duty of Loyalty to Defendant Valverde**

Rule 4-1.9 of the Rules Regulating the Florida Bar provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> > (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
> >
> > (b) use information relating to the representation to the disadvantage of the former client except as rule 4-1.6 would permit with respect to a client or when the information has become generally known.[2]

---

[2]Rule 4-1.6(a) of the Rules Regulating the Florida Bar permits a lawyer to reveal confidential communications upon consent of the client.  Rule 4-1.6(b) requires a lawyer to reveal confidential communications: "(1) to prevent a client from committing a crime; or (2) to prevent a death or substantial bodily harm to another."  Rule 4-1.6(c) permits a lawyer to reveal confidential communications:

> to the extent the lawyer reasonably believes necessary:
>
> > (1) to serve the client's interest unless it is information the client specifically requires not to be disclosed;
> >
> > (2) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and client;
> >
> > (3) to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved;
> >
> > (4) to respond to allegations in any proceeding concerning the lawyer's representation of the client; or
> >
> > (5) to comply with the Rules of Professional Conduct.

9

The duty of loyalty contained within Rule 4-1.9 and similar ethical rules, considered alongside United States v. Wheat, requires the disqualification of an attorney seeking to represent a criminal defendant when the attorney's (or a partner's) former client seeks to cooperate with the government and testify as a government witness against the new client in the same or a related matter and does not consent to the attorney's representation of the new client. See United States v. Miranda, 936 F. Supp. 945 (S.D. Fla. 1996) (Florida Rule 4-1.9); United States v. Culp, 934 F. Supp. 394, 398-99 (M.D. Fla. 1996) (ABA Model Rule of Professional Conduct 1.9); United States v. Davis, 780 F. Supp. 21 (D.D.C. 1991) (D.C. Model Rule of Professional Conduct 1.9); United States v. Cheshire, 707 F. Supp. 235 (M.D. La. 1989) (ABA Model Rule of Professional Conduct 1.9). See also United States v. Cruz, 982 F. Supp. 946 (S.D.N.Y. 1997) (disqualifying attorney when former client's wife was testifying as a government witness in return for possible reduced sentence for husband).

There is no question that Mr. Bergendahl's present representation of defendant Falcon and his prior representation of defendant Valverde arise out of the same matter for purposes of Rule 4-1.9. Defendants Valverde and Falcon are severed co-defendants in the same indictment. Moreover, counsel for defendant Valverde has advised the government that defendant Valverde is not waiving either Mr. Bergendahl's duty of loyalty or Mr. Bergendahl's duty to preserve confidential communications.

Rule 4-1.9 and Wheat call for Mr. Bergendahl's disqualification in this case. As a cooperating witness who based upon his convictions in this case faces substantial exposure under the Sentencing Guidelines, defendant Valverde's interest in this litigation now rests upon his maximizing the value of his cooperation to the government in its prosecution of other defendants. This includes the government's prosecution of defendant Falcon.

10

The government concedes that most or all of defendant Valverde's contact in the course of the conspiracies in this case was with defendant Magluta (as opposed to defendant Falcon), that defendant Valverde had limited contact with defendant Falcon, and that at present the government does not anticipate that defendant Valverde will testify about incriminating admissions made to him by defendant Falcon. The government submits, however, that these factors do not diminish the grounds for disqualifying Mr. Bergendahl. As suggested by the discussion above, supra, at 3-4, considered along with Exhibits 1-6 attached to this motion, defendant Valverde's testimony will implicate defendant Falcon by tying Falcon to the receipt of laundered Magluta-Falcon organization drug proceeds used to fund Falcon's prior attorneys. Exhibits 1-5 underscore that defendant Valverde's testimony will associate payments to Falcon's prior attorneys, and thus constructively from Falcon, with funds transmitted through the false "Piedad Garcia" nominee address. Exhibit 6 similarly underscores that defendant Valverde's testimony also will associate payments to Falcon's prior attorneys, and thus constructively from Falcon, with funds transmitted both through Harry Kozlik and through the drug cash that he (defendant Valverde) would store for Magluta.

As an attorney for defendant Falcon, Mr. Bergendahl necessarily would have to take part in efforts to blunt the impact of defendant Valverde's cooperation. This would go beyond merely cross-examining Valverde. It also would include, for instance, seeking to lessen the evidentiary value against Falcon of the evidence associating him with the laundering of funds through the "Piedad Garcia" nominee address, through Harry Kozlik, and through the cash stored by defendant Valverde.

Moreover, to the extent that defendant Valverde's cooperation exposes leads that yield either witnesses or evidence that more directly implicates defendant Falcon, Mr. Bergendahl's representation of defendant Falcon necessarily would involve seeking to blunt the evidentiary impact

11

of those leads upon defendant Falcon and in so doing necessarily undermine the value of defendant Valverde's cooperation to the government. That the government cannot predict what if any leads defendant Valverde's cooperation will produce against defendant Falcon is irrelevant for purposes of addressing Mr. Bergendahl's disqualification. As the Supreme Court explained in Wheat, "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." 486 U.S. at 162-63.

For at least four reasons, an agreement by Mr. Bergendahl to wall himself off from the cross-examination of defendant Valverde does not solve the problems inherent in his representation of defendant Falcon. First, defendant Valverde does not consent to Mr. Bergendahl's representation of defendant Falcon. Since Rule 4-1.9(a) places the right to make that concession exclusively with defendant Valverde, his refusal to waive the duty of loyalty Mr. Bergendahl continues to owe to him is fatal to any such arrangement. See United States v. Miranda, 936 F. Supp. at 951-52 (rejecting proposal to allow use of "back up counsel" to cross-examine attorney's former client testifying against present client based in part upon former client's refusal to consent). Second, as explained in the previous two paragraphs, excluding Mr. Bergendahl from Valverde's cross-examination does not end the ways in which his representation of defendant Falcon could undermine defendant Valverde's interests.

Third, even if the other attorneys for defendants Magluta or Falcon were to cross-examine defendant Valverde with information obtained independently from Mr. Bergendahl, cross-examination may present a real appearance of impropriety if defendant Valverde had provided to Mr. Bergendahl information similar to that which eventually emerges on cross-examination. In United States v. Davis, 780 F. Supp. 21, the Court addressed the situation in which Attorney Kohlman

12

sought to represent Davis, in a case in which a cooperating witness represented by Attorney Kohlman's partner, Attorney Rochon, was slated to testify against Davis. In response to the government's motion to disqualify Attorney Kohlman, he contended that walling himself off from information obtained by Attorney Rochon would cure the problem. The Court rejected this solution, explaining:

> [E]ven if Kohlman would have independent access to all possible impeaching information, the appearance of a conflict in using the information against a former client of his firm requires his disqualification. The Court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). It would be objectively unfair for Kohlman to confront the cooperating individual with information that the individual confided to Rochon. The appearance of unfairness would remain regardless of Kohlman's actual source of the information.

780 F. Supp. at 23-24.

Fourth, segregating Mr. Bergendahl from the cross-examination of defendant Valverde does not cure the problems implicated by his prior representation of defendant Valverde. Rule 4-1.9(b) prohibits Mr. Bergendahl from using confidential information he obtained in the course of representing defendant Valverde to defendant Valverde's disadvantage. Given that Mr. Bergendahl represented defendant Valverde over the course of one year, including a two-month trial, the Court must presume that defendant Valverde shared confidences with Mr. Bergendahl. See United States v. Cheshire, 707 F. Supp. at 239 ("there is a presumption that a lawyer receives confidential communications in the course of his representation of a client"). It is difficult to conceive that an attorney acting with the best of intentions will be able to segregate all confidential information

13

learned from one client in the course of a lengthy case in molding trial strategies of a subsequent client charged in the same case.

Defendant Falcon's choice of counsel deserves little, if any, weight in this calculation. Rule 4-1.9 puts the decision to allow subsequent representation of a different client in the same matter in the hands of the former client, who is of course defendant Valverde. Moreover, as noted above, defendant Falcon has had separate lead counsel for a year and one-half. Mr. Bergendahl did not seek to represent defendant Falcon until over a year after defendant Falcon's lead counsel entered his appearance. Insofar as Mr. Bergendahl may have become valuable to defendant Falcon due to particular expertise in the facts of this case, Mr. Bergendahl obtained that expertise through the representation of a former client in the same case who does not consent to Mr. Bergendahl's use of that expertise to his detriment and on behalf of defendant Falcon.

Nor does the government's motion for disqualification add any weight to defendant Falcon's separate motion for severance. For the reasons set forth above, see supra, at 3-4 & 11, defendant Valverde will be a witness against defendant Falcon regardless whether the Court were to grant or deny defendant Falcon's motion for severance. Any severance will be irrelevant to the grounds for disqualification.

### 2. Mr. Bergendahl's Representation of Defendant Falcon Would Violate His Duty of Confidentiality to Defendant Valverde

Rule 4-1.6 of the Rules Regulating the Florida Bar prohibits a lawyer from disclosing information relating to representation of a client except in certain enumerated situations that do not apply in this case. (Those situations are delineated supra, at 9 n. 2.) In disqualifying an attorney for potential violation of the attorney's duty of loyalty to a former client in a substantially related matter, the Court in United States v. Miranda, 936 F. Supp. 945, 948 (S.D. Fla. 1996), relied in part upon

14

the danger that the subsequent representation could cause a violation of the attorney's duty of confidentiality to the former client.

Those considerations apply with equal force here. As noted above, defendant Valverde is not waiving Mr. Bergendahl's duty to preserve their confidential communications. And as explained above, see supra, at 12-14, segregating Mr. Bergendahl from the defense cross-examination does not cure the potential that information provided by defendant Valverde in confidence to Mr. Bergendahl could be used to defendant Valverde's disadvantage, or the potential that the public could perceive that cross-examination of defendant Valverde unfairly relied upon attorney-client confidences.

The risk that Mr. Bergendahl's representation of defendant Falcon may endanger the confidentiality of the information that defendant Valverde imparted to him supplements the grounds that call for his disqualification in this case.

### 3.     Mr. Bergendahl's Relationship to the Evidence Would Make Him an "Unsworn Witness"

An attorney becomes an unsworn witness when the attorney's relationship to the issues presented at trial "results in his having a first-hand knowledge of the events presented at trial." United States v. Locascio, 6 F.3d 924, 933 (2d Cir. 1993), cert. denied, 511 U.S. 1070 (1994). The attorney-as-unsworn-witness scenario can arise in a variety of settings. In Locascio, the Second Circuit affirmed a district court order disqualifying counsel for defendant Gotti, based upon counsel's participation in taped conversations and Gotti's taped statement regarding counsel's acceptance of fees "under the table." The government used the taped conversations in which counsel participated to establish Gotti's participation in a racketeering conspiracy and used the reference to "under the table" fees to establish the tax fraud charges against Gotti.

15

With respect to counsel's participation in the taped conversations, the Court held that while it justified disqualification on several grounds, the possibility that counsel would act as an unsworn witness was the "stronger" of these bases. Id. at 933. The Court explained that when an attorney is intertwined in the evidence presented at trial, the attorney's "role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination." Id. The Court described how in the case before it counsel's participation in the tape recordings at issue gave rise to such a danger.

> When an attorney is an unsworn witness . . . the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced. . . .
>
> The government was legitimately concerned that, when [counsel] argues before the jury for a particular interpretation of the tapes, his interpretation would be given added credibility due to his presence in the room when the statements were made. This would have given Gotti an unfair advantage, since [counsel] would not have had to take an oath in presenting his interpretation, but could merely frame it in the form of legal argument.

Id. at 934. The Court added that the conversation in which Gotti referred to counsel's acceptance of fees "under the table" gave rise to the same danger.

> The unsworn witness problem arises not only in relation to the . . . tapes, but to other grounds cited by the district court in support of disqualification. For example, the court found that Gotti's reference to [counsel's] acceptance of fees "under the table" were relevant to the government's case on the tax fraud count. Had [counsel] argued Gotti's defense on that count, he would not only have had a conflict of interest, but he would have been arguing as to events in which he was allegedly involved.

Id.

16

The Second Circuit likewise affirmed the district court's disqualification of counsel for defendant Locascio. The district court had found that the government's proffered evidence with respect to counsel for Locascio – in particular, that Gotti had directed counsel to represent either Locascio or a third defendant, Salvatore Gravano – warranted disqualification on two grounds: first, that counsel was compromised by his divided loyalties to Gotti and Locascio, and second, that counsel potentially would act as an unsworn witness in relation to proof that he acted as "house counsel," which itself was potential evidence of the racketeering enterprise. See United States v. Gotti, 782 F. Supp. 737, 741 (E.D.N.Y. 1992). With respect to this latter point, the district court noted that counsel "could not argue against the existence of the charged RICO enterprise without becoming an unsworn witness." Id. Based upon these considerations, the Second Circuit found that the district court properly exercised its discretion in disqualifying counsel for Locascio. See Locascio, 6 F.3d at 935. See also United States v. Cruz, 1995 WL 463107 (S.D.N.Y. 1995) (disqualifying counsel on grounds that counsel may become unsworn witness in narcotics conspiracy case when government's proof of conspiracy would include evidence that defendant had made "benefactor payment" that financed counsel's previous representation of co-conspirator), remanded on other grounds, 152 F.3d 921 (2nd Cir.1998).

Mr. Bergendahl's representation of defendant Falcon presents unsworn witness problems that further support his disqualification from the case. Evidence in this case against defendants Magluta and Falcon will include actions they took to discourage cooperation by potential witnesses against them through the use of organization drug proceeds to fund defense attorneys for those individuals. Defendant Valverde's testimony in this case will supplement that evidence in a manner that ties Mr. Bergendahl to the evidence.

17

Defendant Valverde will testify that after retaining Mr. Bergendahl, he paid Mr. Bergendahl a portion of the mutually agreed-upon fee. Defendant Valverde later advised defendant Magluta that he did not have the remaining $100,000 owed to Mr. Bergendahl. According to defendant Valverde, defendant Magluta told him not to worry about the money and that he would take care of it. Defendant Valverde will testify that after his conversation with defendant Magluta, Mr. Bergendahl never inquired with him about any unpaid fees. The inference that the government will ask the jury to make is that defendant Magluta funded the remainder of the fees defendant Valverde owed to Mr. Bergendahl and did so as a reward for defendant Valverde's refusal up until that time to cooperate with the government.

The government accepts that the unsworn witness problem in this case is not as pronounced as that in Locascio. The government further accepts that if this were the only problem arising from Mr. Bergendahl's representation of defendant Falcon, it is possible that the problem could be cured with waivers from defendants Magluta and Falcon and by instructing defendant Valverde to refer to Mr. Bergendahl in generic terms, such as his "former lawyer," and not to refer to him by name. However, in light of the more intractable problems discussed supra, at 9-15, the manner in which Valverde's testimony will associate Mr. Bergendahl to the efforts of defendant Magluta and Falcon to use their wealth to reward loyalty by funding attorneys for those who withhold their cooperation from law enforcement adds another consideration upon which the Court should conclude that Mr. Bergendahl's representation of defendant Falcon might undermine the public perception of the system of justice.

IV.   **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court grant this

motion and disqualify Mr. Bergendahl from further representation of defendant Falcon in this case.

The government has discussed this motion with Mr. Bergendahl, and he opposes the relief sought.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _11_ day of April 2001, a true copy of the foregoing was mailed to:

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 905
Boston, MA 02116

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600
Miami, FL 33131

Jacob M. Denaro, Esq.
7700 N. Kendall Drive, Suite 504
Miami, FL 33156-7566

John Bergendahl, Esq.
701 Brickell Avenue, Suite 2080
Miami, FL 33131

Louis St. Laurent, Esq.
220 N.W. 122nd Avenue
Coral Springs, FL 33071

Jeffrey Weiner, Esq.
9130 S. Dadeland Boulevard, Suite 910
Miami, FL 33156

Frederick R. Mann, Jr.
415 E. Central Blvd.
Orlando, FL 32801

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY

20

Sealed

Unsealed _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
Defendant.

_____/

**UNDER SEAL**

## GOVERNMENT'S APPEAL OF ORDER OF MAGISTRATE-JUDGE DENYING GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY JOHN BERGENDAHL

The United States of America, through the undersigned Assistant United States Attorney, files this appeal of the June 21, 2001, Order of the Hon. Ted E. Bandstra denying the government's motion to disqualify attorney John Bergendahl from representation of defendant Augusto Guillermo Falcon. For the reasons set forth below, the government respectfully submits that the Court should reverse Judge Bandstra's Order.

Section 1(A) of this appeal (pages 2-10) addresses the erroneous conclusions in the Order that Mr. Bergendahl's representation of defendant Falcon does not violate relevant bar rules or undermine public confidence in the trial process. Section 1(B) of this appeal (pages 10-15) explains why the cases relied upon the Order for denying the motion – United States v. Abbell, 939 F. Supp. 860 (S.D. Fla. 1996), and United States v. Hanania, 989 F. Supp. 1187 (M.D. Fla. 1997) – are distinguishable. Section 1(C) of this appeal (pages 15-16) explains the error in the Order's



attachment of significance to Falcon's waiver under <u>United States</u> v. <u>Garcia</u>, 517 F.2d 272 (5th Cir.

1975), as a factor that supports denying the motion.

## I.   ARGUMENT

### A.   *The Order Does Not Correctly Address How Mr. Bergendahl's Representation of Defendant Falcon Violates Relevant Bar Rules and Undermines the Public Perception of the Fairness of the System of Justice*

Page 6 of the Order appears to recognize that under <u>Wheat</u> v. <u>United States</u>, 486 U.S. 153

(1988), the two major questions presented in a situation when an attorney seeks to represent multiple

clients in the same case are whether the proposed representation violates applicable ethical rules or

undermines the public's perception of the fairness of the given trial.  Under <u>Wheat</u> and <u>United States</u>

v. <u>Ross</u>, 33 F.3d 1507 (11th Cir. 1994), <u>cert. denied</u>, 515 U.S. 1132 (1995), the considerations

relating to public perception also include more broadly the Court's "independent interest in ensuring

that . . . legal proceedings appear fair to all who observe them," <u>Wheat</u>, 486 U.S. at 160, and "the

integrity of the judicial system," <u>Ross</u>, 33 F.3d at 1524.  <u>See also</u> <u>United States</u> v. <u>Miranda</u>, 936 F.

Supp. 945, 951 n.6 (S.D. Fla. 1996) (disqualifying defense counsel based upon counsel's prior

representation of government witness and observing that public perception "is also a factor in this

analysis").  In concluding that the representation conforms with ethical rules and does not undermine

public confidence, the Order does not properly account for the relevant considerations.

### 1.   Duty of Loyalty Under Rule 4-1.9 of the Rules Regulating the Florida Bar

With respect to the duty of loyalty, page 4 of the Order explains the government's position

as being that "Mr. Bergendahl's representation of Falcon will necessarily 'undermine the evidentiary

2

value of . . . Valverde's testimony.'" In this respect the Order misperceives the full breadth of this aspect of the difficulty presented by Mr. Bergendahl's proposed representation arrangement.

As explained in more depth in the government's motion to disqualify and during the argument before Judge Bandstra on the motion, the problem posed by Mr. Bergendahl's participation is not limited to the potential that his participation may undermine the value of defendant Valverde's *testimony* but rather encompasses the broader problem that his participation will lead him to undermine the value of defendant Valverde's *cooperation*. In pertinent part, Rule 4-1.9(a) of the Rules Regulating the Florida Bar provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are *materially adverse* to the interests of the former client" (emphasis added). As with any cooperating individual, defendant Valverde's value as a cooperator is not limited to the words to which he testifies, but also necessarily includes his ability to provide leads that identify other witnesses or evidence and his ability to corroborate other witnesses or evidence.[1]

---

[1]At pages 3-4 and 11 of the motion to disqualify, as well as Exhibits 1-6 to the motion, the government has outlined the manners of which it is presently aware through which defendant Valverde's cooperation may incriminate defendant Falcon. Although the government has tried to be as comprehensive as possible, the government cannot preclude other scenarios through which defendant Valverde's cooperation may incriminate defendant Falcon. Similarly, the government cannot predict what evidence that it may obtain in the future which in conjunction with defendant Valverde's cooperation may incriminate defendant Falcon. In <u>Wheat</u>, the Supreme Court observed that courts necessarily cannot forecast how the ramifications of a conflict-laden representation arrangement will unfold at trial.

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight but in the murkier pre-trial context when relationships between parties are seen through a glass darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

3

Whenever Mr. Bergendahl participates in any effort that seeks to challenge any witnesses or evidence derived from Valverde's cooperation or any witnesses or evidence that in some way supports defendant Valverde's testimony, he is taking steps to contest the overall value of defendant Valverde's cooperation. By acting on behalf of defendant Falcon in a manner that may undermine the value of any of the aspects of defendant Valverde's cooperation in the same case in which he previously represented him, Mr. Bergendahl would be, in the words of Rule 4-1.9, "represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." The duty of loyalty contained in that Rule does not permit such representation. See United States v. Culp, 934 F. Supp. 394, 397-400 (M.D. Fla. 1996) (disqualifying attorney from representing criminal defendant based in part upon violation of duty of loyalty owed to two former clients who were cooperating witnesses at trial, who would be testifying against subsequent client, who had not yet been sentenced in their cases, and who did not consent to attorney's representation of defendant against whom they was to testify); United States v. Cheshire, 707 F. Supp. 235, 237-40 (M.D. La. 1989) (disqualifying attorney from representing criminal defendant based in part upon violation of duty of loyalty owed to former clients who were cooperating witnesses at trial, who would be testifying against subsequent client, who had not yet been sentenced in his case, and who did not consent to attorney's representation of defendant against whom he was to testify).

---

486 U.S. at 163-64. In a factually complex case such as this one, the Court should address the motion to disqualify based upon the possibility that such "nascent conflicts" may arise at a later point.

4

The Order also misstates the nature of the duty of loyalty problem in a second respect. Page 4 of the Order characterizes the government's position as being that "Mr. Bergendahl's 'duty' to Valverde includes an obligation to ensure that Valverde's testimony will be most effective or contribute to the convictions of Falcon and/or Magluta." That characterization is mistaken. The government does not contend that the bar rules require Mr. Bergendahl to act in perpetuity as defendant Valverde's *advocate* in this case. What the bar rules do require, however, is that Mr. Bergendahl at minimum not switch sides and act as defendant Valverde's *adversary* regarding those interests. By representing defendant Falcon in this case, Mr. Bergendahl would be crossing that line of neutrality and taking on the cause of an individual whose interests are materially adverse to those of defendant Valverde. Under United States v. Miranda, 936 F. Supp. 945 (S.D. Fla. 1996), when an attorney labors under a conflict of interest due to successive or multiple representation of individuals in criminal cases, and one client does not consent, the attorney should withdraw. Id. at 950 ("Miranda has expressed his consent to continue being represented by Shohat, after having been apprised of the perils of such representation. [Cooperating witness] Lopez, however, has expressly stated that he does not consent to Shohat's continued representation of Miranda. Absent Lopez's consent, Shohat must withdraw.").

### 2. Duty to Protect Client Confidences Under Rule 4-1.6 of the Rules Regulating the Florida Bar

The duty of confidentiality, as contained in Rule 4-1.6 of the Rules Regulating the Florida Bar, prohibits a lawyer from disclosing information relating to representation of a client except in certain enumerated situations that do not apply in this case. At page 15 of its motion to disqualify, the government argued that Mr. Bergendahl's proposed representation of defendant Falcon poses an unacceptable risk that information provided by defendant Valverde in confidence to Mr. Bergendahl

5

could be used to defendant Valverde's disadvantage. Page 5 of the Order purports to dispose of this issue: (a) by relying upon Mr. Bergendahl's assurance "that this will not occur" and willingness to cede the cross-examination of defendant Valverde to Mr. Kukec and (b) by dismissing the government's concern in this regard as "mostly speculative."

Although the government does not question that Mr. Bergendahl will in good faith *try* to refrain from making use of those confidential communications, the government respectively submits that in finding Mr. Bergendahl's assurance sufficient to protect defendant Valverde's rights the Order overlooks the realities of Mr. Bergendahl's prior attorney-client relationship with defendant Valverde. "[T]here is a presumption that a lawyer receives confidential communications in the course of his representation of a client." United States v. Cheshire, 707 F. Supp. at 239. Mr. Bergendahl represented defendant Valverde for approximately fourteen months, which included serving as sole trial counsel during a two-month trial. The likelihood that defendant Valverde had numerous confidential communications with Mr. Bergendahl is far from speculative.

Regardless of Mr. Bergendahl's efforts, the government doubts Mr. Bergendahl's practical ability to fully wall his work for defendant Falcon from privileged communications he obtained from defendant Valverde. This is not a situation involving limited attorney-client communications occurring in a discrete period of time. It is inconceivable how as a practical matter Mr. Bergendahl will be able to segregate information he has learned about this case through confidential communications with defendant Valverde from information he has learned through other sources. The solution proposed by Mr. Bergendahl in this case – his subjective good faith – is far from optimal, because the arrangement asks Mr. Bergendahl to act as a one-person "taint wall," maintaining the sanctity of the communications of one long-time client who is now cooperating with

6

the government while simultaneously defending a second client who is a co-defendant in the same case. In this case, the arrangement accepted by the Order does not protect defendant Valverde's confidential communications in a realistic or viable manner. The arrangement becomes even more problematic in view of defendant Valverde's unwillingness to consent to it. See United States v. Miranda, 936 F. Supp. at 951-52 (rejecting proposal to allow use of "back up counsel" to cross-examine attorney's former client testifying against present client based in part upon former client's refusal to consent).

### 3.    Public Perception

As explained above, see supra, at 2, the analysis under Wheat also considers the "independent interest . . . Federal courts have . . . in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." 486 U.S. at 160. Although the top of page 6 of the Order recites Judge Bandstra's conclusion that he does not believe that Mr. Bergendahl's representation of defendant Falcon undermines the public perception of the fairness of the proceedings, the relevant facts compel the contrary conclusion.

As explained in the previous subsections of this response, see supra, at 2-7, Mr. Bergendahl's representation of defendant Falcon violates the duty of loyalty and the duty to protect client confidences, as reflected in Rules 4-1.6 and 4-1.9 of the Rules Regulating the Florida. The manners in which the representation violates these rules is far from technical and, in the government's view, undermines central guarantees that a criminal defendant is owed by his attorney. The representation arrangement is particularly problematic in this case, because it sends the troubling message that a defendant's ability to depend upon these guarantees is not certain and may depend upon his wealth.

7

Although the Court should not expect members of the public to examine the facts of this case against the language of Rules 4-1.6 and 4-1.9, it can expect that the public will comprehend the factual realities of this situation. Certainly, reasonable members of the public will recognize the impact that this case has had upon defendant Valverde and Mr. Bergendahl's association with the events that led to defendant Valverde's situation. Mr. Bergendahl represented defendant Valverde for 14 months from arraignment through a trial in which the jury convicted Valverde on all three counts charged. Defendant Valverde will turn 50 in October and now faces a Sentencing Guideline range of 168-210 months. He has been in custody since August 20, 1999. A sentence at the low end of the range, even with the maximum of 15% good time credit, would have him imprisoned until several months before his 60th birthday.

Defendant Valverde has decided to try to ameliorate the impact of these proceedings upon his liberty by cooperating with the government. Part of defendant Valverde's cooperation will require him to testify against defendant Falcon. Reasonable members of the public certainly will recognize defendant Valverde's motivation for cooperating and for wanting to maximize the value of his cooperation. Reasonable members of the public certainly also will expect that a fair and just legal system will require that Mr. Bergendahl, having walked this far in the process with defendant Valverde, not take any steps that may in any way undermine defendant Valverde's chances to lessen his sentence.

While he was still representing defendant Valverde, Mr. Bergendahl entered a notice of appearance to represent defendant Falcon, a co-defendant in the same case who has yet to stand trial. Mr. Bergendahl entered the appearance for defendant Falcon without defendant Valverde's consent and continues in his representation of defendant Falcon without defendant Valverde's consent. The

8

Court can expect that reasonable members of the public will recognize the inequities and unfairness in this arrangement. Through the course of his representation of defendant Valverde, Mr. Bergendahl obtained a meaningful portion of the knowledge about this case that he can use in representing defendant Falcon. Mr. Bergendahl obtained this knowledge while being paid by defendant Valverde and in the course of a proceeding that ultimately resulted in defendant Valverde's conviction and a substantial potential term of imprisonment. Reasonable members of the public will view how Mr. Bergendahl's proposed use of the knowledge that he obtained at defendant Valverde's expense may in turn undermine defendant Valverde's ability to ameliorate the situation in which he now finds himself.

Reasonable members of the public further will expect that part of the body of information that Mr. Bergendahl obtained about the case came from confidential communications from defendant Valverde. After a lengthy attorney-client relationship, Mr. Bergendahl proposes to act as a one-person "taint wall" in which he proposes to protect the sanctity of the likely numerous client confidences he obtained in the course of his 14-month representation of defendant Valverde while representing a co-defendant in the same case. The government respectfully submits that reasonable members of the public will not have confidence that this arrangement will adequately protect defendant Valverde's confidential communications. As recognized in United States v. Davis, 780 F. Supp. 21 (D.D.C. 1991), courts can refuse to accept "taint walls" as an alternative to disqualification when a law firm establishes a taint wall that the reasonable members of the public would not accept as legitimate. Id., at 23 (rejecting proposed taint wall solution to disqualification when one member of firm, attorney Rochon, represented witness against defendant who was represented by second member of firm, attorney Kohlman, and explaining that "even if Kohlman

9

would have independent access to all possible impeaching information, the appearance of a conflict in using the information against a former client of his firm requires his disqualification").

From widely disseminated public information, numerous members of the public are aware of the evidence that has identified defendant Falcon as one of the two kingpins of a massive national and international cocaine trafficking organization that accumulated massive amounts of wealth. Reasonable members of the public will realize that defendant Falcon is a more lucrative client than defendant Valverde – particularly in view defendant Valverde's anticipated testimony that he was unable to pay Mr. Bergendahl the last $100,000 of the fee he had owed to him and that defendant Falcon's co-defendant, defendant Magluta, apparently took care of it. The government respectfully submits that reasonable members of the public would draw from Mr. Bergendahl's representation of defendant Falcon the message that a criminal defense attorney may jettison a less lucrative client in dire straits in order to take on the cause of a more lucrative client whose interests are adverse to the less lucrative client.

The government respectfully submits that the various messages that reasonable members of the public may draw from this situation will undermine their faith in the fairness of the legal process. The Court's independent interest that the public view the judicial process as fair and just for all members of the public independently requires that it not permit Mr. Bergendahl's proposed representation of defendant Falcon.

### B.   *The Cases Cited in the Order Are Distinguishable*

For the reasons explained in this submission and the government's motion to disqualify, the following cases granting motions to disqualify in situations in which successive representation arrangements threaten to undermine the duty of loyalty and/or duty to protect client confidences

10

owed to the former clients (and present witnesses) call for the same result in this case: <u>United States</u> v. <u>Miranda</u>, 936 F. Supp. 945; <u>United States</u> v. <u>Culp</u>, 934 F. Supp. at 397-400; <u>United States</u> v. <u>Davis</u>, 780 F. Supp. 21; and <u>United States</u> v. <u>Cheshire</u>, 707 F. Supp. 235.

In denying the government's motion to disqualify, the Order relied upon two cases: <u>United States</u> v. <u>Abbell</u>, 939 F. Supp. 860 (S.D. Fla. 1996), and <u>United States</u> v. <u>Hanania</u>, 989 F. Supp. 1187 (M.D. Fla. 1997). Both cases are distinguishable.

### 1.   United States v. Abbell

<u>Abbell</u> was a multiple-defendant case in which defendants Perera and Abbell were charged. Following indictment, defendant Perera was represented by attorney Srebnick. Over one year prior to trial, defendant Perera entered into a plea agreement with the government. <u>See</u> 939 F. Supp. at 861.[2] The disqualification issue arose when Mr. Srebnick subsequently entered an appearance for defendant Abbell. Although the Court in <u>Abbell</u> denied the government's motion to disqualify, <u>see</u> <u>id.</u> at 864-65, for at least four reasons <u>Abbell</u> does not present the same set of factors present in this case.

First, the opinion in <u>Abbell</u> did not articulate any evidence that Perera's testimony would implicate Abbell. <u>See</u> <u>id.</u> at 864 ("Defendants Perera and Abbell have had no contact other than at hearings in this case, there is no evidence linking them, and Defendant Abbell's defense at trial will be independent of Defendant Perera's interests.") By contrast, pages 3-4 and 11 of the motion to disqualify, as well as Exhibits 1-6 to the motion, identify how documents seized from defendant

---

[2]The opinion in <u>Abbell</u> indicates that Perera entered into the plea agreement on February 14, 1996. On April 3, 1997, Judge Hoeveler entered an filed a written opinion denying pre-trial motions to suppress, <u>see</u> <u>United States</u> v. <u>Abbell</u>, 963 F. Supp. 1178 (S.D. Fla. 1997), thus indicating that trial had not yet commenced.

Valverde's house show that he was laundering organization drug money to pay defendant Falcon's lawyers.  Defendant Valverde's testimony will be consistent with the meaning of the seized documents.  Indeed, page 4 of the Order recognizes that "Valverde may testify on issues implicating Falcon to some extent."

Second, the opinion in <u>Abbell</u> does not indicate that the situation in that case presented any issues arising out of Mr. Srebnick's duty of loyalty to defendant Perera under Rule 4-1.9 of the Rules Regulating the Florida Bar.  As explained at pages 9-14 of the government's motion to disqualify and pages 2-5 of this submission, Mr. Bergendahl's successive representation of defendants Valverde and Falcon raises substantial issues relating to the compromising of the duty of loyalty owed to defendant Valverde, in view of the fact that defendant Falcon is one of the defendants against whom he is testifying, as well as other considerations.

Third, the opinion in <u>Abbell</u> does not indicate that the situation in that case presented any issues arising out of Mr. Srebnick's duty to protect the confidences of defendant Perera under Rule 4-1.6 of the Rules Regulating the Florida Bar.  As explained at pages 14-15 of the government's motion to disqualify and pages 5-7 of this submission, Mr. Bergendahl's successive representation of defendants Valverde and Falcon raises substantial issues relating to the compromising of the duty to protect confidential communications owed to defendant Valverde. Along these lines, it is worth noting that defendant Perera pled guilty over a year in advance of the trial in that case – as opposed to defendant Valverde, who was a defendant in a two-month trial.  The Court accordingly can presume that the exchange of confidential communications between defendant Perera and Mr. Srebnick was less than the exchange between defendant Valverde and Mr. Bergendahl.

12

Fourth, the opinion in <u>Abbell</u> does not address the public perception of the fairness of the trial in the case. Because the facts of <u>Abbell</u> do not suggest that Perera was a witness against Abbell, <u>see</u> <u>id.</u> at 864, because by virtue of the plea agreement Mr. Srebnick had obtained for him Perera was not in a position in which he was cooperating from a "worst-case scenario" position after having been convicted of all counts at trial, and because Abbell is not the publicly notorious "deep pocket" that defendant Falcon is, <u>Abbell</u> does not present the public perception considerations present in this case.

## 2.   <u>United States v. Hanania</u>

<u>Hanania</u> was a two-defendant case in which Geries Hanania and Samer Hanania were charged. Prior to indictment, attorney Fallgatter negotiated immunity agreements for Christina and Donnie Brooks, both of whom were witnesses in the case. <u>See</u> 989 F. Supp. at 1189-90. The disqualification issue arose when following the return of the indictment, Fallgatter entered an appearance for defendant Geries Hanania. <u>See</u> <u>id.</u> at 1189. Although the Court denied the government's motion to disqualify, <u>see</u> <u>id.</u> at 1189-91, for at least five reasons that case likewise does not present the same set of factors present in this case.

First, the Brookses testimony was not expected to directly implicate Geries Hanania, and to the extent that they would testify to facts from which the government could argue circumstances that would implicate Geries Hanania, Hanania was not going to dispute the testimony, only the government's interpretation. <u>See</u> <u>id.</u> at 1190-91. As explained at pages 3-4 and 11 of the motion to disqualify, defendant Valverde's testimony will implicate defendant Falcon. In contrast to Geries Hanania, defendant Falcon has not offered to forego any contest to defendant Valverde's testimony.

13

Second, the opinion in <u>Hanania</u> does not indicate that the situation in that case presented any issues arising out of Mr. Fallgater's duty of loyalty to the Brookses under Rule 4-1.9 of the Rules Regulating the Florida Bar. The discussions at pages 9-14 of the government's motion to disqualify and pages 2-5 of this submission outlines the duty of loyalty issues in this case. In contrast to this case, the Brookses were immunized witnesses, as opposed to convicted defendants looking to achieve reduced sentences. They had no further goals to obtain through the case, and thus Mr. Fallgater's representation of Geries Hanania was not adverse to their interests.

Third, the opinion in <u>Hanania</u> does not indicate that the situation in that case presented any issues arising out of Mr. Fallgater's duty to protect the confidences of the Brookses under Rule 4-1.6 of the Rules Regulating the Florida Bar. <u>See id.</u> at 1190. The discussions at pages 14-15 of the government's motion to disqualify and pages 5-7 of this submission outlines the duty of confidentiality issues in this case. In contrast to this case, Mr. Fallgater represented that he was not aware of any attorney-client information that he had obtained from the Brookses that would be relevant in his defense of Geries Hanania. Moreover, because the Brookses were immunized witnesses, and because Mr. Fallgater did not represent them as defendants through a two-month trial, the Court can presume that the exchange of confidential communications between the Brookses and Mr. Fallgater was less than the exchange between defendant Valverde and Mr. Bergendahl.

Fourth, the Brookses and Geries Hanania all consented to Mr. Fallgater's representation arrangement in this case. <u>See id.</u> at 1190-91. By contrast, Mr. Bergendahl is representing defendant Falcon without defendant Valverde's consent.

Fifth, because of these considerations, the Court in <u>Hanania</u> found that the proposed representation arrangement presented no issues regarding the public perception of the administration

14

of justice.  See id. at 1192.  Indeed, because the facts of Hanania indicate that Geries Hanania was not contesting those portions of the Brooks' testimony that might indirectly implicate him, because the Brookses were immunized witnesses as opposed to cooperating defendants, because the situation presented no client confidentiality issues, and because all parties consented to the arrangement, Hanania does not present the public perception considerations present in this case.

C.    *The Order Improperly Attaches Significance to Falcon's Garcia Waiver*

Page 3 of the Order cites Wheat v. United States, 486 U.S. 153, 164 (1988), for the premise that "[t]here is a presumption in favor of defendant's counsel of choice, and a court may disqualify that counsel only if continued representation creates either an actual or serious potential for conflict of interest."  From that premise, the Order attaches weight in resolving the issues presented by the motion to disqualify to defendant Falcon's prior waiver under United States v. Garcia, 517 F.2d 272 (5th Cir. 1975), of Mr. Bergendahl's potential conflicts due to representing him after previously representing defendant Valverde.

This analysis is mistaken.  The discussion in this submission explains that the critical issues in the disqualification analysis concern whether the representation arrangement violates ethical rules or undermines the public's perception in the integrity of the system of justice.  To the extent that the Court may consider waivers of conflicts of interest, the fact that *defendant Valverde* refused to waive the duties owed to him is far more significant than the fact that *defendant Falcon* agreed to waive the duties owed to him.  See United States v. Miranda, 936 F. Supp. at 950-52; United States v. Cheshire, 707 F. Supp. at 237-40.  Of the considerations potentially pertinent to the resolution of the motion to disqualify, Falcon's Garcia waiver is the least pertinent of them.  Indeed, even if both defendants were to waive their rights to conflict-free counsel, Wheat v. United States – which

15

rejected such an across-the-board waiver by all defendants – underscores that the Court still would have discretion to reject such waivers and disqualify Mr. Bergendahl. <u>See</u> 486 U.S. at 160-64. Although the Court necessarily would have to disqualify Mr. Bergendahl if defendant Falcon did not waive the conflicts of interest arising from the representation arrangement, it does not follow that defendant Falcon's waiver of the conflicts cures the arrangement of all of its other difficulties.

## II.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court reverse the Order of Judge Bandstra denying the motion to disqualify Mr. Bergendahl.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:    _____

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

16

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _16_ day of July 2001, a true copy of the foregoing was mailed to:

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 905
Boston, MA 02116

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600
Miami, FL 33131

Jacob M. Denaro, Esq.
7700 N. Kendall Drive, Suite 504
Miami, FL  33156-7566

John Bergendahl, Esq.
701 Brickell Avenue, Suite 2080
Miami, FL 33131

Louis St. Laurent, Esq.
220 N.W. 122nd Avenue
Coral Springs, FL 33071

Jeffrey Weiner, Esq.
9130 S.  Dadeland Boulevard, Suite 910
Miami, FL 33156

Frederick R. Mann, Jr.
415 E. Central Blvd.
Orlando, FL  32801

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY

17

NIGHT BOX
FILED

SEP 1 3 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
                              Defendant.
_____/

## GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO GOVERNMENT'S APPEAL OF ORDER OF MAGISTRATE-JUDGE DENYING GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY JOHN BERGENDAHL

The United States of America, through the undersigned Assistant United States Attorneys, files this reply to defendant Augusto Guillermo Falcon's response to the government's appeal of the June 21, 2001, Order of the Hon. Ted E. Bandstra denying the government's motion to disqualify attorney John Bergendahl from representation of Falcon.  The government states as follows:

1.    Falcon starts his response not by trying to defend the Order on its merits, but by suggesting that the standard of review is too onerous to allow the Court to address the errors in the Order and grant the government's motion (Falcon Response at 1-4).  Falcon correctly notes that the Order relates to a non-dispositive matter, which under 28 U.S.C. §636(b)(1)(A) is reversible upon

a finding that it is "clearly erroneous or contrary to law." Falcon, however, incorrectly suggests that this standard is a toothless one. For purposes of §636(b)(1)(A):

> A finding is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law. A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on consideration of the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Gunter v. Ridgewood Energy Corp., 32 F. Supp.2d 162, 164 (D.N.J. 1998) (internal quotations omitted). For the reasons set forth in the government's appeal of Judge Bandstra's Order, the Order does not withstand scrutiny under this standard.

2.     Falcon incorrectly suggests that controlling case law establishes the primacy of the defendant's right of counsel of his choice (Falcon Response at 4-7). Falcon, however, neglects to address the leading cases in the Supreme Court and the 11th Circuit. Under Wheat v. United States, 486 U.S. 153 (1988), the two major questions presented in a situation when an attorney seeks to represent multiple clients in the same case are whether the proposed representation violates applicable ethical rules or undermines the public's perception of the fairness of the given trial. Under Wheat and United States v. Ross, 33 F.3d 1507 (11th Cir. 1994), cert. denied, 515 U.S. 1132 (1995), the considerations relating to public perception also include more broadly the Court's "independent interest in ensuring that . . . legal proceedings appear fair to all who observe them," Wheat, 486 U.S. at 160, and "the integrity of the judicial system," Ross, 33 F.3d at 1524. As explained at pages 2-10 of the government's appeal, Falcon's proposed representation arrangement fails that test.

3.     Falcon's discussion of the impact of the duty of loyalty (Falcon Response, at 7-11) upon his proposed representation arrangement contains a disturbing statement that highlights one

of the chief problems with the representation arrangement. In support of his contention that the duty of loyalty impacts upon Mr. Bergendahl's proposed representation of Falcon in light of his prior representation of Valverde, Falcon quotes commentary to Rule 4-1.9 of the Rules Regulating the Florida Bar which states that "[t]he underlying question is whether the lawyer . . . can be justly regarded as changing sides in the matter." Falcon identifies the difference between that situation and this case as being that "the *client* has made the decision to "change sides" *after* the prior attorney-client has been terminated" (Falcon Response at 8 (emphasis in original)). The finger-pointing contained in this statement is misplaced, for it was Mr. Bergendahl who in November 2000 decided to take on Falcon as a client – while still representing defendant Valverde and without Valverde's consent. More importantly, the whole notion that Mr. Bergendahl's loyalty to Valverde turns on whose "side" Valverde chooses to stand – the government or the Magluta-Falcon organization – confirms a point at the very heart of the government's motion for disqualification. Reasonable members of the public may view Mr. Bergendahl's choice of Falcon over Valverde as a selection in an organized crime case of fidelity to a wealthy high-level criminal defendant over fidelity to a comparatively lower-level client who is trying to mitigate the 168-210 month guideline sentence. Falcon's insinuation that by abandoning Valverde, Mr. Bergendahl has not changed sides – only Valverde has – adds force to that message.[1]

4.     Falcon complains that the government asks the Court to treat Mr. Bergendahl differently than other attorneys for whom the government has agreed to waive conflicts (Falcon

---

[1]In support of his argument that no duty of loyalty problems exist, Falcon states that "based upon the information thus far proffered by the government, it does not appear that Valverde would have to be cross-examined by counsel for Mr. Falcon" (Falcon Response, at 10). If the Court does not grant the government's motion for disqualification, the government respectfully requests that at the time of trial the Court hold Falcon to this pledge.

Response at 11 n.4). All of the situations cited by Falcon are distinguishable. The situation involving Richard Diaz, Esq., who represented defendant Miguel Vega in this case, arose from his prior representation of government witness Frank Rubino, Esq. In contrast to this case, Mr. Rubino was an immunized witness and not a cooperating co-defendant and agreed to waive the conflict from Mr. Diaz's prior representation of him.[2] The situation involving Jeffrey Weinkle, Esq., arose from his prior representation of government witness Carlos Roig. In contrast to this case, the evidence relating to Mr. Weinkle's client in this case (Juan Hernandez) did not involve the subject of Roig's testimony– that is, activities within the federal prison systems or activities relating to obstruction of inmate-testimony – and Roig's testimony was not expected to implicate defendant Hernandez (and did not implicate him at trial). The situation involving Stephen Bronis, Esq., arose from his law partner's representation of government witness Carlos Canet, Esq. In contrast to this case, Mr. Canet was an immunized witness and not a cooperating co-defendant and agreed to waive the conflict from Mr. Bronis's partner's representation of him. The situation involving Mel Black, Esq., arose from an entry in the ledger seized from Marilyn Bonachea that reflected a payment of $30,000. Mr. Black's name was redacted from the ledger. None of these situations are analogous to the situation presented in this case.

5.     Falcon's discussion of the potential breach of the duty of confidentiality owed to Valverde by Mr. Bergendahl (Falcon Response at 11-15) is likewise troubling. On the one hand,

---

[2]A second situation arose involving Mr. Diaz that stemmed from his representation of immunized government witness Mario Vandenedes. In contrast to this case, Mr. Vandenedes was an immunized witness and not a cooperating co-defendant. Moreover, his testimony related solely to the 1987 incident in which he, defendant Valverde, and two other Magluta associates (Jesus and Reynaldo Fandino) traveled from Miami to Los Angeles in order to bond out Magluta, with Magluta subsequently jumping the bond. Vandenedes's testimony had minimal or mo relevance to Mr. Diaz's client in this trial, defendant Vega.

4

Falcon does not contest one of the core arguments supporting the government's motion for disqualification – that Mr. Bergendahl owes Valverde "the duty to not use confidential information gained during [his] representation to [his] detriment" (Falcon Response at 14 n.6). Falcon, however, provides no viable explanation for how Mr. Bergendahl can realistically perform the cognitive gymnastics required to segregate the confidential information learned from Valverde (or the information derived from those confidences) in a 15-month relationship that included a 2-month trial from the information that he uses to defend Falcon. Lacking such an explanation, Falcon invokes another disturbing notion, complaining that the Court instead should adopt the rule that a cooperating witness constructively waives the attorney-client privilege once he starts cooperating, since law enforcement invariably will question the witness about the witness's prior misconduct (Falcon Response at 11-13). Falcon cites no case law for this proposition. Moreover, the argument simply reinforces the tenor sounded by the proposed representation arrangement – that in an organized crime case the zeal with which an attorney should safeguard the ethical duties owed to a client depends upon which "side" the client is on, the criminal organization or law enforcement.

6.     As noted above, Wheat v. United States, 486 U.S. 153 (1988), permits the Court to disqualify an attorney in a multiple representation situation when the proposed representation violates applicable ethical rules or undermines the public's perception of the fairness of the given trial, with the considerations relating to public perception also including more broadly the Court's "independent interest in ensuring that . . . legal proceedings appear fair to all who observe them." See id. at 160. Falcon tries to evade the appearance of impropriety issues in this case by insinuating that the government's motion to disqualify stems from Valverde's purported "collu[sion] with the prosecution in a desperate effort to curry favor before sentence is passed" (Falcon Response at 16).

5

Falcon also incorrectly contends that case law does not allow for disqualification based upon public perceptions of the propriety of legal proceedings. In support of his claim, Falcon cites to cases that pre-date Wheat and thus are superseded by Wheat: United States v. Washington, 797 F.2d 1461 (9th Cir. 1986), and Waters v. Kemp, 845 F.2d 260 (11th Cir. 1988). The other case – United States v. Martin, 824 F. Supp. 208, 210-11 (M.D. Ga. 1993) – recognized that in some cases an appearance of impropriety can justify disqualification. Without citing Wheat, the Court in Martin found the facts of the case were not sufficient to call for disqualification.

7.      Falcon spends the last nine pages of his response (Falcon Response at 18-27) addressing the relevance of United States v. Abbell, 939 F. Supp. 860 (S.D. Fla. 1996), and United States v. Hanania, 989 F. Supp. 1187 (M.D. Fla. 1997), to the question presented. In this regard, the government relies on the analysis within pages 10-15 of its appeal of Judge Bandstra's Order that explains why these cases are distinguishable. Both the government's motion to disqualify and its appeal of Judge Bandstra's Order explain that United States v. Miranda, 936 F. Supp. 945 (S.D. Fla. 1996); United States v. Culp, 934 F. Supp. 394, 397-400 (M.D. Fla. 1996); United States v. Davis, 780 F. Supp. 21 (D.D.C. 1991); United States v. Cheshire, 707 F. Supp. 235, 237-40 (M.D. La. 1989), provide the fact patterns more comparable to the issues in this case and require disqualification. Rather than restate its analysis of these cases, the government relies upon its earlier submissions.

6

8.    In all other respect, the government relies upon its earlier submissions and respectfully requests that the Court reverse the Order of Judge Bandstra denying the motion to disqualify Mr. Bergendahl.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By:

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this __ day of September 2001, a true copy of the foregoing was mailed to:

Martin G. Weinberg, Esq.
20 Park Plaza, Suite 905
Boston, MA 02116

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600
Miami, FL 33131

Jacob M. Denaro, Esq.
7700 N. Kendall Drive, Suite 504
Miami, FL 33156-7566

John Bergendahl, Esq.
701 Brickell Avenue, Suite 2080
Miami, FL 33131

Louis St. Laurent, Esq.
220 N.W. 122nd Avenue
Coral Springs, FL 33071

Jeffrey Weiner, Esq.
9130 S. Dadeland Boulevard, Suite 910
Miami, FL 33156

Frederick R. Mann, Jr.
415 E. Central Blvd.
Orlando, FL 32801

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY

NIGHT BOX
FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JUL 2 6 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

Case No. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA,

v.

AUGUSTO GUILLERMO FALCON,

Defendant.
_____/

**UNITED STATES' REPLY TO DEFENDANT FALCON'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY RICHARD J.
DIAZ, ESQ., WITH INCORPORATED MEMORANDUM OF LAW**

The United States of America, through its undersigned counsel, respectfully submits the

following reply to defendant Falcon's response to its Motion to Disqualify Attorney Richard J. Diaz.

For the sake of brevity, the government incorporates by references the arguments it raised

in its initial motion to disqualify Mr. Diaz and during the hearing before Magistrate Judge Bandstra

on July 17, 2002. In its motion and during the hearing, the government advanced multiple reasons

for disqualifying Mr. Diaz from representing Falcon. When multiple potential bases support

disqualification, the Court's decision must turn on consideration of the various grounds in aggregate.

*See United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994).

In response to the disqualification motion, Falcon argues against Diaz's disqualification,

despite Diaz's prior representation of Gilberto Barrios – who now is a government witness against

Falcon – claiming: (1) Barrios' testimony "lacks relevancy and is cumulative of voluminous

evidence available to the prosecution from other sources"; (2) the Bar's ethical rules regarding

conflicts of interest do not compel disqualification because Diaz's representation of Falcon is not

materially adverse to Barrios' interests in the same or substantially the same case; (3) Barrios waived

his attorney-client privilege by implicating Diaz in his prior perjured testimony; (4) the appearance of public propriety can be maintained even if Barrios testifies; and (5) the government's motion was untimely and "motivated by improper tactics." The arguments are factually and legally meritless.

## ARGUMENT

1.   **Falcon's Claim that Barrios' Testimony Is Immaterial and Unnecessary is Specious.**

Falcon disingenuously argues that, because Barrios is not charged as a codefendant or co-conspirator in any of the offenses charged against him, and he offers no testimony about any overt acts of the conspiracy or substantive counts, his testimony is immaterial to the government's case. He further claims that, because Barrios did not testify before any grand jury investigating Falcon, or at trial against Falcon's codefendants, his testimony is unnecessary against Falcon. These arguments are meritless. First, there is no real dispute that Mr. Barrios is one of Falcon's co-conspirators. Even though he was not charged in this case, the indictment did not name him as a co-conspirator or mention him in the overt acts, Barrios is nonetheless a co-conspirator of Falcon.[1] It is readily apparent that Barrios was a co-conspirator in the Magluta/Falcon drug organization and that activities alleged in Case No. 91-6060-Cr-Moreno form the basis for the specified unlawful activity charged in the money laundering conspiracy in this case. Even though not named in the indictment as a co-conspirator, Barrios is a co-conspirator nonetheless and his information is highly relevant to this case. Also, as this Court is well-aware, the government is not limited to proving its case against a defendant only through the overt acts specifically identified in the indictment or through witnesses identified as co-conspirators in the indictment.

---

[1]   Ironically, when representing Barrios in 1998 in Case No.95-324-Cr-Nesbitt, Diaz readily-acknowledged that his case was a "spin-off" of the Magluta/Falcon case. *See* Exhibit A. The Eleventh Circuit Court of Appeals likewise recognized Barrios as a participant in the Magluta/Falcon organization in its opinion affirming his conviction and sentence. *See* Exhibit B.

2

As previously argued, Barrios' testimony is highly relevant and material to proving the government's case against Falcon and his codefendants. In establishing the existence of a money laundering conspiracy, the government must prove that the funds laundered were proceeds of a specified unlawful activity which, in this case, was drug trafficking activities of Salvador Magluta and Falcon. Even though the government is not *required*, in proving the money laundering conspiracy charge against Falcon, to show that Falcon participated in the underlying specified unlawful activity, it certainly has the right to prove his involvement in the specified unlawful activity for the purpose of establishing his knowing participation in the money laundering conspiracy. The government's case is significantly strengthened against Falcon if it proves, through Barrios' testimony, that Falcon directly participated in the underlying drug crimes from which the proceeds were later laundered.[2] Contrary to Falcon's claims, the government should not be required to present a weaker, circumstantial case against Falcon merely because he assumed the risk of hiring counsel who, by virtue of prior representation of a co-conspirator who has come forward to cooperate against Falcon, may be disqualified.[3] *United States v. Cortellesso*, 663 F.2d 361, 363 (11th Cir. 1981) (government not required to accede to truncation of its evidence to extent that it would settle for less than its best evidence). Additionally, Barrios's testimony relates directly to the conspiracy to obstruct justice charge based on the organization's intimidation of potential witnesses, murder attempts, and bribery of jurors. Thus, Barrios' direct evidence concerning Falcon's participation in the underlying drug trafficking offenses and other organization members' actions in intimidating and

---

[2]    Although, as Falcon notes, the government has substantial direct evidence of Magluta's participation in the drug trafficking offenses, its evidence relating to Falcon is largely circumstantial. Thus, Barrios' testimony is important direct evidence of Falcon's involvement.

[3]    This is not a situation where no other qualified counsel were available to represent Falcon. Miami has a large, talented federal criminal defense bar. Any number of non-conflicted, qualified criminal defense attorneys could represent Falcon at trial in this case.

bribing witnesses and jurors, and attempting to murder potential government witnesses relates directly to the charges against Falcon and, thus, is highly relevant and material to this case.

2.    **Ethical Considerations Require Diaz's Disqualification.**

a.    **Diaz's Representation of Falcon and Barrios Is Substantially Related.**

Falcon disingenuously argues that Diaz's representation of Falcon would not violate Diaz's ethical duties, despite having represented Barrios (who will be a witness against Falcon), because the matters are not the same or substantially related. Ironically, in pleadings Diaz filed on behalf of Barrios, he referred to that case as a "spin off" of the Magluta/Falcon case in 91-6060-Cr-Moreno. *See* Exhibit A. Additionally, the Eleventh Circuit also considered Barrios' case to be directly related to the Magluta/Falcon case. Even a cursory review of the seventh superseding indictment in this case reveals that it is directly related to Case No. 91-6060-Cr-Moreno. Thus, it is substantially related to Barrios' case.

b.    **Diaz's Continuing Duty to Barrios Prevents Him from Representing Falcon**

Because Barrios directly implicates Falcon in criminal wrongdoing, Falcon's claim that their interests are not materially adverse is laughable. Barrios has refused to waive the obvious conflict of interest created by Falcon in hiring Diaz as counsel. Barrios is entitled to continued protection of his interests, regardless of whether Falcon has opted to waive his protection from the clear conflict of interest.[4] Both ethical considerations and the attorney-client privilege extend Diaz's obligation

---

[4]       Falcon attempts to pigeonhole this issue into one in which the government must prove that an attorney's duty to his former client extends only to obtaining future benefits for him – such as in obtaining a Rule 35 reduction in sentence. The duty extends well beyond that, into preserving client confidences and not presenting his client in a negative light. He also misreads *Fed.R.Crim.P.*35. Although it generally prohibits sentence reductions based on information provided more than a year after sentencing, the rule allows consideration of otherwise time-barred information offered in combination with new information. *See Fed.R.Crim. P.* 35(b).

to protect those interests, even though he no longer represents Barrios. *See United States v. Miranda*, 936 F. Supp. 945, 949-50 (S.D. Fla. 1996).

### 3.   **Barrios' Cooperation Does Not Extinguish His Attorney-Client Privilege**.

Falcon's additional argument that Barrios waived his attorney-client privilege by cooperating with the government and implicating Diaz in Barrios' perjury during his own trial is unpersuasive and is an incorrect application of the law of waiver. Merely because Barrios has decided to cooperate with the government does not mean that he has waived his attorney-client privilege with Diaz. The privilege protects **communications** between a client and counsel. Although, by admitting that he had perjured himself during his own trial, with Diaz's knowledge and advice, those communications between Barrios and Diaz about Barrios' intent to provide perjured testimony are no longer privileged.[5] *See United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir. 1975). Nonetheless, all of Barrios' other communications with Diaz remain privileged. To the extent that Falcon claims that Barrios' communications with Diaz concerning his perjured testimony are no longer protected by the attorney-client privilege under the "crime-fraud" exception, he disregards that, to the extent that the communications constitute a crime, Diaz's participation is a further basis

---

[5]      Even so, as counsel for Falcon, Diaz cannot defend himself against Barrios' accusations and cannot be called as a witness by Falcon to counter Barrios' testimony. *United States v. Defazio*, 899 F.2d 626, 631 (7th Cir. 1990) (role as witness requires disqualification). The Eleventh Circuit also has held that expectations that a witness' testimony would portray the defendant's attorney as having engaged in improper and unethical conduct would impugn severely the attorney's integrity and credibility in the jury's eyes. *United States v. Hobson*, 672 F.2d 825, 828-29 (11th Cir. 1982), *overruled on other grounds by Flanagan v. United States*, 465 U.S. 289 (1984). As such, the Court found the testimony warranted counsel's disqualification and outweighed the defendant's interest in being represented by that attorney. *Id.* It explained that disqualification was proper because of the appearance of impropriety on the part of the attorney, even if there is no evidence of actual wrongdoing on his part. *Id.* If further held that a defendant cannot waive the problem in order to have the benefit of his attorney's continued representation in the case. *Id.* Thus, it found that the defendant's "desire to be represented by particular counsel must yield to the need to protect the public's confidence in our system of justice." *Id.* at 829.

for his disqualification.[6] Falcon also argues that, when Barrios alleged wrongdoing on Diaz's part, Diaz is permitted to defend himself against those allegations. In a civil suit or in a Bar grievance situation, Diaz certainly could defend himself against the accusations by using attorney-client privileged communications directly related to the accusations lodged against him. *See Armstrong v. United States*, 440 F.2d 658, 659 (5th Cir. 1971) (when defendant attacked plea in § 2255 proceeding on ground that it was not intelligently and knowingly entered, and offered testimony of conversations with counsel regarding entry of guilty plea, he waived right to claim attorney-client privilege as to issue, and admission of testimony of former counsel was not erroneous).[7] However, a criminal trial of another defendant is not the venue for such actions. *See United States v. Ballard*, 779 F.2d 287, 289 (5th Cir. 1985) (lawyer may reveal otherwise privileged communications from clients to recover fee or to defend against improper conduct charges without violating ethical confidentiality rules or attorney-client privilege; however, mere institution of suit against lawyer is not waiver of privilege for all subsequent proceedings, however unrelated). Moreover, as discussed

---

[6]     This is not a situation where a defendant merely tells his counsel of his future intent to commit a crime, thus voiding the attorney-client privilege. According to Barrios, Diaz knew and encouraged him to perjure himself at trial in Case No. 95-324-Cr-Nesbitt. Under that scenario, both Barrios and Diaz were engaged in criminal conduct that invalidated the attorney-client privilege as to those specific communications.

[7]     Even so, in that situation, the waiver of the attorney-client privilege extends only to those communications necessary for the attorney to defend himself against his client's accusations. *See Tasby v. United States*, 504 F.2d 332, 336-37) (8th Cir. 1974) (in §2255 proceeding where defendant testified that he had not wished to testify at trial but that defense counsel had advised and coerced him into doing so, he had waived attorney-client privilege with regard to their communications on whether he should testify at trial). The waiver does not permit unfettered use of otherwise privileged communications between a client and his attorney. *See Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992) (revelation of confidential communications, not the institution of suit, determines whether a party waives the attorney-client privilege, even so, it is only those communications at issue that are waived; and privileged communications cannot be used for benefit of third-parties).

previously, Diaz cannot testify as a witness at trial while representing Falcon, even to defend his own name or reputation. *See generally Defazio*, 899 F.2d at 631.

4.    **The Public Integrity of the Trial Mandates Diaz's Disqualification.**

Falcon claims that the public integrity of the upcoming trial can be maintained with both Diaz's continuation as his counsel, and Barrios testifying as a government witness against Falcon. His argument is unpersuasive and is not supported by the case law upon which he relies.[8] Falcon's suggestion of having different counsel cross-examine Barrios, with Diaz absent from the courtroom, is not a remedy. He also could not share Barrios' confidences with his co-counsel. It is difficult to imagine that an attorney, even when acting with the best of intentions, could segregate all confidential information that he had learned from one client in the course of a lengthy case when molding trial strategies of a subsequent client charged in the same or related case. Also, as counsel for Falcon, Diaz necessarily would have to take part in efforts to blunt the impact of Barrios's cooperation. This would go beyond merely cross-examining Barrios and would include attempting to lessen the value of evidence associating Falcon with criminal activity by challenging evidence corroborating Barrios' testimony, such as attacking testimony of Pedro Rosello, Federico de la Cruz,

---

[8]    In *United States v. Abbell*, 939 F. Supp. 860 (S.D. Fla. 1996), the court did not disqualify attorney Srebnick from acting as counsel for Abbell even though he had represented a former co-defendant who would testify as a government witness at trial because the witness and Abbell had no contact with each other and Abbell's defense at trial would be independent of the witness' interests. That is not the case here where Barrios directly implicates Falcon. Also, in *United States v. Hanania*, 989 F. Supp. 1187 (M.D. Fla. 1997), that court did not disqualify counsel who previously had represented a witness who would testify at trial of attorney's current client because the witness had only potential conflict when it was not clear the witness would testify against the defendant rather than against a codefendant. This case is more analogous to *Miranda*, 936 F. Supp. at 949-50 (S.D. Fla. 1996), in which the court found that disqualification was required because the attorney's witness client objected to the attorney's simultaneous representation of the defendant. That court also rejected a suggestion, such as Falcon's suggestion, for back-up counsel. *Id.* at 950-51. Here, Barrios has refused to waive his right to conflict-free counsel and back-up counsel is not a viable alternative. Thus, this Court should follow the same course as the court in *Miranda* and disqualify Diaz.

Sergio Crego, Special Agents James Capra, Kent Paulin, and David Borah, Marilyn Bonachea, and Carlos Canet. Also, Diaz's continued presence at trial affects the public integrity of the trial because the evidence also would raise the jury's concerns about Diaz's ethics and credibility because it necessarily would implicate Diaz in Barrios's decision to lie in his own defense at the trial in Case No. 95-324-Cr-Nesbitt.. Consequently, those concerns could negatively affect Falcon. When a defense attorney's character or truthfulness is impugned at trial, courts have found that "such remarks can prejudice the defendant by directing the jury's attention away from the legal issues in or by inducing the jury to give greater weight to the government's view of the case." *United States v. Xiong,* 262 F.3d 672, 674 (7th Cir. 2001). Here, Barrios' remarks against Diaz are material and relevant to the trial issues and, thus, admissible. Thus, Diaz's presence and continued representation of Falcon at trial jeopardizes the integrity of the proceeding and compels his disqualification.

5.    **The Government Committed No Misconduct in Filing the Disqualification Motion.**

Equally unavailing is Falcon's claim that this Court should deny the disqualification motion because of its timing.[9] Only through conjecture, Falcon accuses the government of having committed misconduct in its actions seeking Diaz's disqualification. As an initial matter, Falcon wholly disregards the fact that, even had the government not filed a disqualification motion, this Court, *sua sponte,* would have had to address the issue once the government announced its intent of

---

[9]In part, Falcon claims that the government's efforts in seeking Diaz's disqualification stem from its interest in removing a "talented" lawyer from the case. That accusation is baseless. This Court can take note that Diaz had prior conflicts in this case, by virtue of his previous representation of two other co-conspirators and a grand jury witness (attorney Frank Rubino) who is a likely witness in this case. Nonetheless, the government did not seek Diaz's disqualification in any of those instances because the former clients waived their rights to conflict-free counsel (as did Falcon), the two co-conspirators are not cooperating with the government at this time, and Mr. Rubino's testimony does not directly implicate Falcon. Therefore, had Barrios not come forward and cooperated, the government would not have sought to disqualify Diaz. However, because Barrios is an important witness who directly implicates not only Falcon, but Diaz as well, the circumstances require Diaz's disqualification.

8

calling Barrios as a witness. *See Wheat v. United States*, 486 U.S. 153, 160 (1988); *United States v. Coleman*, 997 F.2d 1101, 1103 (5th Cir. 1993). Falcon also disregards Diaz's own obligation to alert the Court once the prosecutor advised him of the government's interest in calling Barrios as a witness against Falcon. *Holloway v. Arkansas*, 435 U.S. 475, 485-86(1978) (defense attorneys have obligation, upon discovering conflict of interest, to advise court at once).

Falcon's additional argument of government misconduct by accusing the government of "planting" Barrios as a government agent next to Magluta in an effort to unlawfully obtain his confessions is offensive and libelous. In so arguing, Falcon misstates the facts. The government writted Barrios here after a family friend stated that he might want to cooperate.[10] Barrios, in his own testimony, stated that he had not definitively decided to cooperate, even after arriving here in March of 2002. Also, contrary to Falcon's fallacious claims, government agents and attorneys did not speak or meet with Barrios until April 11 or 12, 2002 – less than a week before the April 16, 2002 hearing regarding allegations of Magluta's jury tampering. By that time, the prosecution team had only met with Barrios during that one two-hour meeting.[11] Therefore, the meeting took place **after** Magluta and Barrios already had conversed. Following that meeting, Barrios was placed in the Special Housing Unit (SHU) at the Federal Detention Center (FDC) and, therefore, had no further contact with Magluta after it became clear that he would cooperate. Thus, Barrios was not a government agent when Magluta initiated conversations. Likewise, the prosecution team took no

_____

[10]    Nothing insidious can be read into the government's decision to obtain a writ to temporarily transfer a prisoner to this district on the belief that he may be interested in cooperating with the government and testifying at trial. As the record in this case shows, defense counsel have sought writs for the temporary transfer of numerous prisoners on the belief that they might cooperate and testify on behalf of the defendants.

[11]    Although Barrios had arrived at FDC earlier, the prosecutors and agents were feverishly preparing for trial against Magluta and did not have the luxury of additional time to meet with Barrios who, at that time, remained unsure as to whether he would cooperate.

9

part in assigning Barrios' housing upon his arrival. Barrios was transferred to SHU for his own

safety only after it was apparent that he would cooperate against Magluta and his co-conspirators.

Equally ridiculous is Falcon's suggestion that the prosecution delayed addressing Diaz's

disqualification issue to allow Barrios to elicit incriminating statements from Magluta.[12] As of the

April 16th hearing, it was not yet clear – based only on one two-hour meeting – whether the

government would call Barrios as a witness against Falcon.[13] Therefore, not until after that hearing,

did prosecutors determine that Barrios' testimony would be important against Falcon, and thereafter

they advised Diaz and this Court of the conflict and of their intent to seek Diaz's disqualification.[14]

Finally, because the government raised the conflict issue as soon as practicable, in light of

counsel's onerous trial obligations, and because other equally-talented criminal defense counsel are

available to represent Falcon, he will not be substantially prejudiced by Diaz's disqualification.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court disqualify

Richard J. Diaz, Esq. from further representation of defendant Falcon based on a conflict of interest

resulting from his prior representation of Falcon's co-conspirator Gilberto Barrios.[15]

---

[12]    Even assuming, *arguendo*, that the government had improperly used Barrios to
interrogate Magluta, Falcon would lack standing to challenge its actions against Magluta.

[13]    The execution of a cooperation agreement does not assure that the government
will use a cooperating individual as a trial witness. Thus, Barrios' execution of an agreement did
not yet raise the potential conflict to the level of an actual conflict until such time as the
government had determined that it would call him to testify against Falcon and his codefendants.

[14]    As previously noted, the prosecutors were in the midst of jury selection in the
Magluta trial when this issue arose. Therefore, their attentions were focused on that trial at the
time, which delayed their ability to actually file the disqualification motion, although they already
had verbally advised this Court and Diaz of the conflict as soon as it was apparent.

[15]    Should this Court refuse to disqualify Diaz, and also refuse to permit Barrios to
testify on the government's behalf, the Court's pretrial suppression of Barrios' testimony would

10

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY


By: _____

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
99 N.E. 4th Street, Eighth Floor
Miami, FL 33132-2111
Tel.    (305) 961-9345
FAX    (305) 536-4675

---

be subject to interlocutory appeal.

11

(

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 29, 2002, copies of the foregoing reply were mailed,

postage prepaid, to the following counsel of record:

Kenneth J. Kukec, Esq.                  Katherine Ferro, Esq.
2 South Biscayne Boulevard, Suite 2600  701 Brickell Avenue, Suite 2080
Miami, FL 33131-1802                     Miami, FL 33131

Edward Shohat, Esq.                      Alan Ross, Esq.
Bierman, Shohat, Loewy & Klein, P.A.    Robbins, Tunkey, Ross, et al.
800 Brickell Avenue, Penthouse 2        2250 S.W. 3rd Ave.
Miami, FL  33131                         Miami, FL  33129

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134


MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY

Mr.210

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

MANUEL MAGLUTA,

Defendant.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S APPEAL OF ORDER OF MAGISTRATE JUDGE DISQUALIFYING ATTORNEY EDWARD SHOHAT

The United States of America, through the undersigned Assistant United States Attorneys,

files this response to the appeal of defendant Manuel Magluta to the order of United States

Magistrate Judge Ted E. Bandstra granting the government's motion to disqualify attorney Edward

Shohat, which was premised upon the government's intent to call Mr. Shohat as a witness at trial.

For the following reasons, the appeal should be denied.

## I.   JUDGE BANDSTRA'S ORDER

At page 4 of his order, Judge Bandstra outlined the general rule governing the government's

motion:

> The Court, in resolving this motion, first recognizes that the Sixth
> Amendment guarantees a criminal defendant the right to assistance
> of counsel for his defense and that a defendant has a presumptive
> right of counsel of his choice. Wheat v. United States, 486 U.S, 153,
> 154 (1988). However, this right is not absolute and the presumption
> may be overcome by the government's demonstrating an actual
> conflict or a serious potential for conflict for the attorney in
> representing a particular defendant. Id. Moreover, in addition to a
> defendant's Sixth Amendment interest in effective representation, the

> federal court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all who observe them." Id. at 160. The evaluation of the facts and circumstances in each case under this standard is left to the informed judgment of the trial court. Id.

At the bottom of page 4 over to the top of page 5 of his order, Judge Bandstra framed the issue as turning upon the necessity of Mr. Shohat's testimony. Over the rest of page 5 of his order, Judge Bandstra then surveyed the various reasons outlined by the government for the necessity of Mr. Shohat's testimony. Judge Bandstra then noted that the defendant accepted the government's recitation as to the substance of Mr. Shohat's testimony and the premise that Mr. Shohat could not be a government witness and represent the defendant at trial.[1]

Judge Bandstra then evaluated the defendant's proposed stipulation and his claim that the Court should compel the government to accept the stipulation in lieu of Mr. Shohat's live testimony. At pages 6-7 of his order, Judge Bandstra rejected this argument. Judge Bandstra found that Mr. Shohat's testimony both was relevant and could not be obtained from any other source. Judge Bandstra determined that the proposed stipulation was not an adequate substitute for Mr. Shohat's live trial testimony. Judge Bandstra recognized the case law holding that the government need not resort to evidence other than counsel's testimony, "'if it means that the government must settle for less than its best evidence.'" United States v. Diozzi, 807 F.2d 10, 13 (1st Cir. 1986) (quoting United States v. Cortellesso, 663 F.2d 361, 363 (1st Cir. 1981).

---

[1] It is well-accepted that an attorney should not act as both an advocate and a witness in the same proceeding. See United States v. Defazio, 899 F.2d 626, 631 (7th Cir. 1990); Model Rules of Professional Conduct 3.7.

Judge Bandstra found that based upon the government's submissions Mr. Shohat's testimony is relevant to the government's case, that it cannot be obtained through any other source, and that the defendant's stipulation was not an adequate substitute for Mr. Shohat's live testimony. At pages 6-7 of his order, Judge Bandstra explained:

> Here, the best evidence of factual matters available through Mr. Shohat is clearly his live testimony at trial. The proposed stipulation, while containing much of the same information, is arguably incomplete and understandably less effective than live testimony from Mr. Shohat. Moreover, this lengthy stipulation is potentially confusing if simply read to the jury and fails to explain the unavailability of the subject attorney. Thus, the undersigned finds that the government has established the need for Mr. Shohat's live testimony at trial – as needed in the initial trial proceedings in this case – so that his disqualification is required under the above authority.[2]

## II.   DEFENDANT'S ARGUMENT

As before Judge Bandstra, the defendant does not contest the accuracy of the government's proffer of Mr. Shohat's testimony. Nor does the defendant challenge the proposition that Mr. Shohat cannot act as trial counsel if he testifies as a government witness.

However, the defendant suggests that Judge Bandstra incorrectly assessed the relevance and value of Mr. Shohat's testimony and maintains that under United States v. Diozzi, 807 F.2d 10 (1st Cir. 1986), Judge Bandstra should have required the government to accept the defendant's proposed stipulation. The defendant further contends that Judge Bandstra's order runs counter to United States v. Crockett, 506 F.2d 759 (5th Cir. 1975).

---

[2]In reaching this conclusion, Judge Bandstra further noted at page 7 of his order that before Mr. Shohat entered his notice of appearance the government advised him of his intent to call him as a witness and thus that the defendant was aware of the conflict before Mr. Shohat entered his permanent appearance.

### III.   ANALYSIS

Because Judge Bandstra's ruling relates to a non-dispositive matter, under 28 U.S.C. §636(b)(1)(A) it is reversible only upon a finding that it is "clearly erroneous or contrary to law." The defendant cannot meet that showing.

### A.   *The Defendant's Reliance upon United States v. Diozzi, 807 F.2d 10 (1ˢᵗ Cir. 1986), Is Misplaced*

In contending that Diozzi requires that the Court deny the government's motion, the defendant misreads that case.

#### 1.   Holding in Diozzi

In Diozzi, the defendants were charged with multiple counts of tax evasion. Following the commencement of the IRS investigation of the case, the defendants hired Attorney Twomey, who in turn hired an accountant to assist him. Attorney Twomey then presented to the IRS a 53-page document, based upon the accountant's work, which made various factual representations in an attempt to contest the evidence of the defendant's criminal intent. Attorney Twomey also was present when the accountant made a verbal presentation of the defendants' position to the IRS. See 810 F.2d at 11.

Prior to indictment, Attorney Twomey withdrew and was replaced by Attorney Lehman, who hired a second accountant. With the accountant's assistance, Lehman prepared a 44-page memorandum that contained factual information from Attorney Twomey's submission and made arguments in support of the defendants' defenses, which he ultimately submitted to the IRS. See id.

Following the return of the indictment, Attorneys Twomey and Lehman entered the case as defense counsel. Six days before trial, the government moved to disqualify both attorneys on the

4

ground that it intended to call both as witnesses. The government sought to call the attorneys as witnesses in order to testify to sixteen statements in the written submissions that the government contended were false and misleading, which the government contended was the best evidence of the defendants' scheme to conceal their alleged tax fraud. See id. at 12.

The defendants opposed the motion. As a substitute for disqualification, the defendants agreed to stipulate to the statements in the written submissions that the government sought to offer in evidence and agreed to stipulate that the submissions were made by counsel acting under valid power of attorney. See id. Without making findings, the District Court granted the motion for disqualification. Although the government called the attorneys as witnesses, the District Court limited their testimony to their memories of the content of the written submissions and the facts contained in the power of attorney forms. See id.

On appeal, the First Circuit reversed. The Court recognized that under its decision in United States v. Cortellesso, 663 F.2d 361 (1st Cir. 1981), "the government need not resort to evidence other than defense counsel testimony 'if it means that the government must settle for less than its best evidence.'" Diozzi, 810 F.2d at 13 (quoting Cortellesso, 663 F.2d at 363). However, the Court determined that a written stipulation to the attorneys' testimony constituted the best evidence of the facts at issue. "The most accurate evidence of the statements was not counsel's memories of the contents of the submissions, but the written submissions themselves." See Diozzi, 810 F.2d at 13. The Court also noted that the relevant contents of the written submissions easily could have been reduced to a typewritten stipulation, which likely would have been less confusing to the jury than the attorneys' testimony. See id.

## 2.   <u>Diozzi is Distinguishable</u>

Unlike the situation in <u>Diozzi</u>, the proposed stipulation is far from the "best evidence" through which to present the facts known to Mr. Shohat. As noted by the Court in <u>Diozzi</u>, the attorneys' testimony in that case essentially amounted to reciting their own written statements to the IRS, thus rendering an actual writing better than testimony. Unlike the attorneys in <u>Diozzi</u>, Mr. Shohat's testimony cannot be characterized as merely publishing statements contained in one or two written memoranda.

Rather, Mr. Shohat's testimony covers a variety of subjects. Subjects of Mr. Shohat's testimony include his participation in a hand-to-hand cash transaction of approximately $150,000 with an anonymous courier; his conversations or encounters with various individuals, including the anonymous cash courier, Case No. 91-6060-Cr-Moreno co-defendant Victor Alvarez, and defense attorneys in Case No. 91-6060-Cr-Moreno; his knowledge of various details relating to at least a dozen different individuals; and the meaning of various entries in either seized records or records produced pursuant to subpoena.

The key subject of Mr. Shohat's testimony of course is a factual event, which is the incident in which an anonymous courier appeared unannounced at his office on behalf of Alvarez, delivered a briefcase containing close to $150,000 cash, and raced out of Mr. Shohat's office without providing identification or asking for a receipt. Important subjects related to this event include conversations that Mr. Shohat had with various individuals, including:

- Mr. Shohat's testimony regarding the subsequent facially incredible statements made to him by Alvarez that the individual(s) responsible made the $150,000 payment in cash and resisted providing identification, not because the funds were tainted, but because they did not "want to become involved in the case";

6

- Mr. Shohat's testimony confirming that he had discussed the restraining order in Case No. 91-6060-Cr-Moreno with Alvarez at the start of his representation; and

- Mr. Shohat's testimony that he had discussed the restraining order with other Case No. 91-6060 defense attorneys (thus confirming that others in the defense team had knowledge of the restraining order during the pendency of the case).

Other relevant testimony from Mr. Shohat either confirms the illicit source of funds for this transaction and the remainder of the fee paid for his representation of Alvarez or the involvement of the Magluta-Falcon organization as the source of the funds. Such testimony includes:

- Alvarez's failure to provide any independent verification that the $150,000 cash delivered by the courier was untainted;

- The appearance on the Alvarez client card in Mr. Shohat's fee records of Isabel Magluta's name and several phone numbers, coupled with Mr. Shohat's inability to explain why she is listed on the client card;

- The appearance on the Alvarez client card in Mr. Shohat's fee records of the name of Dawn Hoffer (who other evidence will identify as a young woman who was employed by the organization to serve as a jailhouse babysitter and do other favors and who was paid through the Marilyn Bonachea ledger under the code name "Dawn"), coupled with Mr. Shohat's inability to explain why she is listed on the client card;

- The appearance of Mr. Shohat's name and contact information in Salvador Magluta's electronic organizer;

- The subsequent $99,000 cash payment for the remainder of Alvarez's fees;

- Mr. Shohat's identification of his law firm billings from the documents seized from Marilyn Bonachea in October 1996, coupled with his inability to explain how they got in her car; and

- Alvarez's ultimate guilty plea and acceptance of a 14-year term of imprisonment without availing himself of the possibility of a reduced sentence by testifying as a government witness against Salvador Magluta and/or Willy Falcon.

7

With the exception of testimony relating to the $99,000 cash payment, all of above-bulleted matters require some testimony from Mr. Shohat beyond publishing records to either confirm that certain information (such as verification as to the source of funds) was not provided to him by Alvarez, or that certain information (such as explanations for the names of Isabel Magluta or Dawn Hoffer on the Alvarez client card) does not exist, or that certain events (such as cooperation with law enforcement by Alvarez) did not take place. The above-recitation does not include Mr. Shohat's testimony regarding his fee arrangements for his representation during the same time periods of organization members Antonio "Tony" Garrudo and Manuel Sires, Sr., which likewise included cash payments and likewise includes evidence associating Garrudo and Sires to the Magluta-Falcon organization. (The entirety of the testimony that the government would anticipate eliciting from Mr. Shohat derives from his direct examination and a portion of his redirect examination from the recent trial of Salvador Magluta. The transcript of that testimony is attached as Exhibit 1.)

Mr. Shohat's testimony requires him to relate the various incidents, conversations, and commercial dealings over the course of his representation of the three different organization members (Alvarez, Garrudo, and Sires, Sr.). His testimony also requires that he discuss his association with and/or knowledge of matters relevant to at least nine other individuals (Alvarez's anonymous courier, Salvador Magluta, Isabel Magluta, Ileana Garrudo, Manuel Sires, Jr., Mark Dachs, Richard Martinez, Marilyn Bonachea, and Dawn Hoffer.) It also requires that his testimony be related to the various exhibits, such as those detailed below:

| Ex # | Description |
|------|-------------|
| 21-a. | Plea agreements of defendant Victor Alvarez in case no. 91-6060 |
| 179. | Ledger seized from Marilyn Bonachea |

8

| Ex # | Description |
|------|-------------|
| 206. | Legal billings of law firm Bierman, Shohat seized during Marilyn Bonachea car stop |
| 529. | Legal fee records produced by law firm of Bierman, Shohat (containing records for representation of Victor Alvarez; Antonio Garrudo, and Manuel Sires, Sr.) |
| 719-b | Print-out from Magluta electronic organizer seized on April 13, 1997 |

Several these exhibits – the Bierman, Shohat billings seized from Marilyn Bonachea and the law firm records produced by the law firm of Bierman, Shohat – have various relevant entries on various different pages that require publication to the jury.

The transcript of Mr. Shohat's direct testimony in the recent Salvador Magluta trial is 37 pages, which means that it would have taken between approximately 45-60 minutes. Ordinarily, parties stipulate to easily understandable facts – such as the testimony of a custodian of records or chain of custody testimony. Parties generally do not seek to present through stipulation evidence regarding the commission of acts in furtherance of a criminal conspiracy that requires a number of steps to explain. Such evidence generally is presented through the testimony of live witnesses – since it is important for the jury to see and hear the witness in order to appreciate and retain the information. The defendant's proposal to condense Mr. Shohat's testimony into a rambling, narrative stipulation renders most of the valuable details of the testimony absolutely incoherent to the jury and saps the testimony it of much of its value.

For these reasons, the facts of this case are not in any way remotely related to the facts in Diozzi. Judge Bandstra's determination that the proposed stipulation is unacceptable is absolutely correct. The defendant certainly cannot show that it is "clearly erroneous or contrary to law," as required by 28 U.S.C. §636(b)(1)(A).

9

### 3. The Fact that Mr. Shohat's Testimony Does Not Directly Implicate Defendant Manuel Magluta Does Not Permit the Court to Require the Government to Settle for a Stipulation in Lieu of Live Testimony

At pages 10-11 of his appeal, the defendant incorrectly suggests that the fact that the value of Mr. Shohat's testimony is indirect and circumstantial should impact upon the question whether to require the government to settle upon a stipulation in lieu of live testimony. The defendant provides no support for this suggestion. Indeed, the defendant's suggestion runs counter to the rule, as set forth in the Eleventh Circuit's Pattern Jury Instructions, that circumstantial evidence is to be accorded no lesser significance than that accorded to direct evidence.

In a complex conspiracy case in which the defendants on trial are not captured on tape meeting with cooperating witnesses or undercover agents, the government's case necessarily will be largely built upon circumstantial evidence. Even though Mr. Shohat did not directly implicate any of the defendants in the Vega trial, as Judge Bandstra noted in his order the government called him as a witness in that trial. (Indeed, Mr. Shohat was an important witness in the recent Salvador Magluta trial, even though he only indirectly implicated Salvador Magluta.) The defendant has no right to use his choice of counsel to undermine the government's ability to rely upon this testimony in his trial or otherwise compromise its ability to prove the charges. See United States v. Cortellesso, 663 F.2d 361, 363 (1st Cir. 1981) ("It is inconceivable that defendant's right to a particular counsel should be permitted to impose . . . artificial disadvantages upon the government.").

### 4. The Defendant's Proposed Stipulation Fails to Explain to the Jury Why the Generic "Attorney" Is Not Available to Testify

In contesting Judge Bandstra's assessment of the shortcomings of his proposed stipulation, the defendant notably does not address what Judge Bandstra recognized to be a serious shortcoming

10

in the stipulation. As Judge Bandstra stated, "[T]his lengthy stipulation . . . fails to explain the unavailability of the subject attorney."

The cash transactions to which Mr. Shohat will testify – particularly the $150,000 hand-to-hand transaction with the anonymous courier who bolted out of his office without leaving identification or seeking a receipt – are textbook concealment-type money laundering transactions. It will be obvious to any reasonable juror that a lengthy stipulation relating to the testimony of an anonymous generic attorney necessarily means that the one of the trial attorneys was a participant in the various transactions.

As the government argued in its response to the defendant's proposed stipulation, the government would be unfairly prejudiced regardless how the Court were to respond. It would be unfair to the government if the jury were not informed that the anonymous attorney is not one of the prosecutors in the case. However, once the jury is led to conclude that the anonymous attorney is associated with the defense, the presence at the defense table of the anonymous attorney will unfairly prejudice the government in several ways. First, it may lead the jury to believe that any interpretation placed on the evidence by the defense has special significance, since one of the defense attorneys was involved in one of the transactions at issue in the case, thus making defense counsel tantamount to unsworn witnesses. See United States v. Locascio, 6 F.3d 924, 933-34 (2d Cir. 1993) (affirming disqualification of defense counsel in part upon attorney's first-hand involvement with evidence offered at trial). Alternatively, it may lead the jury to presume that by allowing the anonymous attorney to participate in the trial, the Court discounts the significance of the government's evidence. See United States v. Gotti, 782 F. Supp. 737, 741 (E.D.N.Y. 1992) (disqualifying defense counsel based upon counsel's first-hand involvement with evidence offered

11

at trial and explaining that counsel's "presence at counsel table could readily serve as a signal to the jury that the court discounts the government's proof on this point – that the court does not believe this evidence").

The defendant's failure to explain how to avoid these problems further defeats the grounds for his appeal of Judge Bandstra's order.

### B.   *The Defendant's Reliance upon United States v. Crockett, 506 F.2d 759 (5th Cir. 1975) Is Similarly Misplaced*

The defendant contends that <u>Crockett</u> requires that the government show that Mr. Shohat's testimony "is both necessary and unavailable from other sources." As explained at pages 12-14 of the government's initial motion to disqualify Mr. Shohat, <u>Crockett</u> is best understood as confirming the principle that an attorney should not act as trial counsel in a case in which he is called as a witness. Because the Court in <u>Crockett</u> affirmed the convictions at issue, the Court's statement that "[a]s a general rule, a party's attorney should not be called as a witness unless his testimony is both necessary and unavailable from other sources," 506 F.2d at 760, has been properly recognized as dictum. <u>See</u> United States v. Cortellesso, 663 F.2d at 363. Any test that would require that the government justify the use of Mr. Shohat's testimony on a standard beyond that required by ordinary application of rules of admissibility under the Federal Rules of Evidence would impose an unjustifiably excessive burden upon the government. To the extent that the language has any independent force, as argued at page 13 of the motion for disqualification, it should be limited to the facts of <u>Crockett</u> – i.e., a situation in which only shortly before trial the government seeks to call a defense attorney as a witness, which given that the government notified Mr. Shohat prior to his entering a permanent appearance that he would be called as a witness is not the situation presented

12

by this case. Rather than repeat these arguments verbatim, the government respectfully refers the Court to pages 12-14 of its initial motion to disqualify.

To the extent that the government needs to justify its decision to call Mr. Shohat, it has done so at pages 14-16 of its initial motion to disqualify. The government likewise incorporates those arguments by reference into this response.

Along these lines, the government notes that even though Mr. Shohat did not directly implicate the defendants on trial in the two trials that he has previously testified, his testimony was relevant to counts of conviction in both trials – the Count 2 money laundering conspiracy conviction in both trials and both objects of the Count 1 conspiracy conviction in the most recent trial. The usefulness of Mr. Shohat's testimony in the earlier trials underscores the government's justification for using it in this trial.

Similarly, the significance of the value of Mr. Shohat's testimony in corroborating Marilyn Bonachea cannot be overlooked. As the Court is familiar from its role in presiding over two previous trials, Marilyn Bonachea's credibility invariably is one of the most significant issues in these case. The Court should reject the defendant's suggestion that he is somehow entitled to use his choice of counsel to handicap the government's efforts in corroborating Bonachea's credibility, or indeed in corroborating any of its evidence in any aspect of its case.

13

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny the defendant's appeal.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:    _____

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

_____

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

14

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 12 day of September 2002, a true copy of the foregoing was mailed or faxed to:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600 701
Miami, FL 33131

Katherine Ferro, Esq.
Brickell Avenue, Suite 2080
Miami, FL 33131

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**NIGHT BOX
FILED**

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)(s)/Bandstra

OCT 18 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
a/k/a Willy,

                           Defendant.
_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT'S APPEAL OF ORDER OF MAGISTRATE JUDGE DISQUALIFYING ATTORNEY RICHARD DIAZ

The United States of America, through the undersigned Assistant United States Attorneys, files this response to the appeal of defendant Augusto Guillermo Falcon to the order of United States Magistrate Judge Ted E. Bandstra granting the government's motion to disqualify attorney Richard Diaz, which was premised upon the government's intent to call Mr. Diaz's former client, Gilberto Barrios, as a witness at trial. As part of this order, Judge Bandstra also granted the government's motion to file its motion for disqualification out-of-time. The defendant also appeals that determination. For the following reasons, the appeal should be denied.

## I.   STANDARD OF REVIEW

Because Judge Bandstra's order relates to non-dispositive matters, under 28 U.S.C. §636(b)(1)(A) it is reversible only upon a finding that it is "clearly erroneous or contrary to law." The defendant cannot meet that showing.

## II.   JUDGE BANDSTRA CORRECTLY GRANTED GOVERNMENT'S MOTION TO FILE OUT-OF-TIME MOTION TO DISQUALIFY ATTORNEY DIAZ

### A.   *Judge Bandstra's Order*

Judge Bandstra granted the government's motion based upon the following considerations, as set forth on pages 4-5 of his order:

Judge Bandstra found that although by order dated May 24, 2002, the Court directed the government to file its motion by May 27, 2002, that order was not file-stamped by the Clerk until May 28, 2002, and was not received by the government until May 31, 2002. Judge Bandstra further found that the conflict that prompted the government's motion for disqualification had not fully developed until the April 16 hearing at which Barrios testified, followed by the government's debriefing of Barrios on April 23, 2002. Judge Bandstra also found that the government had advised Falcon and Mr. Diaz of the potential conflict as early as April 16, 2002,[1] and accordingly that the defense had sufficient advance notice of the issue. Judge Bandstra further found that the government acted with reasonable speed in filing the motion. Moreover, citing Wheat v. United States, 486 U.S. 153, 160 (1989), Judge Bandstra noted the Court's independent interest in enforcing ethical norms further supported considering the merits of the government's motion.

At pages 12-13, Judge Bandstra rejected the defendant's argument that the government had delayed in filing the motion in order to obtain a tactical advantage over Falcon. Judge Bandstra

---

[1]To the extent that Judge Bandstra's order suggests that the government notified Falcon and Mr. Diaz on April 16, 2002, that is probably incorrect. The government did not discuss the matter with Mr. Diaz on April 16, but rather after April 16. However, for the reasons set forth infra, at 5, 7-8, Mr. Diaz was aware of at least some tension between his prior representation of Barrios and his present representation of Falcon and by April 16 or 17 learned of additional facts that added to that tension.

2

noted that he conducted an evidentiary hearing on the government's first knowledge of Barrios as

a potential cooperating witness and the relevant events.  Judge Bandstra explained:

> While Falcon makes serious accusations against the government, the
> Court finds that the government had no knowledge of Barrios as a
> potential government witness against Falcon until February 2002
> when Barrios communicated with a family friend about the possibility
> of cooperating which resulted in his transfer to Miami in March 2002.
> Government attorneys did not even meet with Barrios until April 11,
> 2002 – about a week before the April 16 hearing when Barrios
> testified on the government's motion for a sequestered jury.
> Government lawyer's [sic] then met again with Barrios on or about
> April 23; and determined his possible use as a government witness
> against Magluta and/or Falcon.  The government then advised Mr.
> Diaz and the Court of this possibility and the conflict it created for
> Mr. Diaz.  The motion to disqualify, while somewhat delayed, was
> filed soon thereafter on June 5, 2002.  Falcon has offered no evidence
> supporting his charge of governmental misconduct to gain "tactical
> advantage" over Falcon by "delaying" the filing of this motion to
> disqualify Mr. Diaz in this case.

### B.   *The Court Should Affirm Judge Bandstra*

The defendant's burden is to show that Judge Bandstra's ruling in this regard was "clearly

erroneous or contrary to law." See 28 U.S.C. §636(b)(1)(A).  Although the defendant devotes pages

1-13 of his appeal to addressing the matter, the defendant identifies no error in Judge Bandstra's

ruling.

### 1.   Judge Bandstra Did Not Err in Determining that the Government Filed its Motion in a Reasonable Period of Time

The defendant does not appear to contest Judge Bandstra's finding that the government did

not receive until May 31 the Court's order requiring that the disqualification motion be filed by May

27.  As the Court is aware, at the time that the disqualification issue arose, the government was in

the midst of extensive jury selection proceedings that resulted in the final jury selection on May 13,

3

2002, and the start of the trial on the next day. Trial days generally ran from 9:00 a.m. until 5:30 p.m. Court was in session for a half-day on Saturday, May 18, and Sunday, May 26, and was in session for a full day on Memorial Day, May 27. These circumstances did not afford the government substantial additional time to prepare and finalize its disqualification motion.

The defendant contends that Judge Bandstra should have denied the motion on the basis that the government filed its motion to disqualify Mr. Shohat on May 10, 2002, which was the Friday before the last day of jury selection and start of the Magluta trial. As the Court is aware, the government was aware of the Shohat disqualification issue before becoming aware of the issue relating to Mr. Diaz. The defendant's argument is essentially that once the government learned of the latter issue, it should have reversed the sequence in which it prepared and filed its disqualification motions. That argument does not satisfy the "clearly erroneous or contrary to law" standard necessary for the defendant to prevail on his appeal.

## 2. Judge Bandstra Did Not Err in Determining that the Government Did Not Delay Raising the Disqualification Issue

In an attempt to challenge Judge Bandstra's determination regarding the timing of the government's knowledge regarding the existence of the conflict, the defendant relies in substantial part upon the evidence presented before Judge Bandstra on August 22, 2002. During a hearing on that date, Judge Bandstra allowed the defendant to present evidence to rebut the government's representations regarding the timing of the relevant events. Judge Bandstra found that the evidence presented during that hearing was consistent with the government's representations and does not support the defendant's arguments to the contrary. The defendant's recitation does not show any error in that determination.

4

During the hearing, the defendant called three witnesses: (1) attorney Ruben Oliva, who met with Barrios in March 2002 but was not retained by him; (2) Barrios; and (3) attorney Rene Palomino, who was first contacted on Barrios's behalf in late March 2002 and presently represents him. The defense also presented the stipulated testimony of attorney Arturo Alvarez, who first contacted the government regarding Barrios potentially cooperating. None contradicted the government's depiction of the timing of the relevant events. Below is summary of the relevant testimony. The transcript of the hearing is attached as Exhibit 1 to this response.

### a. *Testimony of Mr. Oliva*

Mr. Oliva testified that he first met with Barrios on March 5, 2002, and also met with him on a second occasion, but was not subsequently retained by Barrios. Transcript, at 4, 6, 15-16. Apart from a chance 30 second conversation with Agent Tariche in which Mr. Oliva indicated that he might be representing Barrios, Mr. Oliva had no additional contact with anyone from the government regarding Barrios. Id. at 7-9.

On March 6 or 7 – a day or two after Mr. Oliva first met Barrios – Mr. Diaz called Mr. Oliva. Mr. Diaz told Mr. Oliva that he understood that Mr. Oliva had seen Barrios and that Barrios had been calling Mr. Diaz's office. Mr. Diaz asked Mr. Oliva to tell Barrios that Mr. Diaz was representing Falcon and that Mr. Diaz did not think that it would be appropriate to contact Barrios. Id. at 15-16. The call was initiated by Mr. Diaz. Id. at 16. Prior to receiving Mr. Diaz's call, Mr. Oliva had not told Mr. Diaz about his March 5 meeting with Barrios.

### b. *Stipulated Testimony of Mr. Alvarez*

Based upon the stipulation, Mr. Alvarez would have testified in substance that he contacted AUSA Sullivan sometime in late 2001 on Barrios's behalf, although he does not remember the

5

precise month or date, id. at 21 & 24, and inquired about the possibility of Barrios qualifying for a sentencing reduction, id. at 21-22. AUSA Sullivan responded that based upon the timing of Barrios's conviction and appeal it did not appear that Barrios would qualify. Id. at 22. Mr. Alvarez contacted AUSA Sullivan during the third week in January and provided a thirty second proffer of information from Barrios about Lourdes Gonzalez, id. at 22 & 24, after which AUSA Sullivan agreed to have Barrios transported to FDC-Miami, id. at 23. After Barrios arrived in February, Mr. Alvarez called AUSA Sullivan to inquire as to what Barrios could expect for his cooperation. Id. at 23. AUSA Sullivan responded to Mr. Alvarez, for whom only 2% of his practice involves federal criminal cases, id. at 21, that the government could not make any promises based upon Barrios's hypothetical cooperation and that if Mr. Alvarez wanted information on how matters involving cooperating witnesses work in practice, he could contact Attorney Ruben Oliva, id. at 23 & 24. After that conversation, Mr. Alvarez referred a member of Barrios's family to Mr. Oliva and had no further contact in the matter. Id. at 23.

### c.   *Testimony of Gilberto Barrios*

Consistent with the Alvarez stipulation, Barrios testified that he instructed Mr. Alvarez to contact the government in late 2001, id. at 28, that he spoke to Mr. Alvarez in early 2002, id. at 30, and that he was brought to Miami on approximately February 22, 2002, id. at 33. After arriving in Miami, Barrios met with Mr. Oliva several times, id. at. 34 & 36, but never asked Mr. Oliva to contact the government on his behalf, id. at 36. Barrios retained Mr. Palomino on March 20 or 30 and asked him to communicate with the government on his behalf. Id. at 40. Barrios first met with the government in the beginning of April, during a meeting with AUSA Sullivan, Agent Tariche, and Agent Angelstad (mis-transcribed as "Janet Engleton"). Id. at 43.

6

Barrios also testified that he had called Mr. Diaz's office and wanted to speak with him. Id. at 36. However, Magluta, who was on the same floor as Barrios, told Barrios that Mr. Diaz was not interested in taking Barrios's case. Id. at . 36-37.

Shortly after Barrios testified that he had first met with the government in the beginning of April, Judge Bandstra sustained a government objection based upon relevance and observed that the testimony of the witnesses called by the defense did not support its argument.

> Mr. Kukec, we keep going around and around as to the issue I have to decide here. And that has to do with when the Government made a decision based on their contact with Mr. Barrios.
>
> Here we are in April, just exactly like the government has told us. I have heard three witnesses who have said exactly the same thing. Id. at 44.

### d.   *Testimony of Mr. Palomino*

The defendant last called Mr. Palomino, who testified that he was contacted on Barrios's behalf in late March 2002, met with him the next day, and attempted to contact AUSA Sullivan in the beginning of April. Id. at 54. Mr. Palomino first met with the government around April 11 (mistranscribed as "April the Eleventh Circuit"). Id. at 56. (On cross-examination, Mr. Palomino identified the date of Barrios's initial debriefing as April 10. Id. at 57).

### 3.   The Defendant's Suggestion that the Government Knew of the Conflict Before the Time Determined by Judge Bandstra is Unsupported

Notwithstanding Judge Bandstra's finding to the contrary, the defendant suggests that the evidence offered on August 22 establishes that the government knew of the conflict far before the April 23 date determined by Judge Bandstra. The defendant's suggestion is unrealistic.

As Judge Bandstra found, the conflict issue did not become apparent until Barrios testified during the April 16 hearing relating to the government's renewed motion for an anonymous jury and

7

accused Mr. Diaz of encouraging his trial perjury, with the government following-up with a subsequent debriefing of Barrios a week later. As the Court acknowledged during the May 6 status conference, the conflict issue did not occur to it as Barrios was testifying. See Defendant's Exh. 6, at 13.

In making the suggestion that the government was aware of the conflict earlier than the time identified by Judge Bandstra, the defense subjects the government to a standard of prescience that it is unwilling to accept for itself. Based upon Mr. Oliva's testimony, by March 6 or 7 Mr. Diaz was aware that Barrios was at FDC meeting with Mr. Oliva and that Barrios had been trying to phone Mr. Diaz's office. According to Mr. Oliva, Mr. Diaz expressed discomfort in returning Barrios's call, in view of his representation of Mr. Falcon.

Six weeks later, additional facts relating to Barrios became known to Mr. Diaz. On April 16, 2002, Barrios admitted his perjury and accused Mr. Diaz of encouraging it. Within a day, counsel for Magluta necessarily brought Barrios's accusation to Mr. Diaz's attention and elicited Mr. Diaz's denial of that allegation, which Magluta introduced to rebut Barrios's April 16 testimony. Neither set of facts prompted the defense to request clarification from the government as to the existence of a conflict. Given that the defense apparently failed to identify the broader conflict issue arising from these facts, the Court cannot fault the government for not identifying the conflict sooner than it did.

### III.   JUDGE BANDSTRA CORRECTLY GRANTED GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY DIAZ

#### A.   *Judge Bandstra's Order*

The government had moved for Mr. Diaz's disqualification on the grounds that his participation in the case, in view of Barrios's role as a government witness, would violate both Mr.

Diaz's duty of loyalty to Barrios under Rule 4-1.9 of the Rules Regulating the Florida Bar and Mr.

Diaz's duty to protect the confidentiality of confidences conveyed to him by Barrios under Rule 4-

1.6 of the Rules Regulating the Florida Bar. At page 7-8 of his order, Judge Bandstra outlined the

general rule governing resolution of the duty of loyalty issue:

> [T]he Court recognizes that the Sixth Amendment guarantees a
> criminal defendant the right to assistance of counsel for his or her
> defense, and that a defendant has a presumptive right of counsel of
> his choice. Wheat v. United States, 486 U.S, 153, 154 (1988).
> However, notwithstanding the importance of a defendant's right to
> counsel of choice, this right is not absolute and the presumption may
> be overcome not only by a demonstration of actual conflict, but by a
> showing of a serious potential for conflict. Id.. In balancing the
> competing interests of a defendant's Sixth Amendment rights, a trial
> court has "an independent duty to ensure that criminal defendants
> receive a trial that is fair." Id. The need for the fair, efficient and
> orderly administration of justice consistent with the ethical rules,
> overcomes the right to counsel of choice where an attorney has an
> actual conflict of interest, such as when he has previously represented
> a person who is to be called as a witness against a current client at
> trial. United States v. Ross, 33 F.3d 1507, 1523 (11th Cir. 1994);
> United States v. Miranda, 936 F.Supp. 945, 950 (S.D. Fla. 1996);
> United States v. Davis, 780 F.Supp. 21 (D.C.D.C. 1991); see also
> United States v. Culp, 934 F.Supp. 394, 398 (M.D. Fla. 1996); United
> States v. Cheshire, 707 F.Supp. 235 (M.D. La. 1989); United States
> v. Agosto, 538 F.Supp. 1149, 1153 (D.Minn. 1982). In such
> circumstances, there is a presumption that the client is denied
> effective assistance of counsel and the fairness and propriety of
> judicial proceedings are undermined.

At page 8-9 of his order, Judge Bandstra cited the rule set forth by the Court in its order

disqualifying Mr. Bergendahl (DE 1853), in which the Court stated that when a former client will

testify against the current client in the same manner, the lawyer cannot represent the current client

without the former client's consent. Judge Bandstra found that because Barrios did not consent to

Mr. Diaz's representation of Falcon or to a waiver of his attorney-client privilege, Rule 4.1-9

required Mr. Diaz's disqualification.

9

In reaching this conclusion, Judge Bandstra found that the government established that Barrios's testimony had sufficient importance to its case. Judge Bandstra noted that Barrios is expected to testify about his participation in the "tractor-trailer" conspiracy in which Magluta-Falcon cocaine was transported in tractor-trailers and money transported back to the western United States to pay for the cocaine, and is expected to testify that he met with Falcon on two occasions to discuss his participation. Along these lines, Judge Bandstra took note of the government's proffer that although other organization members were involved in these activities, Barrios was the only one who had direct contact with Falcon regarding the tractor-trailer conspiracy, making Barrios a significant witness to establish Falcon's involvement in the underlying unlawful activity and his knowledge of the unlawful source of the proceeds. Citing United States v. Cortellesso, 663 F.2d 361, 363 (1st Cir. 1981), Judge Bandstra observed the rule that the government should not be required to forego calling a witness in order to resolve a conflict situation.

At pages 10-11 of his order, Judge Bandstra explained that for purposes of Rule 4-1.9, Mr. Diaz's representation of Barrios in Case No. 95-324-Cr-Nesbitt constituted a matter substantially related to this case. Judge Bandstra noted that in Case No. 95-324-Cr-Nesbitt Mr. Diaz described that case as a "spin-off" from Case No. 91-6060-Cr-Moreno and that independent review of Barrios's anticipated testimony confirms the relationship between Case No. 95-324-Cr-Nesbitt and this case. Judge Bandstra found that because the defendant has a strong interest in discrediting Barrios' testimony through cross-examination of Barrios or through examination of other witnesses or other trial strategies, his interests were materially adverse to Barrios's, even if an attorney other than Mr. Diaz were to cross-examine Barrios.

10

At pages 11-12 of his order, Judge Bandstra rejected the defendant's argument that Barrios had waived his expectation of privilege regarding his prior communications with Mr. Diaz. Citing United States v. Ballard, 779 F.2d 289, 291 (5th Cir. 1985)[2], and United States v. Gordon-Nikkar, 518 F.2d 972, 975 (5th Cir. 1975), Judge Bandstra held that Barrios's accusation that Mr. Diaz encouraged his trial perjury did not waive Barrios's privilege to conversations as to areas other than that subject. Judge Bandstra further found that Barrios did not waive his privilege with Mr. Diaz by virtue of having been debriefed by the government. In this sense, Judge Bandstra referenced an in camera examination with Barrios and his present counsel, in which they advised the Court of several subjects discussed with Mr. Diaz that have not been discussed with the government.

In view of its determination that Rule 4-1.9 required disqualification, Judge Bandstra found no need to address whether Rule 4-1.6 independently required disqualification.

### B.   *The Court Should Affirm Judge Bandstra*

The defendant fails to show that Judge Bandstra's ruling on the disqualification issue is either "clearly erroneous or contrary to law." See 28 U.S.C. §636(b)(1)(A).

### 1.   Falcon's Claim that Barrios's Testimony Is Not "Essential" Is Both Mistaken and Irrelevant

At pages 13-17 of his appeal, the defendant contends that the government must show that Barrios's testimony is essential to its case in order to trigger disqualification. From this, the defendant maintains that Barrios's testimony is neither essential nor relevant. The defendant is incorrect on both points.

---

[2]The order mistakenly cites Ballard as 779 F.2d 287, 289.

11

The defendant's appeal cites no authority for the proposition that the government must show that Barrios's testimony is "essential" in order to sustain its burden in seeking Mr. Diaz's disqualification. Judge Bandstra correctly cited Cortellesso, 663 F.2d at 363, for the proposition that the government should not be required to forego calling a witness in order to resolve a conflict situation.

Morever, Falcon's challenge to the relevance of Barrios's testimony is misplaced. Falcon contends that Barrios's testimony is irrelevant or not essential, because it only relates to Falcon's association to the specified unlawful activity supporting the money laundering charges in this case, and because the government does not have to prove Falcon's involvement in drug trafficking activity or his knowledge that the funds involved in this case derive from drug trafficking, as opposed to some form of unlawful activity.

The defendant correctly recognizes that proof of the defendant's drug trafficking activity is not an essential element in a money laundering prosecution. See United States v. De la Mata, 266 F.3d 1275, 1292 (11th Cir. 2001) ('A conviction for money laundering does not require proof that the defendant committed the specific predicate offense").[3] However, the defendant fails to recognize that proof of a defendant's drug trafficking activity can nonetheless be highly probative of a defendant's commission of money laundering offenses. The defendant's attack upon the relevancy of Barrios's testimony overlooks the case law that confirms that a defendant's participation in drug

---

[3]The defendant's reliance upon this principle is somewhat curious, since the crux of all of his double jeopardy and collateral estoppel pleadings in this matter have relied upon an almost directly opposite point. In those pleadings, Falcon has incorrectly argued that his acquittal of drug trafficking charges in Case No. 91-6060-Cr-Moreno, extinguishes the government's ability to prove the specified unlawful activity element of the money laundering charges against him. Having abandoned that position for purposes of this appeal, the defendant hopefully will not attempt to revive it if double jeopardy or collateral estoppel issues reemerge later in the case.

12

trafficking – when coupled with other evidence such as lack of legitimate income or concealing transactions in manners characteristic of drug traffickers – can prove in a money laundering prosecution that money spent by the defendant derives from the proceeds of drug trafficking. See United States v. Misher, 99 F.3d 664, 668 (5th Cir. 1996); United States v. Hardwell, 80 F.3d 1471, 1483 (10th Cir. 1996); United States v. Jackson, 983 F.2d 757, 766-67 (7th Cir. 1993); United States v. Blackman, 904 F.2d 1250, 1257 (8th Cir. 1990). As a practical matter, a defendant's involvement in drug trafficking can be extraordinarily helpful in a money laundering prosecution to establish the source of the funds, the defendant's knowledge of the source, and his intent to conceal. Moreover, since Barrios discusses meeting Magluta and Falcon together, he helps tie the pair for purposes of the criminal partnership that the government alleges lasted through Case No. 91-6060-Cr-Moreno and continues through the return of the charging documents in this case. Additionally, because, as the government noted at page 5 of its disqualification motion, Barrios will testify that he received payment for his work from Miguel Vega, who was introduced to him by the defendant's brother Gustavo "Taby" Falcon, Barrios also inferentially ties the defendant to Vega, who of course was a key organization money launderer through the 1990's.

The defendant next claims that Barrios's testimony is cumulative of the testimony of other witnesses and provides in Appendix B of his exhibits a lengthy list of individuals who have previously testified for the government as accomplice witnesses and whose testimony he claims duplicates that of Barrios. The defendant's analysis is both simplistic and unrealistic.

For instance, the defendant's list contains eight witnesses who the government has not called in the previous two trials in this case and does not expect to call against the defendant in his trial: Jorge Carnet, Sermon Earl Dyess, Jack Devoe, Jack Snay, Jorge Valdes, Enrique Izaguire, Juan

13

Sosa, and Manny Hernandez.[4] Of the remaining accomplice witnesses, Pedro Rosello, Sergio Crego, and Gustavo Posado do not testify to having direct drug trafficking contact with the defendant. Although Juan Barroso will testify about meeting with the defendant to discuss drug trafficking, Barroso's involvement with Magluta and Falcon ended in the mid-1980s. By contrast, since the tractor-trailer conspiracy continued through the time of Magluta's and Falcon's arrest, Barrios helps extend their criminal association through late 1991, with his testimony about Vega helping to inferentially extend the criminal association past that date.

The defendant lists Milton Morizumi, even though he did not traffic cocaine with Magluta and Falcon. Although the defendant lists Federico de la Cruz as a witness whose testimony makes Barrios's unnecessary, the Court is well aware that de la Cruz is extremely hostile and cannot be depended upon either to testify or to not feign memory loss or take other measures to purposely minimize the value of his testimony. The defendant's contention that Marilyn Bonachea makes Barrios's testimony cumulative is extremely curious. In his motion for severance, the defendant argued that the lack of relevant testimony that Bonachea had to offer against him supported severing his trial from Magluta's (DE 1596:5 & 7).

The defendant incorrectly suggests that the government's decision not to use Barrios against Magluta should impact upon the analysis here. The government's decision not to use Barrios against Magluta was a product of the factors associated with that trial. The sequestration of the Magluta jury in the Magluta trial put added time pressures upon the government to rest its case as soon as possible. Barrios's cross-examination likely would have added at least several days to the trial. As

---

[4]If necessary, the government is prepared to explain in camera its reasoning with respect to these individuals.

14

the Court recalls, the government called a number of accomplice witnesses who testified to having substantial direct criminal contact with Magluta. These witnesses included Marilyn Bonachea, Alfred Alonso, Jorge Hernandez, and Luis Valverde – all of whom testified in English. Bonachea's cross-examination lasted close to a week. Alonso's cross-examination lasted a day. Hernandez's cross-examination lasted over a day. Valverde's cross-examination lasted a day. Cross-examinations of non-English-speaking accomplice witnesses, even those who had minimal or no contact with Magluta, tended to take proportionally far longer than direct examination. The government had an extensive set of witnesses who dealt with Magluta and an extensive set of seized documents that impacted directly upon Magluta.

The same considerations do not apply here. The government does not expect to ask the Court to sequester the jury for this defendant's trial, and absent any unforseen and extraordinary developments the government does not expect that the Court will want to empanel a sequestered jury. Accordingly, jury concerns should not impose the same unique time pressures on the trial. Moreover, the government's accomplice witnesses will not testify to having the same quantity of direct criminal contact with Falcon, as they testified to having with Magluta. Indeed, the disparity in direct evidence between Magluta and Falcon was one of the grounds that Falcon cited in support of his motion for severance (DE 1596). By virtue of his direct, albeit limited, contact with Falcon, Barrios is a relatively significant witness against Falcon, and the government plans to call him against Falcon.

### 2. Falcon's Claim that Barrios Enjoys No Expectation of Confidentiality in His Communications with Mr. Diaz is Unsupported

At pages 18-22 of his appeal, the defendant challenges Judge Bandstra's findings regarding the defendant's attacks upon the existence of Barrios's continuing privilege in his right to

15

confidentiality in his communications with Mr. Diaz.  The defendant's attacks can be quickly disposed.

The defendant first contends that because Barrios perjured himself in his own trial, the crime fraud exception to the attorney-client privilege extinguishes any expectation of confidentiality he might have had in **all** communications he had with Mr. Diaz.  The defendant cites no case law that supports that sweeping proposition, and the Court should reject his unsupported contention.[5]  The defendant does cite United States v. Gordon-Nikkar, 518 F.2d 972 (5th Cir. 1975).  However, that case stands for the proposition that communications intending to further perjury are not privileged. It does not support, however, the proposition that the existence of such communications extinguishes any privilege that attaches to unrelated conversations. The same reasons defeat the defendant's claim that by accusing Mr. Diaz of encouraging his perjury Barrios waived Mr. Diaz's duty of confidentiality under Rule 4-1.6 of the Rules Regulating the Florida Bar as to all unrelated conversations.

The defendant's claim that Barrios waived privilege by discussing his criminal activity with the government is similarly misplaced. Given that Mr. Diaz represented Barrios in a significant trial, the Court should presume that Barrios shared numerous confidences with Mr. Diaz.  See United States v. Cheshire, 707 F. Supp. at 239 ("there is a presumption that a lawyer receives confidential communications in the course of his representation of a client").  As noted above, see supra, at 9,

_____

[5]Indeed, the government suspects that the defendant may wish to reconsider his proposition, for taken to its logical limits the defendant's contention would almost certainly extinguish his attorney-client privilege with the lawyers representing him in Case No. 91-6060-Cr-Moreno.  The government has prima facie proof that Falcon corrupted the trial in Case No. 91-6060-Cr-Moreno.  Under the rule that Falcon proposes in his appeal, Falcon's corruption of that trial would permit the government to compel disclosure of **all** confidences he shared with **all** of his attorneys in that case, over any objection of attorney-client privilege.

16

based upon an in camera examination with Barrios and his present counsel, Judge Bandstra determined that the government's debriefings of Barrios did not cover several subjects Barrios discussed in confidence with Mr. Diaz.

### 3.   Falcon's Challenge to Judge Bandstra's Finding Regarding Mr. Diaz's Duty of Loyalty to Barrios Lacks Merit

The defendant addresses this issue at pages 22-24 of his appeal. The duty of loyalty under Rule 4-1.9 of the Rules Regulating the Florida Bar concerns subsequent representation of by an attorney of a new client in "the same or a substantially related matter" in which the attorney had represented the former client. The defendant contends that Mr. Diaz's representation of Barrios does not fit within the definition of a "substantially related matter."

The defendant's contentions in this appeal stand in stark contrast to his contentions in his earlier double jeopardy and collateral estoppel motions and interlocutory appeal, in which he argued that the testimony of cocaine trafficking co-conspirators up through 1991, such as Barrios, were central to the government's ability to sustain convictions in this matter and that the acquittal in Case No. 91-6060-Cr-Moreno precluded the use of such evidence and mandated dismissal of many of the charges in this case. As Judge Bandstra also observed in his order, this contention also contradicts a pleading that Mr. Diaz filed during his representation of Barrios in which he described Barrios's case as a "spin-off" of Case No. 91-6060-Cr-Moreno. (The relevant portion from that pleading is contained at page 2 of Appendix-A to the government's reply to the defendant's response to the disqualification motion (DE 2284).)

Rule 4-1.9 also requires that the interests of the present and former client be materially adverse. The defendant's argument regarding adversity of interests incorrectly turns upon whether Barrios will receive a sentencing benefit for his cooperation or is motivated by the desire to obtain

17

one. Barrios has made clear, both on April 16 and on August 22, that he has decided to assist the government in its efforts to prosecute his co-conspirators. Barrios's accomplishment of his objective in this regard turns on his ability to maximize the value of his cooperation to the government – which includes not only the value of his testimony, but the value of all inferences that flow from his testimony and evidence that his testimony corroborates or otherwise bolsters. As Judge Bandstra found, the defendant has a strongly clashing interest in minimizing the different ways in which Barrios's testimony can hurt him.

### 4.    The Court Should Reject Falcon's Offered Alternatives

At pages 24-27 of his appeal, the defendant offers a variety of alternatives to disqualification, including segregating Mr. Diaz from Barrios's cross-examination, the use of back-up counsel, and limitations upon cross-examination. The Court should reject these alternatives.

None of the alternatives address the problem that Mr. Diaz proposes to be lead trial lawyer in a case in which Barrios is an accomplice witness who directly implicates his present client. For the reasons set forth in the previous sub-section, Mr. Diaz cannot prevent intruding upon Mr. Barrios's interests in maximizing his assistance to the government merely by walling himself off from the cross-examination of Barrios. To do so would require Mr. Diaz to wall himself off from a much greater, and not necessarily easy to define, number witnesses and exhibits that directly and indirectly relate to Barrios's testimony.

In its order disqualifying Mr. Bergendahl, the Court refused to accept the type of "taint wall" arrangement proposed by the defendant, notwithstanding the Court's respect for Mr. Bergendahl's intentions. "While the Court has every reason to believe that Mr. Bergendahl, a respected member of the Bar, will be true to his oath to preserve his former client's confidences, the Court is also aware

18

that in the stress of a long trial with intense emotions, inadvertent mistakes can and do occur" (DE1853:7). The nature of some of the statements and arguments in this appeal, which repeatedly castigates Barrios's character and attempts to extinguish the privilege that attaches to his communications with Mr. Diaz should cause those concerns to remain in this matter.

The Court's determination in this regard is consistent with the authority cited at pages 11-12 of the government's motion to disqualify Mr. Diaz, all of which reject these types of "taint wall" arrangements in situations in which a criminal defense attorney seeks to represent a client in a case in which his former client is cooperating with the government.  See United States v. Miranda, 936 F. Supp. 945, 951-52 (S.D. Fla. 1996); United States v. Davis, 780 F. Supp. 21 (D.D.C. 1991). Indeed, given the duration of Mr. Diaz's former representation of Barrios, it difficult to conceive that an attorney acting with the best of intentions will be able to segregate all confidential information learned from one client in the course of a lengthy case in molding trial strategies of a subsequent client charged in the same case.

Although the defendant asks the Court to modify the application of the conflict rules as they apply to him, the government submits that the balance of equities do not favor such a resolution. In this respect, the government refers the Court to the government's arguments at pages 14-16 of its motion to disqualify Mr. Diaz.

19

IV.  **CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's appeal.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

20

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _21_ day of October 2002, a true copy of the foregoing was mailed or faxed to:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600  701
Miami, FL 33131

Katherine Ferro, Esq.
Brickell Avenue, Suite 2080
Miami, FL 33131

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131

_____
MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY

21

Mr.215

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)/Bandstra

NIGHT BOX
FILED

NOV 1 2 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

UNITED STATES OF AMERICA,

v.

AUGUSTO GUILLERMO FALCON,
a/k/a "Willie,"

Defendant.
_____/

### GOVERNMENT'S MOTION FOR RECONSIDERATION OF ORDER OVERRULING MAGISTRATE JUDGE'S ORDER DISQUALIFYING RICHARD J. DIAZ AS TRIAL ATTORNEY FOR DEFENDANT FALCON

The United States submits the following motion for reconsideration of this Court's Order Partially Affirming and Partially Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz as Trial Attorney for Defendant Falcon.[1]

### SUMMARY OF ARGUMENT

The United States' motion for reconsideration is based on the following errors it contends that the Court made in overruling the magistrate judge's order: (1) The Court incorrectly utilized a *de novo* standard of review, even though 28 U.S.C. § 636(b)(1)(A) requires that, to reverse a magistrate judge's pretrial non-dispositive order, the reviewing Court must find that the magistrate judge's order was clearly erroneous or contrary to law − neither of which this Court found in this case before reversing Magistrate Judge Bandstra's disqualification order. (2) The Court also erroneously based its order reversing Magistrate Judge Bandstra's disqualification order on what it deemed to be "new facts" not known to Magistrate Judge Bandstra, when §636(b)(1)(A) prohibits the reviewing court from considering information not presented to the magistrate judge who issued the order. (3) The Court improperly held the government to an erroneous standard by requiring it,

---

[1]       For the sake of brevity, the United States incorporates by reference its motion for disqualification, its motion to file the disqualification out of time, its reply to Falcon's response in opposition to the disqualification motion, the transcript of the evidentiary hearing held before Magistrate Judge Bandstra on August 22, 2002, Magistrate Judge Bandstra's disqualification order, and the government's response to Falcon's appeal from the disqualification order.

even in light of an acknowledged actual conflict between Mr. Diaz's representation of Falcon and his prior representation of witness Barrios, to demonstrate that Barrios was a "key" or "clincher" witness in the government's case, even though none of the extensive case law addressing the disqualification issue **requires** the government to make such a showing to justify disqualification. (4) The Court erroneously found that the government should have known that Barrios was a potential witness as early as the Fall of 2001, in contradiction to: (a) the magistrate judge's factual finding and testimony from Barrios himself that he had waffled about whether he actually wanted to cooperate until April of 2002, and where his attorney did not even proffer to the government any information as to how Barrios might provide assistance until February of 2002, and (b) testimony from Barrios and the proffer from Assistant United States Attorney Michael P. Sullivan that Barrios did not meet with any government agents or attorneys until April 11, 2002 regarding a matter unrelated to Falcon's trial, and that the government did not decide to use Barrios as a government witness against Falcon until further debriefings at the end of April of 2002 and learned that Barrios had met directly with Falcon regarding the "tractor trailer" scheme to transport cocaine and currency. (5) The Court's order requiring the government to forego using Barrios as a live witness at Falcon's trial and, instead, rely on a stipulation of his testimony consented to by Falcon is erroneous and constitutes an improper suppression of the government's evidence.

## ARGUMENT

1.  **The Court Reviewed and Reversed the Magistrate Judge's Order under an Erroneous Standard of Review and Improperly Based the Reversal on New Information Not Presented to the Magistrate Judge.**

    A.  ***Background***

This Court referred the motion to disqualify Mr. Diaz to Magistrate Judge Bandstra, pursuant to 28 U.S.C. §636(b)(1)(A), because it was a non-dispositive pretrial motion. Magistrate Judge Bandstra held an evidentiary hearing and considered lengthy oral and written arguments from the parties before issuing his order disqualifying Mr. Diaz (DE:2392). In so doing, Magistrate Judge Bandstra made the following factual findings and legal conclusions: (1) The government's motion

2

to file its motion to disqualify Mr. Diaz out-of-time should be granted in light of its receipt of the Court's May 24, 2002 order on May 31, 2002, days **after** that order made the government's pleading due.  (2)  The government acted with reasonable speed in filing the motion once the conflict crystalized in late April of 2002, following a full debriefing of Barrios. (3) The government already had advised Mr. Diaz of the potential conflict as early as April 16, 2002.[2]  (4)  Barrios has not consented to Mr. Diaz's representation of Falcon, and declined to waive his attorney-client privilege. (5)  "The government has sufficiently proffered a summary of Barrios' expected testimony to demonstrate his importance to the government in the Falcon prosecution and the unique testimony he can offer with respect to personal contacts with Falcon and his alleged illegal drug trafficking activity"because "Barrios is the only government witness who had direct contact with Falcon and who met with him to discuss the 'tractor trailer conspiracy.'"  (6)  Barrios' testimony is important to establish Falcon's involvement in the underlying unlawful activity and his knowledge of the unlawful source of drug proceeds. (7) Mr. Diaz is representing Falcon in a matter substantially related to the criminal case in which he previously had represented Barrios. (8) "The fact that Barrios will be testifying against Falcon, with anticipated cross-examination by Falcon's attorneys, establishes that his interests are materially adverse to Falcon – even if Mr. Diaz defers cross-examination to another attorney for Falcon.  (9)  Falcon has a strong interest in discrediting Barrios['] testimony by impeachment on cross-examination, or in reducing the impact of his testimony by cross-examination of corroborating witnesses, calling conflicting witnesses, or other trial strategies. (10) Rule 4-1.9 of the Rules Regulating the Florida Bar applies and requires Mr. Diaz's disqualification, "even if Falcon agrees to waive the conflict and Mr. Diaz elects to not personally cross-examine Barrios."  (11) There is "no basis for Falcon's accusation that the

---

[2]         The government believes that Judge Bandstra is mistaken in this respect and that it notified Mr. Diaz sometime later in April.

government delayed in the filing of this motion to disqualify to gain a 'tactical' advantage over Falcon in this criminal proceeding" (*id.*).

Magistrate Judge Bandstra also specifically rejected Falcon's arguments and allegations that: (1) Barrios had waived his attorney-client privilege by accusing Mr. Diaz of encouraging his perjury at his own trial or because the government agents have since debriefed Barrios concerning his criminal activity. (2) The fact that Mr. Diaz would be entitled to defend himself against Barrios' accusation that he encouraged Barrios to perjure himself in another forum by revealing certain communications between himself and Barrios, is not a sufficient basis to allow him to remain as Falcon's trial counsel (DE 2392). Finally, Magistrate Judge Bandstra noted that disqualification was warranted, even though it occurs only weeks before trial, when the trial was scheduled to begin in October of 2002, and he found "that disqualification is necessary and cannot be avoided by any alternative suggested by Mr. Diaz on behalf of Falcon" (*id.*).

Falcon submitted a written appeal to this Court from the Magistrate Judge's order disqualifying Mr. Diaz (DE 2421). In that appeal, Falcon essentially reiterated the arguments he previously had presented, but which were rejected by Magistrate Judge Bandstra, including: (1) the purported untimeliness of the government's motion; and (2) that Barrios is not an "essential" witness for the government; and (3) even if Barrios testifies, Mr. Diaz's disqualification is not required because the attorney-client privilege does not apply under the crime-fraud exception and because Barrios waived the privilege by submitting to debriefings by the government agents and attorneys (*id.*).[3]

---

[3]       The government acknowledges that there are apparent scrivener's errors regarding some dates included in Magistrate Judge Bandstra disqualification order. For example, the district court's order requiring the filing of a motion for disqualification was dated May 24, 2002, not April 24, as identified in the disqualification order at page 5 (the Magistrate Judge correctly identified the May 24th date on pages 3 and 4 of the same order). Also, Magistrate Judge Bandstra incorrectly identified February of 2002 as the date when a family friend communicated with government counsel the possibility that Barrios might want to cooperate and that Barrios' transfer to the district occurred in March of 2002. In fact, Barrios arrived in Miami on February 22, 2002 (*see* 9/22/02 Hearing Transcript at 33).

The United States filed an extensive response in opposition to Falcon's appeal, arguing that Falcon was not entitled to reversal of the disqualification order because: (1) He could not demonstrate that the order was clearly erroneous or contrary to law. (2) Magistrate Judge Bandstra had correctly granted the government's motion to file out-of-time the disqualification motion, in that he correctly found that the government had filed its motion within a reasonable period of time and did not improperly delay raising the disqualification issue once it had determined that it would call Barrios as a government witness. (3) Falcon's suggestion that the government knew of the conflict before the April of 2002 date determined by the magistrate judge is not supported by the record. (4) Magistrate Judge Bandstra properly granted the disqualification motion because: (a) an actual conflict exists between Mr. Diaz's prior representation of Barrios and his current representation of Falcon; (b) Falcon's claim that Barrios's testimony is not essential is both mistaken and irrelevant; (c) Falcon's claim that Barrios has no expectation of confidentiality in his communications with Mr. Diaz is not supported by the record; (d) Falcon's challenge to the magistrate judge's finding regarding Mr. Diaz's duty of loyalty to Barrios is meritless; and (e) none of the alternatives offered by Falcon, such as segregating Mr. Diaz from Barrios's cross-examination, use of back-up counsel, or limitations on cross-examination, effectively resolve the conflict issue (DE 2539).

### B.    *Court's Order*

On October 30, 2002, this Court issued an order partially affirming and partially overruling the magistrate judge's disqualification order (DE 2548).   Specifically, the Court affirmed the magistrate judge's findings that Mr. Diaz's cross-examination of Barrios poses an actual conflict of interest in light of Barrios' unwillingness to waive his attorney-client privilege with Mr. Diaz (*id.*). However, because of what this Court found to be "new concessions" to forego cross-examination of Barrios and any government witnesses who would corroborate Barrios' testimony, the Court found that Mr. Diaz should not be disqualified (*id.*). Moreover, the Court found that the magistrate judge's order should not stand because the government had not demonstrated that Barrios was the "'most

5

significant witness' or even a 'clincher'" (*id.*). In support of that "finding," the Court relied on the

fact that the government had not called Barrios as a witness in the trial against codefendants Miguel

Vega, Jorge Hernandez, Juan Hernandez, and Rene Silva,[4] or in the trial against codefendant

Salvador Magluta (*id.*). Additionally, the Court relied on the government's concession that Falcon's

drug trafficking activity is not an essential element of his money laundering prosecution (*id*). On

those grounds, the Court found that the government had failed to demonstrate that Barrios was a "key

witness, let alone an essential or even critically important witness" (*id.*).

Moreover, the Court found, contrary to the magistrate judge's finding, that the government

had known as early as Fall of 2001, that Barrios wished to cooperate (*id.*). Therefore, it found:

> Given the Government's knowledge of Barrios' willingness
> to cooperate, and its failure to raise this potential conflict at the time
> Falcon hired Diaz, it is highly prejudicial to Falcon at this late hour
> and after having had his previous counsel disqualified, to now
> disqualify Diaz who is prepared for trial in January of 2003, and who
> in good faith made every effort to notify the Government of any
> potential conflicts so as not to prejudice his client with additional
> conflict issues and further delay. Because the Government did not
> raise this conflict in January of 2002 when the Government had
> knowledge that Barrios wished to cooperate, and because the
> Government has failed to demonstrate that Barrios' proffered
> testimony is essential or even critically important to the
> Government's case against Falcon, the Court finds that the alternative
> remedies that Falcon proposes will adequately address the ethical
> issues arising out of Diaz's continued representation of Falcon, and
> will avoid the extraordinary remedy of disqualification.

(*id.*). Also, the Court noted that, while it "recognizes that the Government's right to call witnesses

of its choice should not be unnecessarily impeded, in this instance, the Government's right to call

Barrios as a live witness must give way to balance Falcon's right to counsel of choice" (*id.*).

Therefore, the Court ordered the parties to "prepare a joint stipulation of the key facts to be elicited

through Barrios' testimony that will be an exhibit and read to the jury" (*id.*). According to the Court,

"[t]his new remedy, not presented to the Magistrate Judge, permits the Government to introduce

---

[4]     The trial against these codefendants was held in the Summer of 2000, long before
Barrios had expressed any interest in cooperating with the government.

Barrios' testimony via stipulation if it so desires, and also protects Falcon's presumptive right to counsel of choice and prevents any further delay in trial" (*id.*). The Court's decision appears to be based, in part, on Falcon's conditional motion to proceed as *pro se* counsel, which was submitted **after** the magistrate judge had ordered Mr. Diaz's disqualification, and was based on the fact that the order required Mr. Diaz's disqualification (*id.*).

Nowhere in its order does this Court find that the magistrate judge's disqualification order was clearly erroneous or contrary to law (*id.*). Instead, it appears that the Court conducted a *de novo* review of the disqualification proceedings and came to different conclusions than the magistrate judge, based on what it considered to be "new concessions" from Falcon about which the magistrate judge did not know when he ordered Mr. Diaz's disqualification (*id.*).

## C.   *Analysis*

The magistrate judge's issuance of his order disqualifying Mr. Díaz was a pretrial matter that fell under the subject matter jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. §636(b)(1)(A). *See Hutchinson v. Pfiel*, 105 F.3d 562, 565 (10th Cir. 1997); *Affeldt v. Carr*, 628 F. Supp. 1097, 1101 (N.D. Ohio 1985); *Mruz v. Caring, Inc.*, 166 F. Supp.2d 61, 65 (D. N.J. 2001); *Howe Investment, Ltd. v. Perez Y CIA, de Puerto Rico, Inc.*, 96 F. Supp.2d 106, 112 (D. P. R. 2000). Under §636(b)(1)(A), a magistrate judge's decision to disqualify counsel may be reversed on appeal only if it is clearly erroneous or contrary to law. *See generally United States v.* Raddatz, 447 U.S. 667, 673 (1980); *see also United States v. Archeval-Vega*, 883 F. Supp. 904, 906 (W.D. N.Y. 1994).[5] Moreover, the party filing the appeal from the magistrate judge's ruling on a pretrial matter bears the burden of demonstrating that the magistrate judge's decision was clearly erroneous or contrary to law. *See Cardona v. General Motors Corp.*, 942 F. Supp. 968, 971 (D. N.J. 1996).

---

[5]      Magistrate judges' pretrial orders under §636(b)(1)(A) are not subject to the *de novo* review accorded to proposed findings and recommendations issued under §636(b)(1)(B). *See Calderon v. Waco Lighthouse for the Blind*, 630 F.2d 352, 354-55 (5th Cir. 1980).

A magistrate judge's ruling is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). Under the clearly erroneous standard of review, a district court should not reject a magistrate judge's findings even if the reviewing court could have decided the issue differently. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous"). Also, in reviewing a magistrate judge's factual determinations, a court may not consider any evidence which was not presented to the magistrate judge. *See Haines v. Liggett Group, Inc.*, 975 F.2d 81, 92-93 (3d Cir. 1992) ("[i]n a subparagraph (A) matter [under § 636(b)(1)(A)], the district court is not permitted to receive further evidence; it is bound by the clearly erroneous rule in reviewing questions of fact . . . To consider fresh evidence and materials constituted reversible error that may find relief in the petition for mandamus").

Ordinarily, when there is considerable ambiguity in the record on appeal as to what standard the district court used in reviewing the magistrate judge's order, a remand is necessary. *See United States v. Curtis*, 237 F.3d 598, 602 (6th Cir. 2001). Here, it is apparent from reviewing this Court's order that it incorrectly employed a *de novo* review standard in reversing the magistrate judge's disqualification order. Also, there is no indication in its order that this Court concluded, as it would have been required to find to reverse the magistrate judge's order, that the Court found that the magistrate judge's findings were clearly erroneous or that his disqualification order was contrary to law. Instead, it is apparent that this Court merely arrived at a different conclusion than that of the magistrate judge, based in large part on what this Court deemed to be "new facts" that it was not permitted to consider in reviewing the magistrate judge's order under § 28 U.S.C. § 636(b)(1)(A).

It is noteworthy that this Court did not find clearly erroneous the magistrate judge's finding that the government had not acted in bad faith or for some other deleterious reason in the timing of its filing of its disqualification motion, or his finding that Falcon's allegations that the government

8

had insidiously timed the filing of its disqualification motion to gain some sort of tactical advantage over Falcon. Nonetheless, the Court appears to now conclude that the government "should" have known of the conflict as early as the Fall of 2001, even before it had received any sort of proffer from Barrios's counsel or any assurance that Barrios unequivocally was willing to cooperate against Falcon, and that it should now be punished for not advising the Court or Falcon's counsel of the then-remote potential conflict by the exclusion of Barrios's live testimony.

This Court also did not deem clearly erroneous the magistrate judge's findings that "the government has sufficiently proffered a summary of Barrios' expected testimony to demonstrate his importance to the government in the Falcon prosecution and the unique testimony he can offer with respect to personal contacts with Falcon and his alleged illegal drug trafficking activity" because "Barrios is the only government witness who had direct contact with Falcon and who met with him to discuss the 'tractor trailer conspiracy'" and that "Barrios' testimony is important to establish Falcon's involvement in the underlying unlawful activity and his knowledge of the unlawful source of drug proceeds." Moreover, it agreed with the magistrate judge's finding that Mr. Diaz's representation of Falcon and prior representation of Barrios created an actual, not potential, conflict of interest.

Moreover, the Court did not conclude that any of the magistrate judge's legal conclusions were "contrary to law," as would be required to reverse his disqualification order. In fact, it is apparent from the magistrate judge's disqualification order that he scrupulously followed the Supreme Court's edicts in *Wheat* and the Eleventh Circuit's case law in *Ross* and *McCutcheon* in finding that Mr. Diaz had to be disqualified because an actual conflict had arisen as a result of his prior representation of Barrios and his current representation of Falcon. In fact, as discussed in more detail below, it is this Court's order that does not comport with established case law, in that it seems to impose an artificial requirement on the government of proving that the witness it intends to call is a "key" or "clincher" witness before authorizing disqualification of counsel. None of the case law,

including *Cortellesso* requires such a finding. In fact, the only relevant factor is whether the witness's testimony is merely cumulative, immaterial, or irrelevant. The Court has made no such finding in this case. Moreover, it cannot do so. Barrios' testimony concerning his direct conversations with Falcon regarding their drug trafficking activities constitutes evidence of Falcon's involvement in the underlying drug offenses that establish the specified unlawful activity for proving the money laundering conspiracy. That same evidence also serves to establish Falcon's knowledge that the proceeds laundered were from some form of unlawful activity, as required for proving the money laundering conspiracy charge. It also is relevant to counter any defenses raised by Falcon to the charge. Additionally, Barrios' proposed testimony relating to Lourdes Gonzalez's and Salvador Magluta's efforts to keep him from cooperating is evidence of the conspiracy to obstruct justice. Even though that testimony does not directly implicate Falcon, it nonetheless is relevant, material, and highly probative in establishing the conspiracy's existence.

Therefore, the Court's order reversing the magistrate judge's disqualification order is erroneous. It now has the opportunity, in light of the government's filing of a motion for reconsideration to use the proper standard of review of clear error in reviewing and ultimately affirming the magistrate judge's disqualification order.

## 2. The Court Incorrectly Refused to Disqualify Mr. Diaz Absent the Government's Showing that Barrios Was Its "Key" or "Clincher" Witness.

In disqualifying conflicted counsel, no published case law **requires** that the government demonstrate that a witness it intends to call at trial, and with whom defense counsel has loyalties that conflict with the loyalties that he owes to the defendant, is the government's "key" or "clincher" witness.[6] Instead, it requires that a court addressing the conflict issue balance the defendant's

---

[6]        Although some cases have mentioned that the witness at issue is a key or principal witness in the government's case, *e.g., United States v. Combs,* 222 F.3d 353, 361 (7th Cir. 2000); *United States v. Algee,* ___ F.3d ___, 2002 WL 31432170, *3 (7th Cir. 2002), *United States v. O'Malley,* 786 F.2d 786, 791-92 (7th Cir. 1986), that fact was not dispositive in any of those cases. Instead, the nature of the conflict was preeminent. Federal courts have disqualified conflicted counsel in cases without finding that the government witnesses at issue were "key" or "principal" in the government's case. *See, e.g., United States v. Ring,* 878 F. Supp. 134, 139 (C.

qualified right to counsel of his choice with the right to representation by counsel unfettered by any conflict. *Wheat v. United States*, 486 U.S. 153, 164 (1988). It also has an important and independent duty to balance the right to counsel of choice with the broader interests of judicial integrity. *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994). However, "[t]he need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial." *Id.*

In deciding whether the actual or potential conflict warrants disqualification, a court must examine whether the subject matter of the first representation is substantially related to that of the second. *Ross*, 33 F.3d at 1523. The court's goal should be to discover whether defense counsel has divided loyalties that would prevent him from effectively representing the defendant. *Id.* If the conflict **could** cause counsel improperly to use privileged communications in cross-examination, disqualification is warranted. *Id.* Disqualification is equally appropriate if the conflict **could** deter counsel from intensely cross-examining the witness to protect privileged communications with him or to advance counsel's own personal interests. *Id.*

Here, too many factors point to serious actual conflicts and the risk is simply too great that Mr. Diaz's prior representation of Barrios irreconcilably conflicts with his current representation of Falcon.[7]  As the magistrate judge correctly noted, in finding an actual conflict, the subject matter

---

D. Ill. 1995) (attorney disqualified on government's motion for reconsideration based on conflict with government witness who would provide corroborating testimony at trial); *United States v. Cannistraro*, 794 F. Supp. 1313, (D. N.J. 1992) (counsel's prior representation of "potentially important" government witness was factor weighing in favor of disqualification). More importantly, the seminal Eleventh Circuit case addressing attorney disqualification does not require the government to prove that the witness at issue is either "key" or "principal" to the government's case before obtaining disqualification of conflicted counsel. *See United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994). Nonetheless, as the magistrate judge found in his disqualification order, the government demonstrated in its extensive written and oral proffers that Barrios' testimony was relevant, material, non-cumulative, and important to the government's case against Falcon.

[7]     An actual, as opposed to potential, conflict exists when counsel represents a defendant after having previously represented a government witness in a related matter. *United*

11

of Mr. Diaz's prior representation of Barrios is substantially related to his current representation of Falcon. Although Falcon, through counsel, has expressed a desire to waive the conflict, Barrios has refused to do so. Therefore, Barrios is entitled to a continuing attorney-client privilege relating to Mr. Diaz's prior representation of him. Mr. Diaz has proposed as a solution to the conflict problem, among other things, that Falcon waive his right to conflict-free counsel, that he forego cross-examining Barrios, and that other witnesses cannot be cross-examined or presented to contradict Barrios' testimony. This Court should refuse Falcon's proposed waivers of conflicts of interest to ensure adequacy of his representation to protect the court's integrity and to preserve the Court's interest to be free from future attacks over adequacy of waiver and fairness of trial. *Ross*, 33 F.3d at 1524.

When a district court finds that a conflict is severe, such as when "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representations," it is obligated to disqualify the attorney, regardless of whether the defendant has waived the conflict. *See United States v. Levy*, 25 F.3d 146, 153 (2d Cir. 1994). The Second Circuit noted that, "[i]n explaining when the conflict is so severe as to mandate disqualification, we have stated that '. . . [t]he most typical [situation] is where the district court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation or because of counsel's prior representation of a witness or co-defendant.'" *United States v. Zichettello*, 208 F.3d 72, 104 (2d Cir. 2000) (*quoting United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993)), *cert. denied*, 531 U.S. 1143 (2001). Here, the actual conflict is sufficiently severe for this Court to find that no rational defendant would knowingly and intelligently waive his right to conflict-free counsel

---

*States v. Martinez*, 630 F.2d 361 (5th Cir. 1980).

12

and, therefore, that Mr. Diaz's disqualification is required, not only to protect the interests of Falcon, Barrios, and the United States,[8] but also to protect the interests of the judicial system.

The Court's attempt to accommodate the conflict by having Mr. Diaz segregate privileged information that he learned from Barrios is contrary to the Court's recognition in its order disqualifying Mr. Bergendahl of the difficulties inherent in such an arrangement:

> While the Court has every reason to believe that Mr. Bergendahl, a respected member of the Bar, will be true to his oath to preserve his former client's confidences, the Court is also aware that in the stress of a long trial with intense emotions, inadvertent mistakes can and do occur.

(DE 1853:7).  The government respectfully submits that no facts presented in this matter argue for a contrary presumption here.

3.    **The Court's Finding that the Government Should Have Known and Advised the Court that Barrios Was a Potential Witness as Early as the Fall of 2001 Is Unsupported.**

The Court also appears to base its reversal of the disqualification order on a finding that the government should have known and advised the court that Barrios was a potential government witness as early as Fall of 2001.  First, the finding is not supported by the record.

The parties proffered that Arturo Alvarez called AUSA Sullivan shortly after Barrios had called him in late 2001, asking whether Barrios might qualify for substantial assistance if he cooperated (9/22/02 Hearing TR at 21-22, 24).  AUSA Sullivan told Mr. Alvarez that, based on the timing, he did not think that Barrios would qualify (*id.*).  At that time, Mr. Alvarez did not make a proffer of how Barrios could or would cooperate with the government (*id.*).  In late January of 2002, Mr. Alvarez called AUSA Sullivan to provide a "thirty second proffer" in which he claimed that, sometime earlier, Barrios had been improperly contacted by attorney Lourdes Gonzalez (*id.* at 22).  Based on the brief proffer, AUSA Sullivan agreed to writ Barrios to the district to discuss the proffer

---

[8]    *See Locascio,* 6 F.3d at 934 ("the government's case should not be unfairly impaired so that an accused can continue with conflicted counsel"); *see also United States v. James* 708 F.2d 40, 46 (2d Cir. 1983) ("The government has an interest in protecting its witnesses from tactics that are unfair; the public's interest in having trials conducted fairly demands no less on behalf of any witness").

(*id.* at 23).[9] Barrios arrived in the district on February 21, 2002 (*id.* at 23). When Mr. Alvarez contacted AUSA Sullivan again about what Barrios could do to cooperate, AUSA Sullivan advised him that the government could not make promises to Barrios based on his hypothetical cooperation and that, if Mr. Alvarez wanted to learn how cooperation works, he could contact Ruben Oliva (*id.* at 24-25).

Mr. Oliva first met with Barrios on March 5, 2002, after having received a call from Barrios a few days earlier (*id.* at 4-5). Barrios did not share with Mr. Oliva any specific information about what he intended to use to cooperate (*id.* at 5-6). Barrios did not ultimately retain Mr. Oliva (*id.*). Mr. Oliva spoke briefly with Special Agent Mario Tariche a week or two after his meeting with Barrios and told Tariche that he might represent Barrios (*id.* at 7-8). Mr. Oliva did not tell Agent Tariche that Barrios would, in fact, cooperate; instead, he only told Tariche that there was a possibility he would represent Barrios (*id.* at 8). Mr. Oliva recalled that he may have told Tariche that Barrios might have some information that would be of interest to the government, but did not state what that information was (*id.* at 9). According to Barrios, when he met with Mr. Oliva, he "had not quite decided yet to cooperate" (*id.* at 36-37). Barrios also did not ask Mr. Oliva to communicate with the government (*id.*).

Mr. Oliva spoke with Mr. Diaz when he met Barrios at the jail and told him that Barrios and Magluta were housed on the same floor (*id.*at 9-10). Mr. Diaz told Mr. Oliva that Barrios was upset with Mr. Oliva because he believed that Mr. Oliva had told third persons that Barrios had intended to cooperate with the government (*id.* at 10). Mr. Oliva acknowledged having received a call from Mr. Diaz asking him to tell Barrios that, because he now represented Falcon, he could not speak to Barrios (*id.* at 10-12).

In late March of 2002, Barrios spoke to Rene Palomino, whom he ultimately retained, and asked Mr. Palomino to contact AUSA Sullivan about his interest in cooperating (*id.* at 40). Barrios

---

[9]     The writ was dated February 6, 2002 (*id.* at 51).

asked Mr. Palomino to say that he had decided to cooperate and that he "had already lost fear because I respect them" (*id.* at 41). Mr. Palomino tried to contact AUSA Sullivan in the beginning of April of 2002 (*id.* at 54). Mr. Palomino gave AUSA Sullivan a brief proffer of Barrios' proposed cooperation a few days before prosecutors and agents met with Barrios on April 11, 2002 (*id.* at 54-55). The initial meeting lasted approximately 1 ½ to 2 hours (*id.* at 58).

Barrios testified at a hearing before this Court on April 16, 2002, on the government's emergency motion for an anonymous, sequestered jury at Magluta's trial. During his testimony, Barrios testified that he had testified falsely during his own trial and that his counsel, Mr. Diaz, had known of and encouraged him to testify falsely. During that hearing, the Court acknowledged that there could be a conflict between Barrios and Mr. Diaz. Mr. Diaz's co-counsel, Katherine Ferro, was present during the hearing. Thereafter, prosecutors and agents further debriefed Barrios to determine whether he could be a government witness at Magluta's and/or Falcon's trials. In late April of 2002, the government decided that it would call Barrios as a witness at Falcon's trial. Although he was also listed as a government witness for Magluta's trial, he was not called.[10]

The prosecutors have repeatedly explained in pleadings and during disqualification hearings that the government's testimonial evidence against Falcon is considerably less than what it presented against Magluta. They also explained that Barrios is the only government witness who can provide direct testimony about meetings he had with Falcon regarding the "tractor-trailer" drug transportation scheme that forms part of the underlying specified unlawful activity for the money laundering

---

[10]     The government called more than 100 witnesses at Magluta's trial. Unlike this case, because it already had several witnesses who could provide direct testimony about his drug trafficking, money laundering, and obstruction activities, it did not need to present Barrios' testimony to secure Magluta's convictions. As the government previously explained in its response to Falcon's appeal to Judge Bandstra's disqualification order, its decision not to call Barrios against Magluta also stemmed from the pressures created by the use of the sequestered jury and the government's desire to avoid the delay that would result from what likely would have been extensive cross-examination of a non-English speaking witness. The Court also erroneously relies on the government's decision not use Barrios' testimony in the Valverde trial, even though the Valverde trial concluded well before Barrios had expressed an interest in cooperating with the government.

conspiracy charge. Although the government has other witnesses who can provide general testimony regarding the drug trafficking scheme, Barrios is important because he directly implicates Falcon for the purpose of establishing Falcon's knowledge and intent in the money laundering conspiracy. Moreover, Barrios can provide additional testimony, although not directly against Falcon, regarding the obstruction of justice conspiracy, with which Falcon also is charged.

Based on the chronology of events described above, it is clear that the Court's finding that the government should have known and should have advised the Court that Barrios was a potential government witness as early as the Fall of 2001, and therefore, should be precluded from calling him as a witness, is erroneous. The magistrate judge's conclusion that the earliest the government knew that it would use Barrios as a witness against Falcon was late April of 2002. The prosecutors advised the Court of the conflict in early May of 2002. There was no basis for this Court to find the government responsible for knowing that Barrios would be a witness against Falcon before any prosecutor or agent had met with and debriefed him. Barrios himself testified that he had not fully decided to cooperate until April of 2002, and did not meet with anyone from the government until April 11, 2002. The government also should not be held to a standard of having to chase after any potential witness who expresses even a modicum of interest in cooperating, absent a solid proffer of against whom he will cooperate and what reliable information he can provide.

Ironically, as early as March of 2002 – two months after he had entered an appearance on Falcon's behalf – Mr. Diaz himself became aware that Barrios might cooperate against Falcon.[11] Nonetheless, Mr. Diaz did not feel compelled at that time to advise the Court about the potential conflict that he faced. Clearly, neither he nor Falcon can claim "surprise" in Barrios's cooperation.

In refusing to allow Barrios to present live testimony at trial, the Court appears to be sanctioning the government for its perception that the government had failed to promptly advise the

---

[11]      By previously representing Barrios and sharing attorney-client confidences with him, Mr. Diaz was already in a position to know of the potential conflicts with Falcon long before the prosecutors and agents met with Barrios in April of 2002.

Court of its intent to call Barrios as a witness against Falcon. In imposing such a harsh and wholly unjustified "sanction," this Court has disregarded that "[i]t is the function of the court to hear all relevant evidence in an attempt to reach a truthful and reliable verdict." *United States v. Burkhalter*, 735 F.2d 1327, 1330 (11th Cir. 1984) (*per curiam*). Even in clear instances where the government violated discovery or disclosure obligations under *Fed. R. Crim. P.* 16, the Eleventh Circuit has found that trial courts have abused their discretion in suppressing evidence or excluding witness testimony as a sanction for the violation without exploring lesser sanctions. *Id.* (court abused discretion in excluding witness testimony on government's unintentional discovery violation); *see also United States v. Euceda-Hernandez*, 768 F.2d 1307 (11th Cir. 1985) (trial court abused discretion in excluding statements based on government's late disclosure); *United States v. White*, 846 F.2d 678 (11th Cir. 1988) (same).

Here, the government did not improperly delay in bringing Mr. Diaz's conflict to the Court's attention. It raised the issue as soon as it determined that Barrios would be a potential government witness against Falcon. Moreover, Mr. Diaz was aware of the conflict even sooner. Regardless, the government alerted the Court to the conflict less than four months after Mr. Diaz entered his appearance in the case. Furthermore, any minimal delay in filing the disqualification motion was not intentional and did not unduly prejudice Falcon. Also, the Court's continuance of trial cannot be blamed on the disqualification motion, but it does afford Falcon sufficient time to obtain unconflicted trial counsel to assist his other counsel, Kenneth Kukec and Katherine Ferro, both of whom have represented him in this case for more than two years.

In similar situations, courts have ordered disqualifications of counsel near the date of trial. *See, e.g., United States v. Miranda*, 936 F. Supp. 945 (S. D. Fla. 1996) (court disqualified counsel for conflict on May 14, 1996, giving defendant 20 days to retain new counsel, with trial date of July 22, 1996), *aff'd*, 197 F.3d 1357 (11th Cir. 1999). Even in this trial, this Court entered an order in

17

October of 2002, disqualifying Edward Shohat, Esq., from representing defendant Manuel Magluta, based on Mr. Shohat's conflict as a government witness (DE 2422).

4. **The Court's *Sua Sponte* Substitute Solution of Prohibiting Barrios from Testifying at Trial to Avoid Disqualifying Mr. Diaz and, Instead, Requiring an Agreed Stipulation Is Erroneous and an Improper Suppression of Admissible Testimony.**

Although the government recognizes that, in ordering the government and Falcon to stipulate to Barrios's testimony, the Court was attempting to find a resolution short of disqualifying Mr. Diaz, the Court's order prohibiting the government from calling Barrios as a witness at trial, even though his testimony is highly relevant and material to the issues against Falcon and his codefendants, and is not cumulative of other witnesses' expected testimony, constitutes an improper suppression of some of the government's important trial evidence.

The parties are presently attempting to reach a resolution with respect to a joint stipulation as to Barrios's testimony. At this point, the government's proposal *is far more extensive* and detailed than the defendant's proposal. However, regardless of the form of the eventual stipulation, from the government's perspective the stipulation will be a wholly insufficient way of presenting the evidence that derives from Barrios's testimony.

Ordinarily, parties stipulate to easily understandable facts – such as the testimony of a custodian of records or chain of custody testimony. Parties generally do not seek to present through stipulation evidence regarding the commission of acts in furtherance of a criminal conspiracy that requires a number of steps to explain. Such evidence generally is presented through the testimony of live witnesses – since it is important for the jury to see and hear the witness and to associate the witness's testimony with the exhibits that the witness identifies and describes in order to appreciate and retain the information. Allowing the jury these means of receiving, retaining, and differentiating evidence becomes all the more important in a trial of decent length, such as this one.

Commentators have observed the problems inherent in substituting stipulations for live evidence. "'[A] colorless admission by the opponent may sometimes have the effect of depriving

the opponent of the legitimate *moral force of his evidence*; furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations . . . so as to be technically but not practically a waiver of proof.'" Michael H. Graham, *Handbook of Federal Evidence*, § 403.1, at 263, n. 33 (4[th] ed. 1996) (*quoting* Wigmore, *Evidence* §2591, at 589 (3d ed. 1940)) (emphasis in original). Therefore,

> [i]f the probative value test is met, admission of prejudicial evidence may be proper in some instances even though the party against whom it is offered expressly agreed to stipulate to the proposition for which it is offered, as **the stipulation may not provide the jury the same probative force as the evidence itself**.

2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 403.04[3] (2d ed. 1997) (emphasis added); *see also* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5194, at 198-99 (1978) ("Although there is authority that suggests that the trial judge should compel the prosecution to accept such stipulations, the weight of authority in federal courts seems to hold that the defendant has no right to have his stipulation accepted.").

The Court's order in this regard conflicts with its order affirming Magistrate Judge Bandstra's order disqualifying Edward Shohat from representing codefendant Manuel Magluta. In that matter, Manuel Magluta presented the same proposal that is at issue here – a compelled stipulation to Mr. Shohat's testimony. The Court rejected the proposal because "the stipulation deprives the Government of an efficient and effective way of providing evidence needed to satisfy their burden of proving guilt of the charges beyond a reasonable doubt" and it "does not provide the additional evidence that live testimony would provide . . . (DE 2422:2)."

The government respectfully submits that the Court's order requiring a stipulation, in lieu of Barrios's live testimony, saps the value of the evidence that Barrios would present. Courts

generally cannot compel parties to accept stipulations of evidence in criminal cases,[12] and the government is aware of no authority that would support the Court's order in this matter.

## CONCLUSION

**WHEREFORE,** for the foregoing reasons, the United States respectfully requests that this Court reconsider its October 30, 2002 Order Partially Affirming and Partially Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz as Trial Attorney for Defendant Falcon, and issue a new order disqualifying Mr. Diaz as trial counsel for defendant Falcon and reversing its order requiring the government to limit its presentation of testimony from government witness Gilberto Barrios through a compelled stipulation between Falcon and the United States.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____

MICHAEL P. SULLIVAN
Assistant United States Attorney
Senior Litigation Counsel
Fla. Bar No. 134814
99 N.E. 4th Street, Eighth Floor
Miami, FL 33132-2111
Tel.    (305) 961-9274
FAX   (305) 536-9675

By: _____

MICHAEL S. DAVIS
Assistant United States Attorney
Fla. Bar No. 972274
99 N.E. 4th Street, Fourth Floor
Miami, FL 33132-2111
Tel.    (305) 961-9027
FAX   (305) 530-6168

---

[12] The government notes an exception to this rule – it must accept a stipulation to a prior felony conviction where proof of the conviction is an element of the offense. *See Old Chief v. United States*, 519 U.S. 172 (1997). However, additional evidence of circumstances of the prior conviction may be presented if it addresses other issues, such as impeachment or issues not related to the defendant's status as a convicted felon. *See United States v. Crawford*, 130 F.3d 1321, 1323-24 (8th Cir. 1998) (underlying evidence of prior conviction admissible under *Fed. R. Evid.* 609 in § 922(g) case, even though defendant agreed to stipulate to it).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 13th day of November 2002, a true copy of the foregoing was mailed to the following counsel of record:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600  701
Miami, FL 33131

Katherine Ferro, Esq.
Brickell Avenue, Suite 2080
Miami, FL 33131

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134

Michael J. Rosen, Esq.
2400 S. Dixie Highway, Suite 105
Miami, FL 33133

MICHAEL P. SULLIVAN
Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
    a/k/a Willy,
                 Defendant.
_____/

NIGHT BOX
**F I L E D**

NOV 27 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## GOVERNMENT'S CONSOLIDATED REPLY TO DEFENDANT FALCON'S RESPONSE TO GOVERNMENT'S MOTION FOR RECONSIDERATION OF ORDER OVERRULING MAGISTRATE JUDGE'S ORDER DISQUALIFYING RICHARD J. DIAZ AS TRIAL ATTORNEY FOR DEFENDANT FALCON; RESPONSE TO DEFENDANT'S CROSS-MOTION FOR RECONSIDERATION; AND RESPONSE TO FALCON'S CONDITIONAL MOTION TO PROCEED PRO SE

The United States submits the following consolidated reply to the defendant Falcon's response to the government's motion for reconsideration of this Court's Order Partially Affirming and Partially Overruling Magistrate Judge's Order Disqualifying Richard J. Diaz as Trial Attorney for Defendant Falcon and response to the defendant's cross-motion for reconsideration. For the reasons set forth below, the Court should grant the government's motion for reconsideration, affirm Judge Bandstra's order disqualifying Mr. Diaz, and deny Falcon's motion for reconsideration. This submission additionally addresses Falcon's conditional motion to proceed pro se. The government states as follows:

### A.   *The Government Has Made the Necessary Showing for Reconsideration*

At pages 1-2 of his submission, Falcon sets forth the standard governing motions for reconsideration and acknowledges that the standard includes instances of clear error.  Falcon then proceeds to argue incorrectly that the government's motion does not satisfy this test.

In its motion for reconsideration, the government identified a variety of areas in which the Court's order reversing Judge Bandstra was clearly erroneous. These included the following: (1) the Court's order incorrectly employed a de novo standard of review, rather than the clearly erroneous and/or contrary to law standard under 28 U.S.C. §636(b)(1)(A); (2) the Court's order incorrectly required the government to show that Barrios was a key or "clincher" witness in order to warrant disqualification; (3) the Court's order incorrectly disregarded Judge Bandstra's factual finding that the government did not improperly delay identifying the conflict issue; and (4) the Court's order requiring the government to stipulate to Barrios's testimony incorrectly compromised the government's ability to present its evidence.

Although the Court has not yet ruled on the government's motion, during the hearing on November 22, the Court appeared to acknowledge the merit of several of the main points advanced by the government.  In particular, the Court acknowledged that Judge Bandstra had correctly applied the governing law, that Barrios's testimony was not cumulative, and that under a straight-forward application of the relevant law governing the issue presented Mr. Diaz should be disqualified.  See Transcript of Hearing of Nov. 22, at 23-25.

Falcon cites no authority to dispute the government's positions that the Court's order applied an incorrect standard of review to Judge Bandstra's order and incorrectly required the government to show that Barrios was a key or "clincher" witness.  At page 7 of his motion, Falcon

2

unconvincingly seeks to minimize Barrios's significance as a witness against him.  At pages 9-10 of his order, Judge Bandstra found that Barrios offered "unique testimony" against Falcon that is unavailable from other sources.    During the hearing on November 22, the Court likewise acknowledged that Judge Bandstra was correct in this finding and that Barrios "ties Mr. Falcon directly in a way that no else has."  See Transcript of Hearing of Nov. 22, at 25-26.  In the portion of this reply that addresses the problems inherent in allowing Falcon to waive cross-examination of Barrios, see infra, at 5-7, the government explains in more detail some of the reasons why Barrios's testimony is significant.

Falcon seeks to resist this conclusion by once again relying upon the government's failure to call Barrios as a witness against co-defendant Magluta.  At page 15, footnote 10, of its motion for reconsideration, the government explained the considerations that caused it not to call Barrios against Magluta, versus the considerations in this case.  One of those dynamics, of course, was the time pressures associated with the use of a sequestered jury.  Falcon does not answer these considerations on the merits, but rather tries to belittle them through a combination of mischaracterization and misdirected sarcasm – stating at page 7 of his response that "the prosecution persists in its assertion that its decision not to call Barrios during Mr. Magluta's trial was motivated solely by its altruistic concern over the inconvenience such testimony might cause the sequestered jury."  Of course, the government has never stated that its decision in this regard  was based upon "altruism," and Falcon's insistence on addressing the issue through arguments of this sort hardly advances the resolution of the issue.

At pages 5-7 of his response, Falcon reiterates his earlier arguments that the government improperly delayed in identifying the conflict issue.  After hearing the testimony of witnesses

3

presented by Falcon to support this claim, Judge Bandstra rejected that argument at pages 12-13 of his order. As the government explained at pages 13-16 of its motion for reconsideration, Judge Bandstra's finding was overwhelmingly supported by the evidence in the record before him.

At page 8, Falcon also contends that stipulation to Barrios's testimony is an appropriate solution. At pages 18-20 of its motion for reconsideration, the government explains why stipulation unfairly prejudices the government and notes that its argument in this regard is supported by the reasoning in support of the Court's order disqualifying Mr. Shohat.[1]

### B. The Defendant's Offer to Waive Cross-Examination of Barrios, if Accepted, Would Substantially Undermine Falcon's Defense in this Case

At the November 22 hearing, the Court expressed concerns that Falcon's offer to waive cross-examination would deny him effective assistance of counsel. See Transcript of Hearing of Nov. 22, at 25. Those concerns are well-placed. By allowing Barrios's testimony to go unchallenged, Falcon would be agreeing to an array of facts that support the government's case against him in a variety of ways.

By waiving cross-examination of Barrios, Falcon necessarily would be admitting that he and co-defendant Salvador Magluta were partners in a huge cocaine trafficking operation that netted massive sums of money. By so doing, Falcon would be admitting to personal involvement in the

---

[1]At page 8 of its motion, the government also explained that under 28 U.S.C. §636(b)(1)(A), the Court should not have relied upon Falcon's concession made for the first time on appeal to waive cross-examination of Barrios. At pages 4-5 of his response, Falcon argues that the Court's reliance upon what he characterizes as "new information" is not impermissible and achieves the same result as if the Court had remanded the matter to Judge Bandstra. Based upon the Court's remarks at the November 22 hearing, it is apparent that the Court is not going to decide the motion on this procedural issue. Accordingly, the government will not address the issue any farther. As explained in the text, see infra, at 4-8, the substantive implications are sufficient to render it unworkable.

4

specified unlawful activity element of the money laundering charges and would be admitting to a motive both to obstruct justice and to engage in the money laundering activity used to finance the various forms of obstruction.

While these concessions alone have great significance, the ramifications of leaving Barrios's testimony uncontested extend beyond these implications. The various details of Barrios's testimony have an array of consequences that extend beyond merely confirming Falcon's conduct as a massive cocaine trafficker from 1987 until his arrest in 1991. Below are some of the more significant implications that most readily come to mind.

For instance, based upon the government's draft stipulation of Barrios's testimony, Falcon will be admitting to his role with Magluta as leaders of the "tractor-trailer conspiracy,"the participation of people such as Pedro Rosello, a/k/a "Pegy," and Federico de la Cruz-Munoz, a/k/a "Siqui," his (Falcon's) use of the nickname "Tata," and Magluta's use of the nickname "Lechon." These facts directly corroborate Rosello's truthfulness as to the tractor-trailer conspiracy. They also corroborate the authenticity of the red day-timer notebooks seized in the LaGorce mansion – which contain entries for the distribution of $30 million and $22 million in cash respectively to "Lechon," a/k/a Magluta, and "Tata," a/k/a Falcon. Falcon's strategy necessarily will be to distance himself from Magluta. Barrios's testimony, however, puts Falcon at the same level of Magluta within the organization in terms of both leadership and wealth.

The impact of Barrios's corroboration of Rosello extends to specific acts at issue under the charges in this case. Government witnesses Oscar Mas and Carlos Roig will testify to having been recruited to falsely discredit Rosello's testimony. By leaving uncontested testimony that will corroborate Rosello's truthfulness, Falcon necessarily will be leaving uncontested testimony that also

5

will establish a motive for the organization to recruit Mas and Roig to falsely discredit Rosello. Such testimony thus will indirectly corroborate the testimony of Mas and Roig and, to a lesser extent, the testimony of Arturo Avila, who will testify to being recruited falsely discredit the testimony of other cooperating witnesses and more importantly will testify to receiving an assurance from Falcon that he (Avila) would be paid for his assistance.

As the Court may recall from the government's draft stipulation of Barrios's testimony, Barrios also will testify to having worked with Miguel Vega and that Falcon's brother Taby introduced him to Vega. The Court likely appreciates the significant role that Vega plays in the case. To date, with the exception of Rosello, the government accomplice witnesses who associate with Vega – such as Marilyn Bonachea, Luis Valverde, Tony Fandino, and Jorge Hernandez – all come from the Magluta side of the organization.  To government's recollection, Barrios is the only government witness who directly associates Vega with the a high-ranking player on the Falcon side of the organization.  To the extent that Falcon's trial strategy would be to disassociate himself from Vega, leaving Barrios's testimony uncontested would undermine such an effort.

Barrios also will testify to a conversation he had with Falcon following Rosello's arrest in which Falcon told Barrios that he should be careful and that Jose Fernandez could get an apartment for Barrios if he wanted to "lay low."  The Court likely appreciates the significant role that Fernandez plays in the case. Marilyn Bonachea will testify to Fernandez's role in bribing the female juror in Case No. 91-6060 and Luis Valverde will testify to having received from Fernandez a check book used to launder drug proceeds to pay defense lawyers representing organization members. As with Vega, the government accomplice witnesses who associate with Vega – once again, Marilyn Bonachea, Luis Valverde, Tony Fandino, and Jorge Hernandez – all come from the Magluta side of

6

the organization. To government's recollection, Barrios is the only government witness who will directly associate Fernandez with Falcon in criminal activity. To the extent that Falcon's trial strategy would be to disassociate himself from Fernandez, leaving Barrios's testimony uncontested would undermine such an effort.

Additionally, Barrios will discuss the positions in the organization of Vega and Eddy Lezcano in a manner consistent with the testimony of Marilyn Bonachea. By leaving Barrios's testimony uncontested, Falcon leaves uncontested testimony that will corroborate Bonachea. Given Bonachea's central role in the case and Falcon's incentive to discredit her, such a tactic cannot advance his defense.

The facts discussed above all are facts within the government's draft stipulation of Barrios's testimony to which Falcon does not contest. The government's draft stipulation also includes Barrios's account of the efforts in the late 1990s by Lourdes Gonzalez to convince him not to cooperate against Magluta and Falcon and Magluta's admissions to having bribed Miguel Moya. The government expects Falcon to object to the admissibility of such testimony. The government submits that the testimony as to both incidents would be admissible as co-conspirator statements under Rule 801(d)(2)(E). Even though such testimony does not directly implicate Falcon, allowing such testimony to go uncontested would be extraordinarily damaging to Falcon. The testimony regarding Lourdes Gonzalez will update the witness tampering aspect of the conspiracy through 1999. The testimony regarding Magluta's admissions about the Moya bribery will directly corroborate Marilyn Bonachea's testimony in this regard.

At the November 22 hearing, counsel for Falcon justified Falcon's offer to waive cross-examination of Barrios by terming him a "non-entity." See Transcript of Hearing of Nov. 22, at 25.

7

The discussion above should cast enormous doubt upon that characterization and should lead the Court to conclude that Falcon cannot waive cross-examination of Barrios without depriving himself of effective assistance of counsel.

### C.   *The Court Should Reject Falcon's Cross-Motion for Reconsideration*

In the alternative, Falcon now argues that he should have full and free cross-examination of Barrios because, according to Falcon, Barrios already has waived his attorney-client privilege with Mr. Diaz. In support, Falcon has provided to the Court, ex parte, a letter that purports to support this argument and which he characterizes as newly discovered evidence (although he does not explain why it was not available to him at the time that the motion was litigated before Judge Bandstra).

The government cannot respond fully to this claim. The government has not seen the letter, does not know its contents or to whom it supposedly was sent, and has not yet been able to discuss with Barrios the allegations contained in the letter. Nonetheless, the mere allegation itself and the circumstances under which it was made – far from supporting Falcon's position – should weaken it in the Court's eyes.[2]

A substantial portion of Falcon's strategy in opposition to Mr. Diaz's disqualification has been to try to subvert the duties that Mr. Diaz continues to owe to Barrios, particularly the duty of loyalty and of confidentiality. Falcon continues to adhere to the view that, once a co-conspirator cooperates with the government, the co-conspirator forfeits his right to rely upon the duties owed to him by his former counsel. Based upon his motion for reconsideration, it now appears that portions

---

[2]To the extent that Falcon's motion could be read to confirm that Barrios indeed made to Mr. Diaz the statements contained in the motion – and Falcon's motion is not entirely clear as to this – Mr. Diaz may have disclosed confidences he currently owes to Barrios. The fact that Falcon's motion leaves this question unanswered itself is another factor that should concern the Court.

of Falcon's defense team are actively investigating Barrios's relationship with Mr. Diaz. At the November 22 hearing, Mr. Diaz himself – and not either of his co-counsel – asked the Court to conduct an ex parte hearing with Barrios, with the goal of extinguishing any duties that he may owe to his former client. Given that Mr. Diaz represented Barrios during a significant trial, the Court should presume that Barrios shared various confidences with Mr. Diaz.[3] See United States v. Cheshire, 707 F. Supp. at 239 ("there is a presumption that a lawyer receives confidential communications in the course of his representation of a client"). The aggressive assault of Falcon's defense team – including Mr. Diaz – upon the sanctity of those confidences should undermine any confidence that the Court may have that a middle-ground solution will protect the obligations that Barrios is owed.

Falcon likewise continues to maintain that Barrios's accusation that Mr. Diaz engaged in improper conduct by suborning Barrios's trial perjury results in Barrios forfeiting his right to have protected any and all confidences he previously conveyed to Mr. Diaz. See Transcript of Hearing of Nov. 22., at 31-32 & 36-37. At page 11 of his order, Judge Bandstra properly rejected this argument. Falcon contends that no rationale favors such a result. However, to accept Falcon's position would unduly chill a client's ability to lodge any sort of complaint – whether it be a bar complaint or a complaint in some other form. For under Falcon's position, once a client were to

---

[3]At page 12 of his order, Judge Bandstra specifically concluded, following his ex parte hearing with Barrios and Barrios's current counsel, that Barrios shared several confidences with Mr. Diaz unrelated to the information he has provided to the government as a cooperating witness. Therefore, even assuming for sake of argument that there is any merit to Falcon's claim of waiver of Barrios's confidences regarding the allegation contained in Falcon's response, it is insufficient to demonstrate that Barrios has waived his right to attorney-client privilege as to the other areas requiring continued confidentiality.

accuse an attorney of assisting him in misconduct, the attorney would be able to divulge all of the client's secrets, regardless whether they relate to the specific misconduct or to other matters.

> An attorney's duty of loyalty and confidentiality to his clients continues even after the termination of the attorney-client relationship. It does not end until the former client releases his attorney from the duty or waives any interest in the continued protection of the privileged communications.

United States v. Stout, 723 F. Supp. 297, 309 (E.D. Pa. 1989). That principle remains in place in this case – regardless whether the lawyer and the former client remain on friendly terms. The Court should reject Falcon's continued efforts to extinguish the duties that Mr. Diaz continues to owe to Barrios.

### D.   *Government's Response to Defendant's Conditional Motion to Proceed Pro Se*

The Court has requested that the government address Falcon's previously-filed conditional motion to proceed pro se. Under Faretta v. California, 422 U.S. 806 (1975), Falcon has a constitutional right to represent himself. The Eleventh Circuit has recommended that, when a defendant seeks to represent himself, the preferred course is for the Court to have a hearing in which it informs the defendant of the nature of the charges against him, the potential punishments, the basic trial procedures, and the hazards of self-representation. The purpose of such an inquiry is for the Court to determine whether the defendant understands the risks of self-representation and, thus, whether the defendant is waiving his right to counsel knowingly, voluntarily, and intelligently. See United States v. Kimball, 291 F.3d 726, 730-31 (11th Cir. 2002); United States v. Cash, 47 F.3d 1083, 1088-89 (11th Cir. 1995).

Case law also outlines the factors that the Court should consider in assessing the validity of a defendant's waiver of the right to counsel:

> We have identified several factors that are especially important to the determination whether a defendant's decision to proceed pro se is valid. These are the factors: 1) the defendant's age, health, and education; 2) the defendant's contact with lawyers prior to trial; 3) the defendant's knowledge of the nature of the charges and possible defenses and penalties; 4) the defendant's understanding of the rules of evidence, procedure and courtroom decorum; 5) the defendant's experience in criminal trials; 6) whether standby counsel was appointed and, if so, the extent to which standby counsel aided in the trial; 7) any mistreatment or coercion of the defendant; and 8) whether the defendant was attempting to manipulate the trial.

Kimball, 291 F.3d at 730-31 (citing Cash, 47 F.3d at 1088-89). Cash adds that "[a]ll factors need not point in the same direction." Cash, 47 F.3d at 1089.

Because the Court has not yet conducted its inquiry of Falcon, the issue is somewhat premature. However, in the government's view, the Court should view Falcon's motion warily.

Through counsel, Falcon has claimed that his motion to proceed pro se is prompted by his desire for the earliest possible trial. Given that Falcon has delayed his own trial by successfully obtaining two severances and taking an unsuccessful interlocutory appeal, his insistence upon a prompt trial is of relatively recent origin. The government cannot help but suspect that Falcon's claimed desire to proceed pro se is prompted not by a sincere desire for a prompt trial or belief that he is best suited to represent himself but rather is a ploy to raise the costs upon the Court that would be associated with disqualifying Mr. Diaz. When Falcon's counsel at the November 22 hearing previewed the prospect of Falcon proceeding pro se, counsel for one of the co-defendant's responded by suggesting that this would necessitate a severance of the co-defendants.

Given that very experienced counsel, Mr. Kukec, has represented Falcon in this case for over three years, it is hard to imagine how Falcon could reasonably believe that his defense would be better off by discharging Mr. Kukec and representing himself. As noted above, one of the factors

11

that the Court may consider under <u>Cash</u> is whether the defendant's attempt to proceed <u>pro se</u> is prompted by a desire to interfere with the orderly process of the trial. Available evidence suggests such a motive. If Falcon persists in his claimed desire to proceed <u>pro se</u>, the Court should carefully assess this consideration. In any event, the Court should not permit Falcon to use his threat to proceed <u>pro se</u> as a means to manipulate its consideration of the issues relating to Mr. Diaz's disqualification.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

_____
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

12

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this _21ut_ day of November 2002 a true copy of the foregoing was served by facsimile to:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600 701
Miami, FL 33131

Katherine Ferro, Esq.
Brickell Avenue, Suite 2080
Miami, FL 33131

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134

Michael J. Rosen, Esq.
2400 S. Dixie Highway, Suite 105
Miami, FL 33133

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)(s)/Bandstra

UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
                              Defendant.
_____/

## GOVERNMENT'S RESPONSE TO ORDER TO SHOW CAUSE WHY RICHARD DIAZ, ESQ. SHOULD NOT BE DISQUALIFIED AS COUNSEL FOR DEFENDANT FALCON

The government submits the following response to the Court's order to show cause why Richard Diaz, Esq., should not be disqualified as counsel for defendant Falcon. The Court specifically has directed the parties to address why Mr. Diaz should not be disqualified: (a) in view of the decision of his former client and co-defendant in this case, Miguel Vega, to cooperate and testify as a government witness, and (b) given the Court's earlier order disqualifying John Bergendahl, Esq., from representing Falcon after Mr. Bergendahl's former client and co-defendant in this case, Luis Valverde, after Valverde decided to cooperate and testify as a government witness.

For the reasons set forth below, the government respectfully submits that these considerations do call for Mr. Diaz's disqualification. This submission addresses the reasons why the government believes that the Court's order disqualifying Mr. Bergendahl calls for the same result here. This submission also addresses other considerations that warrant disqualification – including the conflict that Mr. Diaz's representation of Falcon will create with the duty he has to protect Vega's

confidences. This submission further addresses arguments that the government expects Falcon to make in opposition to disqualification.

On March 4, 2003, the government sent a letter to counsel for Falcon in which it outlined its anticipated position. On March 5, 2003, counsel for the government conferred with Kenneth Kukec, Esq., in order to attempt to identify grounds on which there may be agreement and to narrow potential differences. Although the parties agree on a small number of matters, as the length of this response suggests the parties do not agree on most of the substantial matters. Where possible, this response indicates where the government believes that the parties are in agreement. (Because this response does not exactly track the letter sent earlier this week and yesterday's conversation between counsel, counsel for the government will attempt to confer with counsel for Falcon after serving this response in order to ensure that the government's understanding of the agreements and disagreements is correct. The government will advise the Court of any mistakes or oversights.)

## I.   VEGA'S EXPECTED TESTIMONY

This proffer of Vega's expected testimony addresses the expected testimony only insofar as it is likely to impact upon the instant disqualification issue. In this regard, the government notes that it so far has been able to meet with Vega only on February 18, 2003, in Tallahassee. Vega now has arrived in Miami. The government plans to interview him this afternoon and will advise the Court and the parties of any additional information that may be relevant to the disqualification issue.

As part of his testimony, Vega will corroborate the testimony of other witnesses that during the 1980s his role in the organization included participating in the collection and distribution of millions of dollars of Magluta-Falcon organization drug proceeds. Vega will testify that during the

period that Salvador Magluta was living in the mansion on LaGorce Island, he (Vega) participated in numerous meetings with Falcon, Magluta, and Gustavo "Taby" Falcon at the LaGorce mansion during which time Vega advised the other three about the status of the distribution and receipt of organization cocaine proceeds. Vega also will corroborate the testimony of Marilyn Bonachea and Jorge Hernandez regarding his regular delivery of large amounts of cash to them during the course of the Case No. 91-6060-Cr-Moreno. Vega also will confirm that he delivered cash to attorneys Frank Rubino, Jon May, L. Mark Dachs, and Richard Martinez..

## II.  COURT'S GROUNDS FOR DISQUALIFYING MR. BERGENDAHL AND THEIR APPLICATION TO THE PENDING DISQUALIFICATION ISSUE

### A.  *Grounds Cited by Court for Disqualifying Mr. Bergendahl*

The Court based its order disqualifying Mr. Bergendahl upon the following findings and reasoning:

1.      The Court held the although the Sixth Amendment vests a criminal defendant with a presumptive right to counsel of choice, that right is not absolute and may be overcome by a demonstration of either an actual conflict or serious potential conflict. The need for the fair and orderly administration of justice consistent with the ethical rules overcomes the right to counsel of choice when a defendant's attorney of choice has an actual conflict, such as when he has previously represented a person who is to be called as a witness against a current client in a criminal trial. (Order at 5-6).

2.      The Court held that under Rule 4-1.9 of the Rules Regulating the Florida Bar when a lawyer's former client will testify against a current client in the same matter, the lawyer cannot represent the current client unless the former client consents (Order at 9-10).

3.      Based upon its understanding from other evidence of Valverde's involvement in the evidence in the case and based upon the government's proffer of Valverde's expected

3

testimony, the Court found that Valverde's testimony was materially adverse to Falcon's interests (Order at 6-7).

    4.    Based upon Valverde's interests in minimizing his sentences for his conviction in the case by testifying as a government witness, the Court found that Valverde's interests were adverse to Falcon's (Order at 7).

    5.    The Court noted that Valverde had disclosed confidences to Mr. Bergendahl, that any compromise of those confidences could undermine Valverde's ability to testify at trial, and thus that Valverde's concerns about Mr. Bergendahl's representation of Falcon were genuine. (Order at 5 & 7-8).

    6.    While not questioning Mr. Bergendahl's good faith, the Court was not willing to accept that, under these circumstances, Valverde's confidences would remain protected. "[T]he Court is aware that in the stress of a long trial with intense emotions, inadvertent mistakes can and do occur" (Order at 7).

    7.    The Court noted Falcon's argument that because Valverde's testimony would not directly implicate him, the conflict could be avoided by excluding Mr. Bergendahl: (a) from the investigating of, trial preparation for, or cross-examination of Valverde; (b) from mentioning him in closing arguments, making any legal arguments regarding his testimony, or questioning other witnesses regarding his participation in the alleged offenses; and (c) from being present in the courtroom when Valverde testifies (Order at 8). The Court rejected this alternative on several grounds.

    a.    The Court concluded that Valverde's credibility will be at issue and that a rigorous cross-examination would be both expected and needed, including testimony about his motives for cooperating (Order at 8-9 & n.8).

    b.    The Court did not accept that the benefits that Falcon obtained by including Mr. Bergendahl within his defense team would outweigh the costs that he would have to assume as a result (Order at 9).

    c.    The Court further suggested that the development of additional evidence by the government over the course of the case could create additional potential difficulties that could not be presently foreseen (Order at 8).

4

        d.     The Court also found that Falcon did not fully appreciate the practical impact that his suggested alternative would impose upon his case such that the Court could comfortably accept a waiver (Order at 8 n.7 & 9).

**B.**    ***Application of Bergendahl Disqualification to this Situation***

Prior to the Court's recent order, Vega – through counsel – had notified the Court and the parties that he was not waiving his attorney-client privilege with Mr. Diaz (i.e., the duty of confidentiality). Since the Court's recent order directed the parties to address the issue in light of the order disqualifying Mr. Bergendahl, and since that order turned on the duty of loyalty, after receiving the Court's order counsel for the government contacted counsel for Vega to inquire whether he would be waiving or asserting the duty of loyalty. Counsel for Vega indicated that he was going to assert the duty of loyalty. Accordingly, the facts and rationale supporting the Court's order disqualifying Mr. Bergendahl call for the same result in this situation.

        1.    **Vega's Testimony is Adverse to Falcon's Interests**

The government does not believe that Falcon is going to question this proposition. However, in order to address the permissibility of any alternatives proposed by Falcon, it is necessary to identify the manners in which Vega's testimony will impact upon Falcon. The brief proffer in Section I, above, when taken in conjunction with other evidence, is sufficient to establish that Vega's testimony will substantially implicate Falcon in a variety of ways.

- Vega's testimony directly ties Falcon to Magluta and "Taby" Falcon and to the drug trafficking and money laundering activity that takes place prior to their October 1991 arrests.

- Vega's testimony directly ties Falcon to Vega and to Vega's money laundering activities on behalf of the Magluta-Falcon organization.

- Vega's testimony puts Magluta and Falcon together on multiple at the LaGorce mansion during a time when both were fugitives.

5

- Vega's testimony corroborates the testimony of Marilyn Bonachea and Jorge Hernandez regarding their money laundering activities during the course of Case No. 91-6060-Cr-Moreno. Bonachea and Hernandez in turn will relate how they either delivered or caused to be delivered to members of Falcon's immediate and extended family the cash drug proceeds that they received from Vega.

- Vega's testimony corroborates the evidence showing that attorneys who worked for Falcon – i.e., Mark Dachs – or his co-conspirators who pled guilty and did not testify against him – i.e, Frank Rubino and Jon May – were paid with laundered Magluta-Falcon organization drug proceeds.

Indeed, Vega's testimony is likely more damaging to Falcon than Valverde's testimony. Valverde is not expected to testify to having had direct contact with Falcon relating to organization criminal activity. By contrast, Vega will testify to participating in multiple meetings with Falcon about core organization drug trafficking and money laundering activity.

The damage that Vega's testimony will cause to Falcon goes beyond Vega's actual testimony and extends to the witnesses that Vega will corroborate, thus bolstering their credibility, and allowing the jury an additional basis for crediting their testimony. Vega's testimony will corroborate a number major cooperating witnesses about facts that include either: Falcon's involvement in organization drug trafficking and/or money laundering activity, "Taby" Falcon's involvement in this activity, Falcon's position next to Magluta at the top of the organization, Vega's role in the organization, and the operation of the aspect of the organization money laundering activities through which organization drug cash was delivered through Marilyn Bonachea and Jorge Hernandez. The cooperating witnesses who Vega will corroborate include:

- Pedro Rosello
- Sergio Crego
- Gilberto Barrios
- Marilyn Bonachea
- Jorge Hernandez
- Alfred Alonso

6

- Luis Valverde
- Jesus Antonio Fandino

### 2. Vega's Desire to Testify for a Reduced Sentence Makes Renders His Interests Material Adverse to Falcon's

The Court already has sentenced Vega to a 210-month term of imprisonment. At Vega's age, he may not live to serve the full term of imprisonment, or at minimum likely would not have many healthy years of freedom after serving the full term of imprisonment. Vega is cooperating in the hope of achieving a reduction in his sentence.

One difference exists between Vega's situation and Valverde's situation. Valverde has not yet been sentenced and thus remains within the time limitations for the filing of a motion for reduced sentence under either §5K1.1 of the Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure. The government has advised counsel for Vega that it does not believe that Vega's testimony in this case would fall within the time limitations under Rule 35. Vega's counsel in turn has advised the government that he intends to argue to the contrary.

The government expects Falcon to argue that the uncertainty in Vega's eligibility for a Rule 35 reduction eliminates any material adversity between his interests and Vega's interests. The Court should reject such an argument. Regardless whether Vega is eligible now for a Rule 35 reduction, he is testifying with the aspiration of receiving such a reduction. Put differently, Vega has decided that, regardless of whatever legal impediments may exist, his interests are best served by cooperating with the government. The materiality of the adversity of interests between Vega and Falcon turns on whether their goals differ – and not on the possibilities that their strategies will achieve their desired goals. Moreover, regardless whether Vega's testimony in this case were to satisfy Rule 35, if Vega were to provide other cooperation that satisfies Rule 35, his interest in maximizing any

7

eventual sentencing reduction would direct that he maximize the value of his cooperation by testifying in the upcoming trial.

### 3.    Vega Is Not Waiving the Duty of Loyalty Owed to Him by Mr. Diaz

Based upon discussions with defense counsel, it does not appear that Falcon is going to contest this proposition.

### 4.    Rule 4-1.9 of the Rules Regulating the Florida Bar Prohibits Mr. Diaz from Cross-Examining Vega

Based upon discussions with defense counsel, it does not appear that Falcon is going to contest this proposition.

### 5.    The Court Should Presume that Vega Had Confidential Communications with Mr. Diaz

Based upon discussions with defense counsel, it does not appear that Falcon is going to contest this proposition.

### 6.    An Arrangement Under Which Mr. Diaz is Segregated from the Cross-Examination of Vega Will Not Protect the Confidentiality of the Communications

Based upon discussions with defense counsel, it appears that Falcon is going to contest this proposition. The Court's finding at page 7 of its order disqualifying Mr. Bergendahl – including its statement that "the Court is aware that in the stress of a long trial with intense emotions, inadvertent mistakes can and do occur" – compel the conclusion that segregating Mr. Diaz from Vega's cross-examination will not be sufficient. In this regard, it is worth recalling the intense defense attacks of Gilberto Barrios during the litigation on the disqualification as an example of how what the Court described as the "stress" and "intense emotions" engendered by this case can play out upon the dual

8

loyalties caused in these multiple representation situations and how such considerations make suggested segregation-type arrangements impractical in situations such as this one.

7. **Rule 4-1.9 of the Rules Regulating the Florida Bar Prohibits Mr. Diaz from Contesting Other Witnesses or Evidence that Corroborates Vega's Testimony**

The government believes that Falcon will contest this proposition. The Court did not expressly express this proposition in its order disqualifying Mr. Bergendahl – perhaps because, as the Court explained at page 8 of the order, in an attempt to avoid Mr. Bergendahl's disqualification in that case Falcon had offered to exclude him mentioning Valverde in closing argument or questioning other witnesses regarding Valverde's participation in the offenses. Either way, the government believes that the proposition necessarily had to have been implicit in the Court's order. To the extent that it was not, the government believes that the principal that Mr. Diaz cannot challenge witnesses or evidence that corroborate Vega is required by the principals underlying Rule 4-1.9 and the cases that the government cited regarding the duty of loyalty in support of Mr. Bergendahl's disqualification. See United States v. Miranda, 936 F. Supp. 945 (S.D. Fla. 1996); United States v. Culp, 934 F. Supp. 394, 398-99 (M.D. Fla. 1996); United States v. Davis, 780 F. Supp. 21 (D.D.C. 1991); United States v. Cheshire, 707 F. Supp. 235 (M.D. La. 1989).

8. **Falcon Cannot Waive the Right to Challenge Vega's Testimony Without Substantially Undermining His Ability to Contest the Charges Against Him**

The discussion in subsection 1, above, which recites the various ways in which Vega's testimony undermine Falcon's interests underscores the harm that would flow to Falcon from not challenging Vega's testimony. The government does not believe that Falcon is going to offer to waive the right to challenge Vega's testimony.

9

9. **The Court Should Reject a Potential Alternative Under Which Falcon Would Retain an Independent Attorney to Cross-Examine Vega Based Discovery and Public Records and Without Consultation with Mr. Diaz**

Such a proposal is insufficient for several reasons. First, it would not prevent Mr. Diaz by acting contrary to Vega's interests by seeking to undermine his value as a witness by contesting the evidence and testimony that corroborates his testimony. Second, it would not address the threat to Vega's confidential communications that could result from Mr. Diaz's participation in this case.

Moreover, although not entirely on point, such a proposal also would run counter to case law cited by the government in support of Mr. Bergendahl's disqualification. In <u>United States</u> v. <u>Miranda</u>, 936 F. Supp. 945, the Court rejected a proposal to allow use of "back up counsel" to cross-examine a conflict-impaired attorney's former client who was testifying against the attorney's present client, based upon the existence of an actual conflict and the former client's refusal to consent. <u>See id</u>. at 951-52. (Although Vega is not waiving his duty of loyalty, the government is not aware whether he would consent to Mr. Diaz's continued representation of Falcon, with the use of back-up counsel to cross-examine him.)

In <u>United States</u> v. <u>Davis</u>, 780 F. Supp. 21, the Court addressed the situation in which Attorney Kohlman sought to represent Davis, in a case in which a cooperating witness represented by Attorney Kohlman's partner, Attorney Rochon, was slated to testify against Davis. In response to the government's motion to disqualify Attorney Kohlman, he contended that walling himself off from information obtained by Attorney Rochon would cure the problem. The Court rejected this solution, explaining:

> [E]ven if Kohlman would have independent access to all possible impeaching information, the appearance of a conflict in using the information against a former client of his firm requires his disqualification. The Court has "an independent interest in ensuring

10

> that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). It would be objectively unfair for Kohlman to confront the cooperating individual with information that the individual confided to Rochon. The appearance of unfairness would remain regardless of Kohlman's actual source of the information.

780 F. Supp. at 23-24.

The anticipated alternative discussed above that Falcon may propose would not prohibit back-up counsel conferring with Mr. Diaz's co-counsel in this case. Although Falcon's attorneys are not partners in the same firm, they have been spending substantial, if not most, of their time over the past year working on this case. Accordingly, similar appearance-type difficulties to those cited by Davis are present in this case.

### 10. In Addressing the Nature of the Conflict, the Court Should Not Presume That the Confidences Are Limited to Criminal Activity and Should Not Inquire into the Nature of the Confidences Between Vega and Mr. Diaz

The government believes that Falcon will contest this proposition. In the past, Falcon has taken the position that once a co-conspirator agrees to cooperate, he essentially waives privilege with the former attorney. Under Falcon's logic, since the co-conspirator is obligated to divulge his criminal activity to the government, what the co-conspirator has divulged to the attorney is no more than what he has divulged to the government. From this, Falcon also has encouraged the Court to inquire into the nature of the co-conspirator's confidences with his former attorney. For a number of reasons, the Court should not follow that approach.

First, Falcon's suggested approach overlooks that confidences that a criminal defendant may share with a lawyer may not necessarily be limited to matters relating to criminal conduct and can include matters that are non-criminal, but nonetheless sensitive to the client. These may include

11

marital indiscretions or sensitive family matters. Because defendants who have long-term relationships with their lawyers may not remember each and every confidence that they share with their lawyers, a process in which a Court tries to determine the extent of the confidences by relying upon the client's memory may result in the client forgetting certain confidences. This may result in the Court mistakenly finding that defendant's confidences with his prior attorney are co-extensive with the facts to which he will testify, mistakenly releasing the defendant's prior attorney from his duty of confidentiality without knowing of the existence of the other protected matters, and mistakenly removing the confidentiality of those communications that the defendant fails to recall when queried by the Court. An individual is entitled to the preservation of these confidences and should not be put in a position in which his cooperation may inadvertently cause the disclosure of the confidences in order to preserve another defendant's lesser right to retain the co-conspirator's former attorney as part of a multi-lawyer defense team.

Second, any process that requires inquiry into client confidence may impede a defendant's willingness to cooperate with law enforcement. This particularly may be the case when the defendant's prior confidences relate to sensitive personal matters that he does not wish to disclose to third parties (including perhaps the Court).

Third, any process that requires inquiry into client confidence whenever a conflict situation arises may discourage defendants from sharing confidences with their attorneys even before they decide to cooperate. Along these lines, it is worth noting that many defendants are not particularly well-educated or knowledgeable about the intricate workings of the legal system. If they were to learn or believe that a decision to cooperate with law enforcement may imperil their confidential communications with their attorneys, they may choose not to disclose confidences to their attorneys

as a means of protecting themselves. Such strategies ultimately would frustrate the operation of the legal system.

### III.   THE DUTY OF CONFIDENTIALITY OWED TO VEGA BY MR. DIAZ INDEPENDENTLY CALLS FOR DISQUALIFICATION

As the Court is aware, Rule 4-1.6 of the Rules Regulating the Florida Bar prohibits an attorney from disclosing confidential information relating to representation of a client. For the reasons suggested at page 7 of the Court's order disqualification Mr. Bergendahl, and for the reasons expressed supra, at 4 & 8-9. this situation presents a realistic threat Mr. Diaz obtained in confidence from Vega may seep in any number of ways into the formation of Falcon's defense strategy and that Mr. Diaz's representation of Falcon unacceptably risks the confidentiality of these communications. For the reasons expressed supra, at 11-13, once Vega's counsel asserts the duty, that should end the inquiry. The Court should be not attempt to have Vega inventory the confidences that he shared with Mr. Diaz in an attempt to assess the extent to which these confidences will overlap with Vega's expected testimony.

### IV.   THE COURT SHOULD REJECT MANUEL MAGLUTA'S ARGUMENTS AS GROUNDS FOR NOT DISQUALIFYING MR. DIAZ

In his response to the Order to Show Cause, defendant Manuel Magluta suggested that the Court should not disqualify Mr. Diaz, in part because Mr. Diaz's participation will assist his attorney in his defense. The fact that Mr. Diaz's disqualification may require greater efforts from his counsel is not sufficient basis to override Vega's assertion of the duties owed to him by Mr. Diaz.

Magluta also suggests that if Mr. Diaz is disqualified, the Falcon may choose to represent himself. That issue is premature. For Falcon to represent himself, Falcon would have to discharge

13

his entire defense team (and the Court would have to permit him to do so), and the Court would have to find that Falcon's choice to represent himself is made knowingly, voluntarily, and intelligently. We have not yet reached that point. In any event, any veiled suggestions about Falcon's intentions provide insufficient basis to override Vega's assertion of the duties owed to him by Mr. Diaz.

## V.  CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court's order disqualifying Mr. Bergendahl, as well as the other matters raised in this submission, call for the disqualification of Mr. Diaz.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _____
MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

14

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 6th day of March 2003 a true copy of the foregoing was served by facsimile to:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600 701
Miami, FL 33131
(Fax: 305-358-1233)

Katherine Ferro, Esq.
Brickell Avenue, Suite 2080
Miami, FL 33131
(Fax: 305-536-2170)

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131
(Fax: 305-358-4010)

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129
(Fax: 305-858-7491)

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134
(Fax: 305-444-8178)

Michael J. Rosen, Esq.
2400 S. Dixie Highway, Suite 105
Miami, FL 33133
(Fax: 305/858-7299)

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-583-Cr-Seitz(s)(s)(s)(s)(s)(s)(s)/Bandstra



UNITED STATES OF AMERICA

v.

AUGUSTO GUILLERMO FALCON,
                    Defendant.
_____/

## GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY RICHARD DIAZ, ESQ., AS COUNSEL FOR DEFENDANT FALCON

The government files this supplemental memorandum in support of its motion that the Court disqualify Richard Diaz, Esq., as counsel for defendant Falcon. The government's motion is based upon Mr. Diaz's previous representation in this case of Miguel Vega, who is now cooperating.

The Court has requested that the parties try to locate and brief case law that defines the term "material adversity" under Rule 4-1.9 of the Rules Regulating the Florida Bar, or related rules. The Court also has requested the government to address the alternative proposed by Falcon on the afternoon of March 7, 2003, under which Mr. Diaz would be allowed to remain in the case so long as he would not participate in the cross-examinations of Miguel Vega, Marilyn Bonachea, Jorge Hernandez, Juan Hernandez, Luis Valverde, Eric Valverde, Tony Fandino, Reynaldo Fandino, Jose Fernandez, Pedro Rosello, Gilberto Barrios, Alfred Alonso, Frank Rubino, Jon May, and Neil Taylor.

Based upon the case law discussed below, the government submits that Falcon's and Vega's and interests are "materially adverse" for purposes of Rule 4-1.9. Additionally, the government does

not believe that the alternative proposed by Falcon is sufficient to address the Rule 4-1.9 issues

presented by this case.

## I.   CASE LAW DEFINING "MATERIALLY ADVERSE"

### A.   *Case Law*

The government has not located any cases defining "materially adverse" under Rule 4-1.9

of the Rules Regulating the Florida Bar. That rule appears modeled after Rule 1.9 of the ABA Rules

of Professional Conduct. As one Court has observed, "[t]here is a paucity of authority interpreting

the adversity requirement of Rule 1.9." Selby v. Revlon Consumer Products Corp., 6 F. Supp. 577

(N.D. Tex. 1997). Two cases, however, provide guidance: (1) Selby and (2) National Medical

Enterprises, Inc. v. Godbey, 924 S.W. 123 (Tex. 1996), which is the case upon which Selby relies.

Taken collectively, these cases support the conclusion that even where the risks to the former

client of his former attorney's subsequent representation are small, if the potential costs are

significant, tha t is sufficient to create material adversity for the former representation rule.

Application of these cases to this case directs the conclusion that Falcon's and Vega's interests are

"materially adverse" and thus that Mr. Diaz should be disqualified. Because Selby relies upon

National Medical Enterprises, Inc., the discussion below addresses the latter case first.

### 1.   National Medical Enterprises, Inc. v. Godbey, 924 S.W. 123 (Tex. 1996)

National Medical Enterprises, Inc. (hereinafter "NME") was an organization that had

operated psychiatric hospitals in Texas and elsewhere in the United States. Along with Psychiatric

Institutes of America, NME had been a target of criminal investigations and a defendant in civil

lawsuits arising from its operation of more than 70 of their psychiatric hospitals. At one point in the

2

course of these matters, NME retained attorney Ed Tomko to represent Ronald Cronen, who had been NME's regional administrator for Texas and previously had been the administrator of an NME hospital in Texas. Tomko represented Cronen and a second NME employee for approximately one year, billing NME a total of approximately $18,000. During the last five months of the representation, Tomko was with the law firm Baker & Botts. Over that final five months, Tomko billed only $700 of the total of $18,000 billed for the representation of the two. See 924 S.W.2d at 124-25.

Seventeen months after Tomko withdrew from representing Cronen and the second employee, Baker & Botts sued NME on behalf of a large number of former patients at NME psychiatric hospitals. The lawsuits charged NME with subjecting the plaintiffs to "outrageous physical and mental abuse" by causing them to be confined for no legitimate medical purposes, but rather for the mere purpose of boosting NME's billings to insurance companies. See id. at 125-26.

Cronen intervened and moved to disqualify Baker & Botts, based upon Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct, which stated in pertinent part:

> (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client: . . .
>
> (3) if it is the same or a substantially related matter.

See id. at 126.

Although Cronen had not been prosecuted as of the time of the disqualification issue, Psychiatric Institutes had pled guilty to federal criminal charges. Cronen's immediate predecessor as Texas regional administrator also had pled guilty to federal criminal charges. Although Cronen had not received a target letter from federal law enforcement, based upon discussions with agents

3

and government attorneys Cronen's new attorney reached the conclusion that Cronen was a target

of the investigation. See id. at 124.

The trial court denied the motion, as well as a related motion to disqualify brought by NME.[1]

On mandamus review, the Texas Supreme Court reversed and held that Baker & Botts should be

disqualified. With respect to Cronen's motion, the Court recognized that if the facts were to warrant

Tomko's disqualification, his conflict would be imputed to Baker & Botts, requiring the firm's

disqualification. See id. at 131-32. The Court adopted the trial court's conclusion that "adverse"

for purposes of Rule 1.09 meant "directly adverse." See id. at 132. The Court then took note of the

trial court's factual findings regarding the limited likelihood that Baker & Botts' participation could

undermine Cronen's interests:

> The court applied those definitions to the evidence before it and
> found that: (1) "there is still some risk that Baker & Botts' diligent
> development of this case will bring to public light information
> adverse to Mr. Cronen that is not presently publicly known and that
> otherwise would have passed unnoticed to governmental or media
> investigations or other civil litigants with less available resources";
> (2) "the kind of detriment to which Mr. Cronen could be subjected is
> serious, and includes possible criminal liability, as well as possible
> civil liability"; and (3) "the risk to Mr. Cronen from Baker & Botts'
> prosecution of this action is small given that he is not a defendant and
> is not even alleged by any party to have committed any misconduct",
> and the risk is "minimal, given the large volume of information
> presently known and the number of other parties investigating these
> subjects."

Id. at 132.[2]

---

[1]NME's motion was premised upon the facts that Tomko had obtained confidences from
NME as a part of a joint defense agreement associated with his representation of Cronen and the
second employee. See id. at 125-26 & 129-31.

[2]The Court also held that NME's motion to disqualify should have been granted. See id.
at 129-32.

After noting the trial court's finding that these circumstances did not render Baker & Botts' representation adverse to Cronen, the Court framed the question as "whether the small but serious risk to Cronen posed by the pending action makes it adverse to him." The Court found that the "small but serious risk" was sufficient to warrant disqualification.

> Adversity is a product of the likelihood of the risk and the seriousness of its consequences. **Here, the probability that Cronen will be affected by the prosecution of the pending litigation is small, but it is not nonexistent.** Cronen was regional administrator of [a] hospital in which plaintiffs were patients. Allegations of misconduct in the operation of the hospitals would naturally be expected to implicate him, but for the fact that he has already survived extensive investigations to date. However, his immediate predecessor pleaded guilty to criminal charges and is a named defendant in the pending case. What has befallen his predecessor illustrates the seriousness of the consequences to Cronen if additional information is uncovered or further charges made. **Even if Baker & Botts is correct that resolution of the pending case will leave Cronen unscathed, Cronen's anxiety that his former law firm is now vigorously advancing the same allegations that have swirled around him for so long is certainly understandable. The chances of being struck by lightning are slight, but not slight enough, given the consequences, to risk standing under a tree in a thunderstorm. Cronen is not likely to be struck by lightning in the pending case, even though he is in the midst of a severe thunderstorm, but he is entitled to object to being forced by his former lawyer to stand under a tree while the storm rages on.**

Id. at 132-33 (emphasis added).

2.    Selby v. Revlon Consumer Products Corp., 6 F. Supp. 577 (N.D. Tex. 1997)

In Selby, the plaintiff brought a sexual harassment suit against Revlon. Attorney Banowsky represented Selby. Before Selby filed suit, Banowsky had sent demand letters based upon alleged sexual harassment to Revlon on behalf of both Selby and Sara Young. Selby followed through with a lawsuit. Young did not. See 6 F. Supp.2d at 578.

After filing suit, Selby sought to depose Young. Both Revlon and Young moved to quash. The Court considered the motion to be controlled by Rule 1.9 of the ABA Rules of Professional Conduct, which provided:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

See id. at 578.

The Court granted the motion to quash. (Based upon the opinion, neither Revlon nor Young sought disqualification. Nor is there any indication in the opinion that Young had revealed confidences to Banowsky, or that the Court was presuming a sharing of confidences.) After finding that there was a "substantial relationship" between Banowsky's representations of Selby and Young, see id. at 580-81, the Court then considered whether Selby's and Young's interests were "materially adverse." The Court concluded that they were.

In reaching this conclusion, the Court followed the Texas Supreme Court's interpretation of "adverse" in the National Medical Enterprises. Inc. opinion.

> The probability that [the former client] will be affected by the prosecution of the pending litigation is small, but it is not nonexistent ... The chances of being struck by lightning are slight, but not slight enough, given the consequences, to risk standing under a tree in a thunderstorm. [The former client] is not likely to be struck by lightning in the pending case, even though he is in the midst of a severe thunderstorm, but he is entitled to object to being forced by his former lawyer to stand under a tree while the storm rages on.

Id. at 580 (quoting National Medical Enterprises, Inc., 924 S.W.2d at 133). Analyzing Young's situation, the Court noted that Young feared that being deposed might subject her to a defamation

action and might undermine her business reputation. The Court held that these interests were sufficient to amount to material adversity for purposes of the ethical rule.

> [T]here is at least a plausible basis for a defamation claim if Young testifies about the alleged affair between Kaprowski and a co-worker. Banowsky maintains there is "virtually no ri sk of civil action" because Selby has renounced her claims against Young and any defamation action is barred by limitations. These arguments are disingenuous at best. Selby is in no position to protect Young from potential lawsuits brought by other Revlon employees despite her characterization that such claims would be "tenuous" . . .

> Moreover, the potential risks to Young are not limited by her exposure in subsequent litigation. Young testified that she also was concerned about her business reputation. She said that her current employer recently lost a $15 million sexual harassment case. Young was convinced that she would be fired if the company learned that she was involved in a similar case against Revlon. These are not inconsequential considerations and should factor into the risk analysis.

> The Court finds that there is a slight risk to Young if the contemplated deposition goes forward. The possible consequences are not as severe as the potential criminal liability faced by the former client in National Medical Enterprises, but they are serious nonetheless. Accordingly, the Court holds that the deposition is adverse to Young's interests within the meaning of ABA Rule 1.9.

Id. at 581.

### B.    *Analysis*

The above-cited cases direct the conclusion that Falcon's and Vega's interests are "materially adverse" for purposes of Rule 4-1.9 of the Rules Regulating the Florida Bar. Vega is in his late 60's and in declining health. Even with good-time credit, if he were to have to serve his full 210-month sentence, Vega still has at least 11 years left to serve. Undoubtedly, Vega has an enormous interest in reducing his sentence. The Court has not heard Vega as to the grounds for why the Court should excuse his failure to cooperate within one year of being sentenced for purposes of considering his

eligibility for a potential sentencing reduction. Even if Vega's chances of prevailing upon the Court to excuse his failure to cooperate in a timely manner were slight, language in both National Medical Enterprises, Inc. and Selby indicates that material adversity can exist even when the risk to the former client is analogous to "[t]he chances of being struck by lightning." See Selby, 6 F. Supp.2d at 580; National Medical Enterprises, Inc., 924 S.W.2d at 133.

Vega also may derive other benefits from his cooperation. These include favorable recommendations on his designation and security classification, either or both of which may cause the Bureau of Prisons to transfer him to an institution that would allow for more frequent family visits. Additionally, through his cooperation in the government's prosecution against Falcon, Vega also may derive the psychic benefits of seeing a more culpable co-conspirator held accountable for his conduct and of assisting a government that gave him refuge when he sought to immigrate. These are not insignificant considerations.

Vega has advised the Court that he opposes Mr. Diaz's continued participation in Falcon's defense. There is no dispute that Vega has confided confidences to Mr. Diaz, and apparently Vega fears that these confidences may be compromised by Mr. Diaz's continued participation in the case. Successive representation rules, such as Rule 4-1.9, are meant to guard against both actual threats to the former client's confidences and perceived threats that may inhibit others from confiding in their attorneys. As the Third Circuit explained:

> A rule against representation of interests adverse to a former client in the same or substantially related litigation has several purposes. It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar. See Richardson, supra [469 F.2d 1382, 1385-86 (3d Cir. 1972)]. Finally, and importantly, a client

8

has a right to expect the loyalty of his attorney in the matter for which
he is retained.

In re Corn Derivatives Antitrust Litigation, 748 F.2d 157, 162 (3d Cir. 1984).

Because Falcon's and Vega's interests are adverse in these different respects, and because
Mr. Diaz's continued representation of Falcon runs counter to both the language and policy of Rule
4-1.9, the Court should disqualify him from further representation of Falcon in this case.

## II.  FALCON'S PROPOSED ALTERNATIVE

For at least three reasons, the alternative proposed by Falcon is not sufficient.

First, it does not satisfy Vega's concerns that his confidences will be maintained. As the
above-quoted language from In re Corn Derivatives Antitrust Litigation explains, one of the
important interests promoted by the successive representation rules is the interest in encouraging
clients to confide in their lawyers. A disposition of this motion that leaves the former client
unsatisfied that his confidences are being protected is a disposition that undermines the legal
system's interests in encouraging clients to confide in their lawyers. In the criminal justice setting,
alternatives such as the one proposed by Falcon that present the appearance of threatening a former
client's confidences may inhibit the willingness of some defendants to come forward and cooperate
with law enforcement.

Second, the proposed alternative underestimates the number of witnesses who will refer to
Vega or whose testimony will address areas similar to those that Vega will address. These include
co-conspirators and/or associates of Magluta and Falcon from the 1980s who link to common drug
trafficking or associated activity – such as Lazaro Cruz, Juan Barroso, Federico de la Cruz-Munoz,
Keith Eickert, and Milton Morizumi. These also include Los Angeles County Detectives John

Austin and Richard Wenig, both of whom link Magluta and Falcon together in drug trafficking activity, and Special Agents David Borah and Kent Paulin, both of whom corroborate Vega's testimony that the red day-timers seized from the LaGorce mansion were drug ledgers. Relevant witnesses also include Richard Passapera, a/k/a "Blondie," Harry Kozlik, and Isaac Benatar, all of whom corroborate Vega by linking Tony Garcia to the Magluta-Falcon organization. Such witnesses further include Special Agent David Roberts and Officer Ray Martinez, both of whom corroborate Vega regarding Luis Valverde's role in storing drug cash for the organization. These witnesses also include attorneys such as Scott Srebnick, Edward Shohat, Benson Weintraub, Jonathan Goodman, and Paul Friedman – all of whom tend to corroborate Vega by providing testimony that circumstantially confirms that fees paid to them for their representation of Magluta, Falcon, or their associates derived from organization drug proceeds.

Lastly, Vega is a significant witness and played a significant role in the organization. Falcon's proposed solution anticipates that he has identified all manners in which Vega's cooperation might impact on the trial. However, as the Court recognized in Wheat v. United States, 486 U.S. 153 (1988):

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight but in the murkier pre-trial context when relationships between parties are seen through a glass darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

Id. at 162-63.

10

It is not unlikely that any conflict that requires such drastic limitations on an attorney's participation in a criminal trial will produce other unanticipated dimensions as the case progresses. These factors add to the considerations that call for Mr. Diaz's disqualification.

### III.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court enter an order disqualifying Mr. Diaz from the representation of Falcon in this case.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By:

MICHAEL P. SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
SENIOR LITIGATION COUNSEL
FL BAR # 134814
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9345
(305) 536-4675 (FAX)

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
(305) 961-9027
(305) 530-6168 (FAX)

11

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this **16** day of March 2003 a true copy of the foregoing was served by facsimile to:

Kenneth J. Kukec, Esq.
2 S. Biscayne Boulevard, Suite 2600
Miami, FL 33131
(Fax: 305-358-1233)

Katherine Ferro, Esq.
701 Brickell Avenue, Suite 2080
Miami, FL 33131
(Fax: 305-536-2170)

Edward Shohat, Esq.
Bierman, Shohat, Loewy & Klein, P.A.
800 Brickell Avenue, Penthouse 2
Miami, FL 33131
(Fax: 305-358-4010)

Alan Ross, Esq.
Robbins, Tunkey, Ross, et al.
2250 S.W. 3rd Ave.
Miami, FL 33129
(Fax: 305-858-7491)

Richard J. Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134
(Fax: 305-444-8178)

Michael J. Rosen, Esq.
2400 S. Dixie Highway, Suite 105
Miami, FL 33133
(Fax: 305-858-7299)

Alvin Entin, Esq.
110 S.E. 6th Street
Suite 1970
Ft. Lauderdale, FL 33301
(Fax: 954-767-8343)


MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY

12

# EXHIBIT "20"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 99-583-CR-SEITZ/GARBER

UNITED STATES OF AMERICA,
  Plaintiff,

v.

AUGUSTO GUILLERMO FALCON
  Defendant.
_____/

FILED by _____ D.C.

DEC 1 2 2001

CLARENCE MADDOX
CLERK, U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER DISQUALIFYING COUNSEL

THIS MATTER is before the Court on the Government's Appeal of Magistrate Judge Ted E. Bandstra's June 21, 2001 Order Denying Government's Motion to Disqualify Attorney John Bergendahl [D.E.-1749]. Because this is an appeal of a magistrate judge's decision on a non-dispositive matter, the Court is limited to determining whether the Order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A). The issue presented is whether the interests of Mr. Bergandahl's successive client, Defendant Augusto Guillermo Falcon ("Falcon"), are materially adverse to the interests of Mr. Bergandahl's former client, co-Defendant Luis Valverde ("Valverde"), who has not consented to the successive representation.

The Court has considered the Government's initial brief, Defendant Falcon's response, the Government's reply, and the transcripts of the December 18, 2000 *Garcia* hearing[1] and the May 3, 2001 hearing on the Motion to Disqualify both held before the Magistrate Judge Bandstra. Because Judge Bandstra's Order indicated the need for an additional *Garcia* hearing, on December 4, 2001, the Court

---

[1]    *United States v. Garica*, 517 F.2d 272 (5th Cir. 1975). A *Garcia* hearing assists a court to determine whether a conflict exists to the degree that a defendant may be prevented from receiving advice and assistance sufficient to afford him or her the quality of representation guaranteed by the Sixth Amendment. During such hearing, a court must conduct a particularized inquiry into the nature of the contemplated defense so that a defendant can be fully advised of the facts underlying the conflict and be given an opportunity to express his views, and if he desires, to question the court as to the nature and consequences of his legal representation.

-1-



conducted an *in camera* hearing with Defendant Falcon and his counsel, Ken Kukec, Katherine Ferro and Mr. Bergendahl. Also present was counsel for Mr. Bergendahl, Michael Tarre. The Court also conducted an *in camera* hearing with co-defendant Valverde and his new counsel, Louis St. Laurent. At the request of Defendant Falcon, the Court also heard argument on the appeal.

The Court must reverse the Magistrate Judge's Order because he erroneously found at page 6 of his Order that "no actual or potential conflict prevents Mr. Bergendahl from representing Falcon ... and that the trial can be conducted within the ethical standards of the legal profession which will 'appear fair to all who observe them.'" Based on the evidence in the record and the controlling law, the Court is compelled to conclude that because there is an actual conflict between Mr. Bergendahl's representation of his former and current clients, which the prior client, Defendant Valverde, has not waived, the ethical rules preclude Mr. Bergendahl's representation of Defendant Falcon. Rule 4-1.9, Rules Regulating The Florida Bar.

## FACTUAL BACKGROUND

Defendants Falcon, Valverde and nine others where charged in August of 1999 in a sixty count indictment alleging conspiracies to obstruct justice and to launder drug proceeds as well as substantive money laundering charges. The obstruction charge alleged acts of paying, tampering with and murdering witnesses, bribing jurors, and using frozen laundered assets to pay attorneys representing defendants Falcon and Magluta in their drug distribution trial, Case Number 90-6060-CR-Moreno. The indictment was superceded several times. Ultimately, Defendants Falcon and Magluta were severed, and five defendants including Valverde went to trial in the summer of 2000. At the end of a nine-week trial, the jury convicted Valverde of the conspiracies to obstruct justice and money laundering and one count of money laundering. His sentencing was set for December 15, 2000.

-2-

The Attorneys of Record

Mr. Bergendahl entered his appearance on behalf of Defendant Valverde on October 28, 1999. Defendant Falcon's attorney, Mr. Kukec, noticed his permanent appearance on Mr. Falcon's behalf on November 10, 1999.  Mr. Kukec remains Mr. Falcon's counsel of record.  Ms. Ferro joined in this representation on November 14, 2000.

Mr. Bergendahl was sole counsel for Valverde through the trial and preparation for sentencing until he was discharged on December 13, 2000.  During Valverde's trial, he and Valverde discussed Bergendahl's representation of co-defendant Falcon.[2]  On November 6, 2000, Mr. Bergendahl noticed his appearance as counsel for Defendant Falcon. On December 13, 2000, he ceased representing Mr. Valverde.  On December 15, 2000, Attorneys Frederick Mann and St. Laurent moved to be substituted as counsel for Defendant Valverde.

The Initial *Garcia* Hearing

On December 18, 2000, Judge Bandstra held a *Garcia* hearing pursuant to Mr. Bergendahl's November 6, 2000 Notice of Appearance on behalf of Mr. Falcon.  At that time, DefendantValverde informed Judge Bandstra that he objected to Mr. Bergendahl's representation of his co-Defendant Falcon.  From the hearing transcript, it appears that both Judge Bandstra and the Government were somewhat surprised by these developments, and that the parties were not in a position to predict the impact that it would have on the case.[3]  During the hearing, Mr. Bergendahl remarked that if, in the future, Mr. Valverde should decide to cooperate with the Government, an actual conflict could occur depending on exactly who Mr. Valverde was going to testify against, the extent of that testimony, and

---

[2]     There appears to be a discrepancy between Mr. Valverde's and Mr. Bergendahl's recollections as to Mr. Valverde's initial reaction when the two discussed Mr. Bergendahl's representation of Mr. Falcon.

[3]     Defendant Valverde began negotiations with the Government that lead to a cooperation agreement after this hearing.

whether the testimony was material or whether it was tangential or remote. (Dec. 18, 2000 Tr. at 13). At the hearing, however, the parties agreed that the conflict issues would have to be "addressed down the road."

Thereafter, Mr. Valverde and the Government entered into a cooperation agreement whereby Valverde agreed to testify truthfully as a government witness in the trial of Defendants Falcon and Magluta. On April 11, 2001, the Government filed its motion to disqualify Mr. Bergendahl. After considering the papers and hearing argument, the Magistrate Judge denied the motion. His June 21st Order noted that a further *Garcia* hearing was necessary.[4]

Individual *In Camera* Hearings with Each Defendant

A court has the obligation to take appropriate measures to protect each defendant's right to conflict free counsel. Unless it appears there is good cause to believe that no conflict of interest is likely to arise as a consequence of the representation, a court may disqualify counsel who poses a conflict. See Fed.R.Crim.Pr. 44(c) Advisory Committee Notes (1979)(requiring an inquiry of all affected defendants).

The Court conducted an *in camera* hearing with Mr. Falcon and his counsel to discuss the limitations Mr. Bergendahl's prior representation of Valverde placed on Mr. Falcon's representation, whether Mr. Falcon appreciated the significance of these limitations, why he desired Mr. Bergendahl's representation given these limitations, and whether other conflict-free counsel could more effectively

---

[4]     Defendant Falcon's initial *Garcia* colloquy consisted primarily of one word responses to questions from the bench, rather than narrative responses. This colloquy was conducted in the Government's presence, before any of the parties could ascertain the nature of any conflict of interest particularly in light of the first public notice of Valverde's objection to the joint representation. During a *Garcia* hearing, a court must look at all the known facts and anticipate any facts which could develop relating to the conflicting interests so that the court can satisfy itself that the current client is fully cognizant of what he or she may be called upon to meet at trial and be able to understand developments which may require changes in strategy which would ultimately impact on counsel's ability to be an effective advocate given any limitations due to counsel's prior representation.

assist Mr. Kukec and Ms. Ferro.[5]

During the separate *in camera* hearing with Defendant Valverde and his new counsel, the Court also sought to determine whether Mr. Valverde's refusal to consent to Mr. Bergendahl's representation of Mr. Falcon was his own, good faith position, free from any Government influence.[6]  Without divulging the contents of this hearing, the Court concludes that Mr. Valverde's refusal to waive the conflict has a good faith basis, namely to protect information confided to Mr. Bergendahl. Mr. Valverde is concerned that there were and continue to be divided loyalties between Mr. Bergendahl and his former and present clients which will result in the use of confidential information shared with Mr. Bergendahl to undermine Valverde's ability to testify, and thus impact on his ability to obtain the benefit of his cooperation agreement.  Mr. Valverde has an interest in testifying, as he has not yet completed his cooperation nor been sentenced. His refusal to waive the conflict was not procured or influenced by the Government.

### DISCUSSION

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel for his or her defense, and a defendant has a presumptive right to counsel of choice. *Wheat v. United States,* 486 U.S. 153, 164 (1988).  However, notwithstanding the importance of a defendant's right to counsel of choice, this right is not absolute and the presumption may be overcome, not only by a demonstration of actual conflict, but by a showing of a serious potential for conflict.  *Id.*  In balancing the competing interests of a defendant's Sixth Amendment rights, a trial court has "an independent duty to ensure that criminal defendants receive a trial that is fair." *Id.* at 161.  The need for the fair, efficient and orderly

---

[5]     The transcript of the *in camera* hearing was ordered sealed and not to be examined or used for any purpose by the Government or any other party except the Court of Appeals.

[6]     This hearing transcript was also sealed for the Court of Appeals.

administration of justice consistent with the ethical rules, overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who is to be called as a witness against a current client at a criminal trial. *United States v. Ross,* 33 F.3d 1507, 1523 (11th Cir. 1994); *United States v. Miranda,* 936 F. Supp. 945, 950 (S.D. Fla. 1996); *United States v. Davis,* 780 F. Supp. 21, 23-24(D.C.D.C. 1991); *see also United States v. Culp,* 934 F. Supp. 394, 398 (M.D. Fla. 1996); *United States v. Cheshire,* 707 F.Supp. 235, 239-242 (M.D. La. 1989); *United States v. Agosto,* 538 F. Supp. 1149, 1153 (D. Minn. 1982). In such circumstances, there is the presumption that the client is denied effective assistance of counsel and the fairness and propriety of judicial proceedings are undermined such that the attorney must be disqualified.

In this case, the Court is mindful of the right to counsel of choice and respects the Magistrate Judge's and counsel's efforts to fashion a solution for the competing interests. The Court is also cognizant of the admonition that a court should hesitate to disqualify defense counsel. *Ross,* 33 F.3d at 1523. Furthermore, the Court has been impressed by Mr. Bergendahl's professionalism during the course of Mr. Valverde's trial and in subsequent proceedings. However, because the proposed solution, more fully outlined below, does not adequately protect Mr. Falcon's rights to a fair trial, and because of the actual conflict between both clients' interests, which the former client in good faith refuses to waive, under the ethical rules governing the conduct of all attorneys admitted to practice in Florida, Mr. Bergendahl cannot represent Mr. Falcon. Rule 4-1.9, Rules Regulating The Florida Bar.

<u>Materially Adverse Interests</u>

Mr. Bergendahl forthrightly noted at the December 18, 2000 hearing that if his former client, Vaverde, testified at his current client Falcon's trial there would be a conflict. That conflict has materialized. The two clients are co-defendants in the same money laundering and obstruction of justice conspiracies. In Mr. Valverde's nine-week trial, the evidence revealed that he was the custodian for

-6-

Defendants Falcon and Magluta's drug proceeds. He safeguarded and dispensed funds, as directed, for Magluta and Falcon's use and benefit during the pendency of Case No. 90-6060-Moreno. Mr. Valverde's actions relating to those funds included storing six million dollars in the attic of his home (which was built with drug proceeds), purchasing real estate, vehicles and other assets, opening and managing bank accounts, and arranging the delivery of drug money to pay for legal fees and other activities during pre-trial, trial and post-trial activities. The proof showed the conspirators laundered twenty million dollars to pay legal fees and bribes to witness and jurors in the trial of Defendants Falcon and Magluta in Case Number 90-6060.

At Mr. Falcon's trial, Mr. Valverde is expected to testify as to how he laundered the drug proceeds and arranged for payments to lawyers and others assisting the defense team in Case Number 90-6060. While Defendant Valverde's testimony will primarily directly implicate Defendant Magluta, Valverde's testimony will also help establish the existence and purpose of the money laundering and the obstruction of justice conspiracies, corroborate the testimony of Marilyn Bonachea, the government's key witness, and otherwise provide unique circumstantial evidence of Mr. Falcon's involvement in these two conspiracies. Thus, Mr. Valverde's testimony will be materially adverse to Mr. Falcon.

Likewise, Mr. Valverde's interests are adverse to that of Mr. Falcon. Because of his conviction of the same charges for which Mr. Falcon has been indicted, Mr. Valverde faces a significant jail sentence. Thus, it is in his best interest that he be able to testify favorably for the Government to complete his cooperation agreement and hopefully obtain the benefits of a 5K1.1 Motion. He has confided information to Mr. Bergendahl which could so embarrass him that he would not be able to testify at trial. While the Court has every reason to believe that Mr. Bergendahl, a respected member of the Bar, will be true to his oath to preserve his former client's confidences, the Court is also aware that in the stress of a long trial with intense emotions, inadvertent mistakes can and do occur. Mr.

-7-

Valverde is adamant that the only way he will know that his confidences will be preserved given the nature of this case, is if Mr. Bergendahl does not represent Mr. Falcon.

Mr. Falcon's Waiver

Defendant Falcon argues that because Mr. Valverde's testimony will not directly implicate him and because he has agreed that Mr. Bergendahl will not be involved in anything relating to Mr. Valverde – the investigation of, trial preparation for or cross-examination of Mr.Valerde, will not mention him in closing argument, will not make any legal arguments regarding his testimony or question other witnesses regarding his participation in the alleged offenses, and, in fact, will be out of the courtroom while Mr.Valverde testifies – the conflict can be avoided.[7]  This is a unusual case that ties back to several other cases involving defendants Falcon and Magluta and their historical relationship, of which Mr. Valverde has personal knowledge.  It is also a case that has engendered strong emotions on both sides. It is probably an understatement to say that it has been impossible to predict the unexpected twists and turns that each new day has brought to this case.  For example, it is now alleged that Mr. Magluta authorized the use of laundered money to pay the balance of Mr. Valverde's legal fees to Mr. Bergendahl.  The Government's investigation is ongoing and its trial preparation is not static, thus it is not possible to say what the final testimony of each witness will be or how the evidence will play out until trial.

Mr. Valverde's credibility like that of all witnesses will be at issue.  Based upon the evidence in the prior trial and the importance of Mr. Valverde's testimony to the Government's case in chief, the Court expects as rigorous a cross-examination of Mr. Valverde as that of Ms. Bonachea in Mr.

---

[7]    Mr. Falcon made certain statements about trial strategy relating to Mr. Valverde, which given the evidence the Court has seen to date, suggests that Mr. Falcon does not see or fully appreciate what he may be called upon to meet at trial and which may require changes in strategy that would impact on Mr. Bergendahl's effectiveness as an advocate

Valverde's trial. Because the Court has not yet sentenced Mr. Valverde for his conviction of the same obstruction of justice and money laundering conspiracies, his motivations for testifying will arise as matters for impeachment. While clients can and do routinely waive conflicts, it is not readily apparent that the benefits Mr. Falcon obtains by adding Mr. Bergendahl to the defense team outweigh the significant limitations that accompany the blanket waiver in this particular case. Furthermore, as noted above, in the Court's discussion with Mr. Falcon during the *in camera* hearing, it appeared that Mr. Falcon did not have the necessary, realistic appreciation of the impact and scope of his waiver on his case so that the Court could comfortably find that his was a knowing waiver.[8]

The Ethical Rules

Rule 4-1.9 of the Rules Regulating The Florida Bar governs Florida lawyers' duty to avoid a conflict of interest between a present and a former client. Rule 4-1.9 provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter: (a) represent another in the same ... matter in which that person's interest are materially adverse to the interest of the former client unless the former client consents after consultation; or (b) use information relating to the representation to the disadvantage of the former client except as Rule 4-1.6 would permit with respect to a client or when information has become generally known.[9]

The case law is definite in its prohibition – when a former client will testify against the current client in the same matter, a lawyer can not represent the current client unless the prior client consents. *Wheat,*

---

[8] Defendant Falcon's interests require a zealous impeachment of the Valverde's testimony and his defense should not be inhibited because of the potential breach of confidentiality towards a former client. While the Court has high regard for Mr. Bergendahl's professionalism, the Court cannot render a decision in this case based upon its subjective opinion of the individual attorney involved. The conflict of interest rules apply to all attorneys including those whom a particular judge considers to have high ethical standards. Courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them. *Wheat,* 486 U.S. 153.

[9] The Confidentiality Rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation whatever the source. A lawyer may not disclose such information except as authorized or required by the Rules of Professional Conduct or by law. A lawyer can only use generally known information. After termination of a client-lawyer relationship, a lawyer may not represent another client except in conformity with Rule 4-1.9 which requires the prior client's wavier after consultation.

*Ross,* and *Miranda, supra* at 5.  The cases on which Judge Bandstra relied, particularly *United States v. Hanania,* 989 F.Supp. 1187 (M.D. Fla. 1997) and *United States v. Abbell,* 939 F. Supp. 860 (S.D. Fla. 1996), are factually inapplicable.  In *Hanania,* the conflict was resolved because the former clients, the Brooks, gave their consent to the counsel's representation of Hanania. 989 F.Supp. at 1190, ¶ 7.  *Abbell* presented two conflict situations.  The court disqualified the first counsel because he would be called as a witness in the case.  The court permitted the second counsel, Mr. Srebnick, to continue as counsel because:  (a) there was no evidence linking Mr. Srebnick's prior client with Mr. Abbell; and (b) Mr. Abbell's defense would be independent of the prior client's interest in the trial.  In short, *Abbell* did not present the direct conflict present in this case.

## CONCLUSION

Given the materially adverse interests of both clients, Falcon and Valverde, which the former client has not waived, the clear ethical rule and consistent case law, the Court concludes that Mr. Bergendahl must be disqualified from participating as counsel for Mr. Falcon in this case, including in the preparation for trial.  Therefore, it is

ORDERED that the Magistrate Judge's Order Denying the Motion to Disqualify Mr. Bergendahl is REVERSED; and it is

FURTHER ORDERED that Mr. Bergendahl is disqualified as counsel for Mr. Falcon.

DONE and ORDERED in Miami, Florida, this ___12th___ day of December, 2001.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:    The Honorable Ted E. Bandstra

       See Attached Service List

Since the initiation of this Court's FAXBACK program, the parties are no longer required to submit envelopes with their motions & proposed orders. Orders should include a full service list.

-10-

SERVICE LIST
99-583-CR-SEITZ
USA v. Falcon and Magluta

Michael Patrick Sullivan, AUSA

Michael Scott Davis, AUSA

Jack M. Denaro, Esq.
7700 North Kendall Drive
Suite 504
Miami, FL 33156

Martin G. Weinberg, Esq.
Oteri Weinberg & Lawson
20 Park Plaza, Suite 905
Boston, MA 02116

Kenneth J. Kukec, Esq.
2 South Biscayne Blvd.
One Biscayne Tower
Miami, FL 33131-1802

John Bergendahl, Esq.
701 Brickell Avenue
Suite 2080
Miami, FL 33131

Katherine Ferro, Esq.
701 Brickell Avenue
Suite 2080
Miami, FL 33131

Michael Tarre, Esq.
2 South Biscayne Blvd.
Suite 3250
Miami, FL 33131

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 99-583-CR-SEITZ/BANDSTRA

UNITED STATES OF AMERICA,

vs.

MANUEL MAGLUTA,

Defendant.
_____/

FILED by _____ D.C.

OCT - 3 2002

CLARENCE MADDOX
CLER  U.S.  DIST. CT.
S.D. OF FLA.  MIAMI

## ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER DISQUALIFYING EDWARD SHOHAT AS TRIAL COUNSEL FOR MANUEL MAGLUTA

THIS MATTER is before the Court on Defendant Manuel Magluta's ("Magluta") Appeal of Magistrate Judge Bandstra's Order Disqualifying Edward Shohat ("Shohat") as Trial Counsel for Manuel Magluta. Having reviewed Magluta's appeal and exhibits attached thereto, the Government's response to the appeal and exhibits thereto, and the argument of counsel, the Court concurs with Magistrate Judge Bandstra's findings and analysis, and finds that the Magistrate Judge's August 22, 2002 Order is neither clearly erroneous nor contrary to law. 28 U.S.C. § 636(b)(1)(A).

The Court recognizes the importance of a criminal defendant's Sixth Amendment right to assistance of counsel, and a defendant's presumptive right to counsel of his choice. Wheat v. United States, 486 U.S. 153 (1988). The presumptive right to counsel of one's choice is particularly applicable in this case, given the gravity of the charges against Mr. Magluta, his age, and the superior trial skills of Mr. Shohat. However, the right to counsel of choice is not unqualified. The Government can defeat the presumption of a defendant's right to counsel of choice "by showing that representation by the chosen counsel poses either an actual conflict of interest, or a serious potential for such a conflict." United States v. Defazio, 899 F.2d 626, 629 (7th Cir. 1990).

Here, there is no dispute that an actual conflict of interest exists as the Government intends to call

Page 1 of 3

Mr. Shohat in its case. Mr. Manuel Magluta hired Mr. Shohat as trial counsel knowing that he previously testified as a Government witness in co-defendant Vega's trial, that the Government intended to use him in Salvador Magluta's trial, and that the Government would likely call him as a witness in Manuel Magluta's case. Although Mr. Magluta has offered a five-page stipulation of facts relating to Shohat's testimony, the Court agrees with the Magistrate Judge that the stipulation deprives the Government of an efficient and effective way of providing evidence needed to satisfy its burden of proving guilt of the charges beyond a reasonable doubt. The stipulation is not only lengthy, but covers facts involving a number of different relationships over different spans of time which would be confusing if simply read to the jury. Furthermore, the stipulation would raise questions as to why the attorney who is the subject of such an extensive stipulation was not available for the jury's consideration. Finally, the stipulation does not provide the additional evidence that live testimony would provide, namely, the corroboration of the Government's key witness, Marilyn Bonachea, and her ledger, from a source that is not a cooperating co-conspirator.

During the two trials of Magluta's co-defendants, this Court heard attorney Shohat's testimony and observed the role that such evidence plays in the Government's effort to prove the elements of the charges in Counts I and II of the Seventh Superseding Indictment. The evidence is not of marginal value, but is instead a most efficient means of providing foundational evidence of the money laundering conspiracy in Count II, establishing the knowledge element in Count I (b) (conspiracy to violate the restraining order), and identifying various players and their interconnection in furthering the conspiracy alleged in Count I (a) (obstruction of justice).

Citing to United States v. Diozzi, 807 F.2d 10 (1st Cir. 1986), Magluta argues that it is reversible error to disqualify a defense counsel at the request of the government when the defendant agrees to stipulate to the relevant facts that defense counsel would testify to. However, Diozzi does not stand for such a *per se* rule, and is factually distinguishable. In Diozzi, six days before trial, the Government moved to disqualify defense counsel who had represented the defendant for over four years. The trial court granted the

Government's motion without findings or opinion.  Additionally, the desired defense counsels' testimony pertained to specific statements in written submissions that defense counsel presented on their client's behalf during the tax fraud investigation that preceded the criminal case.  The Government sought to use those written submissions to show the defendant's express misrepresentations.  The <u>Diozzi</u> Court ruled that the written submissions were the best evidence as opposed to the attorneys testifying as to their recollections of the written submissions.  Thus, the Government's grounds for disqualification were not justified.

As indicated above, neither the timing nor relationship facts in Mr. Magluta's case are at all similar to those in <u>Diozzi</u>.  In fact, it could almost be argued that the hiring of Mr. Shohat was an effort to remove a critical witness from the Government's case against Mr. Magluta.  The Government has demonstrated that its motion to disqualify was justified, as a stipulation does not provide an adequate alternative method for the Government to meet its burden to prove the charges beyond a reasonable doubt.  Therefore, it is hereby

ORDERED that Magistrate Judge Bandstra's Order Disqualifying Edward Shohat as Trial Counsel for Manuel Magluta is AFFIRMED.

DONE AND ORDERED in Miami, Florida, this _3rd_ day of October, 2002.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:

Magistrate Judge Ted E. Bandstra

Michael P. Sullivan, AUSA
Michael S. Davis, AUSA

Jack Denaro, Esq.
7700 N. Kendall Drive, Suite 504
Miami, FL 33156

Richard Diaz, Esq.
3127 Ponce De Leon Blvd
Coral Gables, FL 33134

Kenneth Kukec, Esq.
2 S. Biscayne Blvd., Suite 2600
Miami, FL 33131

Edward Shohat, Esq.
800 Brickell Ave., PH 2
Miami, FL 33131

...ce the initiation of this Court's ..XBACK program, the parties are ...required to submit envelopes ...their motions & proposed orders. ...should include a full service list.

Page 3 of 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 99-583-CR-SEITZ(s)(s)(s)(s)(s)(s)/BANDSTRA

UNITED STATES OF AMERICA,

vs.

AUGUSTO GUILLERMO FALCON,

Defendant.
_____/

## ORDER PARTIALLY AFFIRMING AND PARTIALLY OVERRULING MAGISTRATE JUDGE'S ORDER DISQUALIFYING RICHARD J. DIAZ AS TRIAL ATTORNEY FOR DEFENDANT FALCON, AND ORDER DENYING AS MOOT DEFENDANT FALCON'S CONDITIONAL MOTION TO PROCEED AS *PRO SE* COUNSEL

THIS MATTER is before the Court on Defendant Augusto Guillermo Falcon's ("Falcon") Appeal of Magistrate Judge Bandstra's September 13, 2002 Order Disqualifying Richard J. Diaz ("Diaz") as Trial Attorney for Defendant Falcon. Having reviewed Falcon's appeal, the Government's response to the appeal, and Falcon's new concessions to forgo cross-examination of Gilberto Barrios ("Barrios") and any of the Government's witnesses whose testimony will corroborate Barrios, the Court affirms the Magistrate Judge's decision to grant the Government's motion to file out-of-time a motion to disqualify in an effort to resolve the conflict issue on the merits. In addition, the Court affirms the Magistrate Judge's findings that Diaz's cross-examination of Barrios poses an actual conflict of interest in light of Barrios' unwillingness to waive his attorney-client privilege with Diaz, who previously represented him in a drug conspiracy case related to the Magluta and Falcon organization.

However, in light of the specific facts and circumstances in this case, and new facts that were not previously presented to Magistrate Judge Bandstra, the Court must overrule the Magistrate Judge's decision to impose the extraordinary remedy of disqualifying Diaz as trial counsel for Falcon. 28 U.S.C. § 636(b)(1)(A). For the reasons stated below, Mr. Diaz shall be permitted to continue in this matter as trial

Page 1 of 7

counsel for Falcon, the parties shall have until and including **November 14, 2002** to prepare a joint stipulation of the facts sought to be elicited through Barrios' testimony, and the Government will not be permitted to call Barrios to testify at trial.

<u>Discussion</u>

The Court recognizes the importance of a criminal defendant's Sixth Amendment right to assistance of counsel, and a defendant's presumptive right to counsel of his choice. <u>Wheat v. United States</u>, 486 U.S. 153 (1988). The presumptive right to counsel of one's choice is particularly important in this case, given the gravity of the charges against Falcon, his pretrial detention since 1999, the disqualification of his previous trial counsel, and Diaz's trial skills, his significant knowledge of the case, and his promise to be prepared for trial in January of 2003. While the right to counsel of one's choice is not unqualified, in order to defeat this presumption, the Government has the burden of "showing that representation by the chosen counsel poses either an actual conflict of interest, or a serious potential for such a conflict." <u>United States v. Defazio</u>, 899 F.2d 626, 629 (7th Cir. 1990). Generally, the need for the fair, efficient and orderly administration of justice consistent with the ethical rules, overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who is to be called as a witness against a current client at a criminal trial. <u>United States v. Ross</u>, 33 F.3d 1507, 1523 (11th Cir. 1994).

In considering the specific facts and circumstances before the Magistrate Judge in July and August of 2002, Judge Bandstra found that the Government sufficiently proffered a summary of Barrios' expected testimony to demonstrate his importance in the Government's case against Falcon with respect to the money laundering charges, and that Mr. Diaz's former representation of Barrios in <u>United States v. Barrios et al.</u>, 95-324-Cr-Nesbitt, posed an actual conflict. In that case, Barrios was convicted of conspiracy to possess with intent to distribute cocaine. Specifically, the Magistrate Judge found that Barrios' testimony regarding his driving of tractor trailers filled with cocaine during the late 1980's and 1990's for the Falcon/Magluta

organization will help the Government establish Falcon's involvement in the underlying unlawful activity and his knowledge of the unlawful source of drug proceeds. In concluding that the Government should not be forced to give up Barrios as a witness in order to resolve an attorney conflict situation, the Magistrate Judge relied primarily on the First Circuit's holding in United States v. Cortellesso, 663 F.2d 361 (1ˢᵗ Cir. 1981).

Although Cortellesso stands for the general proposition that the Government need not accede to a truncation of its evidence or settle for less than its best evidence in order to resolve an attorney conflict, the facts and circumstances of Cortellesso are readily distinguishable from the present case for at least two reasons. First, in Cortellesso, the First Circuit affirmed the disqualification of counsel on the grounds that defendant's counsel was the Government's "most significant witness" to prove the Government's charge that the defendant removed evidence to prevent its seizure in violation of 18 U.S.C. § 2232. Id. at 363. The Cortellesso defense counsel allegedly entered into an oral agreement with the Government that his client would not remove the stolen clothing at issue in the case until the Government arranged for its proper removal and storage. When the Government returned several days later to retrieve the stolen goods, the clothing was gone. The First Circuit held that from the Government's perspective, defense counsel, who promised the Government that his client would not remove the stolen goods, "was a clincher" and that "defendant's only hope to win on [the charge of removing evidence] would be to have [defense counsel] not testify." Id. Because the defendant's lawyer was the Government's most significant witness on the evidence tampering count, the Cortellesso court noted that "[i]t is inconceivable that defendant's right to a particular counsel should be permitted to impose [such] artificial disadvantages upon the government." Id.

In this case, however, the Government has not established that Barrios is either the Government's "most significant witness" or even a "clincher." Not only did the Government forgo calling Barrios as a witness in the two prior trials of co-defendants Salvador Magluta and Miguel Vega et al., but the Government also concedes that proof of Falcon's drug trafficking activity is not an essential element in his money

Page 3 of 7

laundering prosecution. (Gov.'s Resp. at 12 citing United States v. De la Mata, 266 F.3d 1275, 1292 (11th Cir. 2001)). Thus, unlike Cortellesso where defense counsel was the Government's key witness, the Government in the present case has failed to demonstrate that Barrios is a key witness, let alone an essential or even critically important witness.

Second, unlike Cortellesso where the Government had no forewarning of an actual conflict, in the present case, the parties had the opportunity to address the conflict issue before Falcon retained Diaz. Following the disqualification of Falcon's previous counsel in December of 2001, and before Falcon retained Diaz, Diaz informed the Court and the Government of his prior representations of co-defendant Miguel Vega and two other known government witnesses. The Government informed the Court that Diaz's prior representations were attenuated and did not rise to the level of presenting a conflict of interest. (Tr., Dec. 21, 2001 at 66). At this time the Government was aware, and had been so since as early as the Fall of 2001, that Barrios wished to cooperate. (Tr., Aug. 22, 2002 at 20-29). Based on the Government's position, Falcon hired Diaz, who appeared as his new trial counsel on January 14, 2002.

Given the Government's knowledge of Barrios' willingness to cooperate, and its failure to raise this potential conflict at the time Falcon hired Diaz, it is highly prejudicial to Falcon at this late hour and after having had his previous counsel disqualified, to now disqualify Diaz who is prepared for trial in January of 2003, and who in good faith made every effort to notify the Government of any potential conflicts so as not to prejudice his client with additional conflict issues and further delay. Because the Government did not raise this conflict in January of 2002 when the Government had knowledge that Barrios wished to cooperate, and because the Government has failed to demonstrate that Barrios' proffered testimony is essential or even critically important to the Government's case against Falcon, the Court finds that the alternative remedies that Falcon proposes will adequately address the ethical issues arising out of Diaz's continued representation of Falcon, and will avoid the extraordinary remedy of disqualification.

While the Court recognizes that the Government's right to call witnesses of its choice should not be

unnecessarily impeded,[1] in this instance, the Government's right to call Barrios as a live witness must give way to balance Falcon's right to counsel of choice. Falcon has agreed to waive completely his right to cross-examine Barrios and any of the Government's witnesses whose testimony will corroborate Barrios.[2] (Def.'s Appeal at 24-25). This is in effect an offer to stipulate to Barrios' testimony. In an effort to ensure that Falcon's waiver of his right to cross-examine Barrios and any other witnesses who will corroborate Barrios' testimony is done knowingly, voluntarily, and willingly, and to ensure that Barrios will not raise any unforeseen issues during live testimony, the parties shall prepare a joint stipulation of the key facts to be elicited through Barrios' testimony that will be an exhibit and read to the jury. This new remedy, not presented to the Magistrate Judge, permits the Government to introduce Barrios' testimony via stipulation if it so desires, and also protects Falcon's presumptive right to counsel of choice and prevents any further delay in trial.[3] Accordingly, based upon the foregoing reasons, it is hereby

ORDERED that:

(1) The Magistrate Judge's September 13, 2002 Order Disqualifying Diaz as Trial Attorney for Defendant Falcon is AFFIRMED IN PART and OVERRULED IN PART;

(2) The Court AFFIRMS the Magistrate Judge's decision to grant the Government's motion to file

---

[1] While the Court presumes that Barrios' testimony is not cumulative, the Court notes that the Government obtained convictions against co-defendants Salvador Magluta and Miguel Vega et al. on the money laundering conspiracy charges without calling Barrios as a witness.

[2] Although the Magistrate Judge found that Diaz should be disqualified "even if Falcon agrees to waive the conflict and Mr. Diaz elects to not personally cross-examine Barrios," at the time the Magistrate Judge considered this matter, Falcon had not offered to completely forego cross-examination of Barrios or other corroborating witnesses.

[3] Neither the Magistrate Judge nor the parties addressed the impact of Diaz's disqualification on Falcon's conditional motion to proceed as *pro se* co-counsel, and the effect that Falcon's proceeding as *pro se* co-counsel would have on the trial date and the rights of Falcon's co-defendants. Mr. Falcon has advised the Court that because of his lengthy pretrial detention, he wants no further delays, he is ready and willing to proceed to trial in January of 2003, and should Diaz be disqualified, he wishes to proceed as *pro se* co-counsel. See United States v. Young, 287 F.3d 1352 (11th Cir. 2002) (holding that "a defendant's right of self-representation is unqualified if the defendant asserts that right before the jury is empaneled, absent any indication that the defendant is attempting to delay the proceedings").

out-of-time motion to disqualify, AFFIRMS the Magistrate Judge's findings as to the existence of an actual

conflict, and OVERRULES the Magistrate Judge's remedy of disqualifying Diaz as trial counsel for Falcon;

(3) Mr. Diaz shall be permitted to proceed as trial counsel for Mr. Falcon, and shall be prepared to

commence trial in January of 2003;

(4) The parties shall have until and including **November 14, 2002** to prepare a joint stipulation of

the facts sought to be elicited through Barrios' testimony;

(5) Mr. Diaz shall not be permitted to cross-examine any of the Government's witnesses who will

directly corroborate the Barrios stipulation.  Although Mr. Diaz's co-counsel may cross-examine such

witnesses, Mr. Diaz, consistent with his ethical obligations as a member of the Florida Bar, shall not disclose

any confidences of Barrios to any of his co-counsel;

(6) The Government shall identify any witnesses who will directly corroborate Barrios' stipulation

so that the Court is in a better position to determine if additional steps must be taken regarding Diaz's

presence in the courtroom during such cross-examination; and

(7) Because Diaz shall be permitted to proceed as trial counsel for Falcon, Falcon's Conditional

Motion to Proceed as *Pro Se* Co-Counsel is DENIED as MOOT.

DONE and ORDERED in Miami, Florida, this _30_ day of October, 2002.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Attached Service List

Service List
CASE NO. 99-583-CR-SEITZ

cc:

Magistrate Judge Ted E. Bandstra

Michael P. Sullivan, AUSA
Michael S. Davis, AUSA
99 NE 4th St.
Miami, FL 33132

Richard Diaz, Esq.
3127 Ponce de Leon Blvd.
Coral Gables, FL 33134

Kenneth J. Kukec, Esq.
2 S. Biscayne Blvd., Suite 2600
Miami, FL 33131

Katherine Ferro, Esq.
701 Brickell Ave., Suite 2080
Miami, FL 33131

Alan S. Ross, Esq.                          Michael J. Rosen, Esq.
2250 S.W. Third Ave., 4th Floor             2400 S. Dixie Highway, Suite 105
Miami, FL 33129-2095                        Miami, FL 33133

Ira N. Loewy, Esq.                          J.C. Elso, Esq.
800 Brickell Ave., PH 2                     501 N.E. 1st Ave., Suite 200
Miami, FL 33131                             Miami, FL 33132

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 99-583-CR-SEITZ/BANDSTRA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

AUGUSTO GUILLERMO FALCON, et al

        Defendants.

_____/

FILED by _____ D.C.

MAR 1 8 2003

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## ORDER PARTIALLY DISQUALIFYING RICHARD DIAZ, ESQ. AS TRIAL COUNSEL FOR DEFENDANT FALCON

THIS MATTER is before the Court on the parties' responses to the Court's March 3, 2003 Order directing them to show cause why Richard Diaz, Esq. should not be disqualified as Defendant Falcon's trial counsel in the case in light of the recent development that Co-Defendant Miguel Vega, Counsel Diaz's former client, will be a Government witness and has filed a Notice of Non-Waiver and Assertion of Attorney-Client Privileges with Richard Diaz, Esq.

This is not the first time that the Court has had to consider attorney disqualification issues as they relate to Defendant Falcon's trial counsel in this case. Defendant Falcon's present trial counsel is Richard Diaz.[1] Before he became Defendant Falcon's counsel, Counsel Diaz was Defendant Vega's counsel in this case. Vega and co-defendants, Luis Valverde, Juan and Jorge Hernandez and Rene Silva went to trial in 2000 and were convicted. Because Falcon and co-defendant Salvador Magluta sought an interlocutory appeal of the double jeopardy ruling, they were severed from the Vega trial. Counsel Diaz became Defendant Falcon's counsel after Falcon's prior trial counsel, John

_____

[1]     In 1999, Defendant Falcon retained Kenneth Kukec to be his counsel. In the Fall of 2000, he also hired additional counsel, Katherine Ferro, in this matter. However, Defendant Falcon maintains that these lawyers were not hired to be his trial counsel in the case. The first counsel to file an appearance for such purpose was John Bergendahl, in the Fall of 2000.

Bergendahl, was disqualified as counsel. Counsel Bergendahl was disqualified because he had represented Luis Valverde in this case, who after his conviction, but before sentencing, discharged Mr. Bergendahl and agreed to cooperate with the Government by testifying against Defendants Salvador Magluta[2] and Falcon in the hopes of receiving a 5K1.1 or Rule 35 benefit.

In considering this issue, the Court has reviewed the written responses including those of the Government, Defendant Falcon and Defendant Manuel Magluta, and Defendant Falcon's and the Government's memoranda of supplemental authorities. The Court required Defendant Falcon to retain independent counsel to advise him on his counsel's alternative to total disqualification.[3] Additionally, on March 7 and 10, 2003, the Court considered the arguments of counsel, held a sealed *ex parte Garcia* hearing with Defendant Falcon, independent counsel Mel Black, Esq. and Falcon's other presently retained counsel,[4] and convened an *in camera* hearing with Miguel Vega and his present counsel, Emilio Benitez, Esq.[5] The Court has also considered the record, particularly its prior rulings on the other attorney disqualification motions in the case.

Based on the foregoing review, the Court finds that pursuant to the Rules Regulating The Florida Bar, particularly Rule 4-1.9 and as incorporated therein, Rule 4-1.7, and the comments to each, Counsel Diaz is subject to disqualification. While Defendant Falcon would like to parse the

---

[2]     Falcon later successfully moved to sever his trial from that of Salvador Magluta. Salvador Magluta was tried and convicted in 2002 after a three and a half month trial before a sequestered and innominate jury. Falcon's trial, which is estimated to take three to four months, was to commence shortly after conclusion of Salvador Magluta's trial. However, for several reasons including the Government's, co-defendants Gonzalez's and Manuel Magluta's requests for continuances, the case was specially re-set for March 24, 2003.

[3]     Attorney Mel Black, Esq., was retained for this limited purpose.

[4]     The transcript of this hearing was ordered sealed and not to be used or examined for any purpose except by the Court of Appeals.

[5]     This hearing transcript was also sealed for the exclusive use of the Court of Appeals.

language of the rules to reach a contrary result, the case law is also definite in its prohibition – when a former client will testify against the current client in the same matter, a lawyer cannot represent the current client unless the prior client consents. *Wheat v. United States*, 486 U.S. 153 (1988); *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994); *see also, Selby v. Revlon Consumer Products Corp.*, 6 F. Supp. 2d 577 (N.D. Tex. 1997); *National Medical Enterprises, Inc. V. Godbey,* 924 S.W.2d 123 (Tex. 1996). Here, Counsel Diaz must be disqualified because: (1) his new representation is in the same matter as his previous representation; (2) his former client Vegas' interests, albeit at this point not as obviously significant as those of co-defendant Valverde,[6] are nonetheless adverse to those of Falcon; and (3) Vega does not consent to Counsel Diaz's representation of Falcon at the trial where he (Vega) will be testifying adverse to Falcon's interests.

<u>The Clients' Adverse Interests</u>

The attorney-client relationship between Counsel Diaz and Vega began in 1999 and continued through trial and his sentencing in late 2000. Thereafter, Counsel Diaz counseled Vega after the Eleventh Circuit Court of Appeals affirmed Vega's conviction and represented Vega's sons before the grand jury in a money laundering investigation in the Northern District of Florida that resulted in a new money laundering indictment against Vega and his two sons. Thus, the relationship between the two has been one of considerable length and intimacy not only with Vega but also with his family. Vega advised the Court why he can not waive the conflict during the *in camera* hearing with his new counsel. Those reasons are real ones that were not influenced or procured by the Government. Additionally, Mr. Benitez, Vega's present counsel, has shared some

---

[6]     Pursuant to *United States v. Orozco,*160 F.3d 1309 (11th Cir. 1998), Vega is not eligible for a Rule 35 reduction of his sentence because his cooperation is more than a year after he was sentenced. Nonetheless, his cooperation can impact his security level and place of incarceration. Vega has had medical problems since his incarceration which have seriously impacted his health.

additional information relating to the duty of loyalty, which he has not shared with Vega, that underscores the difficulties inherent in waiving the conflict in whole or in part. As the Comment to Rule 4-1.7 states there only needs to be a showing that the duties of loyalty and confidentiality to the prior client might be compromised for disqualification. The Court assumes that counsel Diaz would be zealous in his continued representation of Falcon, and such representation should include attacks on Vega's credibility during cross-examination, in closing argument and in the cross-examination of witnesses who would corroborate Vega's testimony. Such activity would jeopardize Diaz's duty of loyalty and confidentiality to Defendant Vega which must remain inviolate.

At Falcon's trial, Vega is expected to testify as to his long standing role in the drug trafficking organization's efforts to collect and distribute millions of dollars in drug proceeds, including his numerous meetings with Falcon, his brother Gustavo "Taby" Falcon and Salvador Magluta at the LaGorce mansion in the late 1980s and early 1990s, and his delivery of cash to attorneys Frank Rubino, Jon May, Mark Dachs and Richard Martinez. Additionally, he will corroborate the testimony of Marilyn Bonachea and Jorge Hernandez regarding his regular delivery of large amounts of cash to them during the course of Case No. 91-6060-Cr-Moreno. Thus, Vega's testimony will directly tie Falcon to Salvador Magluta, to the drug trafficking and money laundering activity prior to Falcon's arrest in October 1991, and to the use of laundered drug proceeds to pay attorneys who worked for Falcon. The Government has not yet completed its debriefing of Vega, and in particular has not yet debriefed him on the obstruction of justice conspiracy charges including the substantive charges of juror bribery and witness bribery. Based on past experience in this case, it is highly possible that Vega may have some information on these charges. However, at present, it appears that Vega's testimony will focus solely on the money laundering conspiracy and substantive

charges in Counts 2 and 6 through 25.[7]  If Falcon is convicted on these charges, he will face a

significant term of imprisonment.  Thus, there can be no dispute as to the severity of the conflict.

Falcon's Alternative to Disqualification and Waiver

　　　　After the Court advised Falcon that it must disqualify Diaz due to the severity of the conflict,

he proposed an alternative remedy whereby Counsel Diaz would be allowed to remain in the case to

handle the defense of the obstruction of justice substantive counts and government agent witnesses,

while conflict-free counsel would be retained within two weeks to provide the defense for the money

laundering charges.  Diaz would have no involvement in the money laundering charges, after he

turned over his files, information and preparation to conflict-free counsel regarding these witnesses.

Diaz would also do everything in his power to preserve and protect his duty of loyalty and

confidentiality to Vega.  The alternative proposal includes the agreement that Diaz would not be in

the courtroom during Vega's cross-examination, would not make any reference to Vega in closing

arguments, nor be involved in any attack on Vega's credibility, such that Diaz would not participate

in the preparation for or actual cross-examination of the cooperating witnesses, specifically, co-

conspirators, Marilyn Bonachea, Jorge Hernandez, Juan Hernandez, Luis Valverde, Eric Valverde,

Tony Fandino, Reynaldo Fandino, Jose Fernandez, Pedro Rosello, Gilberto Barrios, Alfred Alonso,

and attorneys Frank Rubino, Jon May and Neil Taylor.  In short, conflict-free counsel would handle

the defense of the money laundering charges, would cross-examine these cooperating witnesses and

argue to the jury the evidence on the money laundering charges including the evidence relating to

these witnesses' credibility.

---

　　　　[7]　　　Counsel Diaz has previously been the subject of the Government's motion to
disqualify due to his prior representation of another expected government witness, Gilberto Barrios.
Barrios partially waived the conflict and the Court permitted Diaz to remain as counsel after
determining that an alternative remedy to complete disqualification could be crafted, given the
narrow focus of Barrios' testimony.

Falcon argues that his remedy offers a solution for a number of problems that Diaz's conflict presents. First, it removes Diaz from any attack, direct, indirect, or the appearance of the same, on his former client thus protecting Vega's interest in the absolute preservation of Diaz's duty to him of loyalty and confidentiality. Second, it provides Falcon with conflict-free counsel to provide a zealous representation where Diaz can not. Third, it would permit Falcon to have at trial his counsel of choice with whom he has developed a close psychological and language attachment over the past thirteen months. Fourth, it preserves the Government's interest in presenting its case effectively by calling members of the conspiracy to testify. Fifth, it promotes the Court's interest in ensuring the fair, efficient and orderly administration of justice consistent with the ethical rules.

In keeping with the last benefit, Falcon asserts the remedy enables this complex case to begin trial in three months, rather than a year from now. The charges in this case involve a number of other cases. The parties estimate it will take three to four months to try the case. Falcon's counsel says the Government has listed more than 130 potential witnesses. Even independent counsel indicates that given this number of witnesses, and the amount of prior testimony that many of the witnesses have provided, it would be an overly optimistic estimate to say that new conflict-free counsel, without any prior knowledge of the case, could be prepared to go to trial in six months. The more realistic estimate is a year to provide an effective defense for the lead defendant. Falcon's present defense team represented that they believe that new conflict-free counsel could be prepared in three months to handle the 15 specific witnesses covered by the proposed remedy.[8]

---

[8]     It is possible that the number of witnesses conflict-free counsel would have to handle could increase after the Government completes its debriefing of Vega to include potential witnesses, Richard Passapera, Harry Kozlik, Issac Benatar, Tony Garcia, Lazaro Cruz, Juan Barroso, Federico de la Cruz-Munoz, Keith Eickert, Milton Morizumi, Scott Srebnick, Edward Shohat, Benson Weintraub, Jonathan Goodman, and Paul Friedman. To address this matter, the Court will require the Government to advise the Court and Defense Counsel no later than May 19, 2003 which additional witnesses, if any, will be testifying to matters related to Mr. Vega.

While it is cumbersome to have two attorneys handling opening statement and closing argument for a client, it is not unprecedented. Additionally, there are some advantages to bifurcating the defense along count lines as it can impress upon the jury that they are to consider each count separately. However, there could also be negative inferences that the jury could draw from seeing Falcon with four counsel. Such thoughts as 'why does he need so many counsel to defend him' and 'where did he get the money to pay for this' come to mind.

The Court determined that Falcon should have the benefit of independent counsel on the proposed remedy's impact on his defense, therefore, it ordered him to retain separate, independent counsel to advise him. He retained Mel Black, Esq. for the sole, limited purpose of counseling with him regarding the pros and cons of the proposed remedy. Mr. Black, who has taught legal ethics at Nova Southeastern University Law School, has some familiarity with the case, given his representation of co-defendant Arrizo who plead guilty prior to the start of the Vega trial. Mr. Black spent several hours with Mr. Falcon discussing the issue.

Based upon the statements of Mr. Black at the March 10th hearing and the Court's own colloquy with Falcon, the Court is satisfied that Falcon has considered the limitations on Diaz's representations, and the impact of the two counsel approach on his defense. Falcon has persuaded the Court that he is more fully cognizant of what he will be called upon to meet at trial than he was during the Court's colloquy with him regarding John Bergendahl's disqualification. Based on his statements, the Court also finds that Falcon fully appreciates those factors which may require strategy changes that will ultimately impact on Counsel Diaz's ability to be an effective advocate beyond his limitations due to his prior representations of Vega, Barrios and Attorney Rubino. Falcon agreed if for any reason something arises that precludes Counsel Diaz from even this limited representation, Falcon will proceed to trial with the new conflict-free counsel. It is clear from the

-7-

colloquy that Falcon values Counsel Diaz's ability to communicate with him in Spanish and his familiarity with the evidence in the case. Based on the colloquy, it appears to the Court that Falcon has a psychological bond with Counsel Diaz. As mentioned previously, Mr. Falcon has had prior experiences making such waivers, not only in this case as to witness Barrios, but also as to witness Jack Devoe in Case No. 91-6060-CR-MORENO. Falcon recognizes the twists and turns in this case to date make it impossible to predict new developments which may impact on Mr. Diaz's ability to continue as his counsel in the case. However, Falcon knowingly accepts this risk and recognizes the impact that his waiver will have on his ability to assert ineffective assistance of counsel as to Counsel Diaz if there is a conviction in the case. Because of these representations, the Court finds that Falcon has rationally, knowingly, freely and voluntarily waived any conflict so that he can continue to have Counsel Diaz, notwithstanding the limitations on his representation, as part of his defense team.

Disqualification- Waiver Analysis

The Court has analyzed the severity of the conflict and whether the nature of the conflict is such that the Defendant can rationally, knowingly, and voluntarily waive it. If Diaz was to remain the sole trial counsel in the case, the Court would be compelled to find that the limitations that the conflict imposed on Counsel Diaz would be such that a defendant could not rationally, knowingly, and voluntarily waive it. Thus, it would be the Court's preference to require complete disqualification as the best means to protect the competing interests in this unpredictable case. However, because of the age of this case, the fact that this conflict arose so close to trial, the impact that a year's further delay will have on prospective witnesses and their memories, and the fact that Falcon has been detained in FDC's Special Housing Unit since January a year ago, the Court finds that Falcon's remedy provides a workable solution for protecting the interests of the Defendant,

-8-

former client Vega, the Government, and the public in the fair and efficient administration of justice consistent with the ethical rules. The Court is satisfied that Falcon, with the assistance of independent counsel, has made a rational, knowing, intelligent and voluntary decision to accept the remedy and waive any impact it will have on any claims of ineffective assistance of counsel. Therefore, as the Court orally advised the parties at the March 10, 2003 hearing, the Court will permit Counsel Diaz to remain as co-trial counsel for Falcon providing that he obtains conflict-free counsel by **March 21, 2003** who will be prepared to proceed to trial on July 14, 2003 in accordance with Falcon's proposed remedy. Therefore, it is

ORDERED that

(1) Defendant Falcon shall obtain conflict-free counsel who will enter his/her Notice of Appearance by **March 21, 2003**. New conflict-free counsel will be responsible for the defense of the money laundering charges and that counsel alone will be permitted to be in the courtroom for the direct testimony and cross-examination of Miguel Vega, and to conduct the cross-examination of Marilyn Bonachea, Jorge Hernandez, Juan Hernandez, Luis Valverde, Erick Valverde, Tony Fandino, Reynaldo Fandino, Jose Fernandez, Pedro Rosello, Gilberto Barrios, Alfred Alonso, Frank Rubino, John May, Neil Taylor, and any additional witnesses whose direct examination would indicate known dealings with Miguel Vega in the charged crimes. New conflict-free counsel will also be the only counsel permitted to speak about the evidence relating to Miguel Vega and his credibility during opening statements or closing arguments. And it is

FURTHER ORDERED that Richard Diaz may remain as co-trial counsel for Defendant Falcon provided that: (1) Counsel Diaz faithfully preserves inviolate and does not disclose to anyone the confidences of his former client, Miguel Vega; (2) Counsel Diaz shall not undertake any action that would even suggest a conflict in his duty of loyalty to his former client, Miguel Vega, including

-9-

that he may not assist conflict-free counsel or any other *defense counsel* to prepare for the cross-examination of Miguel Vega; (3) Counsel Diaz is not to be present in the courtroom during Miguel Vega's testimony and conflict-free counsel alone will conduct any cross-examination of Miguel Vega for Falcon; (4) any reference to Miguel Vega's testimony in opening statements or closing arguments or during cross-examination of other witnesses will be made solely by conflict-free counsel; and (5) Counsel Diaz shall promptly turn over to conflict-free counsel all his files relating to the 15 cooperating witnesses covered by the proposed remedy. And *it is*

FURTHER ORDERED that the Government will have until and including **May 19, 2003** to notify the Court and Defense Counsel which additional witnesses, if any, will be testifying to matters related to Mr. Vega.

DONE AND ORDERED in Miami, Florida this _18th_ day of March, 2003.


PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE


cc:
Magistrate Judge Ted E. Bandstra
Michael P. Sullivan, AUSA
Kenneth J. Kukec, Esq.
Edward Shohat, Esq.
Richard J. Diaz, Esq.
Alvin Entin, Esq.
Katherine Ferro, Esq.
Alan Ross, Esq.
Michael J. Rosen, Esq.
Emilio Benitiz, Esq.
Mel Black, Esq.